# EXHIBIT 5

appropriating $100,000 to be expended for special counsel in an effort to recover the property, the President allows this Cabinet officer to remain in his position to the end that he may again sign away these reserves as soon as they have been recovered, because, he boldly and defiantly says, "I would do it again."

There is not a member of the Cabinet who will admit that he had any knowledge of what the Secretary of the Navy was doing when these leases were signed. Messrs. Hughes, Hoover, Weeks, and Daugherty have all publicly announced that they had no part in and knew nothing about it. If the President continues to hold Mr. Denby in his Cabinet he can not divorce himself from the policy established by the Secretary of the Navy and the Secretary of the Interior of leasing these reserves. The people will believe—they must believe—the President has confidence in his Secretary of the Navy. His Cabinet officers occupy a peculiarly close and confidential relation with the President, and so long as Mr. Denby is retained so long will the American people believe that the President approves his acts, because he has the power to remove him if he does not approve his acts.

The American people are not asking that Mr. Denby or any other man be sacrificed. They are asking for an administration of the governmental affairs in an honest and efficient manner and by men in whom they have confidence. Whether rightly or wrongly, whether it be his fault or his misfortune, the people have lost faith in the Secretary of the Navy, and they desire to have in that position a man in whom they have confidence, and the longer he remains in that place the less confidence the people will have in the executive branch of the Government.

The loss of these reserves would entail a loss to the American people of probably many hundreds of millions of dollars, but that loss is not comparable to the damage done the Government in the loss of faith in the honesty, integrity, and efficiency of the Government officials. The Teapot Dome scandal has undermined the very foundation of popular government a thousand times more than all the communists could do in a hundred years, and there is but one man in the United States who can make any material headway at restoring that confidence, and that man is the President of the United States, and the American people are asking—

When will the President act?

### REVENUE ACT OF 1924.

Mr. GREEN of Iowa. Mr. Speaker, I move that the House resolve itself into Committee of the Whole House on the state of the Union for the further consideration of the bill (H. R. 6715) to reduce and equalize taxation, provide revenue, and for other purposes; and pending that motion, I may say that there seems to be a little difference about the amount of time used on the respective sides, but it is clear that both of us have used practically the same time, although perhaps I have not used quite as much time as has been used on the other side. In order that there may be no difficulty about the regulation of the time, I ask unanimous consent that the remaining time for general debate be divided equally.

Mr. COLLIER. Mr. Speaker, there is a difference of only three minutes.

Mr. GREEN of Iowa. I thought there was more difference than that. I will withdraw the request.

The motion was agreed to.

Accordingly the House resolved itself into Committee of the Whole House on the state of the Union for the further consideration of the bill (H. R. 6715) to reduce and equalize taxation, to provide revenue, and for other purposes, with Mr. GRAHAM of Illinois in the chair.

The CHAIRMAN. The House is in Committee of the Whole House on the state of the Union for the further consideration of the bill H. R. 6715 which the Clerk will report by title.

The Clerk read as follows:

A bill (H. R. 6715) to reduce and equalize taxation, to provide revenue, and for other purposes.

Mr. COLLIER. Mr. Chairman, I yield 10 minutes to the gentleman from Michigan [Mr. CLANCY].

The CHAIRMAN. The gentleman from Michigan is recognized for 10 minutes.

Mr. CLANCY. Mr. Chairman, I wish to announce to gentlemen of this House that the owners of over 15,000,000 automobiles in this country are going into some measure of politics to protect their rights, and they are going in with their friends and relatives. The reason is that they have been given a raw deal by the hard-boiled old guard of the Ways and Means Committee.

The old guard of this committee have recommended a tax repeal of $11,000,000 on candy; $13,000,000 on jewelry; $29,000,000 on telegraph and telephone messages; $10,000,000 on soft drinks; $35,000,000 on movies and theaters. They gave the automobile and truck owner the marble heart.

Representatives of the great automobile organizations claim they had trouble in getting the right even to present their case. The old guard thought they had heard enough already from the automobile owners, these 15,000,000 voters. They showed a tendency to deny even the American citizen's basic constitutional right of petitioning to redress his grievances.

The Democratic Members of this House are lining up to redress these grievances. They tried to get some relief in the Ways and Means Committee, but failed. The 11 Democratic members of the Ways and Means Committee favor some relief now. Mr. GARNER, leader of the minority on the committee, declared for it on the floor of the House a few days ago. Mr. OLDFIELD spoke for it also in his speech a few days ago. So did Mr. COLLIER and Mr. TAGUE, and so will Mr. RAINEY. So will all our leaders.

It is now Democratic policy and one of the cardinal points of our faith to sympathize with the much-oppressed automobile owner. The Democratic Ways and Means Committee under Claude Kitchin killed these taxes in the committee for seven years, from 1911 onward, until the war broke, despite desperate efforts to levy these taxes—Kitchin and the Congressman from Detroit, Mr. Doremus; and now the 11 Democratic members of the Ways and Means Committee have made fair treatment of the automobile industry and the automobile and truck owner Democratic policy.

It is only the old guard of the Republican Party which is standing for oppression and unfair treatment. Enough liberal Republican Members have declared for a measure of reasonable relief within the past few days to prevent this matter from becoming a partisan question. The old guard defeated 70 Republican Members last session. There are 70 vacant seats on that side now and 70 more seats on the Democratic side now. The old guard, and particularly the old guard of the Ways and Means Committee, are responsible.

The old guard is working to make some more empty seats on this automobile question. They want to send some more good Republicans to their doom next fall by sending them back to their districts to explain how they just had to relieve the taxes on candy and soft drinks, and movies, and telegraphs, and telephones, and the railroads, and chewing gum, but just had to give the automobile owners a rebuff.

The automobile owner is highly organized. The powerful farmers' organizations of the country are standing with them. They are led by able, clever, energetic leaders—men with a punch and men with courage; men who can become just as hard boiled as the old guard. If you challenge them, if you dare them to fight, the results will be on your own conscience, if it is proper to consider the old guard Members as having consciences.

Our program for the fight here on the floor is reasonable. The auto and truck owners paid out $146,000,000 last year on these war excise taxes. We are asking a reduction of about $25,000,000. That is all.

I recommend the reduction of the parts, tires, and accessories tax from 5 per cent to 2½ per cent. This cuts the tax in half. Forty million dollars was raised last year from this tax. To cut it in half gives the motorists $20,000,000 in relief. This reduction brings relief to all the 15,000,000 users of automobiles and trucks owned in the United States.

This is the nuisance or misfortune tax on the owner who ruins a tire or breaks an axle or spring or any part of his auto or truck. It is a penalty on his misfortune. It is double taxation—a tax on the original part and on the repair part. The motor vehicle is the only commodity in the United States which must pay a repair-parts levy. The parts tax is the most odious of all the war excise taxes on automobiles.

All the powerful automobile and truck organizations of the United States are backing me in asking the 50 per cent reduction of the misfortune tax on parts. Practically every farmers' organization represented in Washington backs me also in this reasonable request.

I am going to fight for the repeal of the 3 per cent war excise tax on motor trucks of a capacity of 2 tons and under. I am not asking at this time for the repeal of the tax on the big, heavy motor truck which the friends of the railroads are fighting in Congress and which they claim gives a great deal of wear and tear on the public highways.

I am asking for the repeal of the tax on the small trucks, which is the truck of the farmer and the truck of the grocer

### TEACHERS.

Average annual salaries, 1921 to 1922, in all cities, except New York, from 2,500 population and over:

| | |
|---|---|
| Elementary school teachers | $1,524 |
| Junior high school teachers | 1,565 |
| Elementary school principals | 1,968 |
| Junior high school principals | 2,218 |

### FEDERAL GOVERNMENT EMPLOYEES.

Average salaries as reported for classification purposes:

| Service group. | Average basic salary. |
|---|---|
| Professional and scientific | $2,945 |
| Subprofessional | 1,306 |
| Clerical, administrative, and fiscal | 1,533 |
| Custodial | 738 |
| Clerical-mechanical | 979 |

### MUNICIPAL EMPLOYEES.

An investigation, covering 27 cities in the United States, by the New York Chamber of Commerce, whose results were published in the American City Magazine for October, 1923, shows the following figures:

#### Policemen.

| | |
|---|---|
| Annual salary range | $1,200 to $2,280 |
| Average maximum salary | 1,852 |
| Average minimum salary | 1,585 |

#### Firemen.

| | |
|---|---|
| Annual salary range | $1,200 to 2,280 |
| Average maximum salary | 1,821 |
| Average minimum salary | 1,591 |

### BUILDING TRADES.

These trades include carpenters, cement finishers, electricians, hod carriers, building laborers, lathers, painters, plasters, plasterers' helpers, bricklayers, elevator constructors, gas fitters, hoisting engineers, marble-cutters, marble-setters, masons, ornamental-iron workers, pipe coverers, plumbers, roofers, sheetmetal workers, steam fitters, steam fitters' helpers, structural ironworkers, and tile setters.

Their wages vary throughout the country, but even in the largest cities they rarely exceed $1.25 an hour, or a total of $10 for a working day. Very few of these trades are employed every day of the year, but, assuming that they should work 300 days, their total earnings would not be over $3,000.

### OTHER WORKERS.

It is needless to say that very few skilled or unskilled workmen in the United States get as high rates of wages as the men in the building trades in the large cities. I will insert some further figures proving this statement.

Research Report No. 62 of the National Industrial Conference Board, published in September, 1923, shows that the average weekly earnings of composite and classified groups of labor in 25 industries in June, 1923, earned $27.12, classified as follows:

| | |
|---|---|
| For all male wage earners | $28.97 |
| For all male unskilled wage earners | 23.14 |
| For male skilled wage earners | 30.90 |
| For women wage earners | 17.94 |

These figures show that very few of the wage earners and farmers of the country pay any substantial income taxes directly, but they all pay their full share of the taxes which are diffused and passed on to the ultimate consumers.

With reference to the building trades, I am myself familiar with the conditions in Chicago, and I have ascertained the situation in New York and other large centers of population, and I find that the average wages of all these building trades, which I have enumerated above, are below those paid in Chicago and New York, where the average of such wages is not over $1.25 an hour for eight hours' work, making a daily average of $10. None of these men are employed throughout the whole year, but if they were, if they are heads of families, they would earn only $3,000, which, as I said before, would place them in the exempt class of taxpayers.

I have gone into these details for the purpose of showing that this much vaunted and boasted solicitude for the "poor man" and the "wage earner" and the "average man" has not much foundation in fact. The thing that will benefit the people of this country will be the maintenance of prosperity. A workingman will be worse off even with a larger reduction in his income tax—if he pays any—if he loses one week of employment or even two or three days of employment, by reason of the high surtaxes driving capital into nonproductive enterprises, than he would be with a smaller reduction of his income tax.

The CHAIRMAN. The time of the gentleman from Illinois has expired.

Mr. HAWLEY. Mr. Chairman, I yield to the gentleman two minutes more.

The CHAIRMAN. The gentleman from Illinois is recognized for two minutes more.

Mr. CHINDBLOM. I will insert in the RECORD, because I have not time now to present it to the House, a résumé or discussion of certain administrative features of the bill, including the section on the board of tax appeals, which was particularly assigned to me in the consideration of this matter before the House by the Committee on Ways and Means. Perhaps I shall have an opportunity to discuss those questions if any interrogatories should be propounded when we reach them under the five-minute rule.

Mr. MURPHY. Mr. Chairman, will the gentleman yield?

Mr. CHINDBLOM. Yes; I promised the gentleman from Ohio I would yield to him.

Mr. MURPHY. The gentleman has made a very excellent and logical speech on taxation, and it was a real treat to my intelligence. I am particularly interested in getting the gentleman's views with reference to bringing in taxes in the proposed bills now pending before the House. Will they produce enough revenue to take care of the soldiers' adjusted compensation?

Mr. CHINDBLOM. I will say to the gentleman that of course I know he has asked that question of all the members of the committee.

Mr. MURPHY. I am honestly seeking for information.

Mr. CHINDBLOM. I know that. I do not know that I can speak for other individuals on the committee besides myself, but I saw no indication that the individual members of the committee sought to take into account any other expenditures of the Government than those already provided for by law. We sought means to reduce the amount of revenues to be collected with a view of meeting expenditures known at present. If additional expenditures are taken into consideration, such as the proposed soldiers' adjusted compensation, the proposals to increase the pay of postal employees and to increase the pay of employees in other departments, if any of these are adopted they will make new drains upon the Treasury; but our duty at this time, in the construction of this bill, was to consider the surplus which had accumulated and which is available for the reduction of taxes, and we kept within the estimates of the Treasury Department in that matter. It is said that the tax reduction is $330,000,000. It is more than that; I think it is more nearly $330,000,000, but $80,000,000 are added to the receipts formerly obtained by various provisions in the bill which we hope will stop evasions and stop gaps in the payment of taxes. [Applause.]

The CHAIRMAN. The time of the gentleman from Illinois has again expired.

Mr. HAWLEY. Mr. Chairman, I yield to the gentleman three minutes more.

The CHAIRMAN. The gentleman from Illinois is recognized for three minutes more.

Mr. MURPHY. Mr. Chairman, will the gentleman yield further?

Mr. CHINDBLOM. Yes, sir.

Mr. MURPHY. In view of the condition that has come about in Congress since this bill was introduced, whereby no party can claim the credit for the passage of the tax measure as it now stands, or assert that it will be either a Democratic or a Republican plan of tax reduction—in that event what chance will there be, under the figures you have been working with, for the proposal for the soldiers' adjusted compensation?

Mr. CHINDBLOM. If the Democratic proposal is accepted we would not only use up the surplus of $330,000,000, but we would have a deficit of $800,000,000 in the Treasury, with which I presume the Democratic Party would try to pay the soldiers' bonus.

Mr. MURPHY. On what figures does the gentleman base his judgment?

Mr. CHINDBLOM. On the actual returns for the year 1921 and on the figures as far as known for the receipts for 1923. The latter, however, have not been tabulated as yet or published. But the Treasury Department, and particularly the actuary, has taken them into account in furnishing the estimate, which estimate, I believe, is entirely reliable.

Mr. MURPHY. Did the gentleman hear the statement of the gentleman from Illinois [Mr. RAINEY], who brought to our attention two sets of figures that were furnished, of which one set was taken advantage of when the President vetoed the soldiers' compensation bill?

Mr. CHINDBLOM. I know that the actuary who has furnished us with the figures that we have used for this bill has not made any substantial error since he first began making estimates and studying the receipts of the Government when the first income tax law was adopted back in 1913.

Mr. WATKINS. Will the gentleman yield for a question?

Mr. CHINDBLOM. What is the gentleman's question?

Mr. WATKINS. As a matter of fact, did not the actuary of the Treasury Department estimate on the 1921 yield that the Garner plan would bring in $100,000,000 more than the Mellon plan?

Mr. CHINDBLOM. I did not catch the gentleman's question.

Mr. WATKINS. Did not the actuary of the Treasury Department, Mr. McCoy, estimate upon the returns of 1921—the latest and only full available ones—that the Garner plan would bring in $100,000,000 more than the Mellon plan?

Mr. CHINDBLOM. I do not know what estimate the gentleman from Texas [Mr. GARNER] received. I am speaking about matters which were actually presented before the Committee on Ways and Means.

Mr. WATKINS. I am asking whether Mr. McCoy did not state that as a matter of fact?

Mr. CHINDBLOM. Before the committee?

Mr. WATKINS. Did not Mr. McCoy state that under the Garner plan $100,000,000 more would be received than under the Mellon plan?

Mr. CHINDBLOM. I never heard it before the committee.

Mr. WATKINS. Well, anywhere?

Mr. CHINDBLOM. I do not know what Mr. McCoy may have stated to the gentleman from Texas [Mr. GARNER], and I am not concerned with what Mr. McCoy said elsewhere than in the committee.

Mr. McSWAIN. Will the gentleman yield?

Mr. CHINDBLOM. Yes.

Mr. McSWAIN. Would he not tell the truth anywhere?

Mr. CHINDBLOM. Certainly he would; but as far as I am concerned, I have nothing before me, nor has the Congress, except what he said in the hearings before the Committee on Ways and Means. [Applause.]

The CHAIRMAN. The time of the gentleman has expired.

Mr. CHINDBLOM. Under the leave to extend, I wish to add the following statement prepared by myself:

### BENEFITS TO THE PEOPLE.

The first and immediate benefit or relief to the people under the proposed bill will be the reduction in the 1923 taxes, payable in the current year 1924. This reduction is in the form of an allowance by credit or refund of 25 per cent of the amount shown as the tax upon the return of the taxpayer for the calendar year 1923.

The further financial benefits to the taxpayers under this bill include the reduction in income taxes, both normal taxes and surtaxes, the credit on account of earned income, and certain reductions in penalties and interest where deficiency in tax or failure to pay is not due to fraud, with intent to evade the tax, failure to file return without reasonable cause, or to willful refusal to make return or pay or collect the tax or furnish information, or to any other willful attempt to defeat or evade the tax. Under the bill the normal tax on the first $4,000 of net income is fixed at 3 per cent and upon the remainder of the net income at 6 per cent. The surtax rates begin at 1 per cent on net income from $10,000 to $12,000; an additional 1 per cent for each $2,000 of net income up to $38,000; then 1 per cent additional for the next $4,000 of net income up to $40,000; and 1 per cent additional for each $6,000 of net income up to a total of 25 per cent at $100,000 and over.

The reductions in income taxes are estimated at about $220,000,000 per annum. In addition thereto there are reductions in special taxes, including taxes on admissions, and various excise taxes, occupational taxes, and stamp taxes, all aggregating $108,000,000.

Earned income is entitled to a credit of 25 per cent of the amount of the tax attributable to such income up to $20,000, and $5,000 of every net income is considered and treated as earned income and entitled to the credit of 25 per cent.

Under the 1921 law notice of protest or objection had to be filed with the payment of the tax in order to preserve the right of future review. The result was that all taxpayers who had proper legal advice—and this, of course, included all large taxpayers—paid under protest and secured the benefits of reconsideration and adjudication by the courts, while other taxpayers lost the benefit of departmental or court review. In the proposed bill no notice of protest or objection to the tax is required.

In the matter of interest, the interest rate has been reduced from 6 per cent to 5 per cent, in harmony with the improved money market, and the taxpayer is allowed interest from the Government where he has made excess payment just as the Government is allowed interest where the taxpayer has made insufficient payment.

While every effort has been made in the bill to prevent evasion and avoidance of the tax imposed, numerous administrative provisions have also been included which are designed to relieve the taxpayer of annoyance and undue hardship. The 1921 law imposed double penalties of 5 per cent of the total amount of a deficiency, plus interest of 1 per cent per month from the date the tax was due, where the deficiency in the tax was due to mere negligence, and imposed similar double penalties for failure to pay the tax at the time prescribed for such payment. The pending bill eliminates one of these penalties. In the 1921 law the mere failure to file a return and to pay or collect a tax or to furnish required information subjected the taxpayer to a special penalty of not more than $10,000, but under both the 1921 law and the pending bill such taxpayer would have to pay interest from the date the tax was due. A willful refusal to make a return or to pay or collect a tax or to furnish information, or any other willful attempt to defeat or evade a tax is subject to the same specific penalty in the pending bill as in the 1921 law, viz, penalty of not more than $10,000 or imprisonment for not more than one year, or both. In the matter of estate taxes there are some changes in penalties, but in every such case the penalty is enlarged with a view to strengthening the law.

I insert a statement showing the penalties both in the act of 1921 and in the pending bill as to income taxes and estate taxes, which was prepared at my request by the Treasury Department:

### PENALTIES—INCOME TAX TABLE.

#### AD VALOREM PENALTIES.

In case of deficiency in tax due to negligence:

Present law: Five per cent of the total amount of the deficiency plus interest at the rate of 1 per cent a month from the time the tax was due. (Sec. 250 (b).)

The bill: Five per cent of the total amount of the deficiency. (Sec. 275 (a).)

In case the deficiency or any part thereof is due to fraud with intent to evade tax:

Present law: Fifty per cent of the total amount of the deficiency. (Sec. 250 (b).)

The bill: Same as present law. (Sec. 275 (b).)

Failure to pay tax on day or within period prescribed for the payment thereof:

Present law: Five per cent of the amount unpaid plus interest at the rate of 1 per cent a month from the date prescribed for the expiration of the period prescribed for payment until such amount is paid. (Sec. 250 (e).)

The bill: Interest at the rate of 1 per cent a month on the unpaid amount from the date prescribed for payment or the expiration of the period prescribed for payment until paid. (Sec. 276.)

Failure, without reasonable cause, to file return within the time prescribed for the filing thereof:

Present law: Twenty-five per cent of the amount of the tax. (Sec. 3176 R. S. as amended.)

The bill: Same as present law. (Sec. 3176 R. S. as amended.)

#### SPECIFIC PENALTIES.

Failure to file return, pay or collect tax, or furnish required information:

Present law: Penalty of not more than $1,000. (Sec. 253.)

The bill: No specific penalty.

Willful refusal to make a return, pay or collect tax, or furnish information, or willful attempt in any manner to defeat or evade tax:

Present law: Penalty of not more than $10,000 or imprisonment for not more than one year, or both. (Sec. 253.)

The bill: Same as present law. (Sec. 1017 (a).)

### ESTATE TAX.

#### AD VALOREM PENALTIES.

Failure, without reasonable cause, to file return within the time prescribed for the filing thereof:

Present law: Twenty-five per cent of the amount of the tax. (Sec. 3176 R. S. as amended.)

The bill: Same as present law. (Sec. 3176 R. S. as amended.)

False or fraudulent return or list willfully made:

Present law: Fifty per cent of the tax. (Sec. 3176 R. S. as amended.)

The bill: Same as present law. (Sec. 3176 R. S. as amended.)

Failure to pay tax within the period prescribed for payment:

Present law: Six per cent per annum from the expiration of the period for payment until paid. (Sec. 406.)

The bill: One per cent a month from the expiration of the period prescribed for payment until paid. (Sec. 309.)

Failure to pay a deficiency within the period prescribed for the payment thereof:

Present law: Ten per cent per annum from the expiration of such period until paid. (Sec. 407.)

The bill: One per cent a month from the expiration of such period until paid. (Sec. 309 (b).)

### SPECIFIC PENALTIES.

Making knowingly of false statements in any notice or return:

Present law: Maximum penalty of $5,000 or imprisonment not exceeding one year, or both. (Sec. 410.)

The bill: Same as present law. (Sec. 317 (a).)

Failure to produce papers required:

Present law: Maximum penalty of $500. (Sec. 410.)

The bill: Same as present law. (Sec. 317 (b).)

Willful refusal to make the required return, pay or collect tax, or furnish information, or willful attempt in any manner to defeat or evade tax:

Present law: No penalty other than that of $5,000 mentioned above as appearing in section 410.

The bill: Maximum penalty of $10,000 or imprisonment for not more than one year, or both. (Sec. 1017 (a).)

### BOARD OF TAX APPEALS.

The largest administrative benefit and relief given the taxpayers in the pending bill is the provision for the establishment of a board of tax appeals in Title IX, beginning on page 205 of the bill. In this connection, it is interesting to observe the present procedure covering appeal or review in the Treasury Department. There is at present no administrative body or, in fact, no judicial authority, outside of the Treasury Department itself, which may review the action of that department in income or estate tax matters, prior to the actual call for payment or in other words, the actual maturity of the obligation to the United States. Under the revised statutes, as well as the general administrative provisions of both the 1921 law and the proposed bill, a taxpayer may not enjoin the collection of a tax assessed against him, but must pay the tax and then sue for the recovery thereof and thus secure a judicial determination of his rights. Of course, the right to seek relief, if payment is inadequate, frequently imposes great hardship. On the present procedure covering the taxpayer's right to appeal in the Treasury Department, I have received the following statement from the department:

PROCEDURE GOVERNING THE TAXPAYER'S RIGHT TO APPEAL.

Upon the discovery by the income-tax unit of a deficiency in the tax of any taxpayer, the taxpayer is notified by registered mail. Attached to the letter is a statement showing the facts on which the findings of the unit are based. There is also attached a copy of Treasury Decision 3492, which outlines the rights of the taxpayer to an appeal to the commissioner from the findings of the income-tax unit within a period of 30 days from the date the notice of the deficiency is mailed. If no appeal is received within the 30-day period, the deficiency as determined by the income-tax unit is assessed.

If the taxpayer files an appeal, the appeal is first referred to the income-tax unit and a date is set for a hearing if the taxpayer desires to appear in person or by attorney. If no hearing is requested, the unit reconsiders the case in connection with such additional information as has been submitted by the taxpayer. The taxpayer is then notified of the result, and if it is unsatisfactory to him he may still request a hearing before the income-tax unit within 20 days after the mailing of the second notice.

If a hearing is requested and the result is not satisfactory, the taxpayer is then permitted to go before the committee on appeals and review. The file in the case is forwarded by the unit to the committee, which gives the taxpayer a further opportunity to be heard. The case is assigned to one member or three members of the committee, depending on the nature and complications in the case. When the findings of the member or members of the committee are approved by the chairman, the case is then forwarded to the commissioner, and upon being approved by him, the deficiency, if any, finally determined to be due is assessed.

If at any time during this procedure the taxpayer declines to prosecute his appeal further, the deficiency last determined to be due is assessed.

It will be noted that there is now a committee on appeals and review, but this committee or divisions thereof merely act for and on behalf of the commissioner and report their findings to the commissioner, who thereupon takes final action, but of course in most cases his approval is a matter of form and routine. In fact, where he stops to give any consideration, he generally refers the case to his solicitor, who in his turn again acts for and on behalf of the commissioner. Through all of these proceedings the Treasury Department is the party in interest, the plaintiff or prosecutor, the court or jury, and the final beneficiary and the final judgment or decree creditor, and, it might be added, the sheriff or marshal serving execution and making collection. More than that, the person deciding the appeal is both advocate and judge, since he represents throughout the proceedings the department of the Government which is seeking the collection of the tax, while he also has the power to determine the rights and obligations of the taxpayer. In addition, under the present law an erroneous or prejudicial decision in favor of the Government still allows the taxpayer the opportunity, notwithstanding all those difficulties, of securing a review in the courts after payment of the tax, while a decision against the Government or in favor of the taxpayer leaves the department and the Government without any further recourse.

The further objection has been made that under the present law every taxpayer seeking relief even under present conditions must come to the National Capital to present his case. The bill seeks to remedy this complaint.

The proposed bill provides that a board of tax appeals, composed of not more than 28 and not less than 7 members, shall be appointed by the President, with authority to determine all appeals from the assessment of additional income, war-profits, excess-profits, and estate taxes. They are to receive $10,000 per year each and are to sit locally throughout the United States. Both the Government and the taxpayer may appear before the board. The proceedings are to be more or less informal, but findings of fact are to be made matters of record. If the decision is against the taxpayer, he may still seek court review, but he must first pay the tax assessed. If the decision is against the Government, the Commissioner of Internal Revenue may also seek remedy in the courts in a suit brought for that purpose. In all proceedings for court review the findings of fact, shall have the force of prima facie evidence. It is believed that this procedure will meet the objections heretofore made to the opportunity for review or reconsideration in the Treasury Department.

The witnesses which appeared before the committee at the hearings and several large business organizations who passed resolutions upon the subject, as well as various taxpayers and practitioners before the department, almost universally urged that the appointment of the board should be made by the President rather than by the Secretary of the Treasury, so as to make certain that the board would be altogether independent of the department. The main objection to appointment by the President was the possibility of such appointments becoming more or less in the nature of political patronage, particularly if subject to advice or consent by another authority.

Suggestion has been made that the board of appeals should be made a judicial body with full authority to dispose of its cases and subject only to review by appellate tribunals. It is believed that this would interminably delay action by the board, as all the forms of judicial procedure, with technical rules of evidence and preservation of the evidence itself, would have to be followed. Quick action is one of the things most greatly desired in the work of the board of appeals. A delay of justice is often a denial of justice, particularly in disputes involving large sums of money.

Mr. TAYLOR of West Virginia. Mr. Chairman and gentlemen of the House, two things are said to be absolutely certain—death and taxes. As man tries to evade the first alternative, so will he endeavor to shift the latter, and it is because of this outcropping of human weakness that this House has been engaged in a four-day forensic struggle, and the end is not yet.

I am committed to the principle of tax reduction. The country is groaning under the burdens of taxation, piled on by municipalities, districts, counties, States, and finally by the Federal Government. We are perhaps hit the harder by Federal taxes, because of the fact that the average man, from the time he rises in the morning until he winds his luxury-taxed alarm clock at night, is called upon in some form or other to pay tribute. Very often, since the Fordney-McCumber tariff tax has permitted the trusts and gigantic corporations to exact tribute from him, he pays tax unknowingly but just as surely, and often feels oppressed without being able to point to a specific thing that oppresses him. He only knows that something is wrong in our economic scheme and that he does not prosper in accordance with his effort.

In order to have tax reduction we must also have a reduction of expenditures. This is not an argument against the soldier bonus. The bonus should be treated as war cost, which it undoubtedly is, and paid by an issue of 50-year bonds. In this way we could do justice to those who served us loyally in time of need and at the same time have a substantial reduction in taxes; but, as I stated, we can not have reduction of taxes without reduction of expenditures. We can not hope to eat our cake and have it, too, and with this knowledge we on the Democratic side have consistently sought to lop off from the appropriation bills heretofore presented all those items not specifically sanctioned by law, and have only voted for a few increases where it has been conclusively shown that great public good