

September 16, 2019

Mr. Charles P. Rettig
Commissioner of Internal Revenue
1111 Constitution Avenue, NW
Washington, DC 20224

Also submitted electronically, via the Federal eRulemaking Portal at http://www.regulations.gov
(IRS REG-106282-18)

      **Re:**    **Comments with Respect to Temporary and Proposed Regulations under Section 245A**

Dear Sir:

We are writing to provide comments on behalf of one or more clients on the temporary and proposed regulations under Code section 245A filed with the Federal Register by the IRS and Treasury on June 14, 2019.[1] We respectfully request that the IRS and Treasury withdraw the temporary regulations, on the grounds that: (1) Treasury exceeded its regulatory authority in promulgating section 1.245A-5T; and (2) the temporary section 245A regulations cannot properly be given retroactive effect under section 7805(b).

By this letter, we also request a public hearing on the temporary and proposed regulations, and the opportunity to testify at the public hearing.

After a brief background discussion, we summarize the arguments in support of our position beginning on page 2. A discussion of the first argument begins on page 5. The discussion of the second argument begins on page 23.

<u>**Background**</u>

On Friday, June 14, 2019, the IRS and Treasury filed with the Federal Register temporary regulations under section 245A denying a deduction under sections 245A and 954(c)(6) with respect to dividends under certain specified circumstances.[2] Prior to the filing of these temporary regulations, the IRS and Treasury had issued neither a notice nor proposed regulations on this subject under section 245A, which was added to the Internal Revenue Code by P.L. 115-97, commonly known as the Tax Cuts and Jobs Act ("**TCJA**"). The TCJA was enacted on December 22, 2017.

---

[1] Unless otherwise noted or clear from context, all section references are to sections of the Internal Revenue Code of 1986, as amended (the "**Code**"), and all references to regulations are to the Treasury regulations thereunder. References to the "**Service**" or "**IRS**" are to the Internal Revenue Service and references to "**Treasury**" are to the United States Department of the Treasury.

[2] T.D. 9865, *Limitation on Deduction for Dividends Received from Certain Foreign Corporations and Amounts Eligible for Section 954 Look-Through Exception*. These temporary regulations were published in the Federal Register on June 18, 2019. 84 Fed. Reg. 28398 (June 18, 2019). A notice of proposed rulemaking by cross-reference to the temporary regulations was published at the same time as well. *Id.* at 28426.

1717 K Street, NW, Suite 600
Washington, DC 20006-5343

phone: 202.393.7600
fax: 202.393.7601

www.ipbtax.com

Ivins, Phillips & Barker, Chartered                                                                 Page 2
September 16, 2019

The preamble to the temporary regulations asserts that the temporary regulations are retroactive to the date of enactment of the TCJA, based on section 7805(b)(2), which permits regulations to be retroactive if they are issued within 18 months of the date of enactment of the statutory provisions to which they relate.[3]

## Summary of Arguments

As noted above, we contend that: (1) the regulations exceed the grant of regulatory authority provided by Congress to Treasury and the IRS under sections 245A(g) and 954(c)(6)(A); and (2) the temporary regulations do not qualify for the retroactivity claimed under section 7805(b)(2).

### I. Treasury overstepped its regulatory authority.

The temporary regulations partially disallow the section 245A deduction with respect to "extraordinary dispositions" of earnings and profits. As a threshold matter, this disallowance contradicts clear statutory language and has the effect of altering a statutory effective date. Treasury is bound by clear statutory language and by the statutory measurement and effective dates Congress unambiguously established in for sections 965, 245A and 951A in the TCJA. As the temporary regulations contradict Congress' choices, they are invalid.

The temporary regulations' partial disallowance of the section 245A deduction with respect to extraordinary disposition earnings and profits also exceeds the authority granted by any specific grant of regulatory authority. Because the rules do not implement the provisions of section 245A, they are not authorized by section 245A(g), which only authorizes regulations "to carry out the provisions" of section 245A. Also, the temporary regulations cannot be justified on anti-abuse or anti-avoidance grounds even if section 245A(g) authorized such regulations. Notwithstanding the preamble's errant characterization of section 245A as a "residual" rule for earnings and profits not otherwise considered subpart F income or GILTI, the temporary regulations are contrary to the purpose of section 245A.[4] Treasury's other claimed sources of authority, sections 951A(a) and 965(o), also fail to support the temporary regulations.

The temporary regulations' partial disallowance of the section 245A deduction with respect to extraordinary disposition earnings and profits is arbitrary and capricious for two reasons. First, the preamble offers no explanation for the limitation of the rules' scope to transactions "outside of the ordinary course."[5] To the extent that the preamble offers a coherent justification for the temporary regulations, it applies equally to all transactions meeting the other enumerated requirements, thus offering no rational basis for the disparate treatment of non-ordinary-course transactions. Second, the

---

[3] *Id.* at 28405.

[4] *See, e.g.*, 84 Fed. Reg. 28398, 28399–400 ("Section 245A is designed to operate residually, such that the section 245A deduction generally applies to any earnings of a CFC to the extent that they are not first subject to the subpart F regime, the GILTI regime, or the exclusions provided in section 245A(c)(3) (and were not subject to section 965).").

[5] *See* Section 1.245A-5T(c)(2)(ii)(A).

---

Ivins, Phillips & Barker, Chartered                                                                    Page 3
September 16, 2019

preamble fails to justify, or even acknowledge, the temporary regulations' failure to provide relief from double taxation via a foreign tax credit, as generally provided throughout the U.S. international tax system.

Section 1.245A-5T(d) exceeds the regulatory authority provided by Congress in section 954(c)(6)(A). Section 954(c)(6)(A) authorizes "regulations as may be necessary or appropriate to carry out [section 954(c)(6)], including such regulations as may be necessary or appropriate to prevent the abuse of the purposes of [section 954(c)(6)]." As we explain, section 1.245A-5T(d) runs contrary to the purpose of section 954(c)(6), which is to "allow[] U.S. companies to reinvest their active foreign earnings where they are most needed without incurring the intermediate additional tax that companies based in other countries never incur."[6] Moreover, section 1.245A-5T(d) could not be considered as preventing any abuse in the absence of section 1.245A-5T(c), which, as we discuss, is itself invalid.

Section 1.245A-5T(d)'s partial disallowance of the section 954(c)(6) exclusion with respect to extraordinary disposition amounts is arbitrary and capricious in two regards. First, the preamble incorrectly claims that application of section 954(c)(6) to extraordinary disposition amounts would "prevent[] the taxation of income that would otherwise be taxed under the subpart F or GILTI regimes."[7] Second, the interaction between sections 1.245A-5T(c) and 1.245A-5T(d) recreates the problem that sections 954(c)(6) and 245A were intended to address: lock-in of CFC earnings.

Finally, neither section 1.245A-5T(c) nor section 1.245A-5T(d) are authorized by section 7805(a)'s general grant of regulatory authority.

### II. The temporary regulations cannot properly be given retroactive effect.

The temporary regulations are purportedly retroactive to the date of enactment of the TCJA. The IRS and Treasury assert that such retroactivity is possible under section 7805(b)(2) of the Code, which provides that the restrictions on retroactivity of regulations set forth in section 7805(b)(1) are not applicable in the case of regulations that are issued within 18 months of the date of enactment of the statutory provision to which the regulations relate. If, however, the temporary regulations were issued in a manner that was procedurally invalid, the temporary regulations are invalid.

The principal procedural requirements that the temporary regulations must satisfy are the notice-and-comment requirements in the Administrative Procedure Act. Under these requirements, an agency must give parties who would be affected by regulations the opportunity to submit comments and have those comments considered by the agency before the agency is permitted to issue regulations that have the force of law. The agency can avoid complying with these requirements if it determines there is "good cause" for doing so and explains the reasons for this determination at the time it issues the regulations.

The IRS and Treasury included in the preamble to the temporary regulations an explanation of the reasons why they had determined that the good cause exception applies here. We conclude that this

---

[6] *See* JCS-1-07 at 267 (Jan. 17, 2007).

[7] 84 Fed. Reg. at 28400 (emphasis added).

good cause statement falls far short of satisfying the requirements for good cause that have been established by the case law.

The good cause statement places considerable reliance on the desire by the IRS and Treasury to issue legally effective regulations under section 245A within the 18-month period described in section 7805(b)(2) as the basis for satisfying the good cause requirement. However, the case law dealing with situations where agencies point to a statutory deadline as providing good cause have consistently rejected that rationale, and, in any event, the rule in section 7805(b)(2) is not in any sense a statutory deadline, but is instead merely a rule that provides certain consequences if regulations are issued within the 18-month period described in section 7805(b)(2).

The good cause statement also contends there was a need to prevent taxpayers from engaging in the types of transactions against which the temporary regulations are directed. However, the period in which those transactions could take place had ended long before the temporary regulations were issued, so the temporary regulations could not possibly prevent those transactions. Moreover, with respect to any relevant transactions taking place after the issuance of the temporary regulations, the IRS and Treasury could instead have issued proposed regulations that would apply prospectively to any transactions occurring after issuance of the proposed regulations and thereby achieve exactly the same deterrent effect as was achieved through the temporary regulations.

Finally, the case law dealing with the good cause exception makes clear that it is rarely to be invoked and is applicable only in emergency situations involving threats to public health or public safety. That standard is clearly not satisfied here.

Thus, the good cause statement in the preamble to the temporary regulations does not provide a basis for application of the good cause exception in the present case. Accordingly, the temporary regulations were issued in violation of the APA notice-and-comment requirements.

The courts sometimes hold that engaging in post-promulgation notice-and-comment can cure a failure to engage in pre-promulgation notice-and-comment on the basis that the failure has been cured by giving affected parties the opportunity to comment after the fact. That reasoning does not apply here because the principal reason for the use of temporary regulations without pre-promulgation notice-and-comment was to attempt to come within the 18-month period in section 7805(b)(2), which the IRS and Treasury could not have done if they had engaged in pre-promulgation notice-and-comment. The failure to do so is not an error that could possibly be cured by post-promulgation notice-and-comment.

Finally, even if the IRS and Treasury had satisfied the notice-and-comment requirements, there is a significant issue as to whether temporary regulations, as opposed to only final regulations, are eligible for the 18-month rule in section 7805(b)(2).

Ivins, Phillips & Barker, Chartered                                                    Page 5
September 16, 2019

## Discussion

### Issue 1: Treasury exceeded its regulatory authority.

**I. Legal Framework.**

Under the Administrative Procedure Act, a court may set aside agency action that is "in excess of statutory jurisdiction, authority, or limitations" or "not in accordance with law."[8] Where a regulation is "'procedurally defective' – that that is, where the agency errs by failing to follow the correct procedures in issuing the regulation"[9] – the regulation is invalid. In other cases, courts follow a two-step framework set forth by the Supreme Court in *Chevron U.S.A. Inc. v. Natural Resources Defense Council*.[10]

In the first *Chevron* step, a court determines "whether Congress has directly spoken to the precise question at issue."[11] "If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of congress."[12] The intent of

---

[8] APA § 706(2)(A), (C).

[9] *United States v. Mead Corp.*, 533 U.S. 218, 227 (2001). See discussion of procedural invalidity under the Administrative Procedure Act, Issue 2, below.

[10] 467 U.S. 837, 842 (1984). For cases applying *Chevron* in determining whether agency regulations, including Treasury regulations, exceed statutory authority in violation of section 706(2)(C) of the APA, see, *e.g., Loving v. IRS*, 917 F.Supp.2d 67, 73 (D. D.C. 2013) (*citing Ass'n of Private Sector Colls. & Univs. v. Duncan*, 681 F.3d 427, 441 (D.C.Cir.2012) ("Appellant's claims that various provisions of the challenged regulations are 'in excess of statutory jurisdiction, authority, or limitations, or short of statutory right,' 5 U.S.C. § 706(2)(C), are reviewed under the well-known *Chevron* framework."), *aff'd, Loving v. IRS*, 742 F. 3d 1013, 1016 (Kavanaugh, J.); *Good Fortune Shipping SA v. Commissioner*, 897 F. 3d 256, 260-61 (D.C. Cir. 2018) (applying *Chevron* to evaluate claim that Treasury regulations were inconsistent with the statutory provision to which the regulations related).

[11] *Chevron*, 467 U.S. at 842.

[12] *Id.* at 842–43.

---

1717 K Street, NW, Suite 600                    phone:  202.393.7600
Washington, DC 20006-5343                       fax:    202.393.7601                    www.ipbtax.com

Ivins, Phillips & Barker, Chartered                                                    Page 6
September 16, 2019

Congress is determined "employing traditional tools of statutory construction."[13] The query centers on whether the rule "fill[s] any gap left, implicitly or explicitly, by Congress."[14]

"[I]f the statute is silent or ambiguous with respect to the specific issue," the court proceeds to the second step, in which "the question for the court is whether the agency's answer is based on a permissible construction of the statute."[15] If the agency's interpretation is reasonable, then it receives judicial deference under *Chevron*, regardless of whether it is pursuant to an "express delegation of

---

[13] *Id.* at 843 n. 9. On June 26, 2019, the Supreme Court issued its opinion in *Kisor v. Wilkie*, 139 S. Ct. 2400 (2019). Although this decision does not deal directly with the *Chevron* two-step test for evaluating the substantive validity of agency regulations, the decision addresses the very closely-related concept of *Auer* deference, under which a court defers to an agency's interpretation of one of the agency's own regulations under a test that in part very closely resembles the *Chevron* two-step test. The Court ultimately rebuffed an attempt to have *Auer* deference overruled, but it clarified and narrowed the inquiry under *Auer*. What is significant for purposes of this discussion of the validity of the section 245A temporary regulations is that the Court emphasized that the portions of the *Auer* inquiry that correspond to the *Chevron* two-step test were both to be conducted rigorously rather than casually, and it is definitely reasonable to conclude that this aspect of *Kisor* is equally applicable under *Chevron* itself. With respect to the portion of the *Auer* inquiry that corresponds to *Chevron* step one, the Court noted as follows:

> [B]efore concluding that a rule is genuinely ambiguous, a court must exhaust all the 'traditional tools' of construction. For again, only when that legal toolkit is empty and the interpretive question still has no single right answer can a judge conclude that it is 'more [one] of policy than of law.' That means a court cannot wave the ambiguity flag just because it found the regulation impenetrable on first read. Agency regulations can sometimes make the eyes glaze over. But hard interpretive conundrums, even relating to complex rules, can often be solved. To make that effort, a court must 'carefully consider[]' the text, structure, history, and purpose of a regulation, in all the ways it would if it had no agency to fall back on.

*Id.* at 2415 (citations omitted). With respect to the portion of the *Auer* inquiry that corresponds to *Chevron* step two, the Court likewise emphasized that the application of this step is to be extremely rigorous rather than casual:

> "If genuine ambiguity remains, moreover, the agency's reading must still be 'reasonable.' In other words, it must come within the zone of ambiguity the court has identified after employing all its interpretive tools. (Note that serious application of those tools therefore has use even when a regulation turns out to be truly ambiguous. The text, structure, history, and so forth at least establish the outer bounds of permissible interpretation.) . . . . Under *Auer*, as under *Chevron*, the agency's reading must fall 'within the bounds of reasonable interpretation.' And let there be no mistake: That is a requirement an agency can fail."

*Id.* at 2415–16 (citations omitted). *See* Lee A. Sheppard, *Are the Temporary Dividends Received Deduction Rules Valid?*, 164 *Tax Notes Federal* at 460–61.

[14] 467 U.S. at 843.

[15] *Id.*

---

authority" or is instead pursuant to an "implicit" delegation, which, according to *Chevron*, is provided when Congress leaves an ambiguity or "gap" in the statutory provision and thereby implicitly authorizes the agency to fill that gap by issuing a regulation.[16]

In both cases, however, *Chevron* contemplates congressional delegation of authority to the agency to issue regulations to merely *fill a gap* left by the statute, and even in the case of explicit delegations, *Chevron* does not contemplate delegations of authority to the agency to issue regulations that are *inconsistent* with the statutory provision to which the regulations relate. Under these circumstances, the regulations are not permitted to be "manifestly contrary to the statute."[17] At step two, "[t]he court need not conclude that the agency construction was the only one permissibly could have adopted to uphold the construction, or even the reading the court would have reached if the question initially had arisen in a judicial proceeding."[18]

Separately from the *Chevron* two-step framework, agency action that is arbitrary and capricious is not entitled to deference.[19] Where an agency fails to articulate a "rational connection between the facts found and the choice made," its action is invalid under this standard.[20] A court "may not supply a reasoned basis for the agency's action that the agency itself has not given."[21]

Below, we establish: (1) that Congress has "directly spoken to the precise question at issue," and has not "implicitly or explicitly" delegated authority to Treasury to promulgate these temporary regulations; (2) that the temporary regulations do not fall within the scope of any explicit grant of regulatory authority under sections 245A(g), 954(c)(6)(A), 7805(a) or elsewhere in the Code; (3) that the temporary regulations are manifestly contrary to the relevant statutes; and (4) that the temporary regulations are arbitrary and capricious.

### II. Congress Has 'Directly Spoken to the Precise Question at Issue' and Has Not 'Implicitly or Explicitly' Delegated Authority to Treasury to Promulgate the Temporary Regulations.

The statutory measurement and effective dates for sections 965, 245A and 951A were all clear and unambiguous and left no room for gap-filling by Treasury. Congress chose to make section 245A effective for all dividend distributions after December 31, 2017.[22] (Notably, nothing in section 245A restricts relief on the basis of when the distributed earnings accrued.) Section 965, which provided a

---

[16] *Id.* at 844.

[17] *Id.*

[18] *Id.* at 843 n.11.

[19] *Encino Motorcars*, 136 S. Ct. at 2125 (citing APA § 706(2)(A); *Motor Vehicle Mfrs. Assn. of United States, Inc. v. State Farm Mut. Automobile Ins. Co.*, 463 U.S. 29, 42–43 (1983)).

[20] *State Farm*, 463 U.S. at 43 (citing *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962)).

[21] *Id.* (citing *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947)).

[22] TCJA section 14101(f).

one-time tax on certain offshore earnings of controlled foreign corporations ("CFCs"), required U.S. shareholders to take a "snapshot" of their offshore earnings on each of two measurement dates for purposes of calculating the tax, the later of which was December 31, 2017.[23] Section 951A, which taxes certain low-taxed offshore earnings of CFCs, became effective for taxable years of foreign corporations beginning after December 31, 2017.[24]

It is normal for statutory effective dates for Internal Revenue Code provisions to be drafted with great precision and specificity, so that they do not leave any ambiguity or require any gap-filling by Treasury.[25] Congress exercised this precision and specificity in setting the relevant TCJA statutory effective dates. It created no ambiguity under *Chevron* step one that left any room for interpretation by Treasury, and accordingly any departure from these clear and unambiguous statutory effective dates would be, and is, impermissible under both *Chevron* step one and *Chevron* step two.[26]

Congress' choice of measurement and effective dates for sections 965, 245A and 951A furthers its stated policy aims and reflects principles of sound tax administration. Section 1.245A-5T(c) is directed at U.S. shareholders of fiscal-year CFCs, for whom there is a gap between the measurement date of section 965 (as of no later than December 31, 2017), on the one hand, and the effective date of section 951A (taxable years of foreign corporations beginning after December 31, 2017), on the other. In addition, section 245A is effective for all dividend distributions after December 31, 2017, regardless of when the earnings and profits being distributed were accrued. The temporary regulations view this "gap period" as a flaw or defect to be remedied, but **the existence of this gap period results from conscious and deliberate decisions by Congress as to the varying effective and measurement dates of the relevant provisions.**

The preamble states that the E&P generated by certain gap-period transactions have not been tested and made potentially subject to tax under section 951A (and also were accrued after the measurement date of section 965), and as a result, the E&P generated by these transactions should not receive the benefit of section 245A when distributed.[27] Although Treasury argues that the "literal effect" of section

---

[23] Section 965(a).

[24] TCJA section 14201(d).

[25] In contrast, this precision and specificity is frequently lacking in legislation outside the tax area. For example, the statutory amendments from the Civil Rights Act of 1991 that were at issue in the Supreme Court's landmark *Landgraf* decision on statutory retroactivity had an effective-date rule that provided only that the amendments were effective "upon enactment." *Landgraf v. USI Film Products*, 511 U.S. 244 (1994).

[26] *See* Lee A. Sheppard, *Are the Temporary Dividends Received Deduction Rules Valid?*, 164 *Tax Notes Federal* at 460.

[27] The preamble notes that Treasury and the IRS "have concluded that section 245A was not intended to eliminate taxation with respect to the foreign earnings of a CFC that are attributable to income of a type that is subject to taxation under the subpart F or GILTI regimes." 84 Fed. Reg. 28398, 28400.

245A cannot possibly be the same as its "intended effect,"[28] Congress' choices of effective dates in the TCJA cannot be so easily dismissed. Section 951A can reasonably be implemented only at the beginning of a CFC's tax year, which is the approach Congress took; the subpart F and GILTI regimes center on tax-year-long measurements. (For example, a U.S. shareholder of a CFC cannot know if it has subpart F income for a year until it knows whether a CFC has earnings and profits for that year, which cannot be determined until the CFC's tax year closes.[29]) So for non-calendar-year taxpayers, implementing GILTI on a part-year basis would have been a tremendous additional burden – and they were already disproportionately burdened by administrative demands of implementing other provisions of the TCJA.[30] Fiscal-year taxpayers would have been required to make the various basis, loss and gain calculations under section 951A on a part-year basis, with the first portion of the taxable year treated entirely differently. Most taxpayers do not normally determine these amounts with precision on a partial-year basis. Thus Congress, of necessity, had to write the GILTI statute so that it would apply to a full tax year.

Conversely, Congress chose a date on the calendar – December 31, 2017 – as the point after which section 245A would become effective. Congress was eager to open the repatriation flood gates, and – unlike for section 951A – a midyear effective date for section 245A was easy to implement for all taxpayers – calendar-year and fiscal-year alike – so there was no reason to delay the effective date.[31] The whole point of section 245A was to invite U.S. shareholders of CFCs to bring offshore earnings onto U.S. shores; thus, disallowing section 245A with respect to distributions of earnings derived during the

---

[28] *See* 84 Fed. Reg. 28398, 28400.

[29] Section 952(c)(1)(A).

[30] For example, fiscal-year corporate taxpayers had to determine how to apply what was, for them, a mid-year drop in the top corporate tax rate (from 35 percent to 21 percent), relying on section 15. This created substantial difficulties for financial reporting purposes, as many fiscal-year companies struggled to predict a blended rate for interim financials and to determine the impact of the change on temporary differences reversing before versus after the effective date.

[31] In fact, President Trump rushed the signing ceremony for the legislation so that it would take place before the end of 2017. *See* Remarks of President Trump at Signing of H.R. 1, Tax Cuts and Jobs Act, and H.R. 1370 (December 22, 2017), available at https://www.whitehouse.gov/briefings-statements/remarks-president-trump-signing-h-r-1-tax-cuts-jobs-bill-act-h-r-1370/ . In his remarks, the President specially noted the bill's repatriation incentive:

> We're going to bring back probably $4 trillion from overseas. Nobody knows the exact number, but it's massive. It will be over $3 trillion; it could be $5 trillion. But it's a tremendous amount of money that was caught overseas that the bureaucracy plus the tax laws didn't allow it to reasonably be brought back into our country. So we think at least $4 trillion is going to be brought back.

> And if you look at that, it's going to be brought back right under the code. This is something that Republicans wanted for years and Democrats wanted for years, and yet it never got done. Who would object to trillions of dollars being brought back into our country? Nobody. But it never got done. Now it's being done.

Ivins, Phillips & Barker, Chartered                                                                                          Page 10
September 16, 2019

"disqualified period" punishes taxpayers who did exactly what Congress intended for them to do: They promptly repatriated offshore earnings. [32]

As further indication that Congress was fully cognizant of its choices of the relevant effective dates, the House bill, the Senate bill, and the Conference agreement went back and forth on the issue of whether the effective dates of section 245A and section 951A should be the same or different. The various changes demonstrate that the ultimate decision to make the effective dates different was not a result of inadvertence or oversight but was instead very deliberate. The House and Senate bills adopted prior to the Conference Committee agreement proposed conflicting effective dates for section 245A. The Senate bill's effective date would have synchronized the effective dates of sections 245A and 951A. The Conference Committee rejected that approach and followed the House bill's effective date, as reflected in TCJA §14101(f):

> The amendments made by this section shall apply to distributions made after (and, in the case of the amendments made by subsection (d) [denial of foreign tax credits or deductions for foreign taxes on distributions claiming the benefits of the section 245A deduction], deductions with respect to taxable years ending after) December 31, 2017.[33]

Although it did so without explanation, this legislative history shows that Congress affirmatively chose for section 245A to be effective for distributions made from January 1, 2018, onward, and thereby created the gap period between this effective date and the later effective date of section 951A for fiscal-year CFCs that is the source of the issues addressed by the temporary regulations. In addition, the effective date for section 245A is consistent with the TCJA's effective date for section 1248(j), which applies section 245A to the deemed dividend generated by a domestic corporation's sale of stock in certain foreign corporations.

Moreover, Congress was aware of the so-called "gap period" and granted express authority to Treasury to regulate "non-economic" transactions carried out prior to the effective date of section 951A, but only with respect to transactions intended to reduce a taxpayer's future section 951A liability.[34] Congress

---

[32] *See* Lee A. Sheppard, *Are the Temporary Dividends Received Deduction Rules Valid?*, 164 *Tax Notes Federal* at 460.

[33] Moreover, when the House bill first adopted a fixed January 1, 2018 effective date for section 245A, it also made an affirmative choice to do so. The Camp tax reform bill, on which the TCJA was largely based, had proposed that its version of section 245A be effective with the first taxable year beginning after the year of passage. H.R. 1, 113th Cong. § 4001 (2014).

[34] H.R. Rep. No. 115-466 at 520 (2017) ("The conferees intend that non-economic transactions intended to affect tax attributes of CFCs and their U.S. shareholders (including amounts of tested income and tested loss, tested foreign income taxes, net deemed tangible income return, and QBAI) to minimize tax under this provision be disregarded. For example, the conferees expect the Secretary to prescribe regulations to address transactions that occur after the measurement date of post-1986 earnings and profits under amended section 965, but before the first taxable year for which new section 951A applies, if such transactions are undertaken to increase a CFC's QBAI.")

granted Treasury no authority, under section 245A or otherwise, to effectively make section 951A apply before its effective date.

As for section 954(c)(6), the legislative history is clear that Congress intended for taxpayers to enjoy relief from subpart F on movements of E&P between CFCs to the same extent that they would on dividends from CFCs to the U.S. under section 245A. The purpose of section 954(c)(6) is to "allow[] U.S. companies to reinvest their active foreign earnings where they are most needed without incurring the immediate additional tax that companies based in many other countries never incur."[35]

### III. The Temporary Regulations Exceed the Scope of the Grants of Regulatory Authority in Section 245A(g).

#### A. The temporary regulations go beyond rules that "carry out the provisions" of section 245A, which is the very narrow grant of regulatory authority afforded by Congress.

The grant of authority to Treasury in section 245A(g) to issue regulations relating to section 245A is not broad enough to encompass the new temporary regulations. Congress specifically chose to use narrow language in section 245A(g), authorizing Treasury only to prescribe guidance "to carry out the *provisions*" of section 245A (emphasis added). As discussed further below, this language contains no suggestion that authorized regulations could properly override explicit provisions of section 245A and related provisions and their clear effective dates.

Section 245A(g) reads in full as follows:

> The Secretary shall prescribe such regulations or other guidance as may be necessary or appropriate to carry out the provisions of this section, including regulations for the treatment of United States shareholders owning stock of a specified 10 percent owned foreign corporation through a partnership.

The JCT report on the TCJA effectively restates this provision, without elaboration:

> Under section 245A(g), the Secretary shall prescribe such regulations or other guidance as may be necessary or appropriate to carry out the provisions of this section, including regulations for the treatment of U.S. shareholders owning stock of a specified 10-percent owned foreign corporation through a partnership.[36]

This grant of regulatory authority is narrow—narrower than elsewhere in the Code, where Treasury is permitted to consider statutory intent or legislative purpose in crafting regulations, not simply the text

---

[35] *See* JCS-1-07 at p. 267 (Jan. 17, 2007).

[36] JCS-1-18 at p. 349.

of the relevant statute.[37] In fact, Congress gave broader authority to Treasury elsewhere in the TCJA but chose not to do so in the case of section 245A(g).[38]

In section 245A(g), Congress instructed Treasury to look only within the four corners of section 245A when promulgating guidance. With some specific, narrow exceptions (*e.g.*, U.S.-source income, hybrid dividends), there is no "provision" in section 245A that allows Treasury to limit E&P that can qualify for the deduction. Treasury concedes that it has altered, rather than carried out, the provisions of section 245A, expressly contrasting the statute's "literal application" and "literal effect" with Treasury's own construct.[39] Therefore, section 1.245A-5T(c) exceeds Treasury's authority.

Congress could potentially provide an *explicit* grant of authority to issue regulations overriding specific statutory provisions, and there are instances in the Code where Congress has delegated such authority to Treasury.[40] However, when such delegations are intended, they are expressed very clearly. In the absence of such language in an explicit statutory grant of regulatory authority, in contexts where that type of action might be necessary to achieve the purposes of the statute, it should not be assumed that a statutory override is permitted. That the rulemaking grant of section 245A(g) is too narrow to encompass such authority becomes clear when comparing it to other grants in the Code.[41] Even

---

[37] *See, e.g.*, section 4890G(c) ("The Secretary shall issue regulations to carry out the purposes of this section . . .").

[38] *See, e.g.*, section 1400Z-2(e)(4)(A), also enacted as part of the TCJA, which instructs Treasury to "prescribe such regulations as may be necessary or appropriate to carry out the *purposes of* this section." (Emphasis added.)

[39] 84 Fed Reg at 28400. The preamble states:

> However, in certain atypical circumstances, a *literal application* of section 245A (read in isolation) could result in the section 245A deduction applying to earnings and profits of a CFC attributable to the types of income addressed by the subpart F or GILTI regimes—the specific types of earnings that Congress described as presenting base erosion concerns. *Id.* (emphasis added).

and

> In these cases where the *literal effect* of section 245A would reverse the intended effect of the subpart F and GILTI regimes, this conflict is best resolved, and the structure of the statutory scheme is best preserved, by limiting section 245A's effect. *Id.* (emphasis added).

[40] *See, e.g.*, section 7874(c)(6) ("The Secretary shall prescribe such regulations as may be appropriate to determine whether a corporation is a surrogate foreign corporation, including regulations—(A) to treat warrants, options, contracts to acquire stock, convertible debt interests, and other similar interests as stock, and (B) to treat stock as not stock."); section 7874(g) ("The Secretary shall provide such regulations as are necessary to carry out this section, including regulations providing for such adjustments to the application of this section as are necessary to prevent the avoidance of the purposes of this section, including the avoidance of such purposes through— (1) the use of related persons, pass-through or other noncorporate entities, or other intermediaries, or (2) transactions designed to have persons cease to be (or not become) members of expanded affiliated groups or related persons.").

[41] *See, e.g.*, section 956(e) ("The Secretary shall prescribe such regulations as may be necessary to carry out the purposes of this section, including regulations to prevent the avoidance of the provisions of this section through reorganizations or otherwise."); section 385(a) ("The Secretary is authorized to prescribe such regulations as may

Ivins, Phillips & Barker, Chartered                                                                                   Page 13
September 16, 2019

regulations issued under quite broad grants of regulatory authority have been held to exceed the scope of the authority granted.[42]

In addition, section 245A does not envision in any situation a 50-percent reduction for the dividends-received deduction, as provided by section 1.245A-5T(b)(2)(i). According to the preamble, the approach "*approximates* the reduced tax rate by reason of the deduction provided under section 250(a)(1)(B) with respect to section 951A inclusions or section 965(c) with respect to the transaction tax."[43] Treasury lacks authority to make that determination – *i.e.*, to conclude that the purposes of these new provisions in the TCJA permit Treasury to make up a 50-percent disallowance rule under the limited ("provision" versus purpose) authority in section 245A(g). There is no "provision" in section 245A that creates a percentage disallowance that Treasury is directed to "carry out" under the auspices of section 245A(g). Treasury's admission that it is attempting to approximate sections 951A and 965 offers clear evidence that it is not addressing an abuse of section 245A, but rather it is trying to alter the clear, statutory effective dates of other provisions in the TCJA.

While narrow even unto section 245A itself, section 245A(g) offers no statutory basis to correct a perceived problem with the effective date of *other* TCJA provisions. According to the preamble, the regulations are intended to "address transactions that have the effect of avoiding tax under section 965, 951A, or 951 by inappropriately converting income that should have been subject to U.S. tax into

---

be necessary or appropriate to determine whether an interest in a corporation is to be treated for purposes of this title as stock or indebtedness (or as in part stock and in part indebtedness).").

[42] For example, in *Rite Aid Corp. v. United States,* the Court of Appeals for the Federal Circuit invalidated a regulation promulgated under section 1502, which broadly authorizes regulations concerning taxation of affiliated groups of companies filing a consolidated return. 255 F.3d 1357 (Fed. Cir. 2001). *See* section 1502 ("The Secretary shall prescribe such regulations as he may deem necessary in order that the tax liability of any affiliated group of corporations making a consolidated return and of each corporation in the group, both during and after the period of affiliation, may be returned, determined, computed, assessed, collected, and adjusted, in such manner as clearly to reflect the income-tax liability and the various factors necessary for the determination of such liability, and in order to prevent avoidance of such tax liability."). The foregoing quotation is how the provision read for the year at issue in the *Rite Aid* case. After the *Rite Aid* decision, the provision was amended by adding a new sentence to overrule the decision.

Like the temporary regulations under section 245A, the regulations at issue in *Rite Aid* disallowed a deduction, and so effectively imposed a tax. In holding the regulation at issue invalid, the court noted that although section 1502 authorizes regulations "to identify and correct instances of tax avoidance created by the filing of consolidated returns," it does not authorize "impos[ing] a tax on income that would not otherwise be taxed." *Rite Aid*, 255 F.3d at 1359–60.

As previously discussed, the temporary regulations do not merely fill a gap in the TCJA. The relevant provisions of the TCJA were already complete with respect to the issues the temporary regulations address: The effective and measurement dates of sections 965, 951A and 245A were fully spelled out, with no grant of rule-making authority to change them. Moreover, the temporary regulations do not react to a later development – the dates were in the bill as passed – nor do they merely work out means of compliance.

[43] 84 Fed. Reg. 28398, 28404 (emphasis added).

nontaxed income."[44] In stating that such income "should have been subject to U.S. tax," the preamble assumes that Congress erred in setting the effective date of section 951A. If Treasury's interpretation were correct, the most natural and obvious solution to a gap covered by none of the three systems would be to extend one or more of the systems to cover that gap. In other words, the scope of section 965, 951A, or 951 would be expanded to cover the relevant income. However, Congress offered Treasury no such opportunity.[45] In contrast to section 245A(g), which gives Treasury specific authority to issue regulations relating to section 245A, section 951A contains no corresponding provision authorizing Treasury to issue regulations relating to section 951A as a whole.[46]

### B. Congress avoided giving Treasury a broad grant of anti-abuse or anti-avoidance authority in section 245A(g), and even if it had not done so, the temporary regulations would not be defensible on such grounds.

Congress also opted against couching the section 245A(g) grant in anti-avoidance or anti-abuse language, so the temporary regulations cannot be justified under those grounds.[47] To the contrary, the "including" example provided in both section 245A(g) and the JCT report indicate that the regulatory authority was to be used to ensure that taxpayers will receive the benefit of section 245A relief in certain similar but "one step removed" cases, such as where they hold CFC shares through a partnership.

Even if the grant in section 245A(g) were to authorize anti-avoidance or anti-abuse regulations, it is difficult to argue that abiding by congressionally-created effective dates is an "abuse" that Treasury has the authority to police. The type of transaction described in the "extraordinary disposition" rule in the temporary regulations represents a decision by a taxpayer to engage in a realization transaction with respect to appreciation or depreciation in value that would otherwise not be realized before the effective date of section 951A. This type of taxpayer choice to realize gains or losses at a particular time in order to obtain more favorable tax treatment is standard planning that taxpayers engage in regularly without any suggestion that their choice as to the timing of realization transactions raises any issues.

Even where Congress authorized Treasury in the TCJA to regulate transactions occurring during the gap period, the authorization was limited to "non-economic" transactions and their effect on a taxpayer's

---

[44] 84 Fed. Reg. 28398, 28398.

[45] Treasury admits this: "The Treasury Department and the IRS furthermore do not believe it would be permissible to modify the definition of subpart F income or tested income, or to recharacterize income as subpart F income or tested income, under the authority of section 245A(g)." 84 Fed. Reg. at 28400.

[46] Section 951A(d)(4) authorizes the issuance of regulations relating only to subsection 951A(d).

[47] *Cf.* section 951A(d)(4) ("The Secretary shall issue such regulations or other guidance as the Secretary determines appropriate *to prevent the avoidance of the purposes of this subsection* . . . .") (emphasis added); section 965(o) ("The Secretary shall prescribe such regulations or other guidance as may be necessary or appropriate to carry out the provisions of this section, including . . . regulations or other guidance *to prevent the avoidance of the purposes of this section* . . . .") (emphasis added).

*future* section 951A tax, once that tax was effective.[48] That this authorization gives Treasury no power to regulate transactions with economic substance strongly implies that Treasury has no authority to regulate economically real transactions at all. And, limiting the authority to adjustment of post-effective date section 951A attributes confirms that Treasury lacks the authority to alter statutory effective dates, using section 245A as a proxy or otherwise.

> C. Nothing in the Code or legislative history of the TCJA indicates that section 245A was meant to apply as a "residual" rule for E&P not otherwise considered subpart F income or GILTI.

Treasury argues in the preamble that section 245A is meant to be a "residual" rule for E&P not otherwise covered by subpart F or GILTI.[49] However, there is no indication in section 245A – or any other international provision of the Code – that Congress intended for section 245A to play that role. In other words, although section 245A is a residual provision in the sense that it applies to earnings not taxed under subpart F or section 951A, nothing in the statute suggests that Congress sought to exclude E&P that might have been taxed under these provisions if they had been drafted with different effective dates.

Treasury cites section 959 in support of its position that all E&P must first be tested under subpart F and section 951A before they can qualify for relief on distribution under section 245A. The preamble describes Treasury's view that section 959 has a greater purpose than the avoidance of double taxation on earnings that have already been subject to U.S. tax under section 951 or 951A. After noting that section 959 "generally" treats previously-taxed E&P – referred to as "PTEP" – as distributed before non-previously-taxed E&P and also prevents section 245A from applying to distributions of PTEP, Treasury goes on to state the following:

> [B]oth the interaction of the definitions of subpart F income and tested income with the ordering rules for distributions of PTEP and the overall structure of the international provisions of the [TCJA] contemplate that only residual earnings remaining after the potential application of sections 951(a), 951A and 965 generally are eligible for the section 245A deduction. That is, section 245A(a) applies only to certain "dividends" received from foreign corporations. Therefore, sections 951(a), 951A, and 965 generally have priority over section 245A because, when they apply to a foreign corporation's earnings, distributions of those earnings do not qualify as dividends under section 959(d), and, therefore, section 245A does not apply.[50]

---

[48] *See* H.R. Rep. No. 115-466 at 520 (2017).

[49] *See, e.g.*, 84 Fed. Reg. 28398, 28399–400 ("Section 245A is designed to operate residually, such that the section 245A deduction generally applies to any earnings of a CFC to the extent that they are not first subject to the subpart F regime, the GILTI regime, or the exclusions provided in section 245A(c)(3) (and were not subject to section 965)").

[50] 84 Fed. Reg. 28398, 28399.

Treasury next explains that a "central feature" of the "regime" created by the interaction of 245A, GILTI, subpart F, and the PTEP rules "is that income derived by CFCs is eligible for the section 245A deduction only if the earnings being distributed have not been first subject to the subpart F or GILTI regimes."[51]

In tying in section 959 in this manner, Treasury is taking a code section that provides double-tax relief and corresponding ordering rules for E&P distributions and attempting to turn it into an operative rule that affirmatively requires the application of subpart F and 951A – even if they would not otherwise apply – before a distribution of earnings can be a dividend to which section 245A applies. This reading of section 959 is unsupported by section 959, section 245A, or any other provision of the Code, and it highlights that the goal of the temporary regulations was to change the effective date of section 951A.

In support, Treasury articulates a vision of the post-TCJA U.S. international tax system in which "the transition tax, the subpart F and GILTI regimes, and the participation exemption under section 245A together form a comprehensive and closely integrated set of tax rules with respect to the earnings of foreign corporations with requisite levels of U.S. ownership."[52] While it is indisputably true that examining statutory context is a fundamental tool of statutory construction, this tool is appropriately used *only* to resolve what might otherwise seem to be statutory ambiguity, and *not* to override clear statutory rules such as effective dates or to add requirements for obtaining statutory benefits that are not supported by the statutory text.[53]

But even setting aside whether it was appropriate for Treasury to look to legislative history, nothing in the legislative history supports Treasury's overall view of the TCJA. Congress did not articulate any such vision, and no such vision can be rightfully inferred from the legislation's content. Many of the rules adopted by Congress in the TCJA were intended to achieve different and sometimes contradictory goals, thus disproving any argument that there was any thoughtful cohesion in their approach. For example, taxpayers receive GILTI and FDII relief to the extent of a deemed, fixed return on offshore tangible

---

[51] *Id.*

[52] *Id.*

[53] *See, e.g., United Sav. Ass'n of Texas v. Timbers of Inwood Forest Assocs.,* 484 U.S. 365, 371 (1988) ("Statutory construction . . . is a holistic endeavor. A provision that may seem ambiguous in isolation is often clarified by the remainder of the statutory scheme — because the same terminology is used elsewhere in a context that makes its meaning clear, or because only one of the permissible meanings produces a substantive effect that is compatible with the rest of the law . . . .") (citations omitted); *Gen. Dynamics Land Sys., Inc. v. Cline*, 540 U.S. 581, 600 (2004) ("Even for an agency able to claim all the authority possible under *Chevron*, deference to its statutory interpretation is called for only when the devices of judicial construction have been tried and found to yield no clear sense of congressional intent. Here, regular interpretive method leaves no serious question, not even about purely textual ambiguity in the ADEA. The word 'age' takes on a definite meaning from being in the phrase 'discriminat[ion] . . . because of such individual's age,' occurring as that phrase does in a statute structured and manifestly intended to protect the older from arbitrary favor for the younger."); *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 132 (2000) ("In determining whether Congress has specifically addressed the question at issue, a reviewing court should not confine itself to examining a particular statutory provision in isolation. The meaning—or ambiguity—of certain words or phrases may only become evident when placed in context.").

property. These seem to lead to results inconsistent with the government's stated goal of encouraging investment in tangible property in the U.S. Similarly, Congress chose to treat differently various types of U.S. shareholders. Treasury's argument that all earnings must be taxed at once is contradicted by the fact that S corporations are exempt from the section 965 transition tax until liquidated.[54]

It is also difficult to reconcile Treasury's characterization, in final section 951A regulations issued on the very same day, of GILTI and subpart F as "parallel and independent systems of taxation" with its view of the entire U.S. international tax system as a "coherent whole" that is to be "read collectively."[55]

### IV. No Other Specific Claimed Authority Supports the Temporary Regulations.

In addition to section 245A(g), Treasury also cites sections 951A(a) and 965(o) as authority for the temporary regulations.[56] Like section 245A(g), these provisions fail to support the promulgated rules.

Section 951A(a) provides that "[e]ach person who is a United States shareholder of any controlled foreign corporation for any taxable year of such United States shareholder shall include in gross income such shareholder's global intangible low-taxed income for such taxable year." This is not a grant of regulatory authority. Section 951A(d)(4) provides the only grant of regulatory authority in section 951A. It is limited to regulations appropriate to "prevent the avoidance of the purposes of [section 951A(d)]," which defines qualified business asset investment for purposes of the GILTI calculations.

Construing the citation of section 951A(a) most favorably to Treasury, it implicitly relies upon section 7805(a), the general grant of regulatory authority to Treasury with respect to the Code. For reasons we discuss below, section 7805(a) cannot support the temporary regulations.

Section 965(o) is a narrow grant of authority, limited to regulations "as may be necessary or appropriate to carry out the provisions of [section 965]," including "to provide appropriate basis adjustments" and "to prevent avoidance of the purposes of [section 965]." A set of rules imposing a tax on a period after the final statutory measurement date under section 965 cannot be construed as "carry[ing] out the provisions of" section 965. Moreover, the extraordinary disposition transactions addressed by the temporary regulations cannot constitute an abuse of section 965. Such transactions must have occurred following December 31, 2017. They in no way circumvent or abuse section 965, which taxes earnings and profits accrued by, at the latest, December 31, 2017.

---

[54] Section 965(i).

[55] 84 Fed. Reg. 29288, 29296.

[56] 84 Fed. Reg. at 28413 ("Authority: 26 U.S.C. 7805 . . . Section 1.245A–5 also issued under 26 U.S.C. 245A(g), 951A(a), 954(c)(6)(A), and 965(o)."). We discuss the ineffectiveness of section 7805(a) as a source of authority for the temporary regulations below. Section 954(c)(6)(A) serves solely as a purported source of authority with respect to section 1.245A-5T(d), and is also addressed below.

Ivins, Phillips & Barker, Chartered                                                    Page 18
September 16, 2019


### V. The Partial Disallowance in the Temporary Regulations is Arbitrary and Capricious.

As discussed above, aside from the two-part *Chevron* test, agency action that is arbitrary and capricious is not entitled to deference. Because Treasury has failed to articulate a "rational connection between the facts found and the choice made," section 1.245A-5T(c) fails under this standard.[57]

### A. Treasury offers no explanation for its "outside of the ordinary course" rule.

In drafting section 1.245A-5T(c), Treasury limited the section 245A deduction for distributions of E&P that are derived from "extraordinary dispositions" during the gap period.[58] "Extraordinary dispositions" are defined as a disposition of "specified property" by a CFC to a related party during the gap period "if the disposition occurs outside of the ordinary course of the [CFC's] activities."[59] Whether a disposition occurs outside the ordinary course of a CFC's activities is determined "on the basis of facts and circumstances, taking into account whether the transaction is consistent with the [foreign corporation's] past activities, including with respect to quantity and frequency."[60] A disposition to a related party may be considered non-ordinary-course even if the foreign corporation typically engages in similar transactions with unrelated parties.[61] Under a per se rule in the temporary regulations, a disposition is treated as occurring outside of the ordinary course if it "is undertaken with a principal purpose of generating earnings and profits during the disqualified period or if the disposition is of intangible property, as defined in section 367(d)(4)."[62]

It is unclear why Treasury chose to target transactions that it categorizes as occurring "outside of the ordinary course." The temporary regulations target certain transactions, and thereby certain taxpayers, without justification. While it might be argued that non-ordinary course transactions are more likely to be tax-motivated than ordinary course transactions, the preamble's analysis offers no indication that the motivation for the transaction that generated the earnings is at all relevant. Likewise, the statutory provisions cited by Treasury fail to support a distinction between ordinary-course and non-ordinary-

---

[57] *State Farm*, 463 U.S. at 43 (citing *Burlington Truck Lines v. U.S.*, 371 U.S. 156, 168 (1962)).

[58] Mechanically, section 1.245A-5T(b)(1) provides that a section 245A deduction is allowed only to the extent a dividend "exceeds the ineligible amount of the dividend." Relevant here, section 1.245A-5T(b)(2)(i) defines "ineligible amount" to include 50 percent of the "extraordinary disposition amount." The "extraordinary disposition amount," in turn, is defined in section 1.245A-5T(c)(1) to mean the portion of a dividend paid out of the recipient's portion of a foreign corporation's "extraordinary disposition account." Under section 1.245A-5T(c)(3), the "extraordinary disposition account" reflects E&P that is categorized as "extraordinary disposition E&P," which is defined as the sum of the net gain recognized by a foreign corporation with respect to "specified property" on any "extraordinary disposition."

[59] Section 1.245A-5T(c)(2)(ii)(A).

[60] Section 1.245A-5T(c)(2)(ii)(B).

[61] *Id.*

[62] Section 1.245A-5T(c)(2)(ii)(C).

---

course transactions. The GILTI, subpart F and PTEP rules do not distinguish between E&P earned "outside of the ordinary course" and other E&P.[63]

The preamble neither mentions nor explains Treasury's choice to allow transactions carried out within the ordinary course the full benefit of section 245A. The failure to justify or even explain this central aspect of the temporary regulations indicates that the temporary regulations are arbitrary and capricious, and therefore invalid.

### B. Treasury also offers no justification for its failure to address foreign taxes.

The foreign tax credit is a central feature of U.S. international taxation. The credit mitigates the effects of double taxation, which occurs when the United States and a foreign jurisdiction tax the same income. The section 965, GILTI and subpart F regimes each provide for foreign tax credits.

Double taxation of extraordinary disposition E&P is a concern. Such earnings could have been, and in many cases were, subject to foreign taxes at the time they accrued. When a section 245A deduction is limited under the temporary regulations, the earnings are effectively taxed for a second time, by the United States. The temporary regulations do not follow the section 965, GILTI and subpart F regimes in providing a foreign tax credit to address double taxation. The new rules effectively taxing extraordinary disposition E&P provide no other relief from double taxation.

Had extraordinary disposition E&P been taxed under section 965, as subpart F income or under the GILTI regime, foreign tax credits would have been available. Had Congress granted Treasury authority to effectively tax distributions of extraordinary disposition E&P, it would necessarily encompass the ability and the obligation to conform any promulgated rules with fundamental principles of U.S. international taxation. It would not have anticipated that Treasury would create a regime inconsistent with the other pillars of U.S. international taxation.

Moreover, the lack of foreign tax credits treats similarly-situated taxpayers differently for no reason. The fiscal-year taxpayers affected by this rule relied on the law as it was written. These rules treat them substantially worse than they would have been treated had Congress initially passed the law Treasury thinks Congress should have.

The lack of foreign tax credits under the temporary regulations thus presents two key inconsistencies. First, treatment under the temporary regulations is inconsistent with treatment under the section 965, GILTI and subpart F regimes. Second, treatment is inconsistent between calendar-year and fiscal-year taxpayers. Treasury does not explain, or even mention, these inconsistencies. The preamble only mentions the foreign tax credit in the context of the extraordinary reduction rules, which address a separate concern from the extraordinary disposition rules.

---

[63] A limited number of definitions in subpart F do rely upon an "ordinary course" concept in describing activities of dealers in certain securities and commodities. *See* section 954(c)(2)(C); section 956(c)(2)(I)–(K).

Treasury's failure to address its choice to promulgate rules inconsistent with the balance of U.S. international taxation further supports the conclusion that the temporary regulations are arbitrary and capricious.

### VI. In Promulgating Section 1.245A-5T(d), Treasury Exceeded the Regulatory Authority Provided by Congress in Section 954(c)(6)(A).

Section 1.245A-5T(d) relies on authority under section 954(c)(6)(A).[64] Section 954(c)(6)(A) provides that "[t]he Secretary shall prescribe such regulations as may be necessary or appropriate to carry out this paragraph, including such regulations as may be necessary or appropriate to prevent the abuse of the purposes of this paragraph." Section 1.245A-5T(d) is only authorized under section 954(c)(6)(A) to the extent necessary or appropriate to carry out section 954(c)(6), including to prevent abuses of the purposes of section 954(c)(6). As section 1.245A-5T(d) does neither, it exceeds its claimed authority.

As previously noted, the purpose of section 954(c)(6) is to "allow[] U.S. companies to reinvest their active foreign earnings where they are most needed without incurring the immediate additional tax that companies based in many other countries never incur."[65] By contrast, section 1.245A-5T(d) inhibits transfer of foreign earnings to where they are most needed, actually frustrating, rather than carrying out, the provisions of section 954(c)(6). Accordingly, it cannot be justified as "necessary or appropriate to carry out section 954(c)(6)," except inasmuch as it prevents abuse of the provision.

Treasury frames section 1.245A-5T(d) as an anti-abuse measure, stating that "[g]iven the authority in section 954(c)(6)(A) for the Treasury Department and the IRS *to issue regulations preventing the abuse of section 954(c)(6)*, the temporary regulations under section 954(c)(6) are designed to ensure that the section 954(c)(6) exception is not used to erode the U.S. tax base through certain transactions preventing the taxation of income that would otherwise be taxed under the subpart F or GILTI regimes."[66] Application of section 954(c)(6) to the earnings in question can only be considered an abuse in the context of section 1.245A-5T(c) and the other temporary regulations issued under section 245A. In their absence, application of section 954(c)(6) to those earnings would be consistent with their treatment under sections 245A, 1248(j) and 964(e)(4).

Accordingly, if the temporary regulations issued under section 245A are invalid, then the temporary regulations issued under section 954(c)(6) are also invalid.

---

[64] 84 Fed. Reg. at 28404.

[65] *See* JCS-1-07 at 267 (Jan. 17, 2007).

[66] 84 Fed. Reg. at 28400 (emphasis added).

**VII. Treasury's Partial Disallowance of the Section 954(c)(6) Exclusion with Respect to Extraordinary Disposition Amounts is Arbitrary and Capricious.**

A. Base Erosion.

Treasury justifies section 1.245A-5T(d) by stating that "the temporary regulations under section 954(c)(6) are designed to ensure that the section 954(c)(6) exception is not used to erode the U.S. tax base through certain transactions preventing the taxation of income that would otherwise be taxed under the subpart F or GILTI regimes."[67]

However, the application of section 954(c)(6) plays no role in "preventing the taxation of income that would otherwise be taxed under the subpart F or GILTI regimes," except inasmuch as it serves its main function: to allow free movement of earnings and profits not subject to subpart F across CFCs.

The rules of section 1.245A-5T addressing section 245A chose not to generate a subpart F inclusion or increase tested income with respect to extraordinary disposition amounts. Rather, extraordinary disposition amounts are only effectively taxed when repatriated to the United States. To then treat such amounts as subpart F income merely on account of their movement from one CFC to another is inconsistent with the purpose of section 954(c)(6).

B. Lock-in of CFC earnings.

The interaction between sections 1.245A-5T(c) and (d) has the effect of recreating the key problem that sections 954(c)(6) and 245A were intended to address: lock-in of CFC earnings.

Under section 1.245A-5T, a U.S. entity with CFC subsidiaries is better off if a CFC with extraordinary disposition amounts keeps that cash locked in place than if it deploys those amounts in other CFCs where the money could be put to better use.

The preamble characterizes this treatment as "minimiz[ing] the administrative and compliance burdens that would be created by continuing to track the relevant earnings at the upper-tier CFC."[68] Given that taxpayers already need to create a system for tracking extraordinary disposition amounts in order to have complied with respect to a lower-tier CFC, it beggars belief that the trivial expense of continuing to track those amounts when moved to a higher-tier CFC could justify immediate taxation of those amounts.

For these reasons, the preamble's explanation does not support the rule adopted in section 1.245A-5T(d).

---

[67] 84 Fed. Reg. at 28400.

[68] *Id.* at 28404.

### VIII. Neither Section 1.245A-5T(c) Nor Section 1.245A-5T(d) Are Authorized by Section 7805(a)'s Grant of Regulatory Authority.

Section 7805(a) states that "Except where such authority is expressly given by this title to any person other than an officer or employee of the Treasury Department, the Secretary shall prescribe all needful rules and regulations *for the enforcement of this title*, including all rules and regulations as may be necessary by reason of any alteration of law in relation to internal revenue."[69]

Section 7805(a) provides the necessary rulemaking authority for Treasury to properly treat statutory ambiguity in the Code as an implicit grant of authority to issue a regulation to fill the gap left by that ambiguity. This authority is very general and applies only to the extent that Congress left gaps in the Code's statutory scheme.

The general grant of authority to issue regulations in section 7805(a) is narrower than the specific grants of authority discussed above, such as the one in section 245A(g). If the temporary regulations cannot be justified under that specific grant of authority, and, as discussed above, they cannot, then they cannot be justified under the much more general grant of authority in section 7805(a).

*        *        *

[Issue 2 Follows]

---

[69] Section 7805(b) (emphasis added).

**Issue 2: The new temporary regulations cannot properly be given retroactive effect.**

**I. Background.**

A. Background on Section 7805(b)(2).

Retroactivity for the temporary regulations is based on a claim that the 18-month retroactivity rule in section 7805(b)(2) applies. Because section 7805(b)(2) operates by reference to section 7805(b)(1), it is first necessary to discuss the provisions of section 7805(b)(1).

Section 7805(b)(1) provides:

> Except as otherwise provided in this subsection, no temporary, proposed, or final regulation relating to the internal revenue laws shall apply to any taxable period ending before the earliest of the following dates:
>
> > (A) The date on which such regulation is filed with the Federal Register.
> >
> > (B) In the case of any final regulation, the date on which any proposed or temporary regulation to which such final regulation relates was filed with the Federal Register.
> >
> > (C) The date on which any notice substantially describing the expected contents of any temporary, proposed, or final regulation is issued to the public.

Section 7805(b)(1) refers to temporary, proposed and final regulations. According to the IRS and Treasury's traditional view, the defining characteristic of temporary regulations is that this category of regulations is intended to be immediately effective when issued even though, at the time of issuance, the regulations have not gone through the notice-and-comment procedures prescribed by section 553 of the Administrative Procedure Act ("APA").[70]

Under section 7805(b)(1)(A), before considering the effect of section 7805(b)(2), the temporary regulations could not be made applicable to any taxable period ending before the temporary regulations were filed with the Federal Register, namely, June 14, 2019. Thus, the temporary regulations could not be made applicable to 2018 calendar taxable years. Similarly, under section 7805(b)(1)(B), any final regulation that might subsequently be issued under section 245A could not be made applicable to any taxable year ending before the date on which the temporary regulations were filed with the Federal Register, namely, June 14, 2019. Thus, under section 7805(b)(1), the IRS and Treasury could not achieve the degree of retroactivity they desire for the temporary regulations.

---

[70] *See, e.g.*, Defendants' Opposition to Plaintiffs' Motion for Summary Judgment at 24, *Chamber of Commerce v. Internal Revenue Service*, No. 1:16-cv-00944-LY (W.D. Tex. Sept. 29, 2017), 2017 U.S. Dist. LEXIS 175245 ("Treasury's previous rulemaking practice, the legislative history, and the text of the statute clearly indicate that Congress intended § 7805 to control the procedures for temporary regulations."). *See generally* 5 U.S.C. § 553.

Ivins, Phillips & Barker, Chartered                                                              Page 24
September 16, 2019

Against this background, section 7805(b)(2) provides :

> Paragraph (1) shall not apply to regulations filed or issued within 18 months of the date
> of the enactment of the statutory provision to which the regulation relates.

Thus, section 7805(b)(2), when it applies, eliminates the restrictions on the retroactive application of
regulations that are imposed by section 7805(b)(1).[71]

In order for the 18-month retroactivity rule in section 7805(b)(2) to apply , the regulations to which this
rule might be applied must be valid. If the regulations are invalid for reasons having nothing to do with
retroactivity, the 18-month retroactivity rule in section 7805(b)(2) cannot have any application..

Therefore , it is necessary to examine whether if the temporary regulations are procedurally invalid.

<u>B. Background on APA Notice-and-Comment Requirements for Rulemaking.</u>

The principal procedural requirements that may be applicable to the issuance of regulations by federal
agencies are the notice-and-comment rulemaking requirements that are set forth in section 553 of the
APA. These notice-and-comment rulemaking requirements, when they are applicable, provide that
before a federal agency can issue regulations that are legally binding, the agency must follow a series of
steps:

1.  First, the agency must publish in the Federal Register a notice of proposed rulemaking
    that sets forth either the terms of the proposed rulemaking or a description of the
    subjects and issues involved.

2.  Next, the agency must give interested persons the opportunity to participate in the
    rulemaking process through the submission of comments regarding the proposed
    regulations.

3.  Finally, the agency must give "consideration" to the comments submitted in deciding on
    the terms of the final regulations.

4.  Although section 553(c) requires only that the agency include in the final regulations a
    "concise general statement of basis and purpose," this requirement has been expanded
    by the application of the arbitrary and capricious standard in section 706(2)(A) to
    require that the agency provide an explanation of its reasoning in deciding on the final
    rules that is sufficient to make it possible for a reviewing court to be satisfied that the
    agency has engaged in "reasoned decision-making."

Section 553 sets forth several exceptions as to when following the notice-and-comment procedures is
not required, and the IRS and Treasury have traditionally claimed that there is a special exception for

---

[71] There is an issue, which will be discussed below, as to whether this provision in section 7805(b)(2) applies to
temporary regulations, or whether this provision instead applies only to fully final regulations, but not to
temporary regulations. For the moment, however, the discussion will proceed based on the assumption that this
provision in section 7805(b)(2) could potentially apply to temporary regulations.

Ivins, Phillips & Barker, Chartered                                         Page 25
September 16, 2019

temporary tax regulations. The foregoing notice-and-comment requirements apply only to what section 553 refers to as "substantive" regulations, a category that is often also referred to as "legislative" regulations. Section 553 also provides that the notice-and-comment rulemaking requirements do not apply to "interpretative" regulations.

Section 553 provides an exception to the notice-and-comment procedures where the agency determines there is "good cause" that justifies issuing legally binding legislative regulations without going through pre-promulgation notice-and-comment ( the "good cause" exception).

Finally, in the case of temporary tax regulations, the IRS and Treasury have traditionally asserted there is a special exception to the normal requirement of pre-promulgation notice-and-comment that is created by the special rules relating to temporary tax regulations in section 7805(e).[72]

> C. Steps in the Analysis that Follows.

The analysis that follows will proceed in the following steps:

1.  First, we will examine whether the temporary regulations satisfy the requirements for the "good cause" exception. Based on the preamble to the temporary regulations, this is the exception that the IRS and Treasury are explicitly relying upon.

2.  Based on our conclusion that the temporary regulations do not satisfy the requirements for the application of the "good cause" exception, we will next consider what legal consequences flow from this conclusion, assuming that the IRS and Treasury will go through post-promulgation notice-and-comment *after* the temporary regulations are issued.

3.  Finally, we will consider whether, even if the temporary regulations had satisfied the "good cause" exception, the temporary regulations come within the 18-month retroactivity rule in section 7805(b)(2).

**II. Pre-Promulgation Notice-and-Comment.**

> A. Preliminary Points on Certain Issues These Comments Will Not Address.

Since the preamble to the temporary regulations includes a "good cause" statement, this suggests that the IRS and Treasury are not contending that the temporary regulations are exempt from pre-promulgation notice-and-comment by reason of qualifying as "interpretative" regulations. Accordingly, these comments will not address the issue of whether the temporary regulations under section 245A should be considered interpretative regulations for purposes of the APA notice-and-comment requirements but will instead assume that the regulations are properly considered legislative regulations.

---

[72] *See, e.g.*, Defendants' Opposition to Plaintiffs' Motion for Summary Judgment at 24, *Chamber of Commerce v. Internal Revenue Service*, No. 1:16-cv-00944-LY (W.D. Tex. Sept. 29, 2017), 2017 U.S. Dist. LEXIS 175245.

Ivins, Phillips & Barker, Chartered                                                                    Page 26
September 16, 2019

As noted earlier, the IRS and Treasury have traditionally asserted that there is a special exception from the notice-and-comment requirements for temporary tax regulations. However, since the preamble to the temporary regulations includes a "good cause" statement, this suggests that the IRS and Treasury are not contending that the temporary regulations are exempt from pre-promulgation notice-and-comment by reason of the supposed special exemption from pre-promulgation notice-and-comment for temporary tax regulations that the IRS and Treasury have traditionally claimed. Accordingly, these comments will not address the merits of the claim the IRS and Treasury have traditionally made that temporary tax regulations enjoy a special exemption from the notice-and-comment requirements.

### B. The Temporary Regulations Fail to Satisfy the "Good Cause" Exception in Section 553 of the APA.

#### 1. Several of the generalizations in the good cause statement are inaccurate.

The preamble to the temporary regulations includes a lengthy discussion of why the IRS and Treasury believe these temporary regulations satisfy the "good cause" exception. This portion of the preamble cites no case law in support of the generalized statements it makes about the scope of the "good cause" exception.[73]

The preamble to the temporary regulations fails to acknowledge that courts have consistently held that the "good cause" exception should be narrowly construed. Otherwise federal agencies could easily avoid following the notice-and-comment requirements for rulemaking by invoking the "good cause" exception in circumstances when it was simply more convenient for the agency.[74]

Generally, courts have held that the "good cause" exception applies only in the case of emergency situations involving issues of public safety or public health. A need for immediate guidance on an issue for any other reason does not justify application of the "good cause" exception.[75]

---

[73] For commentary on the good cause exception, *see, e.g.*, Juan J. Lavilla, *The Good Cause Exemption to Notice and Comment Rulemaking Requirements under the Administrative Procedure Act*, 3 *Admin. L. J.* 317 (1989); Kristin E. Hickman and Mark Thomson, *Open Minds and Harmless Errors: Judicial Review of Postpromulgation Notice and Comment*, 101 *Cornell L. Rev.* 261 (2016).

[74] *See, e.g.*, *Mack Trucks, Inc. v. EPA*, 682 F.3d 87, 93 (2012) ("We have repeatedly made clear that the good cause exception 'is to be narrowly construed and only reluctantly countenanced.'") (citing cases).

[75] *See, e.g.*, *Jifry v. FAA*, 370 F.3d 1174, 1179 (D.C. Cir. 2004) ("The exception excuses notice and comment in emergency situations, or where delay could result in serious harm.") (citations omitted) (holding the good cause exception was satisfied in the case of regulations issued without notice and comment after the terrorist attacks of September 11, 2001, that permitted immediate revocation of pilot's licenses in the case of individuals believed to pose a security threat); *Hawaii Helicopter Operators Assoc. v. FAA*, 51 F.3d 212 (9th Cir. 1995) (good cause exception was satisfied in the case of regulations imposing restrictions on helicopter flights in response to a series of seven helicopter crashes in a period of nine months involving four fatalities); *Am. Fed'n of Gov't Emps. v. Block*, 655 F. 2d 1153, 1156 (D.C. Cir. 1981) ("[U]se of these exceptions by administrative agencies should be limited to emergency situations."); *Sharon Steel Corp. v. EPA*, 597 F.2d 377, 379 (3d Cir. 1979) ("[T]he APA's exception for good cause is to be narrowly construed."); *United States Steel Corp. v. EPA*, 649 F. 2d 572 (8th Cir. 1981) (agreeing

---

Ivins, Phillips & Barker, Chartered                                                                   Page 27
September 16, 2019

The good cause statement in the preamble begins with a series of generalizations about the types of circumstances in which the "good cause" exception would be applicable. Several of these generalizations are not supported by the relevant case law.

The first of these generalizations is:

> Among the circumstances in which the good cause exception may be invoked for impracticability or to serve the public interest are situations where the timing and disclosure requirements of the usual procedures would defeat the purpose of the proposal, including if announcement of a proposed rule would enable or increase the sort of financial manipulation the rule sought to prevent.[76]

The lack of citations to applicable case law makes it difficult to determine what precedent the IRS and Treasury are relying on for particular points. However, in the case of this generalization, it appears that the IRS and Treasury are relying on cases dealing with situations involving regulations relating to price controls during the oil crisis of the early 1970s, where good cause was found to exist because the use of pre-promulgation notice-and-comment would have permitted affected parties to avoid the intended effect of the rules by acting in contravention or anticipation of the rules during the notice-and-comment period.[77] These cases are not applicable to the temporary regulations , both because the period for taking the types of actions against which the temporary regulations are directed had ended before the temporary regulations were issued and because, in any event, the IRS and Treasury could have achieved the same deterrent effect by issuing proposed regulations that would have been applicable to any transactions occurring after the date of issuance of the proposed regulations.

---

with a number of other circuits that the EPA had not satisfied the requirements for application of the good cause exception).

[76] 84 Fed. Reg. at 28405.

[77] *See, e.g.*, *Mobil Oil Corp. v. Dep't. of Energy*, 728 F. 2d 1477, 1492 (Temporary Emergency Court of Appeals 1983) ("On a number of occasions . . . this court has held that, in special circumstances, good cause can exist when the very announcement of a proposed rule itself can be expected to precipitate activity by affected parties that would harm the public welfare. . . . If the exception is not to become an all purpose escape-clause . . . the anticipated response must involve a significant threat of serious damage to important public interests."); *Nader v. Sawhill*, 514 F. 2d 1064, 1068, 1069 (Temporary Emergency Court of Appeals 1975) (Holding good cause requirements satisfied based on the agency's determination that "the announcement of a price increase at a future date could have resulted in producers withholding crude oil from the market until such time as they could take advantage of the price increase," but noting that "we stress categorically that our resolution of the procedural issues herein is founded upon the unique circumstances in which *this* price increase was formulated. Assuming less calamitous circumstances, we fully expect that any future decisions will take the utmost advantage of full and open public comment.").

The next generalization states:

> Good cause may also apply where a delayed effective date would have a significant deleterious effect upon the parties to which the regulation applies.[78]

In this generalization, the IRS and Treasury may be referring to the situations involving an immediate threat to public health or public safety that represent the principal type of case where the good cause exception applies. The temporary regulations clearly do not involve this type of situation.

The next generalization is:

> Additionally, the good cause exception may apply when the regulations are by their nature short term and there is an opportunity to comment before final rules are introduced.[79]

We are not aware of any case law that supports this generalization. Instead, courts have repeatedly rejected this argument on the grounds that this approach would create an exception that would swallow the rule requiring pre-promulgation notice-and-comment before the issuance of legally binding legislative regulations.[80]

The next generalization is:

> Finally, good cause is supported where regulations are required to be issued and effective by a certain statutory deadline, and in light of the circumstances affecting the agency and its functions leading up to that statutory deadline, the agency is unable during that timeframe to conduct a timely and fulsome notice-and-comment process.[81]

The foregoing generalization is clearly not supported by the case law. Instead, the general principle that is applied by the case law relating to statutory deadlines is that the existence of such statutory deadlines for agency action *does not represent good cause* for failing to engage in pre-promulgation notice-and-comment.[82] Accordingly,  this generalization in the preamble is directly contrary to the case law.

---

[78] 84 Fed. Reg. at 28405.

[79] *Id.*

[80] *See, e.g., Tennessee Gas Pipeline Co. v. FERC*, 969 F. 2d 1141, 1145 (D.C. Cir. 1992) ("[O]ur cases instruct that the limited nature of the rule cannot in itself justify a failure to follow notice and comment procedures.'  Were the opposite true, agencies could issue interim rules of limited effect for any plausible reason, irrespective of the degree of urgency. Should this be allowed, the good cause exception would soon swallow the notice and comment rule.") (citations omitted).

[81] 84 Fed. Reg. at 28405.

[82] *See, e.g., United States Steel Corp. v. EPA*, 649 F. 2d 572, 575 (8th Cir. 1981) ("[T]he mere existence of deadlines for agency action, whether set by statute or court order, does not in itself constitute good cause for a § 553(b)(B) exception. The deadline is a factor to be considered, but the agency must still show the impracticability of affording notice and comment.") (quoting *United States Steel Corp. v. EPA*, 595 F. 2d 207, 213 (5th Cir. 1979); *W. Oil & Gas v. EPA*, 633 F. 2d 803, 812 (9th Cir. 1980) ("The EPA has argued before this Court for a blanket exemption

Ivins, Phillips & Barker, Chartered                                                    Page 29
September 16, 2019

Moreover, as discussed below, the 18-month rule in section 7805(b)(2) does not in any event represent the type of statutory deadline that was relied on by agencies in these cases.

>    2. The good cause statement's application of these generalizations to the
>    temporary regulations does not satisfy the requirements for application of the
>    good cause exception.

The preamble's application of these generalizations to the good cause exception states:

>    First, good cause exists with respect to these temporary regulations because any period
>    for notice and comment, as well as a delayed effective date, would provide taxpayers
>    with the opportunity to engage in the transactions to which these rules relate with
>    confidence that they achieve the intended tax avoidance results absent the applicability
>    of the regulations. The Treasury Department and the IRS are aware that taxpayers have
>    considered engaging in the transactions described in these temporary regulations, but
>    some may have been deterred from doing so because of uncertainty about the
>    operation and interaction of the various provisions of the Act. By limiting the deduction
>    under section 245A for these transactions, these temporary regulations remove that
>    uncertainty and – if subjected to notice-and-comment and a delayed effective date –
>    could embolden some taxpayers to engage in aggressive tax planning to take advantage
>    of the unintended interactions among the Act's provisions, with the comfort that their
>    actions were not subject to the rules of the temporary regulations during the period of
>    notice and comment and before the regulations' effective date. This concern applies
>    with respect to both the extraordinary disposition and extraordinary reduction rules for
>    an ongoing period. For the extraordinary reduction rules, both the extraordinary
>    reduction and the associated use of section 245A can occur at any time going forward,
>    and **although the gap period for entering into extraordinary dispositions has closed**,
>    the ability to utilize the section 245A deduction for earnings generated in the
>    extraordinary disposition would apply indefinitely absent these temporary regulations.
>
>    For example, a taxpayer who became aware of the tax effects achievable using the
>    transactions described in these temporary regulations could, with confidence, utilize
>    extraordinary disposition E&P or engage in an extraordinary reduction to exit the U.S.
>    taxing jurisdiction without paying any tax during a period of notice and comment and
>    delayed effectiveness. The proliferation of these types of transactions would cause the

---

for agencies operating under pressure of statutory deadlines. Such an interpretation of 'good cause' would amount to judicial legislation. The urgency of the problem to be remedied does not justify the repeal by this court of the notice and comment requirement."); *New Jersey v. EPA*, 626 F. 2d 1038, 1042 (D.C. Cir. 1980) (agreeing with the Fifth Circuit's *United States Steel* decision that "[T]he mere existence of deadlines for agency action, whether set by statute or court order, does not in itself constitute good cause for a § 553(b)(B) exception."); *Sharon Steel Corp. v. EPA*, 597 F. 2d 377, 380 (3d Cir. 1079) ("We cannot . . . accept the Administrator's protestations that the statutory schedule precluded prior notice and comment.").

> regulations to exacerbate the very financial manipulation that they are intended to
> prevent, and accordingly, this rationale supports a finding of good cause for dispensing
> with pre-promulgation notice and public comment, as well as foregoing a delayed
> effective date, for these temporary regulations pursuant to 5 U.S.C. 553(b) and (d).[83]

This passage begins by asserting that "good cause exists with respect to these temporary regulations because any period for notice and comment, as well as a delayed effective date, would provide taxpayers with the opportunity to engage in the transactions to which these rules relate with confidence that they achieve the intended tax avoidance results absent the applicability of the regulations." That blanket statement is contradicted by the bolded language.

Thus, with respect to the extraordinary disposition rule, the preamble acknowledges that because the period in which these transactions could occur has ended, the IRS and Treasury cannot base a claim for the good cause exception on the assertion that there is a need to prevent these transactions from taking place. Instead, the IRS and Treasury can claim only that there is a need to prevent taxpayers from making future distributions of earnings associated with extraordinary disposition transactions that have already occurred.

However, it was clearly not necessary to issue temporary regulations to achieve that goal. The IRS and Treasury could instead have issued proposed regulations with a date of publication effective date. Under 7805(b)(1)(B), if the IRS and Treasury had issued proposed regulations on June 14, 2019, instead of temporary regulations, they could then have made subsequent final regulations retroactive to the date of issuance of the proposed regulations.  Consequently, issuance of proposed regulations  would have achieved the desired deterrent effect.

The same reasoning should apply to the extraordinary reduction rule, since the IRS and Treasury could have achieved precisely the same deterrent effect through the use of proposed regulations followed by final regulations retroactive to the date of the proposed regulations as through the use of temporary regulations.

This ability to issue proposed regulations followed by final regulations that are retroactive to the date of the proposed regulations should foreclose any reliance by the IRS and Treasury on the good cause cases dealing with price controls that were discussed on page 27, *infra*.

The  preamble further states:

> The second reason for a finding of good cause arises from the fact that these temporary
> regulations, as applied retroactively, will affect taxable years of certain taxpayers ending
> in 2018. As a result, these regulations can apply to taxable years for which tax returns
> have been or may be due during a period of comment and delayed effectiveness.
> Deferring the effectiveness of the temporary regulations until after such a period could
> increase taxpayer compliance costs because certain taxpayers would only be able to

---

[83] 84 Fed. Reg. at 28406 (emphasis added).

come into compliance with the regulations by amending and refiling returns and paying additional taxes owed with interest.[84]

The fact that adhering to the APA's required use of pre-promulgation notice-and-comment might result in the need for taxpayers affected by the regulations to file amended returns does not remotely approach the type of emergency situations involving public health or public safety in which the good cause exception is normally held to be applicable.[85]

The discussion in the preamble continues as follows:

> Third, good cause is supported where a regulation is temporary, with public comment permitted and meaningfully considered before finalization of the temporary rule. In this regard, the temporary regulations have a fixed expiration date and are cross-referenced in a notice of proposed rulemaking published in the Proposed Rules section of this issue of the Federal Register. Comments are requested on all aspects of these rules, and specific comment requests contained in this preamble are incorporated by reference into the cross-referenced notice of proposed rulemaking. The Treasury Department and the IRS will consider all written comments properly and timely submitted when finalizing these temporary regulations.[86]

As noted earlier, the courts have rejected the argument that good cause for foregoing pre-promulgation notice-and-comment is present when the period of effectiveness of the regulations will be relatively brief.

Moreover, as will be addressed more fully below, courts have generally rejected the argument that post-promulgation notice-and-comment cures a failure to engage in pre-promulgation notice-and-comment.

The preamble's discussion of the good cause exception concludes as follows:

> Finally, these temporary regulations are part of an effort to implement the provisions of the Act, which effected sweeping and complex statutory changes to the international tax regime. In conjunction with developing and issuing these temporary regulations, the Treasury Department and the IRS have also been tasked with issuing regulations implementing the numerous provisions enacted or modified by the Act, along with attendant changes to forms and other sub-regulatory guidance and attention to the orderly administration of the U.S. tax system.
>
> Good cause exists for the issuance of temporary regulations relating to the transactions affected by these temporary regulations partially because of the statutory deadline in

---

[84] *Id.*

[85] *See* Lee A. Sheppard, *Are the Temporary Dividends Received Deduction Rules Valid?*, 164 *Tax Notes Federal* at 458.

[86] *Id.*

section 7805(b)(2), which provides (among other rules) that a regulation may be applied retroactively if it is issued within 18 months of the date of enactment of the statutory provision to which it relates. The rules in these temporary regulations relate to sections 245A, 951A, and 965, which were enacted as part of the Act on December 22, 2017. Thus, to qualify for retroactivity under section 7805(b)(2), a regulation retroactive to the enactment of these provisions must be effective no later than June 22, 2019. These temporary regulations need to apply retroactively from the date of the underlying statutory provisions to ensure that the international tax regime enacted by Congress in the Act, and its interaction with existing tax rules, functions correctly for all affected periods. Retroactivity is also required to prevent treating taxpayers comparatively advantageously if they have engaged in the types of transactions described in these temporary regulations prior to the issuance date of these temporary regulations.[87]

The attempted reliance by the IRS and Treasury on the fact that the TCJA contained numerous complex provisions requiring the issuance of guidance ignores the fact that in the case of *no other provision in the TCJA* have the IRS and Treasury issued temporary regulations.

Instead, in the case of many other provisions of the TCJA, the IRS and Treasury issued notices, relatively soon after the enactment of the TCJA, notifying taxpayers of taxpayer-adverse positions that the IRS and Treasury were planning to take in future regulations. The existence of these notices relating to other provisions of the TCJA makes it very difficult to understand why the IRS and Treasury could not have issued such a notice in the case of the issues that are addressed in the temporary regulations.

The fact that the IRS and Treasury could have issued a notice soon after the enactment of section 245A describing any circumstances they might have viewed as presenting an "emergency" undercuts the claim by the IRS and Treasury that there was an  emergency justifying foregoing pre-promulgation notice-and-comment with regard to the temporary regulations.

The fact that the temporary regulations were issued nearly 18 months after the enactment of section 245A provides strong evidence that there was no emergency to be addressed. An 18-month delay in issuing regulations is clearly inconsistent with any claim that there was an emergency situation.  Rather, this delay is  evidence that the real motivation for the IRS and Treasury using temporary regulations  was simply an attempt to take advantage of the 18-month retroactivity rule  in section 7805(b)(2).

In fact, the IRS and Treasury acknowledge this motivation by asserting that the "statutory deadline in section 7805(b)(2)" contributes to the justification for application of the good cause exception. As discussed earlier, the courts have generally rejected arguments by agencies that a statutory deadline for agency action represents good cause for foregoing pre-promulgation notice-and-comment, particularly where, as here, there was ample time for agency action, including complying with the notice-and-comment requirements, to take place.

---

[87] *Id.*

Ivins, Phillips & Barker, Chartered                                                                     Page 33
September 16, 2019

Finally, the "statutory deadline in section 7805(b)(2)" is clearly a very different type of "deadline" than those that have been successfully asserted by agencies in other cases as a basis for applying the good cause exception. In those other cases, the agencies were relying on explicit statutory requirements that the agency complete action on the regulation by a specified date. Here there is no such direct statutory mandate to the IRS and Treasury.. Instead,  there is simply a general rule stating that *if* the IRS and Treasury issue regulations relating to a new statutory provision within 18 months of the date of enactment of the provision, *then* the regulations can be made retroactive.

This 18-month rule is nothing like the *actual* statutory deadlines that other agencies have relied upon in other cases. Moreover, as discussed previously, even where there is such an actual statutory deadline, the agency normally loses when it attempts to use that statutory deadline as a basis for an assertion that there is good cause for foregoing pre-promulgation notice-and-comment, especially when there would have been ample time to follow pre-promulgation notice-and-comment procedures.

Under these circumstances, the "good cause" exception should not apply to excuse the failure to follow pre-promulgation notice-and-comment requirements. The temporary regulations have been issued in violation of these requirements.

> C. The Use of Post-Promulgation Notice-and-Comment Will Not Cure the Violation of the Notice-and-Comment Procedures by Failing to Engage in Pre-Promulgation Notice-and-Comment in the Case of the Temporary Regulations Under Section 245A.

The IRS and Treasury have stated in the preamble  that they will follow notice-and-comment procedures after the issuance of the temporary regulations. Thus, the next issue to be addressed is whether this use of post-promulgation notice-and-comment procedures would cure the violation resulting from the failure to follow the required pre-promulgation notice-and-comment rulemaking procedures before the issuance of the regulations.

While the courts fairly uniformly hold that the good cause exception is to be narrowly construed, there is somewhat less uniformity on the issue  whether post-promulgation notice-and-comment procedures can cure a violation. In most circuits, however, the case law is very strong in favor of challengers to regulations. Under these precedents, post-promulgation notice-and-comment procedures do not cure a failure to follow these procedures before the issuance of the regulations.[88]

The fact that one of the principal reasons why notice-and-comment procedures were not followed before the issuance of the temporary regulations was to take advantage of the 18-month rule in section 7805(b)(2) would unquestionably be a factor supporting the conclusion that post-promulgation notice-and-comment should not cure the failure to follow these procedures before the issuance of the

---

[88] *See, e.g., Sharon Steel Corp. v. EPA*, 597 F.2d 377, 381 (3d Cir. 1979) ("If a period for comments after issuance of a rule could cure a violation of the APA's requirements, an agency could negate at will the Congressional decision that notice and an opportunity for comment must precede promulgation. Provision of prior notice and comment allows effective participation in the rulemaking process while the decisionmaker is still receptive to information and argument. After the final rule is issued, the petitioner must come hat-in-hand and run the risk that the decisionmaker is likely to resist change."); *U.S. Steel Corp. v. EPA*, 649 F.2d 572, 575–76 (8th Cir. 1981).

Ivins, Phillips & Barker, Chartered                                      Page 34
September 16, 2019

temporary regulations, because if the IRS and Treasury had engaged in pre-promulgation notice-and-comment, they would not have been able to come within the 18-month period.

One of the considerations courts use in accepting post-promulgation notice-and-comment as curing the failure to follow these procedures before the issuance of the regulations is the harmless error rule. However, the affirmative statement in the preamble that the IRS and Treasury were attempting to come within the section 7805(b)(2) rule would be strong evidence that the error here would not be harmless, because affected taxpayers have clearly been harmed by the failure to engage in pre-promulgation notice-and-comment.

Finally, the rule in section 7805(b)(1)(C) permitting retroactivity based on the issuance of a notice "substantially describing the expected contents" of subsequent regulations would also be a consideration weighing against allowing post-promulgation notice-and-comment to cure the failure to follow these procedures before issuing the regulations. As noted earlier, in the case of other provisions enacted by the TCJA, such as section 965, the IRS and Treasury issued numerous notices relatively promptly after enactment describing particular rules that were being considered for inclusion in regulations. However, this was not done in the case of any issues relating to section 245A.[89]

Accordingly, it seems unlikely that a court would conclude that post-promulgation notice-and-comment should cure the failure to engage in notice-and-comment procedures before the temporary regulations were issued.

> **III. Even if the Requirements for Application of the Good Cause Exception were Satisfied Here, the Temporary Regulations Would Still Not Qualify for the 18-Month Rule in Section 7805(b)(2).**

Even if the temporary regulations were held to satisfy the requirements for the "good cause" exception, or, if the use of post-promulgation notice-and-comment were held to cure the failure to engage in pre-promulgation notice-and-comment, the temporary regulations would still fail to achieve the retroactive effect intended by the IRS and Treasury.

> A. Temporary Regulations Never Qualify for the 18-Month Rule in Section 7805(b)(2);
> Only Final Regulations Qualify for this Rule.

The most significant reason these temporary regulations would fail to attain the intended retroactive effect is because temporary regulations are not covered by the 18-month rule for promptly issued regulations in section 7805(b)(2). Only "final" regulations, i.e., regulations that are issued *after* notice-

---

[89] It is clear from public statements that Treasury and IRS were aware of the types of transactions addressed by the temporary regulations, and that they were considering issuing regulations under section 245A to address their concerns, as early as October 2018, more than eight months before the temporary regulations were promulgated without notice and comment. *See* Emily L. Foster, *U.S. Antiabuse Rules, Imperfect International Tax Regs Coming*, *Tax Notes Today International* (Oct. 10, 2018) ("'We believe that it is appropriate for section 245A to give territorial treatment only for CFC earnings that are not attributable to tested income appropriately taxed under the GILTI regime and not attributable to subpart F income appropriately taxed under that regime,' [Lafayette G. Harter III, Treasury Deputy Assistant Secretary for International Tax Affairs] explained.").

and-comment procedures have been completed, are covered by the 18-month rule in section 7805(b)(2).

As noted previously, section 7805(b)(1) provides as follows:

> Except as otherwise provided in this subsection, no *temporary, proposed, or final regulation* relating to the internal revenue laws shall apply to any taxable period ending before the earliest of the following dates:
>
> > (A) The date on which *such regulation* is filed with the Federal Register.
> >
> > (B) In the case of any *final regulation*, the date on which *any proposed or temporary regulation* to which such *final regulation* relates was filed with the Federal Register.
> >
> > (C) The date on which any notice substantially describing the expected contents of *any temporary, proposed, or final regulation* is issued to the public.

(Emphasis added.)

While section 7805(b)(1) repeatedly refers to regulations specifically as "any [or no] temporary, proposed, or final regulation" section 7805(b)(2) does not use these terms. Instead, section 7805(b)(2) provides:

> Paragraph (1) shall not apply to *regulations* filed or issued within 18 months of the date of the enactment of the statutory provision to which the regulation relates.

(Emphasis added.)

In contrast to the specific references to three categories of regulations in section 7805(b)(1), section 7805(b)(2) uses only the more general term "regulations." The issue of statutory interpretation that is raised by this disparity in terminology  is to determine the meaning of the term "regulations" in section 7805(b)(2) in contrast to the more specific terminology used in section 7805(b)(1).

There are three possibilities.

1.  The term "regulations" in section 7805(b)(2) means regulations in any one of the three categories specifically referred to in section 7805(b)(1), namely, temporary, proposed, and final regulations.

2.  The term "regulations" in section 7805(b)(2) refers only to the category of final regulations within the three categories referred to in section 7805(b)(1).

3.     The term "regulations" in section 7805(b)(2) encompasses both final regulations and temporary regulations, but not proposed regulations, within the three categories referred to in section 7805(b)(1).

Presumably, the IRS and Treasury are relying on the third interpretation. However, that alternative is the least likely to be the correct interpretation.

Based on the text of section 7805(b)(1) and 7805(b)(2), the most likely alternative is the first, under which the term "regulations" in section 7805(b)(2) would encompass all three categories of regulations referred to in section 7805(b)(1).If Congress had intended the term "regulations" in section 7805(b)(2) to have a narrower meaning it would have so specified.

Presumably the IRS and Treasury would not assert the first alternative as the correct interpretation because it would be inappropriate for proposed regulations, which do not have any binding force However, if the term "regulations" in section 7805(b)(2) does encompass all three categories of regulations in section 7805(b)(1), then the most natural way to limit the meaning of the term would be to make it apply only to final regulations.

Section 7805(b)(1) never groups final and temporary regulations together while excluding proposed regulations. Instead, the only time section 7805(b)(1) groups temporary regulations together with only one of the other two categories is in section 7805(b)(1)(B), where temporary regulations are grouped together with proposed regulations.

Thus, it is unlikely that the IRS and Treasury would take the position that the term "regulations" in section 7805(b)(2) encompasses not only final regulations but also temporary regulations. Instead, it is likely the reference to "regulations" in section 7805(b)(2) would be interpreted as encompassing only final regulations. Accordingly, it is unlikely that the 18-month rule in section 7805(b)(2) would apply to temporary regulations under section 245A that are issued within 18 months after the enactment of section 245A.

B. Section 7805(b)(2) Does Not Provide an Affirmative Grant of Authority to Issue Retroactive Regulations.

Sections 7805(b)(1) and 7805(b)(2) do not provide an affirmative grant of authority to issue retroactive regulations. Rather, they limit the degree to which retroactivity will be permitted. The claimed retroactivity of the temporary regulations would need to be supported by separate authority, not the mere invocation of section 7805(b)(2).

C. To the Extent the Temporary Regulations Deal with Section 954(c)(6), the 18-Month Rule in Section 7805(b)(2) is Not Satisfied.

Finally, to the extent the temporary regulations deal with section 954(c)(6), the 18-month period is obviously not satisfied because the provision was enacted in 2006.

Section 7805(b)(2) provides that a regulation may be retroactive if "filed or issued within 18 months of the date of the enactment of the statutory provision to which the regulation relates."[90]

Section 1.245A-5T(d) relates to 954(c)(6) by disallowing the exception from subpart F income under 954(c)(6) in some circumstances. The IRS and, Treasury cited section 954(c)(6)(A) as the source of its authority to issue section 1.245A-5T(d).[91]  Section 1.245A-5T(d) does not directly affect the functioning of any other statutory provision.

Section 1.245A-5T(d) does not relate to any TCJA provision within the meaning of section 7805(b)(2). The preamble does not cite section 245A(g) or any other grant of statutory authority pertaining to the TCJA provisions to support the rules under section 1.245A-5T(d). It only cites as authority section 954(c)(6)(A).

Moreover, given that a regulation must be "filed or issued within 18 months of the date of the enactment of the statutory provision to which the regulation relates," a regulation can only relate, within the meaning of section 7805(b)(2), to a single statutory provision. Section 1.245A-5T(d) relates much more closely to section 954(c)(6) than to section 245A or any other provision of the TCJA. The IRS and Treasury cannot transform this provision of the temporary regulations into a regulation that "relates" to section 245A merely by locating it within a larger set of provisions that do in fact relate to section 245A.

---

[90] Section 7805(b)(2).

[91] *See* 84 Fed. Reg. at 28400.

Ivins, Phillips & Barker, Chartered                                           Page 38
September 16, 2019

Section 1.245A-5T(d) was not issued within 18 months of the date of enactment of section 954(c)(6). Section 954(c)(6) was enacted in 2006 and most recently extended in 2015. This temporary regulation was promulgated on June 14, 2019, far outside the 18-month window permitted by section 7805(b)(2). Accordingly, any argument that section 1.245A-5T(d) qualifies for the exception under section 7805(b)(2) fails.

We appreciate the opportunity to comment on these temporary and proposed regulations and look forward to testifying at the public hearing.

                              Respectfully submitted,

                              /s/
                              Jeffrey E. Moeller

                              /s/
                              Harry L. Gutman

                              /s/
                              Patrick J. Smith

                              /s/
                              Heléna M. Klumpp

                              /s/
                              Jonathan L. Holbrook