**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 20-cv-03501-RBJ

LIBERTY GLOBAL, INC.,

      Plaintiff,

v.

UNITED STATES OF AMERICA,

      Defendant.

---

**APPENDIX: EXCERPTS OF ADMINISTRATIVE RECORD FOR
TREASURY DECISION 9865 (Issuing Treas. Reg. § 1.245A-5T)**

---

Pursuant to the Court's scheduling order of April 9, 2021 (Doc. 24 at 13-14), the parties submit an appendix containing excerpts of the administrative record with respect to Plaintiff's motion for partial summary judgment (Doc. 32). An index of the complete administrative record for this case was previously submitted by the United States (Doc. 25-2), and the parties will submit any additional items requested by the Court. With the exception of cases, statutes, and legislative history already appended to the United States' brief (Doc. 33-8), which are readily available in other formats that may be more convenient to the Court, this appendix contains those portions of the administrative record referred to in the parties' briefs that are necessary to maintain the context of those portions, or matters otherwise relied upon that the parties may refer to at oral argument.

Dated: February 19, 2022.

For the Plaintiff, Liberty Global, Inc.:

/s/ Rajiv Madan
**RAJIV MADAN**
Skadden, Arps, Slate,
  Meagher & Flom LLP
1440 New York Avenue, NW
Tel:  (202) 371-7020
Fax:  (202) 661-9020
raj.madan@skadden.com

GREGORY S. TAMKIN
Dorsey & Whitney LLP
1400 Wewatta Street, Suite 400
Denver, CO 80202-5549
tamkin.greg@dorsey.com

For the Defendant, United States:

DAVID A. HUBBERT
Deputy Assistant Attorney General

/s/ Thomas J. Sawyer
**THOMAS J. SAWYER**
JENNIFER Y. GOLDEN
U.S. Department of Justice, Tax Division
P.O. Box 683, Ben Franklin Station
Washington, D.C.  20044
Tel: (202) 514-8129 (Sawyer)
      (202) 307-6547 (Golden)
Fax: (202) 307-0054
Thomas.J.Sawyer@usdoj.gov
Jennifer.Y.Golden@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that on February 19, 2022, I served a copy of this document by filing it

with the Court's CM/ECF system, which will send an electronic copy to all counsel of record.

/s/ Rajiv Madan
**RAJIV MADAN**
Skadden, Arps, Slate,
  Meagher & Flom LLP

## CONTENTS OF EXCERPTS OF ADMINISTRATIVE RECORD

Dep't of the Treasury, *Policy Statement on the Tax Regulatory Process*, https://home.treasury.gov/system/files/131/Policy-Statement-on-the-Tax-Regulatory-Process.pdf (Mar. 5, 2019) ...................................................................................RECORD-000109-11

Treasury Decision 9865, Limitation on Deduction for Dividends Received from Certain Foreign Corporations and Amounts Eligible for Section 954 Look-Through Exception, 84 Fed. Reg. 28,398 -28,424 (June 18, 2019) (to be codified at 26 C.F.R. § 1.245A-5T) ...........................................................RECORD-000141-67

N.Y. State Bar Ass'n Tax Section, *Report on the GILTI Provisions of the Code* (May 4, 2018) .......................................RECORD-001378, 1426-36

Jared P. Cole, Cong. Rsch. Serv., R44356, *The Good Cause Exception to Notice and Comment Rulemaking:  Judicial Review of Agency Action* (2016).........................................................RECORD001712-33

Tax Cuts and Jobs Act of 2017, An Act to provide for reconciliation pursuant to titles II and V of the concurrent resolution on the budget for fiscal year 2018, Pub. L. No. 115-97, 131 Stat. 2054:

    H.R. Rep. No. 115-409 (2017).............................................RECORD-001771, 001780-86

    S. Comm. on the Budget, 115th Cong., Reconciliation Recommendations Pursuant to H. Con. Res. 71 (Comm. Print 2017) ........................................... RECORD-001849-50, 001860-75

    H.R. Conf. Rep. No. 115-466 (2017)............................ RECORD-001918-28, 001956-57

Staff of Joint Comm. on Tax'n, General Explanation of Public Law 115-97 (Comm. Print 2018) (JCS-1-18)...........................................RECORD-002014-17, ...........................................................................................002040-47, 002076-78



**DEPARTMENT OF THE TREASURY**
WASHINGTON, D.C. 20220

March 5, 2019

### POLICY STATEMENT ON THE TAX REGULATORY PROCESS

The Department of the Treasury and the Internal Revenue Service (IRS) reaffirm their commitment to a tax regulatory process that encourages public participation, fosters transparency, affords fair notice, and ensures adherence to the rule of law.  Consistent with those important regulatory principles, the Department of the Treasury and the IRS hereby clarify and affirm their commitment to sound regulatory practices.

I.      Commitment to Notice-and-Comment Rulemaking

The best practice for agency rulemaking is the notice-and-comment process established by the Administrative Procedure Act (APA).  This process allows the public to participate before any final rule becomes effective and ensures that all views are adequately considered.  It also enables the public to apprise the government of relevant information that the government may not possess or to alert the government to consequences that it may not foresee.

The APA generally requires notice and comment for legislative rules.  The APA exempts interpretive rules from notice-and-comment requirements.  Nonetheless, as a matter of sound regulatory policy, the Treasury Department and the IRS will continue to adhere to their longstanding practice of using the notice-and-comment process for interpretive tax rules published in the Code of Federal Regulations.

II.     Limited Use of Temporary Regulations

Under the APA, if an agency finds that it has "good cause" to do so, it may issue an interim final rule that becomes effective immediately without notice and comment.  The interim final rule must be promulgated with a statement of good cause explaining the basis for that finding.  The Treasury Department and the IRS have long interpreted the Internal Revenue Code, however, to permit the issuance of immediately-effective temporary tax regulations without a statement of good cause.

As a matter of sound regulatory policy, the Treasury Department and the IRS commit to include a statement of good cause when issuing any future temporary regulations under the Internal Revenue Code.  In certain exceptional circumstances, sound tax administration may require temporary regulations to be issued without notice and comment.  For example, such regulations may be necessary and appropriate to stop abusive practices or to immediately resolve an injurious inconsistency between existing regulations and a new statute or judicial decision. When sound tax administration does warrant temporary regulations, the Treasury Department and the IRS will make their reasons for issuing such immediately-effective regulations clear by including a statement of good cause in the preamble.

The Treasury Department and the IRS will also continue to adhere to other limitations in the Internal Revenue Code, which mandate that temporary regulations must expire within three

years of issuance and that proposed regulations must be issued simultaneously with any temporary regulations. These limitations ensure that, even where good cause justifies immediate action without notice and comment, any resulting final regulations will be subject to notice and comment.

III.     Proper Scope of Subregulatory Guidance Documents

In addition to formal regulations that carry the force and effect of law, sound tax administration necessitates less formal guidance to efficiently advise the public about the meaning of the tax laws. The Treasury Department and the IRS use a variety of forms of guidance to interpret and implement federal tax laws, including revenue rulings, revenue procedures, notices, and announcements.[1] Such guidance often provides taxpayers much-needed clarity and certainty concerning the legal interpretation that the IRS intends to apply, and taxpayers thus regularly request such guidance.

Subregulatory guidance is not intended to affect taxpayer rights or obligations independent from underlying statutes or regulations. Unlike statutes and regulations, subregulatory guidance does not have the force and effect of law. Taxpayers can have confidence, however, that the IRS will not take positions inconsistent with its subregulatory guidance when such guidance is in effect. In applying subregulatory guidance, the effect of subsequent legislation, court decisions, rulings, and procedures must be considered.

When proper limits are observed, subregulatory guidance can provide taxpayers the certainty required to make informed decisions about their tax obligations. Such guidance cannot and should not, however, be used to modify existing legislative rules or create new legislative rules. The Treasury Department and the IRS will adhere to these limits and will not argue that subregulatory guidance has the force and effect of law. In litigation before the U.S. Tax Court, as a matter of policy, the IRS will not seek judicial deference under *Auer v. Robbins*, 519 U.S. 452 (1997) or *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984), to interpretations set forth only in subregulatory guidance.

In deciding whether to issue regulations or subregulatory guidance, the Treasury Department and the IRS must consider the content and nature of the interpretation or position being announced. Factors to be considered include the intended effect on taxpayers' rights or duties, the need for public comments, the form and content of prior positions, the significance of the issues, the statutory framework, and whether the interpretation or position is of short-term or long-term value. After weighing relevant factors, if the intended interpretation or position would have the effect of modifying existing legislative rules or creating new legislative rules on matters not addressed in existing regulations, the interpretation or position will generally be issued through notice-and-comment rulemaking, absent exceptional circumstances. Where the Treasury Department and the IRS intend to provide only an interpretation of existing law applied to a

---

[1] For the purpose of this policy statement, "subregulatory guidance" means subregulatory guidance published in the Internal Revenue Bulletin. The following types of subregulatory guidance are published in the Internal Revenue Bulletin: revenue rulings, revenue procedures, notices, and announcements. This policy statement does not apply to regulations issued jointly with the Department of Health and Human Services and the Department of Labor under 26 U.S.C. § 9833.

2

limited set of facts, a statutorily prescribed form of relief, a statement of agency procedure or practice, a public announcement of intent to issue proposed legislative rules, or an announcement that has only immediate or short-term value, the intended interpretation or position will generally be issued as subregulatory guidance rather than through notice-and-comment rulemaking.

IV.     Limit on Notices Announcing Intent to Propose Regulations

        Prior to the issuance of certain proposed regulations, the IRS may publish a notice in the Internal Revenue Bulletin that announces the intention of the Treasury Department and the IRS to issue proposed regulations.  Such notices generally describe the scope and content of the intended proposed regulations and sometimes state that taxpayers may rely on the notice in taking tax positions on upcoming tax returns.  The notices also may invite comments and encourage a dialogue with taxpayers regarding the content of future proposed regulations before any such regulations are proposed.

        Failure to promulgate regulations previewed in notices on a timely basis can cause confusion or uncertainty for taxpayers.  To limit the uncertainty that these situations may create, the Treasury Department and the IRS will include a statement in each future notice of intent to issue proposed regulations stating that if no proposed regulations or other guidance is released within 18 months after the date the notice is published, taxpayers may continue to rely on the notice but, until additional guidance is issued, the Treasury Department and the IRS will not assert a position adverse to the taxpayer based in whole or in part on the notice.

V.      General Provision

        This policy statement is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.


        David J. Kautter                                    Brent J. McIntosh
        Assistant Secretary for Tax Policy                  General Counsel

TD 9865 RECORD-000111

**28398** Federal Register / Vol. 84, No. 117 / Tuesday, June 18, 2019 / Rules and Regulations

## DEPARTMENT OF THE TREASURY

**Internal Revenue Service**

**26 CFR Part 1**

**[TD 9865]**

**RIN 1545–BO64**

**Limitation on Deduction for Dividends Received From Certain Foreign Corporations and Amounts Eligible for Section 954 Look-Through Exception**

**AGENCY:** Internal Revenue Service (IRS), Treasury.

**ACTION:** Final temporary regulations.

**SUMMARY:** This document contains temporary regulations under section 245A of the Internal Revenue Code (the "Code") that limit the dividends received deduction available for certain dividends received from current or former controlled foreign corporations. This document also contains temporary regulations that limit the applicability of the exception to foreign personal holding company income for certain dividends received by upper-tier controlled foreign corporations from lower-tier controlled foreign corporations and temporary regulations under section 6038 to facilitate administration of certain rules in the temporary regulations. The temporary regulations affect certain U.S. persons that are domestic corporations that receive certain dividends from current or former controlled foreign corporations or are United States shareholders of upper-tier controlled foreign corporations that receive certain dividends from lower-tier controlled foreign corporations. The text of the temporary regulations also serves as the text of the proposed regulations set forth in a notice of proposed rulemaking published in the Proposed Rules section of this issue of the **Federal Register**.

**DATES:**

*Effective date:* These regulations are effective on June 18, 2019.

*Applicability dates:* For dates of applicability, see §§ 1.245A–5T(k), 1.954(c)(6)–1T(b), and 1.6038–2T(m).

**FOR FURTHER INFORMATION CONTACT:** Logan M. Kincheloe at (202) 317–6937 (not a toll-free number).

**SUPPLEMENTARY INFORMATION:**

## Background

### I. In General

This document contains amendments to 26 CFR part 1 under sections 245A, 954(c)(6), and 6038 (the "temporary regulations"). Any terms used but not defined in this preamble have the meanings given them in the temporary regulations. Added to the Code by section 14101(a) of the Tax Cuts and Jobs Act (the "Act"), section 245A generally allows a domestic corporation a 100-percent dividends received deduction (the "section 245A deduction") for the foreign-source portion of a dividend received after December 31, 2017, from a specified 10 percent-owned foreign corporation (an "SFC"). Section 954, which predates the Act and remains in effect, generally provides that a dividend received by a controlled foreign corporation (a "CFC"), as defined in section 957, is included in the CFC's foreign personal holding company income ("FPHCI"), as defined in section 954(c). Pursuant to section 954(c)(6), however, a dividend received by a CFC from a related CFC is not included in the CFC's FPHCI if certain requirements are satisfied (the "section 954(c)(6) exception").

The temporary regulations limit the availability of the section 245A deduction and the section 954(c)(6) exception in specific and narrow cases where the deduction or exception, respectively, effectively eliminates subpart F income or income subject to tax under section 951A from the U.S. tax system. Specifically, the temporary regulations address transactions that have the effect of avoiding tax under section 965, 951A, or 951 by inappropriately converting income that should have been subject to U.S. tax into nontaxed income. The temporary regulations also include rules under section 6038 to facilitate administration of certain rules in the temporary regulations. The temporary regulations do not include general rules relating to dividends eligible for the section 245A deduction; those rules will be included in separate guidance.

### II. Scope of Participation Exemption

In order to transition to the new participation exemption system provided under section 245A and certain other provisions of the Act, the Act imposed a tax on certain earnings and profits of a U.S.-owned foreign corporation that had not previously been subject to U.S. tax. *See* section 965. Section 965 was designed to ensure that previously untaxed foreign income of the foreign corporation that accrued before the advent of the participation exemption system generally is subject to U.S. tax (although at a reduced rate). This transition tax applied to the last taxable year of the foreign corporation beginning before January 1, 2018, and generally increased the subpart F income of the foreign corporation by the amount of its previously untaxed earnings as of no later than December 31, 2017.

The Act's legislative history indicates congressional concern that the new participation exemption could heighten the incentive to shift profits to low-taxed foreign jurisdictions or tax havens absent base protections. *See* Senate Committee on the Budget, 115th Cong., Reconciliation Recommendations Pursuant to H. Con. Res. 71, at 365 (Comm. Print 2017) ("Senate Explanation"). For example, without appropriate limits, domestic corporations might be incentivized to shift income to low-taxed foreign affiliates, "where the income could potentially be distributed back to the [domestic] corporation with no U.S. tax imposed." *See id.*

This risk of base erosion is acute with respect to certain types of income, such as passive or mobile income and income derived from intangible property, which historically have posed transfer pricing challenges. To prevent base erosion, the Act retained the subpart F regime (section 951 et. seq.) and enacted a new regime under section 951A for global intangible lowed-taxed income (the "GILTI regime"), both of which subject certain foreign income of a CFC to current U.S. taxation in the hands of the CFC's United States shareholders (within the meaning of section 951(b)) (each shareholder, a "U.S. shareholder"). In order to avoid double taxation when a CFC distributes earnings and profits that have been taxed on a current basis to a U.S. shareholder, the earnings and profits are designated as "previously taxed earnings and profits" (also known as "PTEP") under section 959. Section 959 generally provides that PTEP are not subject to U.S. tax when distributed to a U.S. shareholder.

The subpart F regime, which was established under the Revenue Act of 1962, Public Law 87–834, sec. 12, 76 Stat. at 1006, subjects certain income earned by a CFC to U.S. taxation in the hands of the CFC's U.S. shareholders on a current basis at the full ordinary tax rate, regardless of whether the CFC distributes the earnings attributable to such income. H.R. Rep. No. 1447 at 58 (1962). In general, the subpart F regime applies to certain passive or highly mobile income in order to address base erosion concerns. Thus, for example, section 954(c) provides that subpart F income includes FPHCI. FPHCI includes certain types of passive or mobile income that are relatively easy to situate in tax-advantaged jurisdictions, such as dividends, interest, rents, and royalties.

The GILTI regime generally subjects a CFC's U.S. shareholders to current

taxation on intangible income earned by the CFC in a manner similar to the treatment of a CFC's subpart F income. *See* section 951A; *see also* Senate Explanation at 366 (explaining that such income is often associated with profit shifting). Intangible income is determined for this purpose on an aggregate basis at the U.S. shareholder level and is based on a formulaic approach under which a "normal return" equal to 10 percent of the basis of certain tangible assets is calculated and then each dollar of income above the "normal return" is effectively treated as intangible income (regardless of whether such income is actually attributable to intangible property). *See* Senate Explanation at 366. However, for purposes of this determination, certain income of the CFC—such as income taxed under another Code provision (for example, under the rules for subpart F income in sections 951 through 964 or under section 882 in the case of income effectively connected with the conduct of a U.S. trade or business), immobile income (such as foreign oil and gas extraction income), or highly taxed income that is excluded from subpart F income by reason of the high-tax exception of section 954(b)(4)—is not taken into account. *See also id.* ("[C]ertain items of income earned by CFCs should be excluded from the GILTI, either because they should be exempt from U.S. tax—as they are generally not the type of income that is the source of base erosion concerns—or are already taxed currently by the United States"). The CFC's U.S. shareholders are subject to current U.S. tax on the CFC's income in excess of the CFC's normal return, potentially at a reduced rate through a deduction under section 250, at the corporate U.S. shareholder level. The differing treatment under the GILTI regime with respect to excess returns (taxed currently, though potentially at a reduced rate) versus normal returns (exempt from tax) generally has the effect of differentiating between income that poses base erosion concerns and income that does not pose such concerns. The GILTI regime applies in the first taxable year of a CFC beginning on or after January 1, 2018. Section 245A applies to distributions made by SFCs (which include CFCs) on or after that date.

The rules under section 959 generally treat PTEP (including PTEP that arise by reason of the subpart F regime, the GILTI regime, or the transition tax under section 965) as being distributed before non-previously taxed earnings and profits and also prevent section 245A

from applying to PTEP. *See* section 959(c) (providing ordering rules that treat PTEP as being distributed first) and section 959(d) (providing that a distribution of PTEP to a U.S shareholder is not treated as a dividend). Thus, both the interaction of the definitions of subpart F income and tested income with the ordering rules for distributions of PTEP and the overall structure of the international provisions of the Act contemplate that only residual earnings remaining after the potential application of sections 951(a), 951A, and 965 generally are eligible for the section 245A deduction. That is, section 245A(a) applies only to certain "dividends" received from foreign corporations. Therefore, sections 951(a), 951A, and 965 generally have priority over section 245A because, when they apply to a foreign corporation's earnings, distributions of those earnings do not qualify as dividends under section 959(d), and, therefore, section 245A does not apply.

The statutory text of the participation exemption system under section 245A, the GILTI regime, the subpart F regime, and the PTEP rules collectively operate as a comprehensive framework with respect to a CFC's foreign earnings after the application of the transition tax under section 965. A central feature of this regime is that income derived by CFCs is eligible for the section 245A deduction only if the earnings being distributed have not been first subject to the subpart F or GILTI regimes. The scope of the section 245A deduction (and the authority set forth in section 245A(g)) is thus informed not only by the text of section 245A in isolation, but also by the role of section 245A in the overall structure of the international provisions and its interaction with the subpart F and GILTI provisions.

Section 245A(g) provides that the Secretary shall issue such regulations as are necessary or appropriate to carry out the provisions of section 245A.

### III. Scope of Section 954(c)(6)

Section 954(c)(6) was enacted by the Tax Increase Prevention and Reconciliation Act of 2005, Public Law 109–222. In general, and subject to certain limitations, the section 954(c)(6) exception is intended to facilitate intragroup foreign-to-foreign funds flows by providing that dividends, interest, rents, and royalties received or accrued by a CFC from another related CFC are not treated as FPHCI to the extent attributable or properly allocable to income of the related person which is neither subpart F income nor income treated as effectively connected with the conduct of a trade or business in the

United States. *See* H.R. Rep. No. 109–304 at 45 (2005). Section 954(c)(6)(A) also provides that the Secretary shall prescribe such regulations as may be necessary or appropriate to carry out the provision, including regulations to prevent the abuse of the purposes of the provision. As most recently extended by the Consolidated Appropriations Act of 2016, Public Law 114–113, section 954(c)(6) applies to taxable years of foreign corporations beginning after December 31, 2005, and before January 1, 2020, and to taxable years of U.S. shareholders with or within which such taxable years of foreign corporations end.

Notice 2007–9, 2007–5 I.R.B. 401, provides guidance under section 954(c)(6). The notice describes additional guidance that the Treasury Department and the IRS intend to issue regarding the application of section 954(c)(6), including certain anti-abuse rules.

### Explanation of Provisions

#### I. Overview

The transition tax, the subpart F and GILTI regimes, and the participation exemption under section 245A together form a comprehensive and closely integrated set of tax rules with respect to the earnings of foreign corporations with requisite levels of U.S. ownership. These related provisions must be read and interpreted together in order to ensure that each provision functions as part of a coherent whole, as intended. Although the section 245A deduction is generally available for untaxed foreign-source earnings, read collectively this integrated set of statutory rules can be reasonably understood to require that the deduction not apply to earnings and profits attributable to income of a type that is properly subject to the subpart F or GILTI regimes, which address base erosion-type income. Otherwise, as explained in Part II of this Explanation of Provisions, the section 245A deduction could undermine the anti-base erosion measures that Congress intended to prevent income shifting. Accordingly, and consistent with the coherent functioning of the interlocking statutory scheme for taxation of CFC earnings, the section 245A deduction generally will not apply to distributions of earnings and profits that are attributable to subpart F income or tested income. The interpretation reflected in these rules ensures that these provisions will operate compatibly with, not contradictorily to, each other.

Section 245A is designed to operate residually, such that the section 245A

deduction generally applies to any earnings of a CFC to the extent that they are not first subject to the subpart F regime, the GILTI regime, or the exclusions provided in section 245A(c)(3) (and were not subject to section 965). That is, the text of the subpart F and GILTI rules explicitly defines the types of income to which they apply, and section 245A applies to any remaining untaxed foreign earnings. Under ordinary circumstances, this formulation works appropriately, as earnings are first subject to the subpart F or GILTI regimes before the determination of dividends to which section 245A could potentially apply. However, in certain atypical circumstances, a literal application of section 245A (read in isolation) could result in the section 245A deduction applying to earnings and profits of a CFC attributable to the types of income addressed by the subpart F or GILTI regimes—the specific types of earnings that Congress described as presenting base erosion concerns. These circumstances arise when a CFC's fiscal year results in a mismatch between the effective date for GILTI and the final measurement date under section 965 or involve unanticipated interactions between section 245A and the rules for allocating subpart F income and GILTI when there is a change in ownership of a CFC. Moreover, the Treasury Department and the IRS are aware that some taxpayers are undertaking transactions with a view to eliminating current or future taxation of all foreign earnings of a CFC, including earnings attributable to base erosion-type income, by structuring into these situations. These transactions have the potential to substantially undermine the anti-base erosion framework for post-2017 foreign earnings.

Based on the structure and history of the international provisions of the Code, including changes made by the Act, the Treasury Department and the IRS have concluded that section 245A was not intended to eliminate taxation with respect to the foreign earnings of a CFC that are attributable to income of a type that is subject to taxation under the subpart F or GILTI regimes. In these cases where the literal effect of section 245A would reverse the intended effect of the subpart F and GILTI regimes, this conflict is best resolved, and the structure of the statutory scheme is best preserved, by limiting section 245A's effect. The Treasury Department and the IRS do not believe Congress intended section 245A to defeat the purposes of subpart F and GILTI regimes in these instances. Accordingly, given the

authority in section 245A(g) directing the Secretary to issue such regulations as are necessary or appropriate to carry out the provisions of section 245A, and the authority under section 7805(a) to issue rules and regulations made necessary by reason of changes in the tax laws, the temporary regulations under section 245A are designed to ensure that the section 245A deduction operates properly within the context of a closely coordinated set of rules and, as a result, is not available to eliminate the taxation of subpart F income and tested income in these limited circumstances. However, consistent with the broad application of section 245A, the temporary regulations apply only to certain well-defined circumstances in which subpart F or tested income earned by a CFC would otherwise escape taxation to its U.S. shareholders as a result of the unanticipated interaction of section 245A and certain rules applicable to the inclusion of subpart F income and GILTI under sections 951(a) and 951A, respectively.

To prevent the avoidance of U.S. tax in these specific and narrow circumstances, the temporary regulations limit the section 245A deduction only with respect to certain dividends received by a domestic corporation in connection with specific transactions that facilitate the avoidance of taxation of subpart F income or tested income and that, in many cases, may have been entered into with a purpose of avoiding the consequences of the new international tax regime as adopted by Congress in the Act. This limited denial ensures that the section 245A deduction will continue to apply to earnings and profits that are attributable to all other classes of income to which Congress intended them to apply. The Treasury Department and the IRS emphasize, however, that when the requirements of section 245A as properly construed are satisfied, it would not be permissible under the statute for the section 245A deduction to be denied for these other classes of income—even if, for example, taxpayers choose to generate such income to avail themselves of the benefits of the deduction. The Treasury Department and the IRS furthermore do not believe it would be permissible to modify the definition of subpart F income or tested income, or to recharacterize income as subpart F income or tested income, under the authority of section 245A(g).

Similar to section 245A, the exemption from subpart F income under section 954(c)(6) can be used in the context of certain transactions to avoid taxation of income that would otherwise be taxed under the subpart F or GILTI

regimes. Such transactions are not dependent upon the availability of section 245A at the level of the United States shareholder. This type of concern was first generally described in Notice 2007–9, but has been exacerbated by the enactment of section 951A as part of the Act because (1) dividends qualifying for section 954(c)(6) generally are not treated as tested income pursuant to section 951A(c)(2)(A)(i)(IV); and (2) the same structured transactions used to avoid subpart F inclusions can also be used to avoid GILTI inclusions. Given the authority in section 954(c)(6)(A) for the Treasury Department and the IRS to issue regulations preventing the abuse of section 954(c)(6), the temporary regulations under section 954(c)(6) are designed to ensure that the section 954(c)(6) exception is not used to erode the U.S. tax base through certain transactions preventing the taxation of income that would otherwise be taxed under the subpart F or GILTI regimes. Consistent with the temporary regulations issued under section 245A, these rules are targeted to ensure that the section 954(c)(6) exception is not available for this limited category of earnings.

## II. Limitation of Amounts Eligible for Section 245A Deduction

### A. Scope

In the case of a dividend received by a domestic corporation from an SFC, the temporary regulations limit the amount of the section 245A deduction to the portion of a dividend not constituting an "ineligible amount." *See* § 1.245A–5T(b). In general, the ineligible amount is the sum of (i) 50 percent of the portion of a dividend attributable to certain earnings and profits resulting from transactions between related parties during a period after the measurement date under section 965(a)(2) and in which the SFC was a CFC but during which section 951A did not apply to it (referred to as the "extraordinary disposition amount") and (ii) the portion of a dividend attributable to certain earnings and profits generated during any taxable year ending after December 31, 2017, in which the domestic corporation reduces its ownership of the CFC (referred to as the "extraordinary reduction amount").

### B. Extraordinary Disposition Amount

Under the Act, there may be a gap between when section 951A first applies to the U.S. shareholders of a CFC (as of its first taxable year beginning after December 31, 2017) and the last date on which the earnings and profits of the CFC are measured for purposes of

section 965, which, under section 965(a), is December 31, 2017 (such period, the "disqualified period"). For example, a fiscal year CFC with a taxable year ending November 30 would have a disqualified period from January 1, 2018, the day after its final E&P measurement date under section 965, to November 30, 2018, the last date before section 951A applies with respect to its income. The Treasury Department and the IRS are aware that during the disqualified period, CFCs may have engaged in certain transactions with related parties with a goal of creating stepped-up basis for the buyer, while generating earnings and profits for the seller CFC that are not subject to any current tax and may be eligible for the section 245A deduction. Because the transactions generally are structured to avoid creating subpart F income and occur during the disqualified period, the income from these transactions generally is not subject to U.S. tax under the transition tax under section 965, the subpart F regime, or the GILTI regime. Such earnings and profits could, for example, reduce taxable gain that would otherwise be recognized on the subsequent disposition of stock of the CFC, thus potentially allowing the CFC and its future earnings to be removed from the U.S. tax system without the imposition of any U.S. tax.

The Treasury Department and the IRS have determined that it would be inconsistent with the closely interdependent set of international tax rules implemented by the Act, specifically the transition tax, the GILTI regime, and the participation exemption, for the earnings and profits resulting from these transactions to be eligible for a section 245A deduction even if the other requirements of section 245A are otherwise satisfied. Thus, the temporary regulations limit the amount of the section 245A deduction allowed to a section 245A shareholder (as defined in § 1.245A–5T(i)(21)) with respect to a dividend received from an SFC. Specifically, the deduction is limited to 50 percent of the extraordinary disposition amount, which is the portion of a dividend received by a section 245A shareholder from an SFC that is paid out of the section 245A shareholder's "extraordinary disposition account." *See* § 1.245A–5T(b)(2) and (c)(1). In general, this account represents the shareholder's pro rata share of the SFC's "extraordinary disposition E&P," reduced by the section 245A shareholder's prior extraordinary disposition amounts, if any. *See* § 1.245A–5T(c)[(3)(i)(C)(1)).

Extraordinary disposition E&P is an amount equal to the earnings of an SFC arising from gain recognized by reason of one or more "extraordinary dispositions." *See* § 1.245A–5T(c)(3)(i)(C).

The section 245A deduction is limited to 50 percent of the extraordinary disposition amount to reflect the fact that taxpayers generally would have been eligible for a deduction under either (i) section 250(a)(1)(B) had section 951A applied to the SFC during the disqualified period or (ii) section 965(c) had the net gain been subject to the transition tax under section 965.

For a disposition by an SFC to be an extraordinary disposition, the disposition must (i) be of specified property (defined in § 1.245A–5T(c)(3)(iv) as any property other than property that produces gross income described in section 951A(c)(2)(A)(i)(I) through (V)), (ii) occur during the SFC's disqualified period (as defined in § 1.245A–5T(c)(3)(iii)) and when the SFC was a CFC, (iii) be outside of the ordinary course of the SFC's activities, and (iv) be to a related party. *See* § 1.245A–5T(c)(3)(ii). For these purposes, a disposition by an SFC includes certain indirect dispositions by the SFC through a partnership or other pass-through entities (including through ownership structures involving tiered pass-through entities). *See id.*

In addition, pursuant to an exception intended to limit compliance and administrative burdens, no dispositions by an SFC are considered to be an extraordinary disposition if they do not exceed a threshold of the lesser of $50 million or 5 percent of the gross value of the SFC's property. *See* § 1.245A–5T(c)(3)(ii)(E).

The temporary regulations provide a facts-and-circumstances rule for determining whether a disposition occurs outside of the ordinary course of an SFC's activities. The temporary regulations also provide a per se rule that a disposition is treated as outside of the ordinary course of an SFC's activities if the disposition is undertaken with a principal purpose of generating earnings and profits during the disqualified period or if the disposition is of intangible property, within the meaning of section 367(d)(4). *See id.* The temporary regulations include this latter rule because the disposition of intangible property is not an ordinary course transaction (relative to, for example, a routine sale of raw materials from one SFC to another for manufacturing); moreover, during the disqualified period taxpayers may have had a particularly strong incentive to dispose of intangible property (which

often has low basis) to generate significant amounts of earnings and profits to the seller (without being subject to current tax) that may be eligible for the section 245A deduction.

As described, the Treasury Department and the IRS have determined that the extraordinary disposition rules should not apply to all earnings and profits generated by a CFC during the disqualified period. Rather, the temporary regulations focus on a narrowly and objectively defined class of earnings and profits in circumstances that are inconsistent with the international tax regime adopted by the Act. The Treasury Department and the IRS request comments on whether there should be any further refining of these rules.

The temporary regulations provide shareholder account rules to ensure that a section 245A shareholder's extraordinary disposition account is properly tracked and reduced in appropriate cases (for example, for prior extraordinary disposition amounts). *See* § 1.245A–5T(c)(3)(i). These shareholder account rules also contain successor rules for a section 245A shareholder that acquires stock of an SFC from another section 245A shareholder with respect to which there is an extraordinary disposition account and for certain section 381 transactions and distributions involving section 355 (or so much as section 356 as relates to section 355). *See* § 1.245A–5T(c)(4).

To address cases in which the section 245A deduction might be available for an SFC held through a pass-through entity or foreign corporation, the temporary regulations provide that a section 245A shareholder is treated as owning a pro rata share of stock of an SFC that is owned by a partnership, trust, or estate (domestic or foreign), or a foreign corporation in which the section 245A shareholder owns an interest or stock, as applicable. *See* § 1.245A–5T(g)(3)(i) (providing rules for stock ownership and transfers).

The Treasury Department and the IRS request comments as to how the extraordinary disposition account rules should apply in circumstances in which an SFC is transferred to a partnership, including the extent to which principles similar to section 704(c)(1)(B) apply to prevent the use of partnerships to circumvent the purposes of the temporary regulations, such as where an SFC is subsequently transferred to a non-contributing partner. As a general matter, the Treasury Department and the IRS believe that § 1.701–2(b), as well as the judicial doctrines of economic substance, substance over form, and step transaction, prevent taxpayers from

forming or availing of partnerships with a principal purpose of avoiding the application of these rules. The treatment of partnerships under section 245A will be addressed in separate guidance; and it is anticipated that this guidance will provide rules ensuring that partnerships may not be formed or availed of to avoid the purposes of the temporary regulations.

The Treasury Department and the IRS further request comments on the treatment of consolidated groups under the temporary regulations, including for purposes of maintaining extraordinary disposition accounts. The Treasury Department and the IRS believe that consolidated groups generally should be treated in the same manner as a single taxpayer for the purposes of § 1.245A–5T(c). Subject to any comments received, it is expected that future rules will provide that consolidated groups generally should not be advantaged or disadvantaged as a result of owning directly or indirectly stock of an SFC through multiple members relative to a standalone corporation owning the same stock.

The Treasury Department and the IRS also request comments on whether and how the rules applicable to disqualified basis in proposed § 1.951A–2(c)(5) should be coordinated with § 1.245A–5T(c). In this regard, proposed § 1.951A–2(c)(5) provides rules for the allocation and apportionment of deductions and losses attributable to disqualified basis, which is asset basis created in certain disqualified transfers during the disqualified period. These deductions and losses are allocated and apportioned solely to gross income that is not tested income, subpart F income, or effectively connected income (defined as "residual CFC gross income"), thereby ensuring that such "costless" tax basis does not inappropriately reduce future tax liability. Thus, the Treasury Department and the IRS are considering the extent to which it would be appropriate to coordinate the two sets of rules, taking into account the ability of the IRS to administer and taxpayers to comply with such rules, and request comments on this issue.

*C. Extraordinary Reduction Amount*

The Treasury Department and the IRS are aware that certain transactions in which a section 245A shareholder of a CFC transfers stock of the CFC, or certain transactions in which the shareholder's ownership of the CFC is diluted, could give rise to results that would be inconsistent with the integrated structure of the U.S. tax system for the taxation of CFC earnings,

including section 245A, the subpart F regime, and the GILTI regime. In these cases, absent proper limitation, the section 245A deduction might be allowed inappropriately with respect to a CFC's current year income that, but for the ownership changes, would have been subject to tax under the subpart F or GILTI regimes. Unlike the transactions described in Part II.B of this Explanation of Provisions, the transactions giving rise to these results can occur in any taxable year ending after the Act (and particularly section 245A) is in effect.

These results could arise, for example, as a consequence of the application of section 951(a)(2)(B). Section 951(a)(2)(B), a longstanding provision in the subpart F regime, prevents double taxation of the same earnings by reducing a U.S. shareholder's pro rata share of subpart F income (or, following the Act, tested income as defined in section 951A(c)(2)(A)) of a CFC by dividends received by another person with respect to the same share of stock. However, if section 245A were to apply without limitation to dividends from a CFC that reduce another U.S. shareholder's pro rata share of subpart F income or tested income of the CFC under section 951(a)(2)(B), earnings that would otherwise be subject to the subpart F or GILTI regimes would escape U.S. taxation to the extent of the reduction. For example, in the case of a transfer of CFC stock from one section 245A shareholder (the transferor) to another section 245A shareholder (the transferee), a dividend (including by reason of section 1248) from the CFC to the transferor during the tax year of the transfer might both (i) be excluded from the transferor's income by reason of the section 245A deduction and (ii) reduce the transferee's pro rata share of subpart F income or tested income of the CFC by reason of section 951(a)(2)(B). The Treasury Department and the IRS have determined that it would be inconsistent with the residual definition of section 245A eligible earnings and the interaction of section 245A and the subpart F and GILTI regimes, which form an integrated set of rules to tax post-2017 foreign earnings, to allow a section 245A deduction for a dividend paid out of earnings and profits attributable to subpart F income or tested income where such dividends, by operation of section 951(a)(2)(B), and could result in double non-taxation of such income. Such a result would also be contrary to the legislative intent underlying the interaction of these provisions. *See* Senate Explanation at 365 (noting, in the absence of rules such

as the new GILTI regime, the incentive to shift income to low-taxed foreign affiliates, "where the income could potentially be distributed back to the [domestic] corporation with no U.S. tax imposed.").

Similar results can arise in other cases where the stock of a CFC is transferred during a CFC's tax year by a U.S. shareholder to a foreign person where, after the transfer, the CFC remains a CFC but has no U.S. shareholder that owns (within the meaning of section 958(a)) stock of the CFC. Before the Act, section 958(b)(4) prevented certain attribution of stock under section 318 from a foreign person to a U.S. person. However, the Act repealed section 958(b)(4) such that a foreign corporation may be treated as a CFC despite having no direct or indirect U.S. shareholder that owns (within the meaning of section 958(a)) stock of the CFC and that accordingly can recognize an income inclusion under section 951 or 951A. In general, a U.S. shareholder that owns stock in a CFC on the last day within the foreign corporation's year that it is a CFC is taxable on its pro rata share of the CFC's subpart F income or tested income for purposes of the GILTI regime. However, by reason of the Act's repeal of section 958(b)(4), a U.S. shareholder may transfer a CFC to a person that will not be taxed with respect to an inclusion under the subpart F or GILTI regimes without itself being subject to such an inclusion. Absent any specific limitation in these circumstances, any earnings and profits of the CFC distributed as a dividend (including by reason of section 1248) to the transferor U.S. shareholder during the CFC's taxable year might be eligible for the section 245A deduction. However, had the transfer not occurred (or had the CFC ceased to be a CFC as a result of the transfer), the earnings and profits may have been subject to tax under the subpart F or GILTI regimes and, therefore, would not have been eligible for the section 245A deduction.

In the circumstances described in this section, a broad application of section 245A would present taxpayers with a planning opportunity to completely avoid the application of the subpart F and GILTI regimes on an annual basis. The Treasury Department and the IRS have determined that this result would undermine the integrated provisions constituting the Act's framework for taxing post-2017 CFC earnings and would contravene legislative intent. To address this concern, the temporary regulations limit the amount of the section 245A deduction allowed to a "controlling section 245A shareholder" with respect to a dividend from a CFC

to the portion of the dividend that is paid out of earnings other than the "extraordinary reduction amount." *See* § 1.245A–5T(b)(1) and (e). A controlling section 245A shareholder of a CFC is a section 245A shareholder of the CFC that, taking into account ownership of the CFC by certain other persons (such as related persons), owns more than 50 percent of the stock of the CFC. *See* § 1.245A–5T(i)(2). For purposes of applying these rules, a controlling section 245A shareholder also includes any other shareholder who would not otherwise be a controlling section 245A shareholder but acts in concert with the controlling section 245A shareholder. This includes shareholders that sell their shares of the same CFC to the same buyer or buyers (or a related party with respect to the buyer or buyers) as part of the same plan as the controlling section 245A shareholder's extraordinary reduction.

Under the temporary regulations, for an extraordinary reduction amount to exist with respect to a controlling section 245A shareholder of a CFC, an "extraordinary reduction" must occur during the CFC's taxable year with respect to the shareholder's ownership of the CFC. *See* § 1.245A–5T(e). An extraordinary reduction generally occurs when either (i) the controlling section 245A shareholder transfers more than 10 percent of its stock of the CFC (for example, an extraordinary reduction occurs if the shareholder owns 90 percent of the stock of the CFC and it transfers stock representing more than nine percent of the stock of the CFC) or (ii) there is a greater than ten percent change in the controlling section 245A shareholder's overall ownership of the CFC (for example, if the shareholder owns 90 percent of the stock of the CFC and, as a result of an issuance to a foreign person, the shareholder's ownership of the CFC is reduced such that it no longer owns at least 81 percent of the stock of the CFC). *See* § 1.245A–5T(e)(2)(i)(A). The temporary regulations include the first prong because if, for example, a section 245A shareholder of a CFC were to transfer shares of stock of the CFC to another section 245A shareholder of the CFC and the other shareholder were to transfer an equal number of similar shares to the first shareholder, neither of the shareholders' overall ownership of the CFC would change, but the amount taken into account by each of the shareholders by reason of section 951(a)(2)(B) might be reduced as a result of dividends paid with respect to shares transferred by the other.

An extraordinary reduction amount is earnings and profits representing the amount of dividends paid by the corporation that are attributable to subpart F income or tested income with respect to a CFC, to the extent such subpart F income or tested income (i) would have been taken into account by the controlling section 245A shareholder under section 951 or 951A had the extraordinary reduction not occurred and (ii) is not taken into account by a domestic corporation or a citizen or resident of the United States (that is, a person described in section 7701(a)(30)(A) or (C)). *See* § 1.245A–5T(e)(1) and (2).

The limitation of the section 245A deduction in the case of an extraordinary reduction will generally result in a dividend being included in the income of the controlling section 245A shareholder and not offset by a section 245A deduction. In cases where the CFC has tested income during its taxable year that would have been subject to the GILTI regime but for the extraordinary reduction, a controlling section 245A shareholder might prefer to have an income inclusion under section 951A, potentially benefitting from the deduction available under section 250. Therefore, the temporary regulations provide an election under which a controlling section 245A shareholder is not required to reduce its section 245A deduction if it elects (and, in some cases, certain other United States persons also agree) to close the CFC's taxable year for all purposes of the Code on the date of the extraordinary reduction. *See* § 1.245A–5T(e)(3)(i). The closing of the taxable year of the CFC results in all U.S. shareholders that own (within the meaning of section 958(a)) stock of the CFC on such date taking into account their pro rata share of subpart F income or tested income earned by the CFC as of that date.

In addition, pursuant to an exception intended to limit compliance and administrative burdens, for a taxable year in which an extraordinary reduction occurs, no amount is considered an extraordinary reduction amount if the sum of the CFC's subpart F income and tested income for the taxable year does not exceed the lesser of $50 million or 5 percent of the CFC's total income for the year. *See* § 1.245A–5T(e)(3)(ii).

### D. Coordination Rules

To address cases in which a dividend could qualify as either a hybrid dividend under the rules of section 245A(e) or an ineligible amount under the temporary regulations, the temporary regulations provide a coordination rule pursuant to which a dividend is first subject to the hybrid dividend rules of section 245A(e) and then, to the extent not a hybrid dividend, is subject to the temporary regulations. *See* § 1.245A–5T(g)(3)(iv). In future guidance relating to proposed regulations under section 245A(e) and certain other sections (83 FR 67612), the Treasury Department and the IRS anticipate modifying those regulations to reflect this coordination rule.

In addition, to address cases in which a dividend might be either an extraordinary disposition amount under § 1.245A–5T(c) or an extraordinary reduction amount under § 1.245A–5T(e), the temporary regulations provide a coordination rule pursuant to which a dividend is first subject to the rules of § 1.245A–5T(e) and then, to the extent not an extraordinary reduction amount, is subject to the rules of § 1.245A–5T(c). *See* § 1.245A–5T(g)(5). Because of this ordering rule, the extraordinary disposition amount with respect to a dividend will not exceed the amount by which the dividend exceeds the extraordinary reduction amount with respect to the dividend.

### E. Transactions Described in Section 964(e)(4)

The rules in these temporary regulations for determining eligibility for the section 245A deduction also apply to deemed dividends arising by reason of section 964(e)(4), which the Act added to the Code. Section 964(e)(4) provides in certain cases that a sale by a CFC of stock of another foreign corporation is treated as a dividend from the target foreign corporation to the selling CFC that is, in turn, treated as subpart F income of the selling CFC and included in the gross income of the U.S. shareholders of the selling CFC. Pursuant to section 964(e)(4)(A)(iii), the section 245A deduction is allowed to any U.S. shareholder with respect to such subpart F income included in gross income in the same manner as if such subpart F income were a dividend received by the shareholder from the selling CFC. Thus, section 964(e)(4) presents the same concerns as direct dividends; absent a rule to the contrary, taxpayers might use section 964(e)(4) to avoid the results applicable to actual distributions from an upper-tier CFC to a U.S. shareholder or to constructive dividends under section 1248 that are addressed elsewhere by these temporary regulations. Therefore, the rules in these temporary regulations for determining eligibility for the section 245A deduction also apply to deemed dividends arising by reason of section 964(e)(4). Moreover, all U.S. shareholders of the selling CFC are

deemed to act in concert for purposes of the temporary regulations with respect to transactions described in section 964(e)(4).

### III. Limitation of Amount Eligible for Section 954(c)(6) Exception With Respect to Certain Dividends

*A. In General*

As described in Part I of this Explanation of Provisions, the section 954(c)(6) exception may cause dividends from one CFC to another to result in tax consequences similar to, but not dependent upon, those that can be effectuated using section 245A in conjunction with the disqualified period, section 951(a)(2)(B), or the repeal of section 958(b)(4).

To protect against avoidance of the rules for extraordinary dispositions (described in Part II.B of this Explanations of Provisions), the temporary regulations rely on authority under section 954(c)(6)(A) to prevent the section 954(c)(6) exception from applying in cases where a dividend from a lower-tier CFC to an upper-tier CFC would be an extraordinary disposition amount if distributed directly to the section 245A shareholders of the lower-tier CFC. *See* § 1.245A–5T(d). In these cases, the section 954(c)(6) exception applies only to the extent that the amount of the dividend exceeds the sum of each section 245A shareholder's extraordinary disposition account with respect to the lower-tier CFC, divided by the aggregate ownership of all U.S. tax residents of the upper-tier CFC that have section 951(a) inclusions and multiplied by 50 percent. The amount is divided by the aggregate ownership of these U.S. tax residents to take into account the fact that the U.S. tax residents (including individuals) will include in gross income a pro rata share of the portion of the dividend not eligible for the section 954(c)(6) exception. The amount is multiplied by 50 percent in order to provide similar treatment for a dividend received by a section 245A shareholder from a CFC and a dividend received by an upper-tier CFC from a lower-tier CFC. In both cases, the 50 percent reduction of the section 245A deduction approximates the reduced tax rate by reason of the deduction provided under section 250(a)(1)(B) with respect to section 951A inclusions or section 965(c) with respect to the transition tax.

Unlike the disallowance of the section 245A deduction under § 1.245A–5T(b) with respect to an extraordinary disposition amount, which applies only to corporate U.S. shareholders, the limitation to the application of the section 954(c)(6) exception with respect to a dividend received by an upper-tier CFC can result in a subpart F inclusion to any U.S. shareholder, including individuals. In addition, the temporary regulations limit the section 954(c)(6) exception in these cases, rather than limiting the application of section 245A only when the lower-tier CFC earnings and profits are distributed through intervening CFCs to a section 245A shareholder. This approach prevents deferral of tax with respect to the applicable subpart F income or tested income and minimizes the administrative and compliance burdens that would be created by continuing to track the relevant earnings at the upper-tier CFC.

Similarly, to prevent these inappropriate uses of the section 954(c)(6) exception to avoid the rules for extraordinary reductions (described in Part II.C of this Explanation of Provisions), the temporary regulations apply to limit the amount of any distribution from that CFC out of earnings and profits attributable to subpart F income or tested income that can qualify for the section 954(c)(6) exception in a taxable year in which an extraordinary reduction occurs with respect to the stock of a CFC. Similar to the rules relating to extraordinary disposition amounts, the limitation to the section 954(c)(6) exception with respect to a dividend received by an upper-tier CFC can result in a subpart F inclusion to any U.S. shareholder, including individuals. To the extent a CFC-to-CFC dividend otherwise satisfies the requirements of section 954(c)(6), it is eligible for the section 954(c)(6) exception only to the extent it exceeds the distributing lower-tier CFC's "tiered extraordinary reduction amount," taking into account certain prior inclusions under section 951(a). *See* § 1.245A–5T(f)(1). Such amount is equal to the upper-tier CFC's ownership percentage in the lower-tier CFC multiplied by the lower-tier CFC's subpart F income and tested income for the taxable year, with the resulting product reduced by four amounts. The first amount is the pro rata share of the lower-tier CFC's subpart F income and tested income for the taxable year that is taken into account by U.S. tax residents and attributable to the shares of the lower-tier CFC owned by the upper-tier CFC. The second amount is the amount included in an upper-tier CFC's subpart F income resulting from prior dividends paid by the lower-tier CFC giving rise to tiered extraordinary reduction amounts or the application of section 245A(e). The third amount is for certain prior

extraordinary reduction amounts with respect to the lower-tier CFC arising in cases in which the lower-tier CFC was a first-tier CFC at some point in the taxable year and paid a dividend to one or more controlling section 245A shareholders at that time. The fourth amount is for subpart F income and tested income taken into account by a U.S. tax resident as a result of an issuance of stock directly by the lower-tier CFC during the taxable year. *See* § 1.245A–5T(f)(2). Comments are requested as to whether a lower-tier CFC's tiered extraordinary reduction amount should be reduced for a pro rata portion of a dividend paid on stock of the lower-tier CFC that was held by non-U.S. shareholders before and after an extraordinary reduction. For purposes of applying § 1.245A–5T(f)(1) and (2) in taxable years of a lower-tier CFC beginning on or after January 1, 2018, and ending before June 14, 2019, a transition rule is provided such that the tiered extraordinary reduction amount of a lower-tier CFC is determined by treating the lower-tier CFC's subpart F income for the taxable year as if it were neither subpart F income nor tested income. *See* § 1.245A–5T(f)(3).

The rule in § 1.245A–5T(f)(1) applies to both actual distributions and deemed distributions that occur by reason of stock dispositions subject to section 964(e)(1) but not section 964(e)(4). Dispositions subject to section 964(e)(1) but not section 964(e)(4) are treated as dividends from the target foreign corporation (or other entity whose earnings and profits gave rise to a dividend under section 964(e)(1)) to the selling CFC and, thus, must be tested for eligibility under section 954(c)(6). Additionally, ordering and coordination rules apply with respect to the rules relating to the availability of the section 954(c)(6) exception and generally mirror the rules for the section 245A deduction by giving priority to § 1.245A–5T(f) over § 1.245A–5T(d). *See* § 1.245A–5T(g)(4)(ii). As in the rules relating to extraordinary reduction amounts, a controlling section 245A shareholder of a lower-tier CFC may elect to close the taxable year of the CFC in cases where an extraordinary reduction occurs and the CFC would have a tiered extraordinary reduction amount. *See* § 1.245A–5T(e).

Finally, the Treasury Department and the IRS are studying whether § 1.245A–5T(f), or a similar rule, should also apply to dividends received by an upper-tier CFC from a lower-tier CFC where such CFCs are owned by individuals and there may be a reduction in the individuals' ownership of the lower-tier CFC. Individuals are

not eligible to claim deductions under section 245A and, therefore, dividends subject to section 954(c)(6) do not present the risk of permanently eliminating items of subpart F income, investments in United States property taxed under section 951(a)(1)(B), or tested income from the U.S. tax base. At the same time, section 954(c)(6) dividends might result in a reduction of a U.S. shareholder's pro rata share of a CFC's subpart F income or tested income, thereby resulting in deferred taxation of items that otherwise would have been taxed currently. Therefore, comments are requested as to whether § 1.245A–5T(f), or a similar rule, should be extended to CFCs owned by individuals.

*B. Dividends Received by CFCs Ineligible for Section 245A Deduction*

Section 245A(a), by its terms, applies only to certain dividends received by "a domestic corporation." Section 1.952–2, however, which sets forth rules for determining gross income and taxable income of a foreign corporation, provides that for these purposes a foreign corporation is treated as a domestic corporation. *See* § 1.952– 2(a)(1) and (b)(1). Accordingly, questions have arisen as to whether § 1.952–2 could be interpreted such that a foreign corporation could claim a section 245A deduction despite the statutory restriction in section 245A(a) expressly limiting the deduction to domestic corporations. *See* H.R. Rep. No. 115–466, at 599, fn. 1486 (2017).

The Treasury Department and the IRS intend to address issues related to the application of § 1.952–2, taking into account various comments received in connection with the Act, including in connection with the proposed section 951A regulations, in a future guidance project. This guidance will clarify that, in general, any provision that is expressly limited in its application to domestic corporations does not apply to CFCs by reason of § 1.952–2. The Treasury Department and the IRS continue to study whether, and to what extent, proposed regulations should be issued that provide that dividends received by a CFC are eligible for a section 245A deduction. The Treasury Department and the IRS have determined, however, that in no case would any person, including a foreign corporation, be allowed a section 245A deduction directly or indirectly for the portion of a dividend paid to a CFC that is not eligible for the section 954(c)(6) exception as a result of these temporary regulations. Permitting the deduction in such a case would undermine the application of the rule that reduces the amount of the dividend eligible for the section 954(c)(6) exception (discussed in Part III.A of this Explanation of Provisions).

## IV. Information Reporting Under Section 6038

Under section 6038(a)(1), U.S. persons that control foreign business entities must file certain information returns with respect to those entities, which includes information listed in section 6038(a)(1)(A) through (a)(1)(E), as well as information that "the Secretary determines to be appropriate to carry out the provisions of this title." The temporary regulations provide that ineligible amounts, tiered extraordinary disposition amounts, and tiered extraordinary reduction amounts must be reported on the appropriate information reporting form in accordance with section 6038. *See* § 1.6038–2T(f)(16). Because transactions subject to these temporary regulations may have occurred in taxable years for which returns have been filed before the issuance of these regulations, or for which returns will be filed before revision of forms and instructions for reporting the information required by § 1.6038–2T(f)(16), the temporary regulations provide a transition rule. The transition rule mandates that taxpayers report the required information on the first return filed following the issuance of revised forms, instructions, or other guidance with respect to reporting such information. The transition rule also requires a corporation to report the information with respect to a predecessor corporation (such as a lower-tier foreign corporation that distributes its assets to the corporation in a liquidation described in section 332) to ensure that all of the amounts are properly reported notwithstanding any intervening transactions.

## V. Applicability Dates

Consistent with the applicability date of section 245A, and pursuant to section 7805(b)(2), the rules in the temporary regulations relating to eligibility of distributions for the section 245A deduction apply to distributions occurring after December 31, 2017.

Pursuant to section 7805(b)(1) and (2), the rules in the temporary regulations relating to the eligibility of dividends for the section 954(c)(6) exception also apply to distributions occurring after December 31, 2017, subject to the transition rule in § 1.245A–5T(f)(3) for determining tiered extraordinary reduction amounts.

## VI. Good Cause

The Treasury Department and the IRS are issuing these temporary regulations without prior notice and the opportunity for public comment pursuant to section 553(b)(3)(B) of the Administrative Procedure Act (the "APA"), which provides that advance notice and the opportunity for public comment are not required with respect to a rulemaking when an "agency for good cause finds (and incorporates the finding and a brief statement of reasons therefor in the rules issued) that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest." Under the "public interest" prong of 5 U.S.C. 553(b)(3)(B), the good cause exception appropriately applies where notice-and-comment would harm, defeat, or frustrate the public interest, rather than serving it. The Treasury Department and the IRS are similarly utilizing the good cause exception in section 553(d)(3) of the APA to issue these temporary regulations with an immediate effective date, rather than an effective date no earlier than 30 days after the date of publication.

Among the circumstances in which the good cause exception may be invoked for impracticability or to serve the public interest are situations where the timing and disclosure requirements of the usual procedures would defeat the purpose of the proposal, including if announcement of a proposed rule would enable or increase the sort of financial manipulation the rule sought to prevent. Good cause may also apply where a delayed effective date would have a significant deleterious effect upon the parties to which the regulation applies. Additionally, the good cause exception may apply when the regulations are by their nature short term and there is an opportunity to comment before final rules are introduced. Finally, good cause is supported where regulations are required to be issued and effective by a certain statutory deadline, and in light of the circumstances affecting the agency and its functions leading up to that statutory deadline, the agency is unable during that timeframe to conduct a timely and fulsome notice-and-comment process. Here, these rationales, separately and in combination, provide good cause for the Treasury Department and the IRS's decision to bypass the notice-and-comment and delayed effective date requirements with respect to these temporary regulations. Each rationale is discussed below in turn.

First, good cause exists with respect to these temporary regulations because any period for notice and comment, as well as a delayed effective date, would provide taxpayers with the opportunity to engage in the transactions to which these rules relate with confidence that they achieve the intended tax avoidance results absent the applicability of the regulations. The Treasury Department and the IRS are aware that taxpayers have considered engaging in the transactions described in these temporary regulations, but some may have been deterred from doing so because of uncertainty about the operation and interaction of the various provisions of the Act. By limiting the deduction under section 245A for these transactions, these temporary regulations remove that uncertainty and—if subjected to notice-and-comment and a delayed effective date—could embolden some taxpayers to engage in aggressive tax planning to take advantage of the unintended interactions among the Act's provisions, with the comfort that their actions were not subject to the rules of the temporary regulations during the period of notice and comment and before the regulations' effective date. This concern applies with respect to both the extraordinary disposition and extraordinary reduction rules for an ongoing period. For the extraordinary reduction rules, both the extraordinary reduction and the associated use of section 245A can occur at any time going forward, and although the gap period for entering into extraordinary dispositions has closed, the ability to utilize the section 245A deduction for earnings generated in the extraordinary disposition would apply indefinitely absent these temporary regulations.

For example, a taxpayer who became aware of the tax effects achievable using the transactions described in these temporary regulations could, with confidence, utilize extraordinary disposition E&P or engage in an extraordinary reduction to exit the U.S. taxing jurisdiction without paying any tax during a period of notice and comment and delayed effectiveness. The proliferation of these types of transactions would cause the regulations to exacerbate the very financial manipulation that they are intended to prevent, and accordingly, this rationale supports a finding of good cause for dispensing with pre-promulgation notice and public comment, as well as foregoing a delayed effective date, for these temporary regulations pursuant to 5 U.S.C. 553(b) and (d).

The second reason for a finding of good cause arises from the fact that these temporary regulations, as applied retroactively, will affect taxable years of certain taxpayers ending in 2018. As a result, these regulations can apply to taxable years for which tax returns have been or may be due during a period of comment and delayed effectiveness. Deferring the effectiveness of the temporary regulations until after such a period could increase taxpayer compliance costs because certain taxpayers would only be able to come into compliance with the regulations by amending and refiling returns and paying additional taxes owed with interest.

Third, good cause is supported where a regulation is temporary, with public comment permitted and meaningfully considered before finalization of the temporary rule. In this regard, the temporary regulations have a fixed expiration date and are cross-referenced in a notice of proposed rulemaking published in the Proposed Rules section of this issue of the **Federal Register**. Comments are requested on all aspects of these rules, and specific comment requests contained in this preamble are incorporated by reference into the cross-referenced notice of proposed rulemaking. The Treasury Department and the IRS will consider all written comments properly and timely submitted when finalizing these temporary regulations.

Finally, these temporary regulations are part of an effort to implement the provisions of the Act, which effected sweeping and complex statutory changes to the international tax regime. In conjunction with developing and issuing these temporary regulations, the Treasury Department and the IRS have also been tasked with issuing regulations implementing the numerous provisions enacted or modified by the Act, along with attendant changes to forms and other sub-regulatory guidance and attention to the orderly administration of the U.S. tax system.

Good cause exists for the issuance of temporary regulations relating to the transactions affected by these temporary regulations partially because of the statutory deadline in section 7805(b)(2), which provides (among other rules) that a regulation may be applied retroactively if it is issued within 18 months of the date of enactment of the statutory provision to which it relates. The rules in these temporary regulations relate to sections 245A, 951A, and 965, which were enacted as part of the Act on December 22, 2017. Thus, to qualify for retroactivity under section 7805(b)(2), a regulation retroactive to

the enactment of these provisions must be effective no later than June 22, 2019. These temporary regulations need to apply retroactively from the date of the underlying statutory provisions to ensure that the international tax regime enacted by Congress in the Act, and its interaction with existing tax rules, functions correctly for all affected periods. Retroactivity is also required to prevent treating taxpayers comparatively advantageously if they have engaged in the types of transactions described in these temporary regulations prior to the issuance date of these temporary regulations.

The discussion of good cause with respect to the temporary regulations in this Part VI is consistent with the Policy Statement on the Tax Regulatory Process issued on March 5, 2019, by the Treasury Department and the IRS (the "Statement"). The Statement emphasized the Treasury Department and the IRS's obligation under the APA to issue interim final regulations without prior notice and comment only in conjunction with "a statement of good cause explaining the basis for that finding." The Statement further explains that good cause for interim final regulations may exist, for example, where "such regulations may be necessary and appropriate to stop abusive practices or to immediately resolve an injurious inconsistency between existing regulations and a new statute or judicial decision." As the discussion in this Part VI illustrates, this is the case with respect to these temporary regulations.

**Special Analyses**

**I. Regulatory Planning and Review—Economic Analysis**

Executive Orders 13563 and 12866 direct agencies to assess costs and benefits of available regulatory alternatives and, if regulation is necessary, to select regulatory approaches that maximize net benefits (including potential economic, environmental, public health and safety effects, distributive impacts, and equity). Executive Order 13563 emphasizes the importance of quantifying both costs and benefits, of reducing costs, of harmonizing rules, and of promoting flexibility.

These temporary regulations have been designated by the Office of Management and Budget's Office of Information and Regulatory Affairs (OIRA) as subject to review under Executive Order 12866 pursuant to the Memorandum of Agreement (April 11, 2018) between the Treasury Department

and the Office of Management and Budget regarding review of tax regulations. OIRA has determined that the proposed rulemaking is significant and subject to review under Executive Order 12866 and section 1(b) of the Memorandum of Agreement. Accordingly, the proposed regulations have been reviewed by the Office of Management and Budget.

*A. Background*

The Tax Cuts and Jobs Act (the Act) transitioned the United States from a primarily deferral-based international tax system (subject to the immediate taxation of generally mobile or passive income under the subpart F regime) to a participation exemption system coupled with immediate taxation of certain offshore earnings (in some cases, at a reduced rate of tax).[1] This transition was effected through several interlocking provisions of the Code—sections 245A, 951A, and 965. All three provisions have different effective dates and thus the Act created periods in which some but not all of them apply. The new system also operates alongside the pre-Act subpart F regime that taxes certain offshore earnings using a longstanding rule for attributing pro rata shares of a foreign corporation's earnings to its U.S. shareholders.

1. Background: Section 245A—Dividends Received Deduction

The Act included section 245A, which provides a participation exemption system for repatriation of certain offshore earnings. Prior to the Act, dividends paid by foreign corporations to their U.S. shareholders were generally taxable. Section 245A(a) reverses this result in the case of corporate U.S. shareholders by providing, subject to certain exceptions, a 100-percent deduction for any dividend received by a corporate U.S. shareholder from a specified 10-percent owned foreign corporation.[2] A 100-percent deduction for dividends essentially means that this income is not

---

[1] A deferral-based system is a system in which taxable foreign-source income generally is taxed only when it is repatriated to the United States. A participation exemption system is one in which foreign-source income is generally not taxed by the resident country (in this case, the United States). As explained further below, in the United States the participation exemption system is coupled with immediate taxation of certain types of earnings to avoid erosion of the U.S. tax base. These taxed foreign earnings can then be repatriated to the United States without further tax.

[2] A specified 10-percent owned foreign corporation is any foreign corporation, other than a passive foreign investment corporation with respect to a shareholder that is not also a CFC, with at least one corporate U.S. shareholder. Section 245A(b).

taxed in the United States at the corporate level. The existing rules in sections 951(a) and 959 continue to apply, meaning that generally only earnings associated with income that is not taxed under the subpart F regime (or under the GILTI regime, discussed below) can, upon distribution, give rise to a dividend eligible for the section 245A deduction. Because subpart F (and GILTI) taxation is not reduced by distributions made during the year (except in the case of certain transfers of stock of a CFC during a taxable year), any distribution of earnings and profits that is taxed under the subpart F regime (or GILTI regime) is a distribution of PTEP (that is, a distribution of previously taxed earnings and profits) that is not treated as a dividend by reason of section 959(d), and thus cannot qualify for section 245A. Section 245A applies to distributions made after December 31, 2017.

Because the pre-Act international tax regime imposed U.S. tax on most non-mobile, non-passive earnings and profits only when those earnings were repatriated, a significant amount of untaxed earnings and profits had been accumulated offshore when the Act was passed. The enactment of section 245A by the Act thus presented a potential windfall, allowing taxpayers who had held earnings and profits offshore to distribute all of those earnings back to the United States tax-free. Congress did not intend for section 245A to apply to such pre-Act earnings, and thus included a so-called transition tax (section 965) "[t]o avoid a potential windfall for corporations that deferred income, and to ensure that all distributions from foreign subsidiaries are treated in the same manner under the participation exemption system." H. Rep. No. 115–409 at 375.

2. Background: Section 965—Transition Tax

Section 965 imposed a transition tax on the post-1986 earnings and profits of foreign corporations that had gone untaxed under the pre-Act international tax regime and would not be subject to the GILTI regime because the income was earned in a year prior to that regime being in effect. Absent section 965, such earnings and profits would have been eligible for tax-free distribution under section 245A. Specifically, section 965(a) increases certain foreign corporations' subpart F income for their last taxable year beginning before January 1, 2018, by the amount of their non-previously taxed earnings and profits computed as of no later than December 31, 2017. This has the effect of subjecting all offshore post-1986

untaxed earnings of most U.S. shareholders as of no later than December 31, 2017, to U.S. tax (albeit at a reduced rate by reason of section 965(c)), turning all such earnings into PTEP under section 959. As a result, none of those earnings and profits are eligible for the section 245A deduction, and such earnings and profits, once taxed under section 965, are instead treated in the same way as if they had been taxed under the pre-Act subpart F regime.

For a calendar year CFC, the transition tax generally provides a mechanism for ensuring that only earnings and profits subject to the new international tax system can qualify for the dividends received deduction under section 245A. This appears to be the intended purpose of section 965(a), as the legislative history of the Act provides that "[t]he [transition tax applies in] the last taxable year of a deferred foreign income corporation that begins before January 1, 2018, which is that foreign corporation's last taxable year before the transition to the new corporate tax regime elsewhere in the bill goes into effect." H. Rep. 115–466 at 613. This is not the case, however, for fiscal year CFCs (*i.e.,* CFCs with a taxable year other than the calendar year) as there is a gap period with respect to such entities during which certain of their earnings may escape taxation.

3. Background: Section 951A—GILTI Regime

By subjecting post-1986 earnings and profits to a transition tax, section 965 was generally intended to ensure that only earnings first subjected to the anti-base erosion provisions of the Act could qualify for section 245A. While the Act preserved the existing subpart F regime, legislative history shows congressional concern that the participation exemption system could heighten the incentive to shift profits to low-taxed foreign jurisdictions or tax havens after the Act. *See* Senate Explanation at 365. For example, Congress expressed concern that a domestic corporation might allocate income susceptible to base erosion to certain foreign affiliates "where the income could potentially be distributed back to the [domestic] corporation with no U.S. tax imposed." *See id.* As a result of these concerns, the Act added another, complementary regime to address the additional base erosion incentives engendered by the participation exemption. This regime taxes a U.S. shareholder on its global intangible low-taxed income, or GILTI, with respect to its CFCs at a reduced

TD 9865 RECORD-000150

rate (by reason of section 250) under new section 951A.

Section 951A(a) generally subjects a U.S. shareholder to current taxation each year on its GILTI with respect to its CFCs. The GILTI of a U.S. shareholder is generally defined as its pro rata share of its CFCs' taxable income for the year in excess of a normal return—a formulaic amount equal to 10 percent of the tax basis of the CFCs' tangible assets. *See* section 951A(b), (c), (d). For purposes of this determination, specific types of income of a CFC, including income taxed under another Code provision (including the subpart F regime), certain immobile income, or certain highly taxed income, are not taken into account. *See* Senate Explanation at 366 (explaining that such income is either already taxed or does not present base erosion concerns). The GILTI regime applies in the first taxable year of a CFC beginning after December 31, 2017. Thus, in the case of calendar year CFCs, the application of the GILTI regime generally must be taken into account with respect to all new earnings and profits of a CFC earned immediately after section 965 has caused all of the CFC's pre-Act earnings to be taxed. *See* Public Law 115–97, sec. 14201(d).

As is the case with respect to the subpart F regime, the tax base subject to the GILTI regime is not reduced by distributions made by a CFC during a taxable year (except in the case of certain transfers of stock of a CFC during a taxable year), and section 951A(f)(1)(A) provides that an income inclusion under the GILTI regime is treated in the same manner as an inclusion of subpart F income under the subpart F regime for purposes of section 959. These rules cause a CFC's earnings attributable to GILTI to be taxed under the GILTI regime in section 951A regardless of whether those earnings and profits are distributed before the end of the CFC's year, thus converting such earnings into PTEP and turning distributions (including those made before the end of the year in which the earnings and profits were earned) by the CFC into PTEP distributions that do not constitute dividends eligible for section 245A. Section 959(c), (d). Section 951A(a)(2) also applies for purposes of determining a U.S. shareholder's pro rata share of its CFCs' income and other relevant items for purposes of section 951A. Section 951A(e).

*B. Need for the Temporary Regulations*

Sections 245A, 965, and 951A generally act to tax foreign source income equivalently across taxpayers and sources so long as a U.S. shareholder owns the same amount of

stock of a calendar year CFC throughout the CFC's entire taxable year. Deviations from that condition, however, potentially allow taxpayers to avoid tax by claiming a section 245A deduction in situations where otherwise identical income would be subject to U.S. tax. This circumstance is inconsistent with the purposes of the new international tax regime enacted by Congress.[3] These temporary regulations are needed to limit section 245A to its intended scope and, thereby, prevent the provision from converting income that should be subject to U.S. tax into non-taxable dividends.

There are two situations in which deviations from the condition described in this section can give rise to these results. These are where (1) a U.S. corporation is the shareholder of a fiscal year CFC during 2018 and (2) a CFC pays a dividend and experiences a direct or indirect change in ownership during a taxable year.

The differing application of the GILTI regime with respect to fiscal year and calendar year CFCs creates one scenario where the interaction of section 245A with other new international tax provisions might be used to avoid tax. For a calendar year CFC, any earnings and profits accumulated as of no later than December 31, 2017, that had not been taxed under the subpart F regime generally were taxed under section 965 in the CFC's 2017 taxable year, turning such earnings and profits into PTEP. Then, starting in the calendar year CFC's taxable year beginning on January 1, 2018, the CFC's income became subject to the complementary subpart F and new GILTI regimes, and any income taxed under those provisions now also becomes PTEP. Concurrent with the applicability date of the GILTI regime, section 245A applies to dividends distributed after December 31, 2017, out of earnings that have not been taxed under the subpart F and GILTI regimes. These interlocking provisions create a cohesive regime in which the section 245A deduction applies only for distributions of post-2017 earnings and profits that are properly not taxed as the subpart F income or GILTI regimes. Operating in tandem, these provisions address Congress's concerns with section 245A by applying that provision (1) without granting windfalls for taxpayers that had historically kept earnings and profits offshore (by taxing

all such earnings and profits under section 965 immediately before section 245A applies) and (2) without allowing a section 245A deduction for income susceptible to a heightened risk of base erosion. As a result of these provisions, only post-2017 earnings and profits that are not subject to the subpart F or GILTI regimes can qualify for a dividends received deduction under section 245A upon distribution from a calendar year CFC. Such earnings and profits are generally the normal return on a CFC's property (*i.e.,* 10 percent of tax basis in tangible property), certain immobile income, or certain highly-taxed income that Congress believed would not raise windfall or base erosion concerns.

By contrast, the provisions that apply harmoniously to a calendar year CFC fail to form a cohesive regime when applied to a fiscal year CFC for its first taxable year that ends in 2018. Consider a CFC with a taxable year ending November 30. This CFC's income is still subject to the subpart F regime for all relevant taxable years. Section 965 also applies to the CFC's historical earnings and profits as of no later than December 31, 2017, and section 245A applies to distributions made by the CFC after December 31, 2017. However, the GILTI regime does not begin to apply to the CFC's income until the first taxable year of the CFC beginning after December 31, 2017, and thus does not first apply until the CFC's taxable year that begins on December 1, 2018. As a result of the gap in these effective dates, (1) the ordinary earnings of the CFC during the gap period avoid tax (which is a direct outgrowth of the effective dates); and (2) assets can be transferred between related parties in non-ordinary course transactions during that time period in such a way that current and future earnings and profits associated with the built-in gain in those assets can permanently avoid taxation by the United States because they are not subject to the GILTI regime and are not subject to the transition tax under section 965. Such earnings and profits might nevertheless be eligible to be distributed tax-free under section 245A. Such income, however, is economically identical to income earned by a calendar year CFC. Absent the temporary regulations, similar income from CFCs that differ only in their taxable year would be subject to different taxation. This difference between calendar year and fiscal year CFCs is significant and presents the potential for substantial tax avoidance when utilized to artificially generate earnings and profits in non-ordinary course transactions between related parties.

---

[3] The discussion herein assumes that the transactions at issue would otherwise withstand scrutiny under section 7701(o) (*i.e.,* the economic substance doctrine) and related judicial doctrines. Taxpayers should draw no inferences from this assumption, however, as the IRS may challenge such transactions on these and other grounds.

TD 9865 RECORD-000151

These temporary regulations refer to the portion of a dividend attributable to earnings and profits arising from such a transaction during this period as an "extraordinary disposition amount." An extraordinary disposition amount consists of certain earnings and profits resulting from transactions between related parties during the disqualified period. *See* the Explanation of Provisions section of this preamble for definitions of all relevant terms and conditions. Although the period during which extraordinary dispositions may have occurred has passed, the regulations will potentially apply to any distributions of the associated earnings and profits after 2017.

The second issue occurs because the application of the allocation rules under sections 951(a) and 951A (which determine a U.S. shareholder's pro rata share of a CFC's subpart F income or tested income for GILTI purposes) together with section 245A creates situations in which earnings and profits may not be properly subject to the new international tax regime that Congress enacted to prevent the inappropriate application of the section 245A deduction. For example, this situation may arise because of the "dividend offset" rule in section 951(a)(2)(B), which, subject to certain limitations, reduces a U.S. shareholder's pro rata share of subpart F income or tested income for dividends paid to another owner of the same stock of the CFC during the taxable year (such reduction being a rough approximation of the portion of subpart F income and tested income for the year that is properly attributable to the other owner).

In order to illustrate this concern, consider the following example. A corporate U.S. shareholder generally is taxed with respect to a CFC's subpart F income as of the end of the CFC's taxable year. Suppose, however, that the U.S. shareholder received a dividend from the CFC in an amount equal to its subpart F income and thereafter transferred ownership of the CFC to a new U.S. shareholder shortly before the end of the CFC's taxable year. If a section 245A deduction applied to the dividend, the corporate U.S. shareholder would not be taxed on the distribution. Furthermore, the second U.S. shareholder's subpart F inclusion for the CFC's taxable year may be reduced to approximately zero as a result of the dividend offset rule. As a consequence, absent the application of these temporary regulations, income that should have been subject to U.S. taxation under the subpart F regime could escape taxation altogether.

In contrast to the first issue, this second issue implicates the interlocking provisions of the international tax regime on an ongoing basis. As described in Part II.C of the Explanation of Provisions section of this preamble, section 245A could facilitate the avoidance of the subpart F and GILTI regimes by allowing a U.S. shareholder to transfer, before the end of a CFC's taxable year, stock of the CFC to a new shareholder who will not be taxed on the CFC's subpart F income or tested income. As a consequence of the repeal of section 958(b)(4), this new shareholder might be a foreign person who is not taxable with respect to the CFC's subpart F income or tested income. Alternatively, the new shareholder may not be taxable with respect to these amounts as a result of the dividend offset rule of section 951(a)(2)(B), notwithstanding the fact that if the prior owner of the stock is a corporate U.S. shareholder, the section 245A deduction may apply to dividends received by such prior owner. In these cases, current year subpart F income and GILTI could escape taxation altogether, a result that would undermine the post-Act system for taxing foreign earnings. These temporary regulations refer to earnings and profits representing the portion of a dividend of a CFC attributable to subpart F income or tested income of the CFC that, absent a transfer of stock of the CFC pursuant to an extraordinary reduction, would have been subject to the subpart F or GILTI regimes as an "extraordinary reduction amount." An extraordinary reduction amount consists of certain earnings and profits generated during a CFC's taxable year beginning after 2017 in which a domestic corporate U.S. shareholder reduces its ownership of the CFC by certain threshold amounts (*e.g.,* a decrease in ownership of more than 10 percent). For this purpose, "certain earnings and profits" refers to income generally subject to inclusion under the subpart F or GILTI regimes. See the Explanation of Provisions section of this preamble for definitions of all relevant terms and conditions.

Results similar to the ones described in this section for extraordinary disposition amounts and extraordinary reduction amounts can be achieved using the exemption from subpart F income under section 954(c)(6) and lower-tier CFC dividends to upper-tier CFCs. Accordingly, the temporary regulations limit the application of the section 954(c)(6) exception in order to prevent similar results in circumstances in which a lower-tier CFC pays a

dividend to another CFC, instead of directly to a U.S. shareholder.

*C. Overview of the Temporary Regulations*

The Treasury Department and the IRS have determined that it is appropriate to limit the section 245A deduction to distributions of earnings and profits that are attributable to certain normal return, high-taxed, or immobile income, which will ensure that similar income is taxed similarly. The temporary regulations do not permit section 245A deductions for the portions of dividends made by CFCs that are attributable to ineligible amounts, which comprise extraordinary reduction amounts and 50 percent of any extraordinary disposition amounts.

To accomplish this, the temporary regulations disallow a deduction for transactions that have the effect of avoiding tax under section 951, 951A, or 965. The extraordinary disposition rules accomplish this by denying the deduction under section 245A for a narrowly and objectively defined class of earnings and profits generated by transactions undertaken in the disqualified period in circumstances that raise abuse concerns. The extraordinary reduction rules accomplish this by denying the deduction under section 245A for certain earnings distributed in the same year as reductions in ownership of CFC stock by a controlling section 245A shareholder. The temporary regulations contain similar rules with respect to section 954(c)(6).

*D. Economic Analysis of the Temporary Regulations*

1. Baseline

The Treasury Department and the IRS have assessed the benefits and costs of the temporary regulations relative to a no-action baseline reflecting anticipated Federal income tax-related behavior in the absence of these temporary regulations.

2. Summary of Economic Effects

To assess the economic effects of these regulations, the Treasury Department and the IRS considered the economic effects of disallowing the 245A deduction for (i) extraordinary disposition amounts and (ii) extraordinary reduction amounts.

The disallowance of the dividends received deduction for extraordinary disposition amounts applies, in plain language, only to earnings and profits accrued prior to issuance of the temporary regulations. Thus, no substantive economic activities can be affected by this disallowance and the

economic decisions affected are only those associated with taxpayers' financing of their tax liability.

The Treasury Department and the IRS's analysis therefore focuses on those provisions of the temporary regulations that disallow the dividends received deduction for extraordinary reduction amounts. Absent the temporary regulations, U.S. taxation of income of a CFC that would otherwise be subject to the subpart F or GILTI regime could be avoided by a transfer of ownership of the CFC to other entities in such a way that the income of the CFC would not be subject to U.S. tax. Thus, the economic effects stem from those transfers that would give rise to an extraordinary reduction amount ("ER transfers") and that would not be undertaken as a result of the temporary regulations. The Treasury Department and the IRS project that a substantial portion of these ER transfers would have been undertaken for tax avoidance purposes only and would have negative effects on economic performance (giving rise to a positive economic effect from the temporary regulations) but that those effects would be minor because the transfers would take place among related parties and over short time frames. Thus, there would be only negligible losses in economic performance due to inefficient changes in management, risk-bearing, or other economic activity. Instead, the primary economic losses due to these transfers (and thus gains from the temporary regulations) are likely to consist of resources that would be expended in carrying out such tax planning activities. The Treasury Department and the IRS project that these saved resource costs would be small.

The Treasury Department and the IRS considered that at least some ER transfers that would not be pursued as a result of the temporary regulations would have provided positive economic benefits, such as through more efficient risk-bearing or other managerial control benefits. The Treasury Department and the IRS project that the aggregate value of these foregone benefits will be minimal because the transfers for which a deduction is disallowed and that are likely not to be undertaken as a result of the temporary regulations are not generally associated with productive economic activities. In this regard, the Treasury Department and the IRS expect that economically-motivated transfers of CFCs should not be inhibited by the temporary regulations because the temporary regulations, taking into account the election to close a CFC's taxable year, often will result in the same or similar tax liability to a seller

as if the transfer had not occurred. Thus, the temporary regulations should not discourage economically-motivated transfers of CFCs. If anything, the temporary regulations will discourage transfers of CFCs that would not have occurred absent the tax results the temporary regulations seek to prevent. These transfers, which would be motivated by tax avoidance, likely would not be economically productive.

The temporary regulations will require taxpayers to compute, track, and report information relevant for determination of extraordinary dispositions and extraordinary reductions. The compliance burden component of the Treasury Department and the IRS's estimate of the economic effects of the temporary regulations reflects only those record-keeping and related compliance activities that would not have been undertaken in the absence of the temporary regulations. The Treasury Department and the IRS project that these additional costs, relative to the baseline, will be modest. In general, with respect to the initial year of an extraordinary disposition or any extraordinary reduction, taxpayers are already required to keep track of the required information for other purposes. For example, to the extent that a U.S. taxpayer sells stock in its CFC, earns income in its CFC, or receives a dividend from a CFC, the taxpayer would otherwise record the information needed to determine eligibility for the section 245A deduction under the temporary regulations. Additionally, once calculated the costs to track amounts related to extraordinary dispositions in future years are expected to be minimal. For all of these reasons, the Treasury Department and the IRS expect the non-revenue economic effects of these temporary regulations to be small.[4]

The Treasury Department and the IRS have not undertaken a quantitative estimate of the economic benefits arising from avoided transactions that constitute extraordinary reductions. Any such estimates would be highly uncertain because these tax provisions are new and because the transfers would be between related parties and primarily of short duration, both of which factors make estimation difficult. The tax planning costs of effecting these transfers are also highly uncertain because these specific tax planning efforts are new.

While it is not currently feasible for the Treasury Department and the IRS to

[4] This claim refers solely to the economic benefit arising from this provision and does not refer to any estimate of the tax revenue effects of the provision.

quantify these economic effects, part I.D.3 of these Special Analyses explains the rationale behind the provisions of these temporary regulations and provides a qualitative assessment of the alternatives considered.

The Treasury Department and the IRS solicit comments on this assessment of the economic effects of the temporary regulations.

### 3. Analysis of Specific Provisions

i. Ordering of Distributions of Earnings and Profits With Respect to Extraordinary Disposition Amounts

a. Background and Alternatives Considered

Any transaction that gave rise to an extraordinary disposition has already taken place because the disqualified period has closed for all taxpayers. Thus, the temporary regulations should have no economic effect with respect to these transactions. Nevertheless, the denial of a section 245A deduction with respect to the related extraordinary disposition E&P may in some cases lead CFCs to retain earnings rather than distribute them in order to defer the associated U.S. tax. The undistributed earnings in this case may lead to a so-called "lockout effect" pursuant to which some portion of the offshore capital remains in less productive ventures than would otherwise be the case had the earnings and profits been eligible for a section 245A deduction.

The temporary regulations address this potential concern by providing an ordering rule such that extraordinary distribution E&P generally are the last earnings and profits deemed distributed by a CFC. As a result, CFCs generally may distribute all other earnings and profits that are eligible for a section 245A deduction before extraordinary disposition E&P for which a section 245A deduction is not allowed. This rule will generally minimize the capital allocation inefficiencies stemming from a potential lockout effect by deferring the application of the temporary regulations to the latest extent possible. Moreover, the Treasury Department and the IRS expect that the extraordinary disposition E&P will not often be associated with liquid assets, such as cash. An extraordinary disposition requires a non-ordinary course transaction among related parties. The Treasury Department and the IRS are aware that transactions giving rise to an extraordinary disposition typically involve the issuance of related party debt or stock. These instruments are not the sort of assets that implicate lockout effect concerns because they would

rarely be used as consideration for making a payment to a third party.

The Treasury Department and the IRS considered as an alternative not providing an ordering rule. For the reasons mentioned above, this alternative was not adopted. In particular, the lack of an ordering rule would have inhibited taxpayers from accessing future offshore earnings that had been appropriately subject to tax under Act, which would have frustrated the congressional purpose underlying the participation exemption. By essentially reviving the lockout effect that had motivated certain international aspects of the Act, this alternative approach may have trapped capital in suboptimal offshore uses.

b. Affected Taxpayers

The taxpayers potentially affected by this aspect of the temporary regulations are direct or indirect U.S. shareholders of certain foreign corporations that are eligible for the section 245A deduction or the section 954(c)(6) exception with respect to distributions from the foreign corporation, and the foreign corporation uses a fiscal year, as opposed to the calendar year, as its taxable year. The foreign corporation must have engaged in a sale of property to a related party (1) during the period between January 1, 2018, and the end of the foreign corporation's last taxable year beginning before 2018, (2) outside the ordinary course of the foreign corporation's activities, and (3) generally, while the corporation was a CFC. Additionally, the property sold must give rise to tested income and the value of the property sold must exceed the lesser of $50 million or 5 percent of the total value of the property of the foreign corporation.

The Treasury Department and the IRS have not estimated how many taxpayers are likely to be affected by these regulations because data on the taxpayers that may have engaged in these particular transactions is not readily available. However, based on tabulations of the 2014 Statistics of Income Study file the Treasury Department and the IRS estimate that there are approximately 5,000 domestic corporations with at least one fiscal year CFC. The actual number of affected taxpayers is smaller than the number of domestic corporations with at least one fiscal year CFC, because a domestic corporation will not be affected unless its fiscal year CFC engages in a non-routine sale with a related party that is of sufficient magnitude that the temporary regulations to apply.

ii. Definition of Extraordinary Reduction

a. Background and Alternatives Considered

The temporary regulations limit the amount of the 245A deduction whenever there is an "extraordinary reduction." The temporary regulations generally define an extraordinary reduction, subject to certain conditions, as when either the controlling section 245A shareholder transfers more than 10 percent of its stock of the CFC or there is a greater than 10 percent change in the controlling section 245A shareholder's overall ownership of the CFC.

The Treasury Department and the IRS, in defining an extraordinary reduction, considered other percentage thresholds. They expect that the ownership change threshold provides an effective balance of compliance costs for taxpayers, effective administration of section 245A, and revenue considerations. The Treasury Department and the IRS do not have appropriate data or models to precisely compute an optimal percentage threshold. The Treasury Department and the IRS solicit comments on the economic and revenue consequences of the ownership change threshold and alternative thresholds. The Treasury Department and the IRS particularly solicit comments that provide data, models, or analysis suitable for evaluating alternative thresholds.

b. Affected Taxpayers

The taxpayers potentially affected by this aspect of the temporary regulations are U.S. shareholders that own directly or indirectly stock of a CFC that has a controlling U.S. shareholder that owns 50 percent or more of the stock of the CFC. Additionally, during the taxable year, the controlling U.S. shareholder generally must directly or indirectly sell stock in the CFC that exceeds 10 percent of the controlling U.S. shareholder's interest in the CFC and 5 percent of the total value of the stock of the CFC. Furthermore, in the year of the ownership reduction, the subpart F income and tested income of the CFC must exceed the lesser of $50 million or 5 percent of the CFC's total income for the year.

The Treasury Department and the IRS have not estimated how many taxpayers are likely to be affected by these regulations because data on the taxpayers that may have engaged or would engage in these particular transactions is not readily available. However, based on 2014 Statistics of Income tax data, the Treasury Department and the IRS estimate that there are approximately 15,000 domestic corporations with CFCs. The Treasury Department and the IRS project that the actual number of affected taxpayers is likely much smaller than the number of domestic corporations with CFCs, given that the controlling U.S. shareholder must engage in a sale of stock of a CFC in a year in which the CFC pays a dividend in order for the temporary regulations to apply.

iii. Election To Avoid Taxable Dividend by Closing the CFC's Taxable Year

a. Background and Alternatives Considered

The Treasury Department and the IRS provide taxpayers with an election to avoid having a taxable dividend with respect to an extraordinary reduction amount by closing the taxable year of the CFC for all purposes of the Code on the date of the extraordinary reduction. Such an election would subject the earnings and profits that, absent the election, would give rise to an extraordinary reduction amount instead to taxation under the subpart F or GILTI regimes, and therefore, exemption under section 245A for any remaining earnings is appropriate. By providing this election, the Treasury Department and the IRS allow taxpayers to choose the tax treatment that would have been imposed in the absence of the interactions among provisions.

In addition to ensuring that similar income is taxed similarly, this election increases the choices available to taxpayers, thus increasing flexibility and thereby minimizing the burden imposed by these regulations. To the extent taxpayers choose this election, tax burdens could be reduced relative to tax burdens under the temporary regulations in the absence of the election, because denying the section 245A deduction could result in higher tax (*i.e.*, at ordinary corporate rates) than imposition of a reduced tax under the GILTI regime. The Treasury Department and the IRS chose to allow such election because if the election were not allowed, some taxpayers would be taxed more heavily than the Treasury Department and the IRS have determined is intended under the Act.

b. Affected Taxpayers

The taxpayers potentially affected by this aspect of the temporary regulations are described in Part I.D.3.ii.b of this Special Analyses.

**II. Paperwork Reduction Act**

The collections of information in the temporary regulations are in §§ 1.245A–5T(e)(3) and 1.6038–2T(f)(16).

The collection of information in § 1.245A–5T(e)(3) is elective for a domestic corporation that is a controlling U.S. shareholder of a CFC receiving a dividend from the CFC and wants to elect to have none of the dividend considered an extraordinary reduction amount by closing the CFC's tax year. The collection of information is satisfied by timely filing of the "Elective Section 245A Year-Closing Statement" with the domestic corporation's original Form 1120, U.S. Corporation Income Tax Return, for the taxable year in which the dividend is received. For purposes of the Paperwork Reduction Act, the reporting burden associated with § 1.245A–5T will be reflected in the Paperwork Reduction Act submission associated with Form 1120 (OMB control no. 1545–0123).

The collection of information in § 1.6038–2T(f)(16) is mandatory for every U.S. person that controls a foreign corporation that has paid a dividend for which a deduction under section 245A was limited by an ineligible amount under § 1.245A–5T(b) or paid a dividend for which the section 954(c)(6) exception was limited by a tiered extraordinary disposition amount or tiered extraordinary reduction amount under § 1.245A–5T(d) and (f), respectively, during an annual accounting period and files Form 5471 for that period (OMB control number 1545–0123 in the case of business taxpayers, formerly, OMB control number 1545–0704). The collection of information in § 1.6038–2T(f)(16) is satisfied by providing information about the ineligible amount, tiered

extraordinary disposition amount, or tiered extraordinary reduction amount for the corporation's accounting period as Form 5471 and its instructions may prescribe. For purposes of the Paperwork Reduction Act, the reporting burden associated with § 1.6038–2T(f)(16) will be reflected in the applicable Paperwork Reduction Act submission, associated with Form 5471. As provided below, the estimated number of respondents for the reporting burden associated with § 1.6038–2T(f)(16) is 12,000–18,000, based on estimates provided by the Research, Applied Analytics and Statistics Division of the IRS.

The related new or revised tax form is as follows:

| | New | Revision of existing form | Number of respondents (estimate) |
|---|---|---|---|
| Schedule to Form 5471 ............................................................................................... | | ✓ | 12,000–18,000 |

The current status of the Paperwork Reduction Act submissions related to the new revised Form 5471 as a result of the information collections in the temporary regulations is provided in the accompanying table. The reporting burdens associated with the information collections in §§ 1.245A–5T–(e)(3) and 1.6038–2T(f)(16) are included in the aggregated burden estimates for OMB control number 1545–0123, which represents a total estimated burden time for all forms and schedules for corporations of 3.157 billion hours and total estimated monetized costs of $58.148 billion ($2017). The overall burden estimates provided in 1545–0123 are aggregate amounts that relate to the entire package of forms associated with the OMB control number and will in the future include but not isolate the estimated burden of the tax forms that will be revised as a result of the information collections in the proposed regulations. These numbers are therefore unrelated to the future calculations needed to assess the burden

imposed by the temporary regulations. The Treasury Department and the IRS urge readers to recognize that these numbers are duplicates of estimates provided for informational purposes in other proposed and final regulatory actions and to guard against over-counting the burden that international tax provisions imposed prior to the Act.

In September 2018, the IRS released and invited comment on drafts of new revised Form 5471 in order to give members of the public the opportunity to benefit from certain specific provisions made to the Code. The IRS received no comments on the draft revised Form 5471 on the portions of the form that relate to section 245A during the comment period. Consequently, the IRS made the form available in December 2018 for use by the public. The IRS is contemplating making additional changes to Form 5471 to implement these temporary regulations.

No burden estimates specific to the temporary regulations are currently

available. The Treasury Department and the IRS have not identified any burden estimates, including those for new information collections, related to the requirements under the temporary regulations. Those estimates would capture both changes made by the Act and those that arise out of discretionary authority exercised in the temporary regulations. The Treasury Department and the IRS request comments on all aspects of information collection burdens related to the temporary regulations, including estimates for how much time it would take to comply with the paperwork burdens described above for each relevant form and ways for the IRS to minimize the paperwork burden. Proposed revisions to these forms that reflect the information collections contained in these temporary regulations will be made available for public comment at *www.irs.gov/draftforms* and will not be finalized until after approved by OMB under the PRA.

| Information collection | Type of filer | OMB No.(s) | Status |
|---|---|---|---|
| Form 5471 ............................... | Business (NEW Model) .......... | 1545–0123 | Approved by OMB on 12/21/2018. |
| | *Link: https://www.federalregister.gov/documents/2018/12/21/2018-27735/agency-information-collection-activities-submission-for-omb-review-comment-request-multiple-irs.* | | |

### III. Unfunded Mandates Reform Act

Section 202 of the Unfunded Mandates Reform Act of 1995 requires

that agencies assess anticipated costs and benefits and take certain other actions before issuing a final rule that

includes any Federal mandate that may result in expenditures in any one year by a state, local, or tribal government, in

the aggregate, or by the private sector, of $100 million in 1995 dollars, updated annually for inflation. In 2019, that threshold is approximately $154 million. These temporary regulations do not include any Federal mandate that may result in expenditures by state, local, or tribal governments, or by the private sector in excess of that threshold.

## IV. Executive Order 13132: Federalism

Executive Order 13132 (entitled "Federalism") prohibits an agency from publishing any rule that has federalism implications if the rule either imposes substantial, direct compliance costs on state and local governments, and is not required by statute, or preempts state law, unless the agency meets the consultation and funding requirements of section 6 of the Executive Order. These temporary regulations do not have federalism implications and do not impose substantial direct compliance costs on state and local governments or preempt state law within the meaning of the Executive Order.

## Drafting Information

The principal author of the temporary regulations is Logan M. Kincheloe, Office of Associate Chief Counsel (International). However, other personnel from the Treasury Department and the IRS participated in their development.

## List of Subjects in 26 CFR Part 1

Income taxes, Reporting and recordkeeping requirements.

## Amendments to the Regulations

Accordingly, 26 CFR part 1 is amended as follows:

## PART 1—INCOME TAXES

■ **Paragraph 1.** The authority citation for part 1 is amended by adding a sectional authority for § 1.245A–5 to read in part as follows:

**Authority:** 26 U.S.C. 7805 * * *

\* \* \* \* \*

Section 1.245A–5 also issued under 26 U.S.C. 245A(g), 951A(a), 954(c)(6)(A), and 965(o).

\* \* \* \* \*

■ **Par. 2.** Reserved sections 1.245A–1 through 4 and § 1.245A–5T are added to read as follows:

Sec.
1.245A–1  [Reserved].
1.245A–2  [Reserved].
1.245A–3  [Reserved].
1.245A–4  [Reserved].
1.245A–5T  Limitation of section 245A deduction and section 954(c)(6) exception (temporary).

### § 1.245A–5T   Limitation of section 245A deduction and section 954(c)(6) exception (temporary).

(a) *Overview.* This section provides rules that limit a deduction under section 245A(a) to the portion of a dividend that exceeds the ineligible amount of such dividend or the applicability of section 954(c)(6) when a portion of a dividend is paid out of an extraordinary disposition account or when an extraordinary reduction occurs. Paragraph (b) of this section provides rules regarding ineligible amounts. Paragraph (c) of this section provides rules for determining ineligible amounts attributable to an extraordinary disposition. Paragraph (d) of this section provides rules that limit the application of section 954(c)(6) when one or more section 245A shareholders of a lower-tier CFC have an extraordinary disposition account. Paragraph (e) of this section provides rules for determining ineligible amounts attributable to an extraordinary reduction. Paragraph (f) of this section provides rules that limit the application of section 954(c)(6) when a lower-tier CFC has an extraordinary reduction amount. Paragraph (g) of this section provides special rules for purposes of applying this section. Paragraph (h) of this section provides an anti-abuse rule. Paragraph (i) of this section provides definitions. Paragraph (j) of this section provides examples illustrating the application of this section. Paragraph (k) of this section provides the applicability date of this section. Paragraph (l) of this section provides the expiration date of this section.

(b) *Limitation of deduction under section 245A*—(1) *In general.* A section 245A shareholder is allowed a section 245A deduction for any dividend received from an SFC (provided all other applicable requirements are satisfied) only to the extent that the dividend exceeds the ineligible amount of the dividend. See paragraphs (j)(2), (4), and (5) of this section for examples illustrating the application of this paragraph (b)(1).

(2) *Definition of ineligible amount.* The term *ineligible amount* means, with respect to a dividend received by a section 245A shareholder from an SFC, an amount equal to the sum of—

(i) 50 percent of the extraordinary disposition amount (as determined under paragraph (c) of this section), and

(ii) The extraordinary reduction amount (as determined under paragraph (e) of this section).

(c) *Rules for determining extraordinary disposition amount*—(1) *Definition of extraordinary disposition amount.* The term *extraordinary*

*disposition amount* means the portion of a dividend received by a section 245A shareholder from an SFC that is paid out of the extraordinary disposition account with respect to the section 245A shareholder. See paragraph (j)(2) of this section for an example illustrating the application of this paragraph (c).

(2) *Determination of portion of dividend paid out of extraordinary disposition account*—(i) *In general.* For purposes of determining the portion of a dividend received by a section 245A shareholder from an SFC that is paid out of the extraordinary disposition account with respect to the section 245A shareholder, the following rules apply—

(A) The dividend is first considered paid out of non-extraordinary disposition E&P with respect to the section 245A shareholder; and

(B) The dividend is next considered paid out of the extraordinary disposition account to the extent of the section 245A shareholder's extraordinary disposition account balance.

(ii) *Definition of non-extraordinary disposition E&P.* The term *non-extraordinary disposition E&P* means, with respect to a section 245A shareholder and an SFC, an amount of earnings and profits of the SFC equal to the excess, if any, of—

(A) The product of—

(*1*) The amount of the SFC's earnings and profits described in section 959(c)(3), determined as of the end of the SFC's taxable year (for this purpose, without regard to distributions during the taxable year other than as provided in this paragraph (c)(2)(ii)(A)(*1*)), but, if during the taxable year the SFC pays more than one dividend, reduced (but not below zero) by the amounts of any dividends paid by the SFC earlier in the taxable year; and

(*2*) The percentage of the stock (by value) of the SFC that the section 245A shareholder owns directly or indirectly immediately after the distribution (taking into account all transactions related to the distribution); over

(B) The balance of the section 245A shareholder's extraordinary disposition account with respect to the SFC, determined immediately before the distribution.

(3) *Definitions with respect to extraordinary disposition accounts*—(i) *Extraordinary disposition account*—(A) *In general.* The term *extraordinary disposition account* means, with respect to a section 245A shareholder of an SFC, an account the balance of which is equal to the product of the extraordinary disposition ownership percentage and the extraordinary disposition E&P, reduced (but not below zero) by the

prior extraordinary disposition amount, and adjusted under paragraph (c)(4) of this section, as applicable.

(B) *Extraordinary disposition ownership percentage.* The term *extraordinary disposition ownership percentage* means the percentage of stock (by value) of a SFC that a section 245A shareholder owns directly or indirectly at the beginning of the disqualified period or, if later, on the first day during the disqualified period on which the SFC is a CFC, regardless of whether the section 245A shareholder owns directly or indirectly such stock of the SFC on the date of an extraordinary disposition giving rise to extraordinary disposition E&P; if not, see paragraph (c)(4) of this section.

(C) *Extraordinary disposition E&P.* The term *extraordinary disposition E&P* means an amount of earnings and profits of an SFC equal the sum of the net gain recognized by the SFC with respect to specified property in each extraordinary disposition. In the case of an extraordinary disposition with respect to the SFC arising as a result of a disposition of specified property by a specified entity (other than a foreign corporation), an interest of which is owned directly or indirectly (through one or more other specified entities that are not foreign corporations) by the SFC, the net gain taken into account for purposes of the preceding sentence is the SFC's distributive share of the net gain recognized by the specified entity with respect to the specified property.

(D) *Prior extraordinary disposition amount*—(1) *General rule.* The term *prior extraordinary disposition amount* means, with respect to an SFC and a section 245A shareholder, the sum of the extraordinary disposition amount of each prior dividend received by the section 245A shareholder from the SFC by reason of paragraph (c) of this section and 200 percent of the sum of the amounts included in the section 245A shareholder's gross income under section 951(a) by reason of paragraph (d) of this section (in the case in which the SFC is, or has been, a lower-tier CFC). A section 245A shareholder's prior extraordinary disposition amount also includes—

(i) A prior dividend received by the section 245A shareholder from the SFC to the extent not an extraordinary reduction amount and to the extent the dividend was not eligible for the section 245A deduction by reason of section 245A(e) or the holding period requirement of section 246 not being satisfied but would have been an extraordinary disposition amount had paragraph (c) of this section applied to the dividend;

(ii) The portion of a prior dividend (to the extent not a tiered extraordinary disposition amount by reason of paragraph (d) of this section) received by an upper-tier CFC from the SFC that by reason of section 245A(e) was included in the upper-tier CFC's foreign personal holding company income and was included in gross income by the section 245A shareholder under section 951(a) but would have been a tiered extraordinary disposition amount by reason of paragraph (d) of this section had paragraph (d) applied to the dividend;

(iii) If a prior dividend received by an upper-tier CFC from a lower-tier CFC gives rise to a tiered extraordinary disposition amount with respect to the section 245A shareholder by reason of paragraph (d) of this section, the qualified portion.

(2) *Definition of qualified portion*—(i) *In general.* The term *qualified portion* means, with respect to a tiered extraordinary disposition amount of a section 245A shareholder and a lower-tier CFC, 200 percent of the portion of the disqualified amount with respect to the tiered extraordinary disposition amount equal to the sum of the amounts included in gross income by each U.S. tax resident under section 951(a) in the taxable year in which the tiered extraordinary disposition amount arose with respect to the lower-tier CFC by reason of paragraph (d) of this section. For purposes of the preceding sentence, the reference to a U.S. tax resident does not include any section 245A shareholder with a tiered extraordinary disposition amount with respect to the lower-tier CFC.

(ii) *Determining a qualified portion if multiple section 245A shareholders have tiered extraordinary disposition amounts.* For the purposes of applying paragraph (c)(3)(i)(D)(2)(i) of this section, if more than one section 245A shareholder has a tiered extraordinary disposition amount with respect to a dividend received by an upper-tier CFC from a lower-tier CFC, then the qualified portion with respect to each section 245A shareholder is equal to the amount described in paragraph (c)(3)(i)(D)(2)(i) of this section, without regard to this paragraph (c)(3)(i)(D)(2)(ii), multiplied by a fraction, the numerator of which is the section 245A shareholder's tiered extraordinary disposition amount with respect to the lower-tier CFC and the denominator of which is the sum of the tiered extraordinary disposition amounts with respect to each section 245A shareholder and the lower-tier CFC.

(ii) *Extraordinary disposition*—(A) *In general.* Except as provided in

paragraph (c)(3)(ii)(E) of this section, the term *extraordinary disposition* means, with respect to an SFC, any disposition of specified property by the SFC on a date on which it was a CFC and during the SFC's disqualified period to a related party if the disposition occurs outside of the ordinary course of the SFC's activities. An extraordinary disposition also includes a disposition during the disqualified period on a date on which the SFC is not a CFC if there is a plan, agreement, or understanding involving a section 245A shareholder to cause the SFC to recognize gain that would give rise to an extraordinary disposition if the SFC were a CFC.

(B) *Facts and circumstances.* A determination as to whether a disposition is undertaken outside of the ordinary course of an SFC's activities is made on the basis of facts and circumstances, taking into account whether the transaction is consistent with the SFC's past activities, including with respect to quantity and frequency. In addition, a disposition of specified property by an SFC to a related party may be considered outside of the ordinary course of the SFC's activities notwithstanding that the SFC regularly disposes of property of the same type of, or similar to, the specified property to persons that are not related parties.

(C) *Per se rules.* A disposition is treated as occurring outside of the ordinary course of an SFC's activities if the disposition is undertaken with a principal purpose of generating earnings and profits during the disqualified period or if the disposition is of intangible property, as defined in section 367(d)(4).

(D) *Treatment of dispositions by certain specified entities.* For purposes of paragraph (c)(3)(ii)(A) of this section, an extraordinary disposition with respect to an SFC includes a disposition by a specified entity other than a foreign corporation, provided that immediately before or immediately after the disposition the specified entity is a related party with respect to the SFC, the SFC directly or indirectly (through one or more other specified entities other than foreign corporations) owns an interest in the specified entity, and the disposition would have otherwise qualified as an extraordinary disposition had the specified entity been a foreign corporation.

(E) *De minimis exception to extraordinary disposition.* If the sum of the net gain recognized by an SFC with respect to specified property in all dispositions otherwise described in paragraph (c)(3)(ii)(A) of this section does not exceed the lesser of $50 million or 5 percent of the gross value

of all of the SFC's property held immediately before the beginning of its disqualified period, then no disposition of specified property by the SFC is an extraordinary disposition.

(iii) *Disqualified period.* The term *disqualified period* means, with respect to an SFC that is a CFC on any day during the taxable year that includes January 1, 2018, the period beginning on January 1, 2018, and ending as of the close of the taxable year of the SFC, if any, that begins before January 1, 2018, and ends after December 31, 2017.

(iv) *Specified property.* The term *specified property* means any property if gain recognized with respect to such property during the disqualified period is not described in section 951A(c)(2)(A)(i)(I) through (V). If only a portion of the gain recognized with respect to property during the disqualified period is gain that is not described in section 951A(c)(2)(A)(i)(I) through (V), then a portion of the property is treated as specified property in an amount that bears the same ratio to the value of the property as the amount of gain not described in section 951A(c)(2)(A)(i)(I) through (V) bears to the total amount of gain recognized with respect to such property during the disqualified period.

(4) *Successor rules for extraordinary disposition accounts.* This paragraph (c)(4) applies with respect to an extraordinary disposition account upon certain direct or indirect transfers of stock of an SFC by a section 245A shareholder.

(i) *Another section 245A shareholder succeeds to all or portion of account.* Except for a transfer described in § 1.1248–8(a)(1), paragraphs (c)(4)(i)(A) through (C) of this section apply when a section 245A shareholder of an SFC (the *transferor*) transfers directly or indirectly a share of stock (or a portion of a share of stock) of the SFC that it owns directly or indirectly (the share or portion thereof, a *transferred share*).

(A) If immediately after the transfer (taking into account all transactions related to the transfer) another person is a section 245A shareholder of the SFC, then such other person's extraordinary disposition account with respect to the SFC is increased by the person's proportionate share of the amount allocated to the transferred share.

(B) For purposes of paragraph (c)(4)(i)(A) of this section, the amount allocated to a transferred share is equal to the product of—

(1) The balance of the transferor's extraordinary disposition account with respect to the SFC, determined after any reduction pursuant to paragraph (c)(3) of this section by reason of dividends

and before the application of this paragraph (c)(4)(i)(B); and

(2) A fraction, the numerator of which is the value of the transferred share and the denominator of which is the value of all of the stock of the SFC that the transferor owns directly or indirectly immediately before the transfer.

(C) For purposes of paragraph (c)(4)(i)(A) of this section, a person's proportionate share of the amount allocated to a transferred share under paragraph (c)(4)(i)(B) of this section is equal to the product of—

(1) The amount allocated to the share; and

(2) The percentage (expressed as a decimal) of the share (by value) that the person owns directly or indirectly immediately after the transfer (taking into account all transactions related to the transfer).

(D) The transferor's extraordinary disposition account with respect to the SFC is decreased by the amount by which another person's extraordinary disposition account with respect to the SFC is increased pursuant to paragraph (c)(4)(i)(A) of this section.

(E) If a principal purpose of the transfer is to shift, or to avoid, an amount in the transferor's extraordinary disposition account with respect to the SFC to another person, then for purposes of this section, the transfer may be disregarded or other appropriate adjustments may be made.

(ii) *Certain section 381 transactions.* If assets of an SFC (the *acquired corporation*) are acquired by another SFC (the *acquiring corporation*) pursuant to a transaction described in section 381(a) in which the acquired corporation is the transferor corporation for purposes of section 381, then a section 245A shareholder's extraordinary disposition account with respect to the acquiring corporation is increased by the balance of its extraordinary disposition account with respect to the acquired corporation, determined after any reduction pursuant to paragraph (c)(3) of this section by reason of dividends and before the application of this paragraph (c)(4)(ii).

(iii) *Certain distributions involving section 355 or 356.* If, pursuant to a reorganization described in section 368(a)(1)(D) involving a distribution under section 355 (or so much of section 356 as it relates to section 355) by an SFC (the *distributing corporation*) of stock of another SFC (the *controlled corporation*), earnings and profits of the distributing corporation are allocated between the distributing corporation and the controlled corporation, then a section 245A shareholder's extraordinary disposition account with

respect to the distributing corporation is allocated on a similar basis between the distributing corporation and the controlled corporation.

(iv) *Certain transfers of stock of lower-tier CFCs by upper-tier CFCs.* If an upper-tier CFC directly or indirectly transfers stock of a lower-tier CFC and if as a result of the transfer a section 245A shareholder ceases to be a section 245A shareholder with respect to the lower-tier CFC, then the section 245A shareholder's extraordinary disposition account with respect to the upper-tier CFC is increased by the balance of the section 245A shareholder's extraordinary disposition account with respect to the lower-tier CFC, determined after any reduction pursuant to paragraph (c)(3) of this section by reason of dividends and after application of paragraph (c)(4)(i) of this section, if applicable. If a section 245A shareholder ceases to be a section 245A shareholder with respect to a lower-tier CFC by reason of a direct or indirect transfer of stock of the lower-tier CFC by multiple upper-tier CFCs that occur pursuant to a plan (or series of related transactions), then the balance of the section 245A shareholder's extraordinary disposition account is allocated among the upper-tier CFCs. The portion of the balance of the account allocated to each upper-tier CFC is equal to the balance of the account multiplied by a fraction, the numerator of which is the value of the stock of the lower-tier CFC transferred directly or indirectly by the upper-tier CFC, and the denominator of which is the sum of the value of the stock of the lower-tier CFC transferred directly or indirectly by all upper-tier CFCs.

(d) *Limitation of amount eligible for section 954(c)(6) when there is an extraordinary disposition account with respect to a lower-tier CFC*—(1) *In general.* If an upper-tier CFC receives a dividend from a lower-tier CFC, the dividend is eligible for the exception to foreign personal holding company income under section 954(c)(6) only to the extent that the amount that would be eligible for the section 954(c)(6) exception (determined without regard to this paragraph (d)) exceeds the *disqualified amount,* which is 50 percent of the quotient of the following—

(i) The sum of each section 245A shareholder's tiered extraordinary disposition amount with respect to the lower-tier CFC; and

(ii) The percentage (expressed as a decimal) of stock of the upper-tier CFC (by value) owned, in the aggregate, by U.S. tax residents that include in gross income their pro rata share of the upper-

tier CFC's subpart F income under section 951(a) on the last day of the upper-tier CFC's taxable year. If a U.S. tax resident is a direct or indirect partner in a domestic partnership that is a United States shareholder of the upper-tier CFC, the amount of stock owned by the U.S. tax resident for purposes of the preceding sentence is determined under the principles of paragraph (g)(3) of this section.

(2) *Definition of tiered extraordinary disposition amount—(i) In general.* The term *tiered extraordinary disposition amount* means, with respect to a dividend received by an upper-tier CFC from a lower-tier CFC and a section 245A shareholder, the portion of the dividend that would be an extraordinary disposition amount if the section 245A shareholder received as a dividend its pro rata share of the dividend from the lower-tier CFC. The preceding sentence does not apply to an amount treated as a dividend received by an upper-tier CFC from a lower-tier CFC by reason of section 964(e)(4) (in such case, see paragraphs (b)(1) and (g)(2) of this section).

(ii) *Section 245A shareholder's pro rata share of a dividend received by an upper-tier CFC.* For the purposes of paragraph (d)(2)(i) of this section, a section 245A shareholder's pro rata share of the amount of a dividend received by an upper-tier CFC from a lower-tier CFC equals the amount by which the dividend would increase the section 245A shareholder's pro rata share of the upper-tier CFC's subpart F income under section 951(a)(2) and § 1.951–1(b) and (e) if the dividend were included in the upper-tier CFC's foreign personal holding company income under section 951(a)(1), determined without regard to section 952(c) and as if the upper-tier CFC had no deductions properly allocable to the dividend under section 954(b)(5).

(e) *Extraordinary reduction amount—* (1) *In general.* Except as provided in paragraph (e)(3) of this section, the term *extraordinary reduction amount* means, with respect to a dividend received by a controlling section 245A shareholder from a CFC during a taxable year of the CFC ending after December 31, 2017, in which an extraordinary reduction occurs with respect to the controlling section 245A shareholder's ownership of the CFC, the lesser of the amounts described in paragraph (e)(1)(i) or (ii) of this section. *See* paragraphs (j)(4) through (6) of this section for examples illustrating the application of this paragraph (e).

(i) The amount of the dividend.

(ii) The amount equal to the sum of the controlling section 245A

shareholder's pre-reduction pro rata share of the CFC's subpart F income (as defined in section 952(a)) and tested income (as defined in section 951A(c)(2)(A)) for the taxable year, reduced, but not below zero, by the prior extraordinary reduction amount.

(2) *Rules regarding extraordinary reduction amounts—(i) Extraordinary reduction—(A) In general.* Except as provided in paragraph (e)(2)(i)(C) of this section, an *extraordinary reduction* occurs with respect to a controlling section 245A shareholder's ownership of a CFC during a taxable year of the CFC, if either of the conditions described in paragraph (e)(2)(i)(A)(1) or (2) of this section is satisfied. See paragraphs (j)(4) and (5) of this section for examples illustrating an extraordinary reduction.

(1) The condition of this paragraph (e)(2)(i)(A)(1) requires that during the taxable year, the controlling section 245A shareholder transfers directly or indirectly (other than by reason of a transfer occurring pursuant to an exchange described in section 368(a)(1)(E) or (F)), in the aggregate, more than 10 percent (by value) of the stock of the CFC that the section 245A shareholder owns directly or indirectly as of the beginning of the taxable year of the CFC, provided the stock transferred, in the aggregate, represents at least 5 percent (by value) of the outstanding stock of the CFC as of the beginning of the taxable year of the CFC; or

(2) The condition of this paragraph (e)(2)(i)(A)(2) requires that, as a result of one or more transactions occurring during the taxable year, the percentage of stock (by value) of the CFC that the controlling section 245A shareholder owns directly or indirectly as of the close of the last day of the taxable year of the CFC is less than 90 percent of the percentage of stock (by value) that the controlling section 245A shareholder owns directly or indirectly on either of the dates described in paragraphs (e)(2)(i)(B)(1) and (2) of this section (such percentage, the *initial percentage*), provided the difference between the initial percentage and percentage at the end of the year is at least five percentage points.

(B) *Dates for purposes of the initial percentage.* For purposes of paragraph (e)(2)(i)(A)(2) of this section, the dates described in paragraphs (e)(2)(i)(B)(1) and (2) of this section are—

(1) The day of the taxable year on which the controlling section 245A shareholder owns directly or indirectly its highest percentage of stock (by value) of the CFC; and

(2) The day immediately before the first day on which stock was transferred directly or indirectly in the preceding taxable year in a transaction (or a series of transactions) occurring pursuant to a plan to reduce the percentage of stock (by value) of the CFC that the controlling section 245A shareholder owns directly or indirectly.

(C) *Transactions pursuant to which CFC's taxable year ends.* A controlling section 245A shareholder's direct or indirect transfer of stock of a CFC that but for this paragraph (e)(2)(i)(B) would give rise to an extraordinary reduction under paragraph (e)(2)(i)(A) of this section does not give rise to an extraordinary reduction if the taxable year of the CFC ends immediately after the transfer, provided that the controlling section 245A shareholder directly or indirectly owns the stock on the last day of such year. Thus, for example, if a controlling section 245A shareholder exchanges all the stock of a CFC pursuant to a complete liquidation of the CFC, the exchange does not give rise to an extraordinary reduction.

(ii) *Rules for determining pre-reduction pro rata share—(A) In general.* Except as provided in paragraph (e)(2)(ii)(B) of this section, the term *pre-reduction pro rata share* means, with respect to a controlling section 245A shareholder and the subpart F income or tested income of a CFC, the controlling section 245A shareholder's pro rata share of the CFC's subpart F income or tested income under section 951(a)(2) and § 1.951–1(b) and (e) or section 951A(e)(1) and § 1.951A–1(d)(1), respectively, determined based on the controlling section 245A shareholder's direct or indirect ownership of stock of the CFC immediately before the extraordinary reduction (or, if the extraordinary reduction occurs by reason of multiple transactions, immediately before the first transaction) and without regard to section 951(a)(2)(B) and § 1.951–1(b)(1)(ii), but only to the extent that such subpart F income or tested income is not included in the controlling section 245A shareholder's pro rata share of the CFC's subpart F income or tested income under section 951(a)(2) and § 1.951–1(b) and (e) or section 951A(e)(1) and § 1.951A–1(d)(1), respectively.

(B) *Decrease in section 245A shareholder's pre-reduction pro rata share for amounts taken into account by U.S. tax resident.* A controlling section 245A shareholder's pre-reduction pro rata share of subpart F income or tested income of a CFC for a taxable year is reduced by an amount equal to the sum of the amounts by which each U.S. tax

resident's pro rata share of the subpart F income or tested income is increased as a result of a transfer directly or indirectly of stock of the CFC by the controlling section 245A shareholder or an issuance of stock by the CFC (such an amount with respect to a U.S. tax resident, a *specified amount*), in either case, during the taxable year in which the extraordinary reduction occurs. For purposes of this paragraph (e)(2)(ii)(B), if there are extraordinary reductions with respect to more than one controlling section 245A shareholder during the CFC's taxable year, then a U.S. tax resident's specified amount attributable to an acquisition of stock from the CFC is prorated with respect to each controlling section 245A shareholder based on its relative decrease in ownership of the CFC. See paragraph (j)(5) of this section for an example illustrating a decrease in a section 245A shareholder's pre-reduction pro rata share for amounts taken into account by a U.S. tax resident.

(C) *Prior extraordinary reduction amount.* The term *prior extraordinary reduction amount* means, with respect to a CFC and section 245A shareholder and a taxable year of the CFC in which an extraordinary reduction occurs, the sum of the extraordinary reduction amount of each prior dividend received by the section 245A shareholder from the CFC during the taxable year. A section 245A shareholder's prior extraordinary reduction amount also includes—

(*1*) A prior dividend received by the section 245A shareholder from the CFC during the taxable year to the extent the dividend was not eligible for the section 245A deduction by reason of section 245A(e) or the holding period requirement of section 246 not being satisfied but would have been an extraordinary reduction amount had this paragraph (e) applied to the dividend;

(*2*) If the CFC is a lower-tier CFC for a portion of the taxable year during which the lower-tier CFC pays any dividend to an upper tier-CFC, the portion of a prior dividend received by an upper-tier CFC from the lower-tier CFC during the taxable year of the lower-tier CFC that, by reason of section 245A(e), was included in the upper-tier CFC's foreign personal holding company income and that by reason of section 951(a) was included in income of the section 245A shareholder, and that would have given rise to a tiered extraordinary reduction amount by reason of paragraph (f) of this section had paragraph (f) applied to the dividend of which the section 245A

shareholder would have included a pro rata share of the tiered extraordinary reduction amount in income by reason of section 951(a); and

(*3*) If the CFC is a lower-tier CFC for a portion of the taxable year during which the lower-tier CFC pays any dividend to an upper-tier CFC, the sum of the portion of the tiered extraordinary reduction amount of each prior dividend received by an upper-tier CFC from the lower-tier CFC during the taxable year that is included in income of the section 245A shareholder by reason of section 951(a).

(3) *Exceptions*—(i) *Elective exception to close CFC's taxable year*—(A) *In general.* For a taxable year of a CFC in which an extraordinary reduction occurs with respect to a controlling section 245A shareholder and for which, absent this paragraph (e)(3), there would be an extraordinary reduction amount or tiered extraordinary reduction amount greater than zero, no amount is considered an extraordinary reduction amount or tiered extraordinary reduction amount with respect to the controlling section 245A shareholder if each controlling section 245A shareholder elects, pursuant to this paragraph (e)(3), to close the CFC's taxable year for all purposes of the Internal Revenue Code (and, therefore, as to all shareholders of the CFC) as of the end of the date on which the extraordinary reduction occurs, or, if the extraordinary reduction occurs by reason of multiple transactions, as of the end of each date on which a transaction forming a part of the extraordinary reduction occurs. For purposes of applying this paragraph (e)(3), a controlling section 245A shareholder that has an extraordinary reduction (or a transaction forming a part thereof) with respect to a CFC is treated as owning the same amount of stock it owned in the CFC immediately before the extraordinary reduction (or a transaction forming a part thereof) on the end of the date on which the extraordinary reduction occurs (or such transaction forming a part thereof occurs). To the extent that stock of a CFC is treated as owned by a controlling section 245A shareholder as of the close of the CFC's taxable year pursuant to the preceding sentence, such stock is treated as not being owned by any other person as of the close of the CFC's taxable year. If each controlling section 245A shareholder elects to close the CFC's taxable year, that closing will be treated as a change in accounting period for the purposes of § 1.964–1(c).

(B) *Allocation of foreign taxes.* If an election is made pursuant to this paragraph (e)(3) to close a CFC's taxable

year and the CFC's taxable year under foreign law (if any) does not close at the end of the date on which the CFC's taxable year closes as a result of the election, foreign taxes paid or accrued with respect to such foreign taxable year are allocated between the period of the foreign taxable year that ends with, and the period of the foreign taxable year that begins after, the date on which the CFC's taxable year closes as a result of the election. If there is more than one date on which the CFC's taxable year closes as a result of the election, foreign taxes paid or accrued with respect to the foreign taxable year are allocated to all such periods. The allocation is made based on the respective portions of the taxable income of the CFC (as determined under foreign law) for the foreign taxable year that are attributable under the principles of § 1.1502–76(b) to the periods during the foreign taxable year. Foreign taxes allocated to a period under this paragraph (e)(3)(i)(B) are treated as paid or accrued by the CFC as of the close of that period.

(C) *Time and manner of making election*—(1) *General rule.* An election pursuant to this paragraph (e)(3) is made and effective if the statement required by paragraph (e)(3)(iv) of this section is timely filed (including extensions) by each controlling section 245A shareholder making the election with its original U.S. tax return for the taxable year in which the extraordinary reduction occurs. Before the filing of the statement described in paragraph (e)(3)(iv) of this section, each controlling section 245A shareholder and each U.S. tax resident that on the end of the date on which the extraordinary reduction occurs (or, if the extraordinary reduction occurs by reason of multiple transactions, each U.S. tax resident that on the end of each date on which a transaction forming a part of the extraordinary reduction occurs) owns directly or indirectly stock of the CFC and is a United States shareholder with respect to the CFC must enter into a written, binding agreement agreeing that each controlling section 245A shareholder will elect to close the taxable year of the CFC. If a controlling section 245A shareholder is a member of a consolidated group (within the meaning of § 1.1502–1(h)) and participates in the extraordinary reduction, the agent for such group (within the meaning of § 1.1502– 77(c)(1)) must file the election described in this paragraph (e)(3) on behalf of such member.

(2) *Transition rule.* In the case of an extraordinary reduction occurring before the date these regulations are filed as final regulations in the **Federal**

**Register**, the statement required by paragraph (e)(3)(iv) of this section is considered timely filed if it is attached by each controlling section 245A shareholder to an original or amended return for the taxable year in which the extraordinary reduction occurs.

(D) *Form and content of statement.* The statement required by paragraph (e)(3)(iii) of this section is to be titled "Elective Section 245A Year-Closing Statement." The statement must—

(*1*) Identify (by name and tax identification number, if any) each controlling section 245A shareholder, each U.S tax resident described in paragraph (e)(3)(iii) of this section, and the CFC;

(*2*) State the date of the extraordinary reduction (or, if the extraordinary reduction includes transactions on more than one date, the dates of all such transactions) to which the election applies;

(*3*) State the filing controlling section 245A shareholder's pro rata share of the subpart F income, tested income, and foreign taxes described in section 960 with respect to the stock of the CFC subject to the extraordinary reduction, and the amount of earnings and profits attributable to such stock within the meaning of section 1248, as of the date of the extraordinary reduction;

(*4*) State that each controlling section 245A shareholder and each U.S. tax resident described in paragraph (e)(3)(iii) of this section have entered into a written, binding agreement to elect to close the CFC's taxable year in accordance with paragraph (e)(3)(iii) of this section; and

(*5*) Be filed in the manner prescribed by forms, publications, or other guidance published in the Internal Revenue Bulletin.

(E) *Consistency requirements.* If multiple extraordinary reductions occur with respect to one or more controlling section 245A shareholders' ownership in a single CFC during one or more taxable years of the CFC, then to the extent those extraordinary reductions occur pursuant to a plan or series of related transactions, the election described in this paragraph (e)(3) section may be made only if it is made for all such extraordinary reductions with respect to the CFC. Furthermore, if an extraordinary reduction occurs with respect to a controlling section 245A shareholder's ownership in multiple CFCs, then, to the extent those extraordinary reductions occur pursuant to a plan or series of related transactions, the election described in this paragraph (e)(3) may be made only if it is made for all such extraordinary reductions with respect to all of the

CFCs that have the same or related (within the meaning of section 267(b) or 707(b)) controlling section 245A shareholders.

(ii) *De minimis subpart F income and tested income.* For a taxable year of a CFC in which an extraordinary reduction occurs, no amount is considered an extraordinary reduction amount with respect to a controlling section 245A shareholder of the CFC if the sum of the CFC's subpart F income and tested income (as defined in section 951A(c)(2)(A)) for the taxable year does not exceed the lesser of $50 million or 5 percent of the CFC's total income for the taxable year.

(f) *Limitation of amount eligible for section 954(c)(6) where extraordinary reduction occurs with respect to lower-tier CFCs*—(1) *In general.* If an extraordinary reduction occurs with respect to a lower-tier CFC and an upper-tier CFC receives a dividend from the lower-tier CFC in the taxable year in which the extraordinary reduction occurs, then, the amount of the dividend that would otherwise be eligible for the exception to foreign personal holding company income under section 954(c)(6) (determined without regard to this paragraph (f)) is eligible for such exception only to the extent the dividend exceeds the tiered extraordinary reduction amount. The preceding sentence does not apply to an amount treated as a dividend received by an upper-tier CFC by reason of section 964(e)(4) (in this case, see paragraphs (b) and (g)(2) of this section). See paragraph (j)(7) of this section for an example illustrating the application of this paragraph (f)(1).

(2) *Definition of tiered extraordinary reduction amount.* The term *tiered extraordinary reduction amount* means, with respect to the portion of a dividend received by an upper-tier CFC from a lower-tier CFC during a taxable year of the lower-tier CFC that would be eligible for the exception to foreign personal holding company income under section 954(c)(6) (determined without regard to this paragraph (f)), the amount of such dividend equal to the excess, if any, of—

(i) The product of—

(A) The sum of the amount of the subpart F income and tested income of the lower-tier CFC for the taxable year; and

(B) The percentage (by value) of stock of the lower-tier CFC owned (within the meaning of section 958(a)(2)) by the upper-tier CFC immediately before the extraordinary reduction (or the first transaction forming a part thereof); over

(ii) The following amounts—

(A) The sum of each U.S. tax resident's pro rata share of the lower-tier CFC's subpart F income and tested income under section 951(a) or 951A(a), respectively, that is attributable to shares of the lower-tier CFC owned (within the meaning of section 958(a)(2)) by the upper-tier CFC immediately prior to the extraordinary reduction (or the first transaction forming a part thereof), computed without the application of this paragraph (f);

(B) The sum of each prior tiered extraordinary reduction amount and sum of each amount included in an upper-tier CFC's subpart F income by reason of section 245A(e) with respect to prior dividends from the lower-tier CFC during the taxable year;

(C) The sum of the prior extraordinary reduction amounts (but, for this purpose, computed without regard to amounts described in paragraphs (e)(2)(ii)(C)(*2*) and (*3*) of this section) of each controlling section 245A shareholder with respect to shares of the lower-tier CFC that were owned by such controlling section 245A shareholder (including indirectly through a specified entity other than a foreign corporation) for a portion of the taxable year but are owned by an upper-tier CFC (including indirectly through a specified entity other than a foreign corporation) at the time of the distribution of the dividend; and

(D) The product of the amount described in paragraph (f)(2)(ii)(B) of this section and the sum of the amounts of each U.S. tax resident's pro rata share of subpart F income and tested income for the taxable year under section 951(a) or 951A(a), respectively, attributable to shares of the lower-tier CFC directly or indirectly acquired by the U.S. tax resident from the lower-tier CFC during the taxable year.

(3) *Transition rule for computing tiered extraordinary reduction amount.* Solely for purposes of applying this paragraph (f) in taxable years of a lower-tier CFC beginning on or after January 1, 2018, and ending before June 14, 2019, a tiered extraordinary reduction amount is determined by treating the lower-tier CFC's subpart F income for the taxable year as if it were neither subpart F income nor tested income.

(g) *Special rules.* The following rules apply for purposes of this section.

(1) *Source of dividends.* A dividend received by any person is considered received directly by such person from the foreign corporation whose earnings and profits give rise to the dividend. Therefore, for example, if a section 245A shareholder sells or exchanges stock of an upper-tier CFC and the gain

recognized on the sale or exchange is included in the gross income of the section 245A shareholder as a dividend under section 1248(a), then, to the extent the dividend is attributable under section 1248(c)(2) to the earnings and profits of a lower-tier CFC owned, within the meaning of section 958(a)(2), by the section 245A shareholder through the upper-tier CFC, the dividend is considered received directly by the section 245A shareholder from the lower-tier CFC.

(2) *Certain section 964(e) inclusions treated as dividends.* An amount included in the gross income of a section 245A shareholder under section 951(a)(1)(A) by reason of section 964(e)(4) is considered a dividend received by the section 245A shareholder directly from the foreign corporation whose earnings and profits give rise to the amount described in section 964(e)(1). Therefore, for example, if an upper-tier CFC sells or exchanges stock of a lower-tier CFC, and, as a result of the sale or exchange, a section 245A shareholder with respect to the upper-tier CFC includes an amount in gross income under section 951(a)(1)(A) by reason of section 964(e)(4), then the inclusion is treated as a dividend received directly by the section 245A shareholder from the lower-tier CFC whose earnings and profits give rise to the dividend, and the section 245A shareholder is not allowed a section 245A deduction for the dividend to the extent of the ineligible amount of such dividend.

(3) *Rules regarding stock ownership and stock transfers*—(i) *Determining indirect ownership of stock of an SFC or a CFC.* For purposes of this section, if a person owns an interest in, or stock of, a specified entity, including through a chain of ownership of one or more other specified entities, then the person is considered to own indirectly a pro rata share of stock of an SFC or a CFC owned by the specified entity. To determine a person's pro rata share of stock owned by a specified entity, the principles of section 958(a) apply without regard to whether the specified entity is foreign or domestic.

(ii) *Determining indirect transfers for stock owned indirectly.* If, under paragraph (g)(3)(i) of this section, a person is considered to own indirectly stock of an SFC or CFC that is owned by a specified entity, then the following rules apply in determining if the person transfers stock of the SFC or CFC—

(A) To the extent the specified entity transfers stock that is considered owned indirectly by the person immediately before the transfer, the person is

considered to transfer indirectly such stock;

(B) If the person transfers an interest in, or stock of, the specified entity, then the person is considered to transfer indirectly the stock of the SFC or CFC attributable to the interest in, or the stock of, the specified entity that is transferred; and

(C) In the case in which the person owns the specified entity through a chain of ownership of one or more other specified entities, if there is a transfer of an interest in, or stock of, another specified entity in the chain of ownership, then the person is considered to transfer indirectly the stock of the SFC or CFC attributable to the interest in, or the stock of, the other specified entity transferred.

(iii) *Definition of specified entity.* The term *specified entity* means any partnership, trust, or estate (in each case, domestic or foreign), or any foreign corporation.

(4) *Coordination rules*—(i) *General rule.* A dividend is first subject to section 245A(e). To the extent the dividend is not a hybrid dividend or tiered hybrid dividend under section 245A(e), the dividend is subject to paragraph (e) or (f) of this section, as applicable, and then, to the extent the dividend is not subject to paragraph (e) or (f) of this section, it is subject to paragraph (c) or (d) of this section, as applicable.

(ii) *Coordination rule for paragraphs (c) and (d) and (e) and (f) of this section, respectively.* If an SFC or CFC pays a dividend (or simultaneous dividends), a portion of which may be subject to paragraph (c) or (e) of this section and a portion of which may be subject to paragraph (d) or (f) of this section, the rules of this section apply by treating the portion of the dividend or dividends that may be subject to paragraph (c) or (e) of this section as if it occurred immediately before the portion of the dividend or dividends that may be subject to paragraph (d) or (f) of this section. For example, if a dividend arising under section 964(e)(4) occurs at the same time as a dividend that would be eligible for the exception to foreign personal holding company income under section 954(c)(6) but for the potential application of paragraph (d) this section, then the tiered extraordinary disposition amount with respect to the other dividend is determined as if the dividend arising under section 964(e)(4) occurs immediately prior to the other dividend.

(5) *Ordering rule for multiple dividends made by an SFC or a CFC during a taxable year.* If an SFC or a CFC pays dividends on more than one

date during its taxable year or at different times on the same date, this section applies based on the order in which the dividends are paid.

(6) *Partner's distributive share of a domestic partnership's pro rata share of subpart F income.* If a section 245A shareholder or a U.S. tax resident is a direct or indirect partner in a domestic partnership that is a United States shareholder with respect to a CFC and includes in gross income its pro rata share of the CFC's subpart F income under section 951(a), then, solely for purposes of this section, a reference to the section 245A shareholder's or U.S. tax resident's pro rata share of the CFC's subpart F income included in gross income under section 951(a) includes such person's distributive share of the domestic partnership's pro rata share of the CFC's subpart F income. A person is an indirect partner with respect to a domestic partnership if the person indirectly owns the domestic partnership through one or more specified entities (other than a foreign corporation).

(h) *Anti-abuse rule.* The Commissioner may make appropriate adjustments to any amounts determined under this section if a transaction is engaged in with a principal purpose of avoiding the purposes of this section.

(i) *Definitions.* The following definitions apply for purposes of this section.

(1) *Controlled foreign corporation.* The term *controlled foreign corporation* (or *CFC*) has the meaning provided in section 957.

(2) *Controlling section 245A shareholder.* The term *controlling section 245A shareholder* means, with respect to a CFC, any section 245A shareholder that owns directly or indirectly more than 50 percent (by vote or value) of the stock of the CFC. For purposes of determining whether a section 245A shareholder is a controlling section 245A shareholder with respect to a CFC, all stock of the CFC owned by a related party with respect to the section 245A shareholder or by other persons acting in concert with the section 245A shareholder to undertake an extraordinary reduction is considered owned by the section 245A shareholder. If section 964(e)(4) applies to a sale or exchange of a lower-tier CFC with respect to a controlling section 245A shareholder, all United States shareholders of the CFC are considered to act in concert with regard to the sale or exchange. In addition, if all persons selling stock in a CFC, held directly, sell such stock to the same buyer or buyers (or a related party with respect to the buyer or buyers) as part of the same

plan, all sellers will be considered to act in concert with regard to the sale or exchange.

(3) *Disqualified amount.* The term *disqualified amount* has the meaning set forth in paragraph (d)(1) of this section.

(4) *Disqualified period.* The term *disqualified period* has the meaning set forth in paragraph (c)(3)(iii) of this section.

(5) *Extraordinary disposition.* The term *extraordinary disposition* has the meaning set forth in paragraph (c)(3)(ii) of this section.

(6) *Extraordinary disposition account.* The term *extraordinary disposition amount* has the meaning set forth in paragraph (c)(3)(i) of this section.

(7) *Extraordinary disposition amount.* The term *extraordinary disposition amount* has the meaning set forth in paragraph (c)(1) of this section.

(8) *Extraordinary disposition E&P.* The term *extraordinary E&P* has the meaning set forth in paragraph (c)(3)(i)(C) of this section.

(9) *Extraordinary disposition ownership percentage.* The term extraordinary disposition ownership percentage has the meaning set forth in paragraph (c)(3)(i)(B) of this section.

(10) *Extraordinary reduction.* The term *extraordinary reduction* has the meaning set forth in paragraph (e)(2)(i)(A) of this section.

(11) *Extraordinary reduction amount.* The term *extraordinary reduction amount* has the meaning set forth in paragraph (e)(1) of this section.

(12) *Ineligible amount.* The term *ineligible amount* has the meaning set forth in paragraph (b)(2) of this section.

(13) *Lower-tier CFC.* The term *lower-tier CFC* means a CFC whose stock is owned (within the meaning of section 958(a)(2)), in whole or in part, by another CFC.

(14) *Non-extraordinary disposition E&P.* The term *non-extraordinary disposition E&P* has the meaning set forth in paragraph (c)(2)(ii) of this section.

(15) *Pre-reduction pro rata share.* The term *pre-reduction pro rata share* has the meaning set forth in paragraph (e)(2)(ii) of this section.

(16) *Prior extraordinary disposition amount.* The term *prior extraordinary disposition amount* has the meaning set forth in paragraph (c)(3)(i)(D) of this section.

(17) *Prior extraordinary reduction amount.* The term *prior extraordinary reduction amount* has the meaning set forth in paragraph (e)(2)(ii)(C) of this section.

(18) *Qualified portion.* The term *qualified portion* has the meaning set forth in paragraph (c)(3)(i)(D)(*2*)(*i*) of this section.

(19) *Related party.* The term *related party* means, with respect to a person, another person bearing a relationship described in section 267(b) or 707(b) to the person, in which case such persons are *related.*

(20) *Section 245A deduction.* The term *section 245A deduction* means, with respect to a dividend received by a section 245A shareholder from an SFC, the amount of the deduction allowed to the section 245A shareholder by reason of the dividend.

(21) *Section 245A shareholder.* The term *section 245A shareholder* means a domestic corporation that is a United States shareholder with respect to an SFC that owns directly or indirectly stock of the SFC.

(22) *Specified 10-percent owned foreign corporation (SFC).* The term *specified 10-percent owned foreign corporation* (or *SFC*) has the meaning provided in section 245A(b)(1).

(23) *Specified entity.* The term *specified entity* has the meaning set forth in paragraph (g)(3)(iii) of this section.

(24) *Specified property.* The term *specified property* has the meaning set forth in paragraph (c)(3)(iv) of this section.

(25) *Tiered extraordinary disposition amount.* The term *tiered extraordinary disposition amount* has the meaning set forth in paragraph (d)(2)(i) of this section.

(26) *Tiered extraordinary reduction amount.* The term *tiered extraordinary reduction amount* has the meaning set forth in paragraph (f)(2) of this section.

(27) *United States shareholder.* The term *United States shareholder* has the meaning provided in section 951(b).

(28) *Upper-tier CFC.* The term *upper-tier CFC* means a CFC that owns (within the meaning of section 958(a)(2)) stock in another CFC.

(29) *U.S. tax resident.* The term *U.S. tax resident* means a United States person described in section 7701(a)(30)(A) or (C).

(j) *Examples.* The application of this section is illustrated by the examples in this paragraph (j).

(1) *Facts.* Except as otherwise stated, the following facts are assumed for purposes of the examples:

(i) US1 and US2 are domestic corporations, each with a calendar taxable year, and are not related parties with respect to each other.

(ii) CFC1 and CFC2 are foreign corporations that are SFCs and CFCs.

(iii) Each entity uses the U.S. dollar as its functional currency.

(iv) Year 2 begins on or after January 1, 2018, and has 365 days.

(v) Absent application of this section, the dividends received by US1 and US2

from CFC1 meet the requirements to qualify for the section 245A deduction.

(vi) The de minimis rules in paragraphs (c)(3)(ii)(E) and (e)(3)(ii) of this section do not apply.

(2) *Example 1. Extraordinary disposition—*(i) *Facts.* US1 and US2 own 60% and 40%, respectively, of the single class of stock of CFC1. CFC1 owns all of the single class of stock of CFC2. CFC1 and CFC2 use the taxable year ending November 30 as their taxable year. On November 1, 2018, CFC1 sells specified property to CFC2 in exchange for $200x of cash (the "Property Transfer"). The Property Transfer is outside of CFC1's ordinary course of activities. The transferred property has a basis of $100x in the hands of CFC1. CFC1 recognizes $100x of gain as a result of the Property Transfer ($200x − $100x). On December 1, 2018, CFC1 distributes $80x pro rata to US1 ($48x) and US2 ($32x), all of which is a dividend within the meaning of section 316 and treated as a distribution out of earnings described in section 959(c)(3). No other distributions are made by CFC1 to either US1 or US2 in CFC1's taxable year ending November 30, 2019. For its taxable year ending on November 30, 2019, CFC1 has $110x of earnings and profits described in section 959(c)(3), without regard to any distributions during the taxable year.

(ii) *Analysis—*(A) *Identification of extraordinary disposition.* Because CFC1 is a CFC and uses the taxable year ending on November 30, under paragraph (c)(3)(iii) of this section, it has a disqualified period beginning on January 1, 2018, and ending on November 30, 2018. In addition, under paragraph (c)(3)(ii) of this section, the Property Transfer is an extraordinary disposition because it (i) is a disposition of specified property by CFC1 on a date on which it was a CFC and during CFC1's disqualified period, (ii) is to CFC2, a related party with respect to CFC1, (iii) occurs outside of the ordinary course of CFC1's activities, and (iv) is not subject to the de minimis rule in paragraph (c)(3)(ii)(E) of this section.

(B) *Determination of section 245A shareholders and their extraordinary disposition accounts.* Because CFC1 undertook an extraordinary disposition, under paragraph (c)(3)(i) of this section, a portion of CFC1's earnings and profits are extraordinary disposition E&P and, therefore, give rise to an extraordinary disposition account with respect to each of CFC1's section 245A shareholders. Under paragraph (i)(21) of this section, US1 and US2 are both section 245A shareholders with respect to CFC1. The amount of the extraordinary disposition account with respect to US1 is $60x, which is equal to the product of the extraordinary disposition E&P (the amount of the net gain recognized by CFC1 as a result of the Property Transfer ($100x)) and the extraordinary disposition ownership percentage (the percentage of the stock of CFC1 owned directly or indirectly by US1 on January 1, 2018 (60%)), reduced by the prior extraordinary disposition amount ($0). *See* paragraph (c)(3)(i) of this section. Similarly, the amount of the extraordinary disposition

account with respect to US2 is $40x, which is equal to the product of the extraordinary disposition E&P (the net gain recognized by CFC1 as a result of the Property Transfer ($100x)) and extraordinary disposition ownership percentage (the percentage of the stock of CFC1 owned directly or indirectly by US2 on January 1, 2018 (40%)), reduced by the prior extraordinary disposition amount ($0).

(C) *Determination of extraordinary disposition amount with respect to US1.* The dividend of $48x paid to US1 on December 1, 2018, is an extraordinary disposition amount to the extent the dividend is paid out of the extraordinary disposition account with respect to US1. *See* paragraph (c)(1) of this section. Under paragraph (c)(2)(i) of this section, the dividend is first considered paid out of non-extraordinary disposition E&P with respect to US1, to the extent thereof. With respect to US1, $6x of CFC1's earnings and profits is non-extraordinary disposition E&P, calculated as the excess of $66x (the product of $110x of earnings and profits described in section 959(c)(3), without regard to the $80x distribution, and 60%) over $60x (the balance of US1's extraordinary disposition account with respect to CFC1, immediately before the distribution). *See* paragraph (c)(2)(ii) of this section. Thus, $6x of the dividend is considered paid out of non-extraordinary disposition E&P with respect to US1. Under paragraph (c)(2)(i)(B) of this section, the remaining $42x of the dividend is next considered paid out of US1's extraordinary disposition account with respect to CFC1, to the extent thereof. Accordingly, $42x of the dividend is considered paid out of the extraordinary disposition account with respect to CFC1 and gives rise to $42x of an extraordinary disposition amount. As a result, US1's prior extraordinary disposition amount is increased by $42x under paragraph (c)(3)(i)(D) of this section, and US1's extraordinary disposition account is reduced to $18x ($60 − $42x) under paragraph (c)(3)(i)(A) of this section.

(D) *Determination of extraordinary disposition amount with respect to US2.* The dividend of $32x paid to US2, on December 1, 2018, is an extraordinary disposition amount to the extent the dividend is paid out of extraordinary disposition E&P with respect to US2. *See* paragraph (c)(1) of this section. Under paragraph (c)(2)(i) of this section, the dividend is first considered paid out of non-extraordinary disposition E&P with respect to US2, to the extent thereof. With respect to US2, $4x of CFC1's earnings and profits is non-extraordinary disposition E&P, calculated as the excess of $44x (the product of $110x of earnings and profits described in section 959(c)(3), without regard to the $80x distribution, and 40%) over $40x (the balance of US2's extraordinary disposition account with respect to CFC1, immediately before the distribution). *See* paragraph (c)(2)(ii) of this section. Thus, $4x of the dividend is considered paid out of non-extraordinary disposition E&P with respect to US2. Under paragraph (c)(2)(i)(B) of this section, the remaining $28x of the dividend is next considered paid out of US2's extraordinary disposition account with

respect to CFC1, to the extent thereof. Accordingly, $28x of the dividend is considered paid out of the extraordinary disposition account with respect to US2 and gives rise to $28x of an extraordinary disposition amount. As a result, US2's prior extraordinary disposition amount is increased by $28x under paragraph (c)(3)(i)(D) of this section, and US2's extraordinary disposition account is reduced to $12x ($40 − $28x) under paragraph (c)(3)(i)(A) of this section.

(E) *Determination of ineligible amount with respect to US1 and US2.* Under paragraph (b)(2) of this section, with respect to US1 and the dividend of $48x, the ineligible amount is $21x, the sum of 50 percent of the extraordinary disposition amount ($42x) and extraordinary reduction amount ($0). Therefore, with respect to the dividend received by US1 of $48x, $27x is eligible for a section 245A deduction. With respect to US2 and the dividend of $32x, the ineligible amount is $14x, the sum of 50% of the extraordinary disposition amount ($28x) and extraordinary reduction amount ($0). Therefore, with respect to the dividend received by US2 of $32x, $18x is eligible for a section 245A deduction.

(3) *Example 2. Application of section 954(c)(6) exception with extraordinary disposition account*—(i) *Facts.* The facts are the same as in paragraph (j)(2)(i) of this section (the facts in *Example 1*) except that the Property Transfer is a sale by CFC2 to CFC1 instead of a sale by CFC1 to CFC2, the $80x distribution is by CFC2 to CFC1 in a separate transaction that is unrelated to the Property Transfer, and the description of the earnings and profits of CFC1 is applied to CFC2. Additionally, absent the application of this section, section 954(c)(6) would apply to the distribution by CFC2 to CFC1. Under section 951(a)(2) and § 1.951–1(b) and (e), US1's pro rata share of any subpart F income of CFC1 is 60% and US2's pro rata share of any subpart F income of CFC2 is 40%.

(ii) *Analysis*—(A) *Identification of extraordinary disposition.* The Property Transfer is an extraordinary disposition under the same analysis as provided in paragraph (j)(2)(ii)(A) of this section (the analysis in *Example 1*).

(B) *Determination of section 245A shareholders and their extraordinary disposition accounts.* Both US1 and US2 are section 245A shareholders with respect to CFC2, US1 has an extraordinary disposition account of $60x with respect to CFC2, and US2 has an extraordinary disposition account of $40x with respect to CFC2 under the same analysis as provided in paragraph (j)(2)(ii)(B) of this section (the analysis in *Example 1*).

(C) *Determination of tiered extraordinary disposition amount*—(1) *In general.* US1 and US2 each have a tiered extraordinary disposition amount with respect to the $80x dividend paid by CFC2 to CFC1 to the extent that US1 and US2 would have an extraordinary disposition amount if each had received as a dividend its pro rata share of the dividend from CFC2. *See* paragraph (d)(2)(i) of this section. Under paragraph (d)(2)(ii) of this section, US1's pro rata share of the dividend is $48x (60% − $80x), that is, the increase to US1's pro rata share of the

subpart F income if the dividend were included in CFC1's foreign personal holding company income, without regard to section 952(c) and the allocation of expenses. Similarly, US2's pro rata share of the dividend is $32x (40% − $80x).

(2) *Determination of tiered extraordinary disposition amount with respect to US1.* The extraordinary disposition amount with respect to US1 is $42x, under the same analysis provided in paragraph (j)(2)(ii)(C) of this section (the analysis in *Example 1*). Accordingly, the tiered extraordinary disposition amount with respect to US1 is $42x.

(3) *Determination of extraordinary disposition amount with respect to US2.* The extraordinary disposition amount with respect to US2 is $28x, under the same analysis provided in paragraph (j)(2)(ii)(D) of this section (the analysis in *Example 1*). Accordingly, the tiered extraordinary disposition amount with respect to US2 is $28x.

(D) *Limitation of section 954(c)(6) exception.* The sum of US1 and US2's tiered extraordinary disposition amounts is $70x ($42x + $28x). The portion of the stock of CFC1 (by value) owned (within the meaning of section 958(a)) by U.S. tax residents on the last day of CFC1's taxable year is 100%. Under paragraph (d)(1) of this section, the disqualified amount with respect to the dividend is $35x (50% × ($70x/100%)). Accordingly, the portion of the $80x dividend from CFC2 to CFC1 that is eligible for the exception to foreign personal holding company income under section 954(c)(6) is $45x ($80x − $35x). Under section 951(a)(2) and § 1.951–1(b) and (e), US1 includes $21x (60% × $35x) and US2 includes $14x (60% × $35x) in income under section 951(a).

(E) *Changes in extraordinary disposition account of US1.* Under paragraph (c)(3)(i)(D)(1) of this section, US1's prior extraordinary disposition amount with respect to CFC2 is increased by $42x, or 200% of $21x, the amount US1 included in income under section 951(a) with respect to CFC1. Under paragraph (c)(3)(i)(D)(1)(iii) of this section, US1 has no qualified portion because all of the owners of CFC2 are section 245A shareholders with a tiered extraordinary disposition amount with respect to CFC2. As a result, US1's extraordinary disposition account is reduced to $18x ($60x − $42x) under paragraph (c)(3)(i)(A) of this section.

(F) *Changes in extraordinary disposition account of US2.* Under paragraph (c)(3)(i)(D)(1) of this section, US2's prior extraordinary disposition amount with respect to CFC2 is increased by $28x, or 200% of $14x, the amount US2 included in income under section 951(a) with respect to CFC1. Under paragraph (c)(3)(i)(D)(1)(iii) of this section, US2 has no qualified portion because all of the owners of CFC2 are section 245A shareholders with a tiered extraordinary disposition amount with respect to CFC2. As a result, US2's extraordinary disposition account is reduced to $12x ($40x − $28x) under paragraph (c)(3)(i)(A) of this section.

(4) *Example 3. Extraordinary reduction*—(i) *Facts.* At the beginning of CFC1's taxable

year ending on December 31, Year 2, US1 owns all of the single class of stock of CFC1, and no person transferred any CFC1 stock directly or indirectly in Year 1 pursuant to a plan to reduce the percentage of stock (by value) of CFC1 owned by US1. Also as of the beginning of Year 2, CFC1 has no earnings and profits described in section 959(c)(1) or (2), and US1 does not have an extraordinary disposition account with respect to CFC1. As of the end of Year 2, CFC1 has $160x of tested income and no other income. CFC1 has $160x of earnings and profits for Year 2. On October 19, Year 2, US1 sells all of its CFC1 stock to US2 for $100x in a transaction (the ''Stock Sale'') in which US1 recognizes $90x of gain. Under section 1248(a), the entire $90x of gain is included in US1's gross income as a dividend and, pursuant to section 1248(j), the $90x is treated as a dividend for purposes of applying section 245A. At the end of Year 2, under section 951A, US2 takes into account $70x of tested income, calculated as $160x (100% of the $160x of tested income) less $90x, the amount described in section 951(a)(2)(B). The amount described in section 951(a)(2)(B) is the lesser of $90x, the amount of dividends received by US1 with respect to the transferred stock, and $128x, the amount of tested income attributable to the transferred stock ($160x) multiplied by 292/365 (the ratio of the number of days in Year 2 that US2 did not own the transferred stock to the total number of days in Year 2). US1 does not make an election pursuant to paragraph (e)(3)(i) of this section.

(ii) *Analysis*—(A) *Determination of controlling section 245A shareholder and extraordinary reduction of ownership.* Under paragraph (i)(2) of this section, US1 is a controlling section 245A shareholder with respect to CFC1. In addition, the Stock Sale results in an extraordinary reduction with respect to US1's ownership of CFC1. *See* paragraph (e)(2)(i) of this section. The extraordinary reduction occurs because during Year 2, US1 transferred 100% of the CFC1 stock it owned at the beginning of the year and such amount is more than 5% of the total value of the stock of CFC1 at the beginning of Year 2; it also occurs because on the last day of the year the percentage of stock (by value) of CFC1 that US1 owns directly or indirectly (0%) (the end of year percentage) is less than 90% of the stock (by value) of CFC1 that US1 owns directly or indirectly on the day of the taxable year when it owned the highest percentage of CFC1 stock by value (100%) (the initial percentage), no transactions occurred in the preceding year pursuant to a plan to reduce the percentage of CFC1 stock owned by US1, and the difference between the initial percentage and the end of year percentage (100 percentage points) is at least 5 percentage points.

(B) *Determination of extraordinary reduction amount.* Under paragraph (e)(1) of this section, the entire $90x dividend to US1 is an extraordinary reduction amount with respect to US1 because the dividend is at least equal to US1's pre-reduction pro rata share of CFC1's Year 2 tested income described in paragraph (e)(2)(ii)(A) of this section ($160x), reduced by the amount of

tested income taken into account by US2, a U.S. tax resident, under paragraphs (e)(2)(ii)(B) and (i)(29) of this section ($70x).

(C) *Determination of ineligible amount.* Under paragraph (b)(2) of this section, with respect to US1 and the dividend of $90x, the ineligible amount is $90x, the sum of 50% of the extraordinary disposition amount ($0) and extraordinary reduction amount ($90x). Therefore, with respect to the dividend received of $90x, no portion is eligible for the dividends received deduction allowed under section 245A(a).

(iii) *Alternative facts—election to close CFC's taxable year.* The facts are the same as in paragraph (j)(4)(i) of this section (the facts of this *Example 3*), except that, pursuant to paragraph (e)(3)(i) of this section, US1 elects to close CFC1's Year 2 taxable year for all purposes of the Internal Revenue Code as of the end of October 19, Year 2, the date on which the Stock Sale occurs; in addition, US1 and US2 enter into a written, binding agreement that US1 will elect to close CFC1's Year 2 taxable year. Accordingly, under section 951A(a), US1 takes into account 100% of CFC1's tested income for the taxable year beginning January 1, Year 2, and ending October 19, Year 2, and US2 takes into account 100% of CFC1's tested income for the taxable year beginning October 20, Year 2, and ending December 31, Year 2. Under paragraph (e)(3)(i)(A) of this section, no amount is considered an extraordinary reduction amount with respect to US1.

(5) *Example 4. Extraordinary reduction; decrease in section 245A shareholder's pre-reduction pro rata share for amounts taken into account by U.S. tax residents*—(i) *Facts.* At the beginning of CFC1's taxable year ending December 31, Year 2, US1 owns all of the single class of stock of CFC1, and no person transferred any CFC1 stock directly or indirectly in Year 1 pursuant to a plan to reduce the percentage of stock (by value) of CFC1 owned by US1. CFC1 generates $120x of subpart F income during its taxable year ending on December 31, Year 2. On October 1, Year 2, CFC1 distributes a $120x dividend to US1. On October 19, Year 2, US1 sells 100% of its stock of CFC1 to PRS, a domestic partnership, in a transaction in which no gain or loss is realized (the ''Stock Sale''). PRS is owned 50% each by A, an individual who is a citizen of the United States, and B, a foreign individual who is not a U.S. tax resident. On December 1, Year 2, US2 and FP, a foreign corporation, contribute property to CFC1; in exchange, each of US2 and FP receives 25% of the stock of CFC1. PRS owns the remaining 50% of the stock of CFC1. US1 does not make an election pursuant to paragraph (e)(3)(i) of this section.

(ii) *Analysis*—(A) *Determination of controlling section 245A shareholder and extraordinary reduction.* Under paragraph (i)(2) of this section, US1 is a controlling section 245A shareholder with respect to CFC1. In addition, the Stock Sale results in an extraordinary reduction with respect to US1's ownership of CFC1. *See* paragraph (e)(2)(i) of this section. The extraordinary reduction occurs because during Year 2, US1 transferred 100% of the CFC1 stock it owns on the first day of Year 2, and that amount is more than 5% of the total value of the

stock of CFC1 at the beginning of Year 2; it also occurs because on the last day of Year 2 the percentage of stock (by value) of CFC1 that US1 owns directly or indirectly (0%) (the end of year percentage) is less than 90% of the highest percentage of stock (by value) of CFC1 that US1 owns directly or indirectly on the day of the taxable year when it owned the highest percentage of CFC1 stock by value (100%) (the initial percentage), no transactions occurred in the preceding year pursuant to a plan to reduce the percentage of CFC1 stock owned by US1, and the difference between the initial percentage and the end of year percentage (100 percentage points) is at least 5 percentage points.

(B) *Determination of pre-reduction pro rata share.* Before the extraordinary reduction, US1 owned 100% of the stock of CFC1. Thus, under paragraph (e)(2)(ii)(A) of this section, the tentative amount of US1's pre-reduction pro rata share of CFC1's subpart F income is $120x. A and US2 are U.S. tax residents pursuant to paragraph (i)(29) of this section because they are United States persons described in section 7701(a)(30)(A) or (C). Thus, US1's pre-reduction pro rata share amount is subject to the reduction described in paragraph (e)(2)(ii)(B) of this section because U.S. tax residents directly or indirectly acquire stock of CFC1 from US1 or CFC1 during the taxable year in which the extraordinary reduction occurs. With respect to US1's pre-reduction pro rata share of CFC1's subpart F income, the reduction equals the amount of subpart F income of CFC1 taken into account under section 951(a) by these U.S. tax residents.

(C) *Determination of decrease in pre-reduction pro rata share for amounts taken into account by U.S. tax resident.* On December 31, Year 2, both PRS and US2 will be United States shareholders with respect to CFC1 and will include in gross income their pro rata share of CFC1's subpart F income under section 951(a). With respect to US2, this amount will be $30x, which is equal to 25% of CFC1's subpart F income for the taxable year. With respect to PRS, its pro rata share of $60x under section 951(a)(2)(A) (50% of $120x) will be reduced under section 951(a)(2)(B) by $48x. The section 951(a)(2)(B) reduction is equal to the lesser of the $120x dividend paid with respect to those shares to US1 or $48x (50% × $120x × 292/365, the period during the taxable year that PRS did not own CFC1 stock). Thus, PRS includes $12x in gross income pursuant to section 951(a). Of this amount, $6x is allocated to A (as a 50% partner of PRS) and, therefore, treated as taken into account by A under paragraphs (e)(2)(ii)(B) and (g)(6) of this section. Thus, A and US2 take into account a total of $36x of CFC1's subpart F income under section 951(a). This amount reduces US1's pre-reduction pro rata share of CFC1's subpart F income to $84x ($120x − $36x) under paragraph (e)(2)(ii)(B) of this section. CFC1 did not generate tested income during the taxable year and, therefore, no amount is taken into account under section 951A with respect to CFC1, and US1 has no pre-reduction pro rata share with respect to tested income of CFC1.

(D) *Determination of extraordinary reduction amount.* Under paragraph (e)(1) of

this section, the extraordinary reduction amount equals $84x, which is the lesser of the amount of the dividend received by US1 from CFC1 during Year 2 ($120x) and the sum of US1's pre-reduction pro rata share of CFC1's subpart F income ($84x) and tested income ($0).

(E) *Determination of ineligible amount.* Under paragraph (b)(2) of this section, with respect to US1 and the dividend of $120x, the ineligible amount is $84x, the sum of 50% of the extraordinary disposition amount ($0) and extraordinary reduction amount ($84x). Therefore, with respect to the dividend received by US1 from CFC1, $36x ($120x − $84x) is eligible for a section 245A deduction.

(6) *Example 5. Controlling section 245A shareholder—(i) Facts.* US1 and US2 own 30% and 25% of the stock of CFC1, respectively. FP, a foreign corporation that is not a CFC, owns all of the stock of US1 and US2. FP owns the remaining 45% of the stock of CFC1. On September 30, Year 2, US1 sells all of its stock of CFC1 to US3, a domestic corporation that is not a related party with respect to FP, US1, or US2. No person transferred any stock of CFC1 directly or indirectly in Year 1 pursuant to a plan to reduce the percentage of stock (by value) of CFC1 owned by US1.

(ii) *Analysis.* Under paragraph (i)(21) of this section, US1 is a section 245A shareholder with respect to CFC1, an SFC. Because US1 owns, together with US2 and FP (related persons with respect to US1), more than 50% of the stock of CFC1, US1 is a controlling section 245A shareholder of CFC1. The sale of US1's CFC1 stock results in an extraordinary reduction occurring with respect to US1's ownership of CFC1. The extraordinary reduction occurs because during Year 2, US1 transferred 100% of the stock of CFC1 that it owned at the beginning of the year and that amount is more than 5% of the total value of the stock of CFC1 at the beginning of Year 2; it also occurs because on the last day of the year the percentage of stock (by value) of CFC1 that US1 directly or indirectly owns (0%) (the end of year percentage) is less than 90% of the stock (by value) of CFC1 that US1 directly or indirectly owned on the day of the taxable year when it owned the highest percentage of CFC1 stock by value (30%) (the initial percentage), no transactions occurred in the preceding year pursuant to a plan to reduce the percentage of CFC1 stock owned by US1, and the difference between the initial percentage and end of year percentage (30 percentage points) is at least 5 percentage points.

(7) *Example 6. Limitation of section 954(c)(6) exception with respect to an extraordinary reduction.* (i) *Facts.* At the beginning of CFC1 and CFC2's taxable year ending on December 31, Year 2, US1 and A, an individual who is a citizen of the United States, own 80% and 20% of the single class of stock of CFC1, respectively. CFC1 owns 100% of the stock of CFC2. Both US1 and A are United States shareholders with respect to CFC1 and CFC2, and US1 and A are not related parties with respect to each other. No person transferred CFC2 stock directly or indirectly in Year 2 pursuant to a plan to reduce the percentage of stock (by value) of

CFC2 owned by US1, and US1 does not have an extraordinary disposition account with respect to CFC2. At the end of Year 2, and without regard to any distributions during Year 2, CFC2 had $150x of tested income and no other income, and CFC1 had no income or expenses. On June 30, Year 2, CFC2 distributed $150x as a dividend to CFC1, which would qualify for the exception from foreign personal holding company income under section 954(c)(6) but for the application of this section. On August 7, Year 2, CFC1 sells all of its CFC2 stock to US2 for $100x in a transaction (the ''Stock Sale'') in which CFC1 realizes no gain or loss. At the end of Year 2, under section 951A, US2 takes into account $60x of tested income, calculated as $150x (100% of the $150x of tested income) less $90x, the amount described in section 951(a)(2)(B). The amount described in section 951(a)(2)(B) is the lesser of $150x, the amount of dividends received by CFC1 during Year 2 with respect to the transferred stock, and $90x, the amount of tested income attributable to the transferred stock ($150x) multiplied by 219/365 (the ratio of the number of days in Year 2 that US2 did not own the transferred stock to the total number of days in Year 2). US1 does not make an election pursuant to paragraph (e)(3)(i) of this section.

(ii) *Analysis—(A) Determination of controlling section 245A shareholder and extraordinary reduction of ownership.* Under paragraph (i)(2) of this section, US1 is a controlling section 245A shareholder with respect to CFC2, but A is not. In addition, the Stock Sale results in an extraordinary reduction with respect to US1's ownership of CFC2. *See* paragraph (e)(2)(i) of this section. The extraordinary reduction occurs because during Year 2, US1 transferred indirectly 100% of the CFC2 stock it owned at the beginning of the year and such amount is more than 5% of the total value of the stock of CFC2 at the beginning of Year 2; it also occurs because on the last day of the year the percentage of stock (by value) of CFC2 that US1 owns directly or indirectly (0%) (the end of year percentage) is less than 90% of the stock (by value) of CFC2 that US1 owns directly or indirectly on the day of the taxable year when it owned the highest percentage of CFC2 stock by value (80%) (the initial percentage), no transactions occurred in the preceding year pursuant to a plan to reduce the percentage of CFC2 stock owned by US1, and the difference between the initial percentage and the end of year percentage (80 percentage points) is at least 5 percentage points. Because there is an extraordinary reduction with respect to CFC2 in Year 2 and CFC1 received a dividend from CFC2 in Year 2, under paragraph (f)(1) of this section, it is necessary to determine the limitation on the amount of the dividend eligible for the exception under section 954(c)(6).

(B) *Determination of tiered extraordinary reduction amount.* The limitation on the amount of the dividend eligible for the exception under section 954(c)(6) is based on the tiered extraordinary reduction amount. The sum of the amount of subpart F income and tested income of CFC2 for Year 2 is $150x, and immediately before the

extraordinary reduction, CFC1 held 100% of the stock of CFC2. Additionally, US2 is a U.S. tax resident as defined in paragraph (i)(29) of this section because it is a United States person described in section 7701(a)(30)(A) or (C), and US2 has a pro rata share of $60x of tested income under section 951A with respect to CFC2. Accordingly, under paragraph (f)(2) of this section, the tiered extraordinary reduction amount is $90x (($150x × 100%) − $60x).

(C) *Limitation of section 954(c)(6) exception.* Under paragraph (f)(1) of this section, the portion of the $150x dividend from CFC2 to CFC1 that is eligible for the exception to foreign personal holding company income under section 954(c)(6) is $60x ($150x − $90x). To the extent that the $90x that does not qualify for the exception gives rise to additional subpart F income to CFC1, both US1 and A will take into account their pro rata share of that subpart F income under section 951(a)(2) and § 1.951–1(b) and (e).

(k) *Applicability date.* This section applies to distributions occurring after December 31, 2017.

(l) *Expiration date.* The applicability of this section expires June 14, 2022.

■ **Par. 3.** Section 1.954(c)(6)–1T is added to read as follows:

### § 1.954(c)(6)–1T   Certain cases in which section 954(c)(6) exception not available (temporary).

(a) *Cross-references to other rules.* For a non-exclusive list of rules that limit the applicability of the exception to foreign personal holding company income under section 954(c)(6), see—

(1) Section 1.245A–5T(d) (rules regarding the application of section 954(c)(6) to extraordinary disposition amounts);

(2) Section 1.245A–5T(f) (rules regarding the application of section 954(c)(6) to tiered extraordinary reduction amounts);

(3) Section 1.245A(e)–1(c) (rules regarding tiered hybrid dividends);

(4) Section 1.367(b)–4(e)(4) (rules regarding income inclusion and gain recognition in certain exchanges following an inversion transaction);

(5) Section 964(e)(4)(A) (rules regarding certain gain from the sale or exchange of stock that is recharacterized as a dividend); and

(6) Section 1.7701(l)–4(e) (rules regarding recharacterization of certain transactions following an inversion transaction).

(b) *Applicability date.* This section applies on or after June 14, 2019.

(c) *Expiration date.* The applicability of this section expires June 14, 2022.

■ **Par. 4.** Section 1.6038–2T is added to read as follows:

**§ 1.6038–2T   Information returns required of United States persons with respect to annual accounting periods of certain foreign corporations beginning after December 31, 1962 (temporary).**

(a) through (e) [Reserved].

(f)(1) through (15) [Reserved].

(16) *Dividends for which section 245A deduction or section 954(c)(6) exception is limited*—(i) *General rule.* If for the annual accounting period, the corporation distributes or receives a dividend that gives rise to an ineligible amount (as defined in § 1.245A–5T((i)(12)), a tiered extraordinary disposition amount (as defined in § 1.245A–5T(i)(25)), or a tiered extraordinary reduction amount (as defined in § 1.245A–5T(i)(26)), then Form 5471 (or a successor form) must contain such information about the ineligible amount, tiered extraordinary disposition amount, or tiered extraordinary reduction amount, as applicable, in the form and manner and to the extent prescribed by the form, instructions to the form, publication, or other guidance published in the Internal Revenue Bulletin.

(ii) *Transition rule.* If the corporation (or predecessor corporation) distributed or received a dividend that gave rise to an ineligible amount, a tiered extraordinary disposition amount, or a tiered extraordinary reduction amount in an annual accounting period for which the Form 5471 (or successor form) has been filed before the date of publication of these Temporary regulations, the corporation must provide the information described in paragraph (f)(16)(i) of this section on the first Form 5471 (or successor form) filed by the corporation after the issuance of guidance setting forth the form and manner of reporting such information.

(g) through (l) [Reserved].

(m)(1) [Reserved].

(2) *Special rule for paragraph (f)(16).* Paragraph (f)(16) of this section applies with respect to information for annual accounting periods in which a dividend subject to § 1.245A–5T is paid.

(n) *Expiration date.* The applicability of paragraphs (f)(16) and (m) of this section expires June 14, 2022.

**Kirsten Wielobob,**

*Deputy Commissioner for Services and Enforcement.*

Approved: June 4, 2019.

**David J. Kautter,**

*Assistant Secretary of the Treasury (Tax Policy).*

[FR Doc. 2019–12442 Filed 6–14–19; 4:15 pm]

**BILLING CODE 4830–01–P**

TD 9865 RECORD-000167

# I. Introduction

This Report[1] discusses the so-called "GILTI" provisions of the Code added by the legislation informally known as the Tax Cuts and Jobs Act (the "**Act**").[2]   The GILTI provisions are primarily in new Code Section 951A (income inclusion) and Section 250 (deduction), although the Act made conforming changes to other Code provisions.[3]   In general, the GILTI provisions require a U.S. shareholder (a "**U.S. shareholder**")[4] of a controlled foreign corporation ("**CFC**")[5] to pay, on a current basis, a minimum aggregate U.S. and foreign tax on its share of the earnings of the CFC.  The GILTI rules, along with other changes to the international tax rules made by the Act, are the most far-reaching changes made to these rules in many decades.

Part II of this Report is a summary of our recommendations.  Part III is a summary of the GILTI rules.  Part IV is a more detailed analysis of certain of the GILTI provisions and discussion of our recommendations.  Appendix 1 contains diagrams and more detailed calculations concerning some of the Examples in the Report.

The Report discusses the issues under the GILTI rules that we have identified so far and that we consider most significant.  As a consequence, there are many issues that are beyond the scope of the Report.  In most cases we comment on the statute as written without proposing far-reaching revisions to it, although we make some specific suggestions for statutory changes to make the GILTI regime work better.

---

[1] The principal authors of this report are Kara Mungovan and Michael Schler.  Helpful comments were received from Neil Barr, Kimberly Blanchard, Nathan Boidman, Andy Braiterman, Peter Connors, Charles W. Cope, Michael Farber, Kevin Glenn, Peter Glicklich, David Hardy, David P. Hariton, Monte Jackel, Shane Kiggen, John Lutz, Jeffrey Maddrey, Alexey Manasuev, Teddy McGehee, David Miller, Michael Mollerus, Jose E. Murillo, John Narducci, Richard M. Nugent, Amanda H. Nussbaum, Cory John O'Neill, Paul Oosterhuis, Alexander Pettingell, Vasujith Hegde Rajaram, Yaron Z. Reich, Richard L. Reinhold, Robert Scarborough, Stephen Shay, David R Sicular, Eric B. Sloan, Andrew P. Solomon, Karen G Sowell, David Stauber, Chaim Stern, Ted Stotzer, Joe Sullivan, Jonathan Talansky, Marc D. Teitelbaum, Shun Tosaka, Richard R. Upton, Philip Wagman, Andrew Walker, Gordon E. Warnke and Robert H. Wilkerson.  This report reflects solely the views of the Tax Section of the New York State Bar Association ("*NYSBA*") and not those of the NYSBA Executive Committee or the House of Delegates.

[2] The Act is formally known as "*An Act to provide for reconciliation pursuant to titles II and V of the concurrent resolution on the budget for fiscal year 2018*", P.L. 115-97.

[3] Unless otherwise stated, all "Code" and "Section" references are to the Internal Revenue Code of 1986, as amended.

[4] A U.S. shareholder is defined in Section 951(b) as a U.S. person that actually or constructively owns 10% or more of the vote or value of the stock in a foreign corporation.  Prior to the Act, the test was based solely on voting power.

[5] A CFC is defined in Section 957(a) as a foreign corporation if stock with more than 50% of the total vote or value of its shares is actually or constructively owned by U.S. shareholders on any day during its taxable year.

We do not believe Congress intended these results.  Consequently, we believe that GILTI First is more consistent with both the plain meaning of the statute and the intent of Congress.

In principle, it would be possible for "Section 956 First" to apply, with tested income being reduced for Section 956 inclusions.  However, actual distributions do not reduce tested income, so it would be inconsistent for deemed distributions from Section 956 inclusions to do so.

Moreover, in some cases taxpayers will prefer Section 956 inclusions and in other cases they will prefer tested income, in part because of very different FTC rules.  This modified version of "Section 956 First" would effectively create an elective regime where well-advised taxpayers could choose between Section 956 and tested income by having CFCs making (or not making) loans to U.S. shareholders or otherwise investing in U.S. property.  On the other hand, the same rule would create a trap for the unwary for less well advised taxpayers.

We observe that in applying GILTI First, a U.S. shareholder's income inclusion is based first on the CFC's Subpart F income (which is limited to e&p), then on its tested income and NDTIR (which are not based on e&p), and finally by Section 956 (which is limited to e&p).  This ordering is not intuitive, but for the reasons described above, it seems most consistent with the language and purpose of the statute.

2.   GILTI and Subpart F Inclusions in a Year When CFC Stock is Sold

When stock of a CFC is sold in the middle of a taxable year, in some cases the Subpart F income and GILTI inclusions allocable to the selling shareholder for the pre-sale portion of the year of the sale are permanently eliminated from the U.S. tax base.  These results arise because of the enactment of Section 245A.[107]  We discuss ways in which legislation or regulations could prevent these results.  However, we do not take a position on whether any such legislation or regulations should be adopted.

(a)   Background

The Section 951A inclusion applies only to a U.S. shareholder of a CFC that owns (directly or indirectly through a foreign entity) stock in the CFC on the last day of the taxable year of the CFC that it is a CFC (the "**last CFC date**").[108]  The same rule applies to a Subpart F inclusion.[109]  The U.S. shareholder's Section 951A inclusion is based on its *pro rata* share of the CFC's tested income for the CFC's taxable year.[110]  The U.S. shareholder's *pro rata* share of tested income, tested loss, and QBAI is determined

---

[107] The Tax Section is preparing a separate report on Section 245A.

[108] Section 951A(e)(1) and (2).  This rule is also expressly stated in the Conference Report at 645.

[109] Section 951(a)(1).

[110] Section 951A(a), (b)(1)(A) and (c)(1)(A).

"under the rules of section 951(a)(2) in the same manner as such section applies to subpart F income".[111]

Assume that a U.S. shareholder owns X% of the CFC stock on the last CFC date, and the CFC is a CFC for Y% of the year.   Under Section 951(a)(2), the U.S. shareholder's *pro rata* share of the Subpart F income for the year is equal to:

- X% times Y% times the Subpart F income for the entire year, including periods after the last CFC date, *see* Section 951(a)(2)(A), *minus*

- actual dividends paid by the CFC during the tax year to other holders of the stock (or deemed dividends under Section 1248(a) on a sale of the stock by another holder), but not in excess of the product of (i) X% (the ownership percentage), (ii) the Subpart F income for the year, and (iii) the percentage of the year that the U.S. shareholder did not own the stock, *see* Section 951(a)(2)(B).

In other words, the *pro rata* share of the U.S. shareholder on the last CFC date is first determined as if the U.S. shareholder had held the stock for the entire period of the year through the last CFC date.   That amount is then reduced by dividends to another holder of the same stock during the year, but only to the extent those dividends do not exceed the Subpart F income attributable on a *pro rata* basis to the period that the U.S. shareholder did not own the stock.

As will be seen below, these rules worked well under the prior law rules for Subpart F.   However, they can now allow Subpart F income and tested income allocable to a U.S. shareholder for the portion of the taxable year before the shareholder sells its stock to avoid being a Subpart F or GILTI inclusion or ever being included in U.S. taxable income to anyone.

(b) Fact patterns and results

(i) *Sale of a CFC from one Section 958(a) U.S. Shareholder to another Section 958(a) U.S. Shareholder*

Consider first the case where a CFC is a CFC throughout the year and has 100% U.S. shareholders throughout the year that are subject to Subpart F or GILTI inclusions, *i.e.*, they are shareholders under Section 958(a) ("**Section 958(a) U.S. Shareholders**"). Assume in all cases that the relevant CFCs have no PTI as of the beginning of the year in question, there is no gain in the CFC stock on January 1 of the year in question, the U.S. shareholder's holding period for the CFC stock satisfies the Section 245A holding period

---

[111] Section 951A(e)(1).  This section is written in a rather peculiar way because it refers separately to tested income, tested loss, and QBAI, but since these three items are in effect combined to determine the Section 951A inclusion, we assume it is intended to apply the *pro rata* rule to the Section 951A inclusion.

requirement,[112] the U.S. shareholder holds no other CFCs and none of the relevant CFCs has any QBAI return.

> Example 14(a) (CFC with Section 958(a) U.S. shareholders throughout the year): A U.S. shareholder (US1) owns the CFC. During the year, the CFC has $1000 of earnings. On June 30, the CFC pays a dividend of $500 to US1, and immediately thereafter US1 sells the stock to another Section 958(a) U.S. shareholder (US2) at no gain or loss. US2 continues to own the stock until the end of the year, so the last CFC date is December 31.

Consider first this fact pattern under prior law, and assume that the $1000 of earnings is all Subpart F income. US1 did not have any Subpart F inclusion because it was not a shareholder on the last CFC date. Thus, it did not have any PTI account, and the $500 dividend it received was taxable at ordinary rates. US2 had Subpart F income of $1000 under Section 951(a)(2)(A), but this was reduced by $500 under Section 951(a)(2)(B). Thus, the total inclusion was $1000, the full amount of Subpart F income for the year.

The same result would arise if there had been no dividend, but US1 had sold the stock of the CFC to US2 on June 30 for a gain of $500. Then, the gain would be a deemed dividend under Section 1248 subject to the same rules. Section 951(a)(2)(B) is essential in these cases to avoid double taxation of $500 of Subpart F income, since otherwise $500 would be taxed to US1 and $1000 would be taxed to US2.

Consider now the same fact pattern under current law. Just as under prior law, US1 does not have a Subpart F inclusion or PTI account, US1 has dividend income of $500, and US2 has Subpart F income of $1000 minus $500, or $500. However, now the dividend of $500 received by US1 is eligible for the 100% dividends received deduction under Section 245A. Likewise, if US1 sold the stock at a $500 gain without taking out the dividend, new Section 1248(j) provides that the deemed dividend under Section 1248 is eligible for the Section 245A deduction.

In either of these cases, US2 would obtain a PTI account of $500 by the first day of the CFC's next taxable year and could withdraw that amount tax free under Sections 959(a) and (e). As a result, in both the dividend and Section 1248 cases, $500 of Subpart F income permanently goes untaxed. Section 951(a)(2)(B), which was originally intended and needed to avoid double taxation of Subpart F income, is now eliminating even a single level of taxation of Subpart F income.

Since the Section 951A rules incorporate the Subpart F rules, the same results arise if income of the CFC is tested income rather than Subpart F income. Again, since

---

[112] *See* Section 246(c).

US1 is not a shareholder on the last CFC date, it does not have a Section 951A inclusion. US2's *pro rata* share of tested income is $1000 minus the distribution or deemed distribution to US1 of $500, or $500. US1 has a taxable dividend or deemed dividend of $500 and a Section 245A deduction of $500. The CFC has $1000 of tested income for the year, but only $500 of it is taxable (to US2).

These results arise even if US2 is related to US1 (assuming no Section 304 transaction). In addition, an even more taxpayer-favorable result arises if the sale is near the end of the taxable year of the CFC, and so there will be tax benefits to deferring a sale until that time of year. In some cases it might also be possible for US1 to change the taxable year of the CFC to be the 12-month period ending shortly after the sale, to fix the amount of income in the previous portion of the year that would not be taxed under Subpart F or Section 951A.

This elimination of tax on Subpart F income or GILTI inclusions arises because Section 951(a)(2)(B) reduces the Subpart F inclusion (and because of the cross-reference in Section 951A(e)(1) to Section 951(a)(2), the tested income) regardless of whether the dividends to prior shareholders are subject to U.S. tax. In particular, the elimination of tax arises because Section 951(a)(2)(B) applies to dividends paid in the year of sale even if the dividends are eligible for the Section 245A deduction to the shareholder.[113]

(ii) *Sale of CFC stock from a Section 958(a) U.S. Shareholder to a Non-U.S. Shareholder; CFC ceases to be a CFC*

We now consider how existing law applies when the CFC ceases to be a CFC on the sale date.

> Example 14(b) (CFC for only part of year). A Section 958(a) U.S. shareholder (US1) owns the CFC on January 1. During the year, the CFC has $1000 of earnings. On June 30, the CFC pays a dividend of $500 to US1, and immediately thereafter US1 sells the stock to a non-U.S. shareholder (F1) at no gain or loss on the stock. F1 continues to own the stock until the end of the year. Assume no attribution rules apply, so the last CFC date is June 30.

In this case, US1 is a Section 958(a) U.S. shareholder on the last CFC date. As a result, US1 has Subpart F income or a Section 951A inclusion, and PTI, equal to the Subpart F income or tested income for the year, or $500, as well as a Section 250 deduction if the income is tested income. Section 951(a)(2)(B) never applies, since there is no prior shareholder of the relevant stock. The $500 dividend to US1 is out of PTI, and so there is a single inclusion of $500 of Subpart F income or a net Section 951A inclusion

---

[113] If the distribution to US1 is not taxable because of a preexisting PTI account, such as on account of a prior Section 965 inclusion, it is not a dividend covered by Section 951(a)(2)(B).

of $250.  The statute reaches the correct result without regard to Section 951(a)(2)(B).  The same result arises if there is no dividend on June 30, but instead the stock is sold at a gain of $500.  There is still a Subpart F inclusion of $500 on June 30 and Section 1248(d)(1) excludes such amount from being taxed again under Section 1248.

However, there is one further issue.  Section 951A(e)(3) states that for purposes of Section 951A, "a foreign corporation shall be treated as a controlled foreign corporation for any taxable year if such foreign corporation is a controlled foreign corporation at any time during such taxable year."  This rule was apparently intended to conform the Section 951A rules to the repeal of the rule that had been in Section 951(a) and that had prevented the application of Subpart F to a corporation that was a CFC for less than 30 days during the year.

Yet it is possible to read this provision as stating that in Example 14(b), the CFC is treated as a CFC for the entire year even though it has no actual or constructive U.S. owners in the second half of the year.  We do not think this result was intended, since it would make meaningless the rules in Section 951 that look to the last day of the year on which the CFC is a CFC.  Such last day would always be the last day of the taxable year.  We recommend that regulations clarify that this provision is merely stating that there is no minimum period of time for a CFC to qualify as a CFC in order for it to be a CFC during its qualification period.

      (iii)    *Sale of CFC Stock from a Section 958(a) U.S. Shareholder to a non-U.S. Shareholder; CFC remains a CFC*

We now turn to another case where, as in Example 14(a), the CFC remains a CFC until the end of its tax year.

> Example 14(c) (CFC for whole year, taxable Section 958(a) U.S. shareholder for only part of year).  U.S. shareholder (US1) owns the CFC on January 1.  During the year, the CFC has $1000 of earnings.  On June 30, the CFC pays a dividend of $500 to US1, and immediately thereafter US1 sells the stock to a buyer (F1) at no gain or loss.  Assume F1 continues to own the stock until the end of the year, and the CFC remains a CFC through the end of the year.

Suppose the prior Subpart F rules apply, the income was Subpart F income, and there was no Subpart F inclusion for the year to any U.S. taxpayer because there was no U.S. taxpayer with Section 958(a) ownership on December 31, the last CFC date.  This fact pattern would have arisen, for example, if F1 was a U.S. partnership with all foreign partners.[114]  While the partnership would have the Subpart F inclusion as a U.S.

---

[114] This fact pattern would also have arisen as to, say, 49% of the stock of the CFC if US1 sold 49% of the stock of the CFC to a foreign corporation and retained the rest.  The CFC would have remained a CFC

shareholder on the last CFC date, none of its partners would be subject to U.S. tax. Section 951(a)(2)(B) was irrelevant because it merely reduces a Subpart F inclusion. However, US1 had a taxable dividend of $500 on June 30, which was taxable because US1 had no PTI.  The same is true if there was no dividend and US1 sold the stock on June 30 at a gain of $500, since Section 1248(a) would apply to the gain.

Now assume these facts arise in 2018, and the income is either Subpart F income or tested income.  The CFC will remain a CFC following the sale to F1 far more often under current law than before the Act.  The reason is that the Act repealed Section 958(b)(4), which prevented a U.S. corporation from being considered a U.S. shareholder by virtue of attribution from a related foreign person.[115]  Now, the CFC will continue to be a CFC through the end of the year even if F1 is a foreign corporation, as long as F1 has at least one U.S. subsidiary, since the subsidiary will constructively own the CFC stock owned by F1.

As before, there is no Subpart F or Section 951A inclusion, because the last CFC date is December 31 and there is no Section 958(a) U.S. shareholder on that date.[116]  Section 951(a)(2)(B) is irrelevant because it merely reduces a Subpart F (and now a Section 951A) inclusion.  The dividend to US1 is included in its gross income since the CFC has e&p and there is no PTI.  However, the dividend is eligible for the Section 245A deduction, so there is no net income inclusion.  The same is true if there was no dividend and the stock was sold at a gain of $500, since Section 1248(j) treats the Section 1248(a) gain as a dividend for purposes of Section 245A.

Thus, the Subpart F income or tested income allocable to US1, the selling U.S. shareholder of the CFC with Section 958(a) ownership, has permanently avoided U.S. tax by being converted into a tax-free dividend.[117]  Moreover, no interpretation or amendment of Section 951(a)(2)(B) will change this result, since there is no inclusion of Subpart F or tested income that is being reduced by that provision.  As before, the goal of US1 would be to sell the stock shortly before the end of the tax year of the CFC, and either take out a tax-free dividend shortly before the sale or else recognize a corresponding tax-free dividend under Section 1248.

---

throughout the year with a 51% U.S. shareholder, but there would have been no Subpart F inclusion on December 31 as to the 49% purchased interest.

[115] The scope of the repeal of Section 958(b)(4) is discussed in Part IV.G.3.

[116] Even if the CFC remains a CFC because F1 has a U.S. subsidiary that is a U.S. shareholder for determining CFC status, the subsidiary is not a U.S. shareholder under Section 958(a) and therefore has neither a GILTI inclusion (Section 951A(e)(2)) nor a Subpart F inclusion (Section 951(a)(1)).

[117] The converse situation would arise in Example 14(c) if F1 owned the stock in the first part of the year and sold it (without a distribution) to US1 on June 30.  US1 would have a Subpart F or tested income inclusion on December 31 equal to the CFC's income for the entire year, and it is doubtful that an offset would be allowed under Section 951(a)(2)(B).  The offset is only allowed for an amount included in gross income under Section 1248, and a non-U.S. person such as F1 would not have any gross income under Section 1248 or otherwise.  A pre-sale dividend to F1 would avoid this problem.

As noted above, this permanent elimination of tax on Subpart F income and Section 951A inclusions will be more common in light of the repeal of Section 958(b)(4), since there will now be many more situations where a CFC remains a CFC even though it does not have a taxable Section 958(a) U.S. shareholder. However, the issue is conceptually distinct from such repeal, since the issue could arise even if Section 958(b)(4) were fully restored. For example, as in the discussion of prior law above, the same issue would arise (a) if the sale of 100% of the stock was to a U.S. partnership to the extent the partnership had foreign partners that would not be required to report their share of partnership income, or (b) as to 49% of the tested income of a CFC, if a 51% direct U.S. shareholder retained its stock for the entire year, and a 49% direct U.S. shareholder sold its stock in the middle of the year to a non-U.S. person.

(iv)     *Sale of stock of second tier CFC where ownership of top CFC does not change*

Similar issues arise when a first tier CFC receives a dividend from, or sells the stock of, a second tier CFC during a taxable year, where the ownership of the first tier CFC does not change. This transaction is identical as an economic matter to the situation in Examples 14(a), (b), and (c) if the first tier CFC is a shell company, and if the buyer of the CFC stock is the same in each case. The result is in substance the same as in the previous situations.

The different fact patterns discussed above are now discussed in this lower-tier CFC context. In the examples, a U.S. shareholder ("**US1**") directly owns all the stock of a top tier CFC ("**CFC1**"), CFC1 directly owns all the stock of the lower tier CFC ("**CFC2**"), and CFC1 has no income or assets other than the stock of CFC2. As before, assume in all cases that the relevant CFCs have no PTI as of the beginning of the year in question, there is no gain in the CFC stock on January 1 of the year in question, the U.S. shareholder's holding period for the CFC stock satisfies the Section 245A holding period requirement,[118] the U.S. shareholder holds no other CFCs and none of the relevant CFCs has any QBAI return.

> Example 14(d) (Second Tier: CFC2 has Section 958(a) U.S. shareholders throughout the year): During the year, CFC2 has $1000 of earnings. On June 30, CFC2 pays a dividend of $500 to CFC1, and immediately thereafter CFC1 sells the stock of CFC2 to a Section 958(a) U.S. shareholder ("**US2**") at no gain or loss on the stock. US2 continues to own the stock until the end of the year, so the last CFC date for CFC2 is December 31.

---

[118] *See* Section 246(c).

Consider first this fact pattern under prior law, and assume that the $1000 of earnings is all Subpart F income.  US1 did not have any Subpart F inclusion from CFC2 because it was not a shareholder on the last CFC date.  US2 had Subpart F income of $1000 from CFC2 under Section 951(a)(2)(A), but this was reduced by $500 under Section 951(a)(2)(B).  However, US1 would have an additional $500 of income either when CFC1 received the dividend as Subpart F income (*i.e.*, if the same country exception did not apply), or (if not Subpart F income initially) when CFC1 paid the cash to US1 or when US1 sold the stock of CFC1.  Thus, the total inclusion was $1000, the full amount of Subpart F income for the year.

The same result would have arisen if there had been no dividend, but CFC1 had sold the stock of CFC2 to US2 on June 30 for a gain of $500.  Under Section 964(e)(1), CFC1 would have a deemed dividend as if Section 1248(a) applied, and the foregoing results would be unchanged.  Note that Section 951(a)(2)(B) is essential in these cases to reduce US2's Subpart F inclusion from $1000 to $500, since otherwise $500 would be taxed to US1 and $1000 would be taxed to US2.

Now consider the effects of the Act.  The Act added new Section 964(e)(4), which provides that when CFC1 sells the stock of CFC2, the Section 1248(a) amount created by Section 964(e)(1) is Subpart F income to CFC1, is includible in the income of US1, and is eligible for the Section 245A deduction in the same manner as if the Subpart F income were a dividend from CFC1 to US1.

Return now to Example 14(d) under current law, and assume the $1000 of income of CFC2 is Subpart F income or tested income.  The dividend to CFC1 would not be Subpart F income or tested income in CFC1's hands.[119]  CFC1 could pass on the dividend to US1, and US1 would be eligible for the Section 245A deduction.  If instead CFC1 sells the CFC2 stock at a gain of $500, under Section 964(e)(4), US1 will have a deemed Subpart F inclusion that is eligible for the Section 245A deduction.[120]   In addition, in either case, US2 will continue to have $1000 of Subpart F income or Section 951A inclusion that is reduced, under Section 951(a)(2)(B), by an actual dividend of $500 paid by CFC2 to CFC1, or by "any gain included in the gross income of any person as a dividend under section 1248".  If CFC2 paid an actual dividend of $500, US2's CFC inclusion would be $500, and the clear intent is that the same result arises if CFC1 sold the stock for gain of $500.[121]

---

[119] Under Section 951A(c)(2)(A)(i)(IV), a dividend from a related party is not tested income.  The dividend might be exempt from Subpart F income to CFC1 under Section 954(c)(3) (same country exception) or Section 954(c)(6) (look-through rule).  Note that the look-through rule does not apply if the underlying income is Subpart F income, but there is no exclusion if the underlying income is tested income.  At least if the underlying income is Subpart F income and the same-country exception does not apply, CFC1 would apparently be entitled to the Section 245A deduction, *see* Conference Report at 599 n. 1486.

[120] Note that Section 964(e)(4) applies "notwithstanding any other provision of this title".

[121] Section 964(e)(4) does not say that CFC1's gain on the sale of the CFC2 stock is "included in the gross income of any person" as a Section 1248 dividend, but the intent is clear.

These results are similar to the results today under Example 14(a) when the stock of a first tier CFC is sold in the middle of the year to another U.S. shareholder. Here, if CFC2 has $1000 of tested income, the Section 951A inclusion reported for the year is $500. Likewise, if CFC2 has $1000 of Subpart F income, the Subpart F inclusion for the year is $500. In both the GILTI and Subpart F cases, the Act has conformed the results of the sale of stock of a second tier CFC to the results of a sale of a first tier CFC.

Next, consider the analog to Example 14(c), where CFC1 sells the stock of CFC2 to F1 and CFC2 continues as a CFC until the end of the year. Regardless of whether the $500 is paid up as a dividend or the stock is sold at a gain of $500, the results to CFC1 and US1 are the same as in the second preceding paragraph. Moreover, there is no U.S. shareholder that pays tax on any Subpart F income or Section 951A inclusions on the last CFC date. Just as in Example 14(c), $500 of Section 951A inclusion or Subpart F income attributable to US1 has avoided U.S. tax, and just as in that example, the reason has nothing to do with Section 951(a)(2)(B).

Finally, consider the results under the Act if the CFC2 income is either GILTI or Subpart F, CFC1 sells the stock of CFC2 to a non-U.S. person, and the CFC ceases to be a CFC. This is the analog to Example 14(b) but in the context of a sale of a second tier subsidiary. Now, US1 is a U.S. shareholder of CFC2 on the last CFC date. As a result, US1 has Subpart F income or a Section 951A inclusion of $500 on that date, regardless of whether the $500 is paid up as a dividend or the stock is sold at a gain of $500. The non-U.S. purchaser of CFC2 is not a U.S. shareholder and has no inclusion. As a result, the total inclusion is $500, just as in Example 14(b), and the result conforms to the amount of Subpart F income or GILTI allocable to the selling shareholder.

(c) Discussion

It is clear from the foregoing that on a sale of a first tier or second tier CFC in the middle of a taxable year, the Subpart F income or Section 951A inclusion attributable to the selling shareholder for the pre-sale portion of the taxable year of sale will now permanently avoid tax because of Section 245A.

Absent a stock sale, it is clear that the payment of a dividend eligible for Section 245A does not reduce the amount of Subpart F income or Section 951A inclusion for the year. The policy question is whether a dividend eligible for Section 245A should reduce the amount of the inclusion if it occurs in the year the stock of a first-tier or second-tier CFC is sold.

On the one hand, it can be argued that Congress did not intend to allow for such an easy avoidance of Subpart F income or Section 951A inclusion. In addition, the fact that the Act conforms the treatment of a first and second tier subsidiary does not mean that it intended to allow such avoidance in either case. Moreover, such an avoidance of tax on a Section 951A inclusion is inconsistent with the theory that GILTI is a flat tax on foreign earnings. This result also allows for considerable tax planning to reduce the taxation of GILTI or Subpart F income. For example, a sale can occur near the end of the

year to maximize the amount of excluded income, and the sale can be made to a U.S. or non-U.S. affiliate in a manner that avoids Section 304.

On the other hand, arguably Congress was not concerned about these results.  The Act adds both Section 951A and Section 964(e)(4), and both sections refer to Section 951(a)(2).  Moreover, the new rule in Section 964(e)(4), combined with new Section 245A, expands the scope of tax free treatment of GILTI and Subpart F income to second tier subsidiaries. Arguably Congress must have determined that the operation of Section 951(a)(2), in conjunction with Section 245A, was consistent with its intent or at least not important enough to fix.  In addition, if Congress was satisfied with the operation of Section 951(a)(2) and Section 245A when the sale of stock was to a Section 958 U.S. shareholder, presumably it was satisfied with the equivalent result when the sale was to a non-Section 958 U.S. shareholder.

Moreover, Section 951(a)(2)(B) arguably allowed the elimination of Subpart F income in the year of a sale even before the Act.  Return to Example 14(b), where the CFC ceased to be a CFC on June 30.  Assume in addition that the CFC paid F1 a dividend of $500 on December 31.  US1 is a U.S. shareholder on the last CFC date. Under a literal reading of Section 951(a)(2)(B), US1 has a Subpart F inclusion of (i) $500 (*pro rata* share of Subpart F income for the full taxable year of the CFC) minus (ii) $500 (distribution to F1 not in excess of F1's share of Subpart F income for the year), or $0. At least one Technical Advice Memorandum from 1995 confirms this result.[122]  No legislative or regulatory action has been taken to change this result.

We take no position on whether these results should be changed by legislation or, if there is authority to do so, regulations.  However, we point out some possible approaches if a change is desired.

First, Section 245A could be amended to provide that when stock of a CFC is sold during a taxable year, and the CFC continues to be a CFC after the sale, dividends paid on that stock out of Subpart F income or Section 951A inclusions for that year are not eligible for Section 245A.  However, this would be a basic structural change to the Subpart F and GILTI rules, as well as Section 245A, and would create other complexities.

Second, Section 951(a)(2)(B) could be modified to reduce a Subpart F inclusion only for distributions not eligible for Section 245A.  This approach would result in inclusion for the full amount of Subpart F income or GILTI for the year of the stock sale if the CFC continued to be a CFC with a continuing Section 958(a) U.S. shareholder. However, it would not result in full inclusion if the CFC continued as a CFC without a Section 958(a) U.S. shareholder.  Moreover, it could be viewed as unfair to the Section 958(a) U.S. shareholder that buys the stock, since it would have a Section 951A inclusion of $1000 (without reduction for the $500 distribution to the seller eligible for Section

---

[122] TAM 9538002 (May 16, 1995).

245A) even though it only held the stock for half the year. This is penalizing the buyer because of the under-taxation of the seller.

Third, a new rule could apply on any sale of stock by a U.S. shareholder where the tax year does not end and the CFC remains a CFC, regardless of the buyer. In that event, the taxable year of the CFC would be deemed to end, with respect to the sold stock only, on the sale date. This would result in full inclusion to the seller for the year of the sale, as in Example 14(b), regardless of whether the buyer was a Section 958(a) U.S. shareholder.

The notional ending of the tax year could, like today, result in a *pro rata* allocation of income for the full year to the periods before and after the sale date, as opposed to a factual determination of income before and after the sale date. However, if the closing of the tax year applied for all purposes, it would result in short tax years for the sold stock. This would exacerbate the tax detriments under GILTI that arise from tax years with tested losses, and the fact that FTCs do not carry over.

3.   Relationship between Section 163(j) and Section 250

As indicated in Part III.E.3 of the Section 163(j) Report, regulations should address the relationship between Section 163(j) and Section 250. Notice 2018-28, relating to Section 163(j), is silent on this question. A taxpayer could first apply the Section 250(a)(1) deduction in determining "adjusted taxable income" under Section 163(j)(8), then determine allowed interest deductions under Section 163(j), and then apply the Section 250(a)(2) limitation of the Section 250 deduction to taxable income. However, a reduction in deductions under Section 250(a)(2) would "retroactively" increase "adjusted taxable income" under Section 163(j)(8), which would require re-calculating allowed interest deductions under Section 163(j), which, in turn, would require re-calculating the reduction in deductions under Section 250(a)(2), and so on and so forth. When Section 250(a)(2) applies, simultaneous equations might be required in order to replicate the effect of this iterative process.

4.   Limit on Section 250 Deduction

Regulations should clarify that, for purposes of the limit on the Section 250 deduction under Section 250(a)(2), "taxable income of the domestic corporation" includes all income, including Subpart F, Section 951A, Section 78, and FDII inclusions, determined without regard to the Section 250(a)(1) deduction.

In addition, regulations should clarify whether the Section 250(a)(2) carve-back applies to the Section 78 gross-up amount for a Section 951A inclusion. For example, assume the U.S. shareholder has no income or loss except for a Section 951A inclusion of $50, a Section 78 gross-up amount of $20, and a current NOL of $60. Tentative taxable income before Section 250 is $10. Section 250(a)(2) might require the $70 base for the 50% Section 250(a)(1) deduction to be reduced to either:

(a) $10, *i.e.*, the total Section 951A and Section 78 inclusions of $70 are reduced by the excess of such inclusions ($70) over tentative taxable income ($10), a



*Congressional*
*Research Service*
Informing the legislative debate since 1914 ⸻

# The Good Cause Exception to Notice and Comment Rulemaking: Judicial Review of Agency Action

**Jared P. Cole**
Legislative Attorney

January 29, 2016

**Congressional Research Service**

7-5700

www.crs.gov

R44356

**CRS REPORT**
Prepared for Members and
Committees of Congress ⸻

# Summary

While the Administrative Procedure Act (APA) generally requires agencies to follow certain procedures when promulgating rules, the statute's "good cause" exception permits agencies to forgo Section 553's notice and comment requirement if "the agency for good cause finds" that compliance would be "impracticable, unnecessary, or contrary to the public interest" and bypass its 30-day publication requirement if good cause exists. Federal courts reviewing this agency practice have varied in their analysis, resulting in confusion as to precisely what constitutes "good cause." In addition, some courts have indicated that these are two distinct standards; others do not always distinguish between the two.

What precisely constitutes good cause is not explicit from the APA's text. In order to understand the operation of the good cause exception, it may be helpful to divide good cause cases into several categories: (1) emergencies; (2) contexts where prior notice would subvert the underlying statutory scheme; and (3) situations where Congress intends to waive Section 553's requirements.

Courts differ as to the proper standard of review when agencies invoke the good cause exception. One pitfall is the proper characterization of the agency's action—is an agency determination that good cause exists to bypass Section 553 a discretionary decision or a legal conclusion? Challenges to agency discretionary decisions are governed by Section 706(2)(A)'s arbitrary and capricious standard, while procedural challenges pursuant to Section 706(2)(D) that an agency failed to comply with the provisions of the APA are often reviewed *de novo*. Some courts have applied the former standard when reviewing good cause determinations, others the latter. Still other courts appear to not clearly adopt either standard, but focus instead on simply "narrowly construing" the provision. Recent judicial analysis of the Attorney General's actions pursuant to the Sex Offender Registration and Notification Act (SORNA) illustrates this divergence. The Attorney General issued an interim rule applying SORNA retroactively and relied on the good cause exception to bypass Section 553's requirements. Federal courts split as to the legality of the Attorney General's actions as well as to the appropriate standard of review when examining good cause invocations.

Agency use of the good cause exception can also be important in the context of presidential transitions. Recent outgoing presidential administrations have engaged in "midnight rulemaking," whereby federal agencies increase the number of regulations issued during the final months of a presidential administration. A subsequent presidential administration of a different party, however, may have different policy priorities. Nonetheless, once a rule is finalized by an agency, repeal of a rule requires compliance with Section 553's notice and comment procedures. In order to gain control of the rulemaking process, some Presidents have sought to impose a moratorium on new regulations at the beginning of their administration. Agencies implementing such moratorium directives have often relied on use of the good cause exception to justify their actions.

TD 9865 RECORD-001713

# Contents

Introduction ........................................................................................................................ 1

Notice and Comment Rulemaking ...................................................................................... 1

Are There Actually Two Good Cause Standards? .............................................................. 3

What Constitutes Good Cause? .......................................................................................... 4

    Emergencies ................................................................................................................... 5

    Congressional Intent....................................................................................................... 7

    Harm Caused by Prior Notice ........................................................................................ 8

Standards of Review ........................................................................................................... 9

    Judicial Review of Agency Action ................................................................................ 9

        Review of Legal Conclusions ................................................................................. 10

        Review of Factual Determinations and Discretionary Decisions ..................................... 12

    Standard of Review When Agencies Invoke the Good Cause Exception .............................. 13

What Happens When a Court Rejects an Agency's Good Cause Finding?.................................... 16

Presidential Transitions .................................................................................................... 17

Congressional Proposals to Alter the Standard.............................................................................. 18

# Contacts

Author Contact Information ............................................................................................... 19

Acknowledgments ............................................................................................................. 19

TD 9865 RECORD-001714

# Introduction

Federal agencies issue numerous rules pursuant to congressionally delegated authority. These rules have the force and effect of law. The Administrative Procedure Act (APA) generally requires agencies to follow certain procedures when promulgating rules. The statute's "good cause" exception, however, permits agencies to forgo Section 553's notice and comment requirement if "the agency for good cause finds" that compliance would be "impracticable, unnecessary, or contrary to the public interest" and to bypass its requirement that rules be published 30 days before implementation if good cause exists.[1] In 2012, the Government Accountability Office (GAO) found that between 2003 and 2010 federal agencies issued about 35% of major rules and about 44% of nonmajor rules without a notice of proposed rulemaking (NPRM).[2] Of those rules issued without an NPRM, agencies justified their action most often by invoking the good cause exception.[3] However, federal courts reviewing this agency practice have varied in their analysis— as to the proper standard of review, whether there are actually two good cause provisions, and what factors justify the exception—resulting in confusion as to precisely what constitutes "good cause."[4] This report will examine judicial analysis of the good cause standard and map several factors that lead courts to uphold or reject agencies' invocation of the exception.

# Notice and Comment Rulemaking

The APA imposes procedural requirements on the actions of executive branch agencies.[5] Agencies engaged in "formulating, amending, or repealing" a rule are subject to either the APA's formal or informal rulemaking provisions.[6] A rule is "an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or describing the organization, procedure, or practice requirements of an agency."[7] If an agency's organic statute requires rulemaking to be "on the record," then the APA's formal rulemaking procedures are required.[8] Otherwise, the informal notice and comment rulemaking provisions of

---

[1] 5 U.S.C. § 553(b)(3)(B); (d).

[2] The GAO report adopted the definition of major rules in the Congressional Review Act, which distinguishes between major rules and nonmajor rules. Major rules are those determined by the office of Information and Regulatory Affairs (OIRA) to, among other things, have or be likely to have an annual effect on the economy of $100 million or more. 5 U.S.C. § 804(2).

[3] *See* Government Accountability Office, Federal Rulemaking: Agencies Could Take Additional Steps to Respond to Public Comments (Dec. 2012). Of the agency rules examined in the GAO's sample, agencies invoked the good cause exception in 77% of major rules and 61% of nonmajor rules promulgated without an NPRM. *Id.* at 15.

[4] Some commentators have opined that the apparent circuit split on the proper standard of review will be addressed by the Supreme Court. *See* Leland E. Beck, *APA Circuit Split – Notice and Comment Good Cause Bypass In SORNA Retroactivity Regulations, Federal Regulations Advisor*, http://www.fedregsadvisor.com/2013/03/16/apa-circuit-split-notice-and-comment-good-cause-bypass-in-sorna-retroactivity-regulations/ (Mar. 16, 2013). However, the Solicitor General has so far successfully argued against review of the question in Supreme Court certiorari stage briefs. *See* Brief for the Federal Respondents in Opposition to Certiorari, Oregon Trollers Association, et al. v. Carlos Gutierrez, et al., No. 06-662, 452 F.3d 1104 (9th Cir. 2006), *certiorari denied*, Oregon Trollers Ass'n v. Gutierrez, 549 U.S. 1338, 1338 (2007). *See also* United States Steel Corp. v. EPA, 444 U.S. 1035, (denying certiorari in United States Steel Corp. v. EPA, 605 F.2d 283 (7th Cir. 1979)), *reh'g denied*, 445 U.S. 939 (1980).

[5] 5 U.S.C. § 551 *et seq.*

[6] 5 U.S.C. § 551(5).

[7] 5 U.S.C. § 551(4).

[8] United States v. Florida East Coast Ry. Co., 410 U.S. 224 (1973); 5 U.S.C. §§ 556, 557.

TD 9865 RECORD-001715

Section 553 of the APA apply.[9] The most common process for issuing rules is under the latter category.[10]

Section 553 requires agencies to provide the public with notice of a proposed rulemaking.[11] The notice must include "(1) the time, place, and nature of public rulemaking proceedings; (2) reference to the legal authority under which the rule is proposed; and (3) either the terms or substance of the proposed rule or a description of the subjects and issues involved."[12] The public then has an opportunity to submit written comments on the rule.[13] Following consideration of these comments, the agency publishes a final rule with a "concise general statement of [its] basis and purpose."[14] Such rules must be published in the Federal Register not less than 30 days before the effective date.[15]

However, the APA contains several exceptions to Section 553's procedural requirements. First, certain subject areas are wholly exempt from the requirements of Section 553.[16] Second, certain "rules" issued by agencies that do not regulate public conduct with the "force and effect of law" are exempt from Section 553's notice and comment requirements. These include rules concerning "agency organization, procedure, or practice," or procedural rules,[17] as well as interpretive rules and general statements of policy, or nonlegislative rules.[18] Such "rules" differ from the substantive, or legislative, rules subject to Section 553 that do bind the public's behavior. Third, certain legislative rules are exempt from Section 553's notice and comment requirement when an "agency for good cause finds" that issuing a proposed rule and holding a comment period would be "impracticable, unnecessary, or contrary to the public interest."[19] Finally, the 30-day publication requirement does not apply when an agency finds good cause.[20]

The APA's "good cause" exception(s) thus permits agencies to issue substantive rules that bind the public without following Section 553's notice and comment requirement and to waive the 30-day publication requirement.[21] However, the proper standard for invoking the exemption is unclear; commentators have noted the vagueness of the applicable terms.[22] Federal courts are

---

[9] Other types include formal, hybrid, direct final, and negotiated rulemaking. *See* CRS Report R41546, *A Brief Overview of Rulemaking and Judicial Review*, by Todd Garvey and Daniel T. Shedd.

[10] CRS Report RL32240, *The Federal Rulemaking Process: An Overview*, coordinated by Maeve P. Carey.

[11] 5 U.S.C. § 553(b).

[12] 5 U.S.C. § 553(b)(1)-(3). This is done via publication in the *Federal Register*.

[13] 5 U.S.C. § 553(c).

[14] 5 U.S.C. § 553(c).

[15] 5 U.S.C. § 553(d).

[16] Rules pertaining to (1) "a military or foreign affairs function of the United States," (2) "a matter relating to agency management or personnel," or (3) a matter relating to "public property, loans, grants, benefits, or contracts" are exempt. 5 U.S.C. § 553(c).

[17] 5 U.S.C. § 553(b)(3)(A).

[18] 5 U.S.C. § 553(b)(3)(A).

[19] 5 U.S.C. § 553(b)(3)(B). Agencies must provide "a brief statement of reasons" supporting the good cause invocation. 5 U.S.C. § 553(b)(3)(B). *See* S. California Aerial Advertisers' Ass'n v. F.A.A., 881 F.2d 672, 677 (9th Cir. 1989).

[20] 5 U.S.C. § 553(d)(2), (3). The publication requirement also does not apply to interpretive rules or statements of policy and substantive rules which relieve a restriction. 5 U.S.C. § 553(d)(2), (3).

[21] Courts sometimes require good cause to be established separately in order to waive the notice-and-comment procedures as well as the 30-day publication requirement. *See* U.S. v. Brewer, 766 F.3d 884, 888 (8th Cir. 2014) ("[C]ourts should not conflate the pre-adoption notice-and-comment requirements, listed in § 553(b) and (c), with the post-adoption publication requirements, listed in § 553(d). Because these are separate requirements, the agency must have good cause to waive each.").

[22] *See* Adrian Vermeule, *Our Schmittian Administrative Law*, 122 HARV. L. REV. 1095, 1123 (2009); Connor Raso, (continued...)

---

divided on the proper standard of review when faced with challenges to agencies' use of the exemption to forgo notice and comment procedures. And judicial analysis of agencies' use of the exception appears to consider a wide range of factors without a clear limiting principle.[23] Further, courts divide as to whether a failure to include a formal statement of reasons in the rule when bypassing Section 553's requirements is fatal to the rule's validity.[24]

# Are There Actually Two Good Cause Standards?

Section 553(b)(B) of the APA provides that compliance with notice and comment rulemaking may be bypassed when an "agency for good cause finds" that doing so would be "impracticable, unnecessary, or contrary to the public interest";[25] Section 553(d) provides that the 30-day publication rule may be waived for good cause.[26] Some courts have indicated that these are two distinct standards; others do not always distinguish between the two.[27] Courts that do conceptualize them differently note that notice and comment rulemaking allows public participation, while "the purpose of the thirty-day waiting period is to give affected parties a reasonable time to adjust their behavior before the final rule takes effect."[28] In making the latter determination, the D.C. Circuit has noted that agencies "should 'balance the necessity for immediate implementation against principles of fundamental fairness which require that all affected persons be afforded a reasonable amount of time to prepare for the effective date of its ruling.'"[29] In addition, some courts have indicated that the test for good cause to waive notice and comment is more stringent than to waive the 30-day rule.[30]

However, courts sometimes decline to decide whether the two standards are different, ruling that the circumstances do or do not support good cause under both exceptions,[31] or do not

---

(...continued)

*Agency Avoidance of Rulemaking Procedures*, 67 ADMIN L. REV. 65, 87–90 (2015).

[23] *See* Raso, *supra note* 22, at 87–90 (asserting that judicial analysis of the good cause exception is "inconsistent.").

[24] *Compare* DeRieux v. Five Smiths, Inc., 499 F.2d 1321, 1333 (Temp. Emer. Ct. App. 1974) ("A failure to incorporate in rules a statement of basis and purpose, in technical violation of § 553(c), has been held not to void the rules where 'both the basis and purpose are obvious from the specific governing legislation and the entire trade was fairly apprised of them by the procedure followed.'") (quoting Hoving Corp. v. Federal Trade Commission, 290 F.2d 803, 807 (2d Cir. 1961) *with* Kelly v. U.S. Dep't of Interior, 339 F. Supp. 1095, 1102 (E.D. Cal. 1972) ("We think the omission is fatal not only because it violates § 553(b) (B), but also because it leaves us with nothing to measure the propriety of ignoring the 30-day rule.").

[25] 5 U.S.C. 553(b)(B).

[26] 5 U.S.C. 553(d).

[27] *Compare* Buschmann v. Schweiker, 676 F.2d 352, 356 (9th Cir. 1982); U.S. v. Johnson, 632 F.3d 912, 927–30 (5th Cir 2011) *with* United States v. Gould, 568 F.3d 459, 481 (4th Cir. 2009) (Michael, J., dissenting) (asserting that "courts have regarded § 553(d)(3)'s good cause standard as distinct from and somewhat more flexible than § 553(b)(B)'s good cause standard") (citing Am. Fed'n of Gov't Employees v. Block, 655 F.2d 1153, 1156 (D.C.Cir. 1981)); Rowell v. Andrus, 631 F.2d 699, 703 (10th Cir. 1980) (noting that the two provisions have different purposes).

[28] Omnipoint Corp. v. F.C.C., 78 F.3d 620, 630 (D.C. Cir. 1996).

[29] *Id.* (quoting United States v. Gavrilovic, 551 F.2d 1099, 1105 (8th Cir. 1977)). *See* Black v. Pritzker, No. CV 14-782 (CKK), 2015 WL 4747409, at *12 (D.D.C. Aug. 10, 2015).

[30] Am. Fed'n of Gov't Emp., AFL–CIO v. Block, 655 F.2d 1153, 1156 (D.C. Cir. 1981); U.S. Steel Corp. v. E.P.A., 605 F.2d 283, 289–90 (7th Cir. 1979).

[31] NW Airlines v. Goldsmidt (8th Cir. 1981) (upholding good cause for both based on similar reasoning); U.S. v. Cain, 583 F.3d 408, 423-24 (6th Cir. 2009) (acknowledging that the two standards are different but rejecting both claims of good cause on similar grounds).

---

TD 9865 RECORD-001717

acknowledge that the two might differ in substance.[32] In fact, some courts distinguished between the two in some cases, but not in others.[33]

Whether courts distinguish conceptually between the two standards or not, at a functional level, the two can sometimes operate independently. Courts will sometimes find that good cause exists to issue immediately applicable emergency regulations, but conclude that there is no reason the agency cannot make them temporary, subject to notice and comment procedures.[34] In addition, courts have sometimes found good cause for an agency to issue an immediately applicable interim rule when the agency permits comment on the final rule.[35]

# What Constitutes Good Cause?

Leaving aside disagreements over the proper standard of review, under what circumstances have courts upheld agency invocations of good cause to bypass notice and comment rulemaking? The APA's text limits good cause to an agency finding that compliance with notice and comment rulemaking is "impracticable, unnecessary, or contrary to the public interest."[36] However, judicial application of these factors tends to converge.[37] Consequently, leaving aside minor or technical rules where compliance with Section 553 is unnecessary,[38] it may be helpful to divide good cause

---

[32] U.S. v. Johnson, 632 F.3d 912, 927-30 (5th Cir 2011); U.S. v. Valverde, 628 F.3d 1159 (9th Cir. 2010); United States v. Reynolds, 710 F.3d 498, 509-14 (3d Cir. 2013).

[33] *Compare* Tennessee Gas Pipeline Co. v. F.E.R.C., 969 F.2d 1141, 1144 (D.C. Cir. 1992) *with* Am. Fed'n of Gov't Emp., AFL-CIO v. Block, 655 F.2d 1153, 1156 (D.C. Cir. 1981).

[34] *See e.g.*, Am. Fed'n of Gov't Emp., AFL-CIO v. Block, 655 F.2d 1153, 1156 (D.C. Cir. 1981); Riverbend Farms, Inc. v. Madigan, 958 F.2d 1479 (9th Cir. 1992); Kollett v. Harris, 619 F.2d 134, 145 & n.15 (1st Cir. 1980) ("The case upon which the Secretary relies, dealt not with good cause for eliminating prior notice and comment under section 553(b)(B) but with good cause under section 553(d) to forego the 30-day waiting period before an adopted rule becomes effective. The section 553(d) deferral period is for the purpose of affording affected persons time to adjust to the rule. As plaintiffs have suggested no reason why such an adjustment interval was needed here or demonstrated any prejudice from the interim rule's being given immediate effect, and as the Secretary had an obvious need to administer the program, we conclude, under the circumstances, that the Secretary had good cause to make the interim deeming regulations immediately effective but not to bypass prior notice and comment procedures.") (citations omitted); Ishtyaq v. Nelson, 627 F. Supp. 13, 23 (E.D.N.Y. 1983) ("By proceeding as it did here, promulgating an immediately effective interim rule and following it with a 30 day notice and comment period and the adoption of a final rule, amended in light of the public comments received, the INS fully discharged its obligations under § 553 of the Act"); Black v. Pritzker, No. CV 14-782 (CKK), 2015 WL 4747409, at *9 (D.D.C. Aug. 10, 2015) ("Instead, the D.C. Circuit has made clear that the requirements for showing good cause under § 553(b), not at issue in this case, and under § 553(d), which is at issue in this case, are different.").

[35] Am. Transfer & Storage Co. v. I.C.C., 719 F.2d 1283, 1294 (5th Cir. 1983).

[36] 5 U.S.C. § 553(b)(B).

[37] *See* Util. Solid Waste Activities Grp. v. E.P.A., 236 F.3d 749, 755 (D.C. Cir. 2001).

[38] Rulemaking is unnecessary when agencies make minor or technical determinations involving little to no agency discretion. *See* Mack Trucks, Inc. v. E.P.A., 682 F.3d 87, 94 (D.C. Cir. 2012) ("This prong of the good cause inquiry is 'confined to those situations in which the administrative rule is a routine determination, insignificant in nature and impact, and inconsequential to the industry and to the public.'") (quoting Util. Solid Waste Activities Grp. v. EPA, 236 F.3d 749, 755 (D.C. Cir. 2001)); N. Carolina Growers' Ass'n, Inc. v. United Farm Workers, 702 F.3d 755, 767 (4th Cir. 2012); Nat'l Nutritional Foods Ass'n v. Kennedy, 572 F.2d 377, 385 (2d Cir. 1978); United States Department of Justice, Attorney General's Manual on the Administrative Procedure Act 30–31 (1947) ("'Unnecessary' refers to the issuance of a minor rule in which the public is not particularly interested."); Senate Report, No. 752, 79th Cong. 1st Sess. at 14(1945) ("'Unnecessary' means unnecessary so far as the public is concerned, as would be the case if a minor or merely technical amendment in which the public is not particularly interested were involved.").

Agencies also sometimes utilize "direct-final rulemaking," whereby the agency publishes a proposed rule, and the notice includes language providing that the rule will become effective as a final rule on a specific date unless an adverse comment is received by the agency. If even a single adverse comment is received, the direct final rule is (continued...)

---

cases into several categories: (1) emergencies; (2) contexts where prior notice would subvert the underlying statutory scheme; and (3) situations where Congress intends to waive Section 553's requirements.

# Emergencies

Concern for public safety can constitute good cause to bypass notice and comment procedures. For example, in 2004, the D.C. Circuit upheld the Federal Aviation Administration's (FAA) rule, promulgated without notice and comment, covering the suspension and revocation of pilot certificates on security grounds.[39] The agency argued that the regulation was necessary to protect the public against security threats. The court accepted this contention, ruling that the "legitimate concern over the threat of further terrorist acts involving aircraft in the aftermath of September 11, 2001" supported the good cause finding.[40] Likewise, the Ninth Circuit upheld an FAA rule that established special operating procedures for air tour operators.[41] The agency argued that current regulations were insufficient to protect public safety, as the regulation was promulgated after seven helicopter accidents in the preceding year. The court accepted the agency's position and upheld the good cause finding.[42]

However, the "mere existence" of a deadline is usually insufficient to establish good cause.[43] Courts have generally rejected good cause exemptions when agencies argue that statutory deadlines alone justify bypassing notice and comment procedures or the 30-day publication requirement.[44] Instead, some "exigency" is required, independent of the deadline itself, which merits dispensing with Section 553's requirements.[45] Importantly, courts have precluded efficiency goals and concern for agency convenience from qualifying as exigencies.[46]

For example, courts may find good cause when circumstances outside an agency's control make compliance with notice and comment rulemaking or the 30-day publication requirement impracticable.[47] This can include situations where an agency, faced with a statutory or regulatory deadline to promulgate regulations, invokes good cause to support an order deferring a rule's

---

(...continued)

withdrawn, and the agency must issue a proposed rule under the APA's informal notice and comment requirements. One might justify such action as bypassing Section 553's requirements because the proposed rule is unnecessary. However, some have argued that such procedures comply with Section 553 as they issue notice and delay finality of the rule for 30 days. *See* Ronald M. Levin, *Direct Final Rulemaking*, 64 GEO. WASH. L. REV. 1, 4-6 (1995).

[39] Jifry v. F.A.A., 370 F.3d 1174, 1179-80 (D.C. Cir. 2004).

[40] *Id.* at 1180.

[41] Hawaii Helicopters Operators Ass'n v. F.A.A., 51 F.3d 212, 214 (9th Cir. 1995).

[42] *Id.*

[43] United States Steel Corp. v. United States Environmental Protection Agency, 595 F.2d 207, 213 (5th Cir. 1979).

[44] Council of S. Mountains, Inc. v. Donovan, 653 F.2d 573, 581 (D.C. Cir. 1981); Am. Fed'n of Gov't Emp., AFL-CIO v. Block, 655 F.2d 1153, 1158 (D.C. Cir. 1981); United States Steel Corp. v. United States Environmental Protection Agency, 595 F.2d 207, 213 (5th Cir. 1979).

[45] Natural Resources Defense Council, Inc., v. Evans, 316 F.3d 904, 912 (9th Cir. 2003); Chamber of Commerce of U.S. v. S.E.C., 443 F.3d 890, 908 (D.C. Cir. 2006).

[46] *See, e.g.*, Chamber of Commerce of U.S. v. S.E.C., 443 F.3d 890, 908 (D.C. Cir. 2006).

[47] Northwest Airlines v. GoldSchmit, 645 F.2d 1309, 1320-21 (8th Cir. 1981); American Federation of Government Emp., AFL-CIO v. Block, 655 F.2d 1153, 1157 (D.C. Cir. 1981) (upholding good cause exception to issue interim rule when agency, in response to judicial order, promulgated immediately effective regulations that aimed to prevent economic harm to poultry producers and consumers).

---

TD 9865 RECORD-001719

implementation.[48] This exception is only appropriate in "exceptional circumstances. Otherwise, an agency unwilling to provide notice or an opportunity to comment could simply wait until the eve of a statutory, judicial, or administrative deadline, then raise up the 'good cause' banner and promulgate rules without following APA procedures."[49] For example, the D.C. Circuit ruled that the Office of Personnel Management's deferment of a health plan enrollment period because of recent litigation uncertainty and threats to the financial stability of the program did not violate the APA.[50] In that case, litigation in other courts, combined with losses associated with a major health benefit provider, created an emergency situation wherein commencement of the enrollment period without deferment would have "posed a serious threat to the financial stability of the benefit program."[51] These circumstances were outside of the agency's control, not leaving enough time to comply with notice and comment procedures.[52] Consequently, the court found that good cause existed to waive Section 553's requirements.

Similarly, swift action may be permitted when, due to circumstances outside of an agency's control, a regulation is needed in the public interest.[53] For example, in 1981 the Eighth Circuit upheld a temporary FAA rule allocating air carrier slots at National Airport in Washington, D.C.[54] Previously, air carriers had traditionally agreed on the appropriate slots through air scheduling committees, which reported their agreement to the FAA. In 1980, for the first time in the scheduling committees' history, the air carriers could not come to an agreement. The court noted the need for notice to the airlines and the public for scheduling purposes, and concluded that "the rapid resolution of the slot allocation problem at National was not only in the interest of the traveling public, particularly on the eve of the winter holiday season, but also consistent with the national interest in the efficient utilization of the navigable airspace."[55] The court thus upheld the agency's good cause finding to shorten the comment period and make the rule effective immediately.[56] In contrast, concerns about the fiscal health of one regulated entity might not rise to this level.[57] For instance, in 2012, the EPA promulgated an interim final rule (IFR) without notice and comment that permitted heavy-duty diesel engine manufacturers to sell noncompliant engines if they paid certain penalties.[58] The D.C. Circuit found that the purpose of the IFR was not to prevent any threat to the public, but instead "to rescue a lone manufacturer from the folly of its own choices."[59] Absent some important public interest, or even a systemic threat to an entire

---

[48] Council of Southern Mountains, Inc. v. Donovan, 653 F.2d 573, 581 (D.C. Cir. 1981).

[49] *Id.*

[50] Nat'l Fed. of Federal Emp. v. Devine, 671 F.2d 607 (D.C. Cir. 1982).

[51] *Id.* at 611.

[52] *Id.*

[53] Reeves v. Simon, 507 F.2d 455, 457 (Temp. Emer. Ct. App. 1974) (finding that good cause was established to dispense with 30-day publication requirement because of a national gasoline shortage emergency).

[54] Northwest Airlines v. GoldSchmit, 645 F.2d 1309, 1320 (8th Cir. 1981) ("Although some dispute exists over whether the 'good cause' exception of § 553(d)(3) encompasses more situations than the 'good cause' exception of § 553(b)(B), we need not determine in the present case whether the two 'good cause' exceptions carry the same meaning. In our view the urgent necessity for rapid administrative action under the circumstances of the present case would justify the Secretary's finding of 'good cause' under either exception.").

[55] *Id.* at 1321.

[56] *Id.* The court acknowledged that "some dispute exists over whether the 'good cause' exception of § 553(d)(3) encompasses more situations than the 'good cause' exception of § 553(b)(B)" but concluded that good cause was established here in either case.

[57] Mack Trucks, Inc. v. E.P.A., 682 F.3d 87, 95 (D.C. Cir. 2012).

[58] *Id.* at 89.

[59] *Id.* at 93 (quoting Petitioner's Brief at 29).

---

TD 9865 RECORD-001720

industry and its customers, saving one regulated entity—which could have avoided the problem if it made better business decisions—did not constitute good cause.[60]

Importantly, conclusory claims by an agency of an emergency situation, unaccompanied by independent facts, are insufficient to constitute good cause.[61] In a leading case for this proposition, the D.C. Circuit invalidated the Federal Energy Regulatory Commission's (FERC's) issuance of an interim rule that required pipeline companies to make disclosures and give advance notice prior to constructing new facilities or replacing existing ones.[62] Previously, the agency automatically approved the construction of new facilities. In a shift of policy, the agency simultaneously published a Notice of Proposed Rulemaking to solicit comments on a forthcoming final rule as well as a binding interim rule. The agency defended the interim rule as, among other things, necessary to prevent environmental damage from companies accelerating the construction of new facilities before the final rule came into force.[63] However, the court found that good cause to do so had not been established. It ruled that the agency had not provided a sufficient factual basis to accept this reasoning.[64] At bottom, the agency relied upon its own expertise in predicting that, without the interim rule, firms would rush to begin new projects that would harm the environment. Because the agency failed to provide evidence beyond its own expertise on the matter, the D.C. Circuit refused to uphold a finding of good cause.[65]

## Congressional Intent

As discussed above, the mere existence of a statutory deadline, in and of itself, is usually insufficient to constitute good cause. However, Congress can implicitly waive the APA's requirements. For instance, when Congress imposes certain procedures, which, taken together with a deadline, are irreconcilable with Section 553's requirements, then courts may read congressional intent to waive the APA's requirements.[66]

Similarly, some courts have found that the imposition of a congressional deadline can support a good cause finding. For example, the congressional imposition of a stringent deadline which makes agency compliance with Section 553 impracticable can constitute good cause.[67] Similarly,

---

[60] *Id.* at 94.

[61] *See, e.g.*, Sorenson Commc'ns Inc. v. F.C.C., 755 F.3d 702, 707 (D.C. Cir. 2014) (finding that no good cause existed when the agency failed to establish facts supporting a "threat of impending fiscal peril"). As mentioned previously, *supra* notes 73-93, a number of courts recently rejected the Attorney General's invocation of good cause in the SORNA cases as merely restating the purpose of the statute, rather than proffering independent evidence. *See* United States v. Valverde, 628 F.3d 1159, 1167 (9th Cir. 2010) ("[T]he Attorney General did little more than restate the general dangers of child sexual assault, abuse, and exploitation that Congress had sought to prevent when it enacted SORNA."); United States v. Brewer, 766 F.3d 884, 890 (8th Cir. 2014) ("[T]he Attorney General cannot constitute a reasoned basis for good cause because it is nothing more than a rewording of the statutory purpose Congress provided in the text of SORNA.'") (quoting Reynolds, 710 F.3d at 512 ); *see also* United States v. Johnson, 632 F.3d 912, 928 (5th Cir. 2011); United States v. Cain, 583 F.3d 408, 421 (6th Cir. 2009).

[62] Tennessee Gas Pipeline Co. v. F.E.R.C., 969 F.2d 1141, 1146 (D.C. Cir. 1992). The court found that there was not good cause to waive the notice and comment requirements or the 30-day publication rule, but did not distinguish between the two as separate standards.

[63] *Id.* at 1143.

[64] *Id.* at 1145-46.

[65] *Id.*

[66] *See, e.g.*, Asiana Airlines v. F.A.A., 134 F.3d 393, 398 (D.C. Cir. 1998); Methodist Hospital of Sacramento v. Shalala, 38 F.3d 1225, 1237 (D.C. Cir. 1998). Here, courts are finding that the APA is inapplicable, rather than that good cause is established.

[67] Philadelphia Citizens in Action v. Schweiker, 669 F.2d 877, 885-86 (3rd Cir. 1982).

TD 9865 RECORD-001721

when the issuance of interim rules is necessary in order to comply with a new law, good cause to waive Section 553's requirements can be established.[68] That said, whether Congress intended to waive these procedures in a particular situation is largely a fact-specific inquiry. In the past, courts have divided as to whether Congress so intended in the same statutory scheme.[69]

## Harm Caused by Prior Notice

Courts have sometimes found good cause when advance notice of a rule would cause harm to the public. For example, the Ninth Circuit upheld the Secretary of Agriculture's invocation of good cause to bypass the APA's 30-day publication requirement when issuing rules governing the orange market.[70] Pursuant to the Agricultural Marketing Agreement Act, the Secretary is authorized to regulate the market in certain commodities and issue rules regarding volume restrictions every week. With regard to navel oranges, a committee holds a regular meeting, open to the public, to decide on the appropriate volume restrictions for the next week. The decision is then recommended to the Secretary, who actually issues the binding rule. The court reasoned that requiring the Secretary to give 30-day advance notice of each rule would cause harm by forcing the agency to predict the proper restrictions in advance of when a reasonable determination could actually be made.[71] The committee in charge of formulating recommendations revises its projections "right up until, and occasionally even during, the week in question."[72] The court concluded that it could not require compliance with this requirement "without throwing the entire regulatory program out of kilter."[73] However, the court ruled that good cause had not been established to bypass the notice and comment requirements.[74] While it was impracticable to predict the final rule a month in advance, nothing precluded the Secretary from notifying the public of the meeting and permitting comments every week.

Similarly, courts have found good cause when compliance with Section 553 would subvert the rule or underlying statute's purpose.[75] This has occurred several times in the context of government price controls. For example, in response to the 1970's oil crisis, the Federal Energy Administration (FEA)[76] issued regulations to equalize prices without notice and an opportunity to comment.[77] The Temporary Emergency Court of Appeals upheld the good cause invocation, finding that given the emergency conditions behind the oil price legislation and the potential "price discrimination and other market dislocations" that could be caused by advance notice of the rule, the agency had good cause to bypass notice and comment rulemaking.[78] Likewise, courts have upheld good cause invocations when notice of a price increase would worsen oil supply

---

[68] American Transfer & Storage Co. v. I.C.C., 719 F.2d 1283, 1292-93 (5th Cir. 1983).

[69] *Compare* U.S. Steel Corp. v. U.S. E.P.A., 595 F.2d 207, 210 (5th Cir. 1979); Sharon Steel Corp. v. EPA, 597 F.2d 377, 381 (3d Cir. 1979); W. Oil & Gas Ass'n v. U.S. E.P.A., 633 F.2d 803, 811 (9th Cir. 1980); State of N. J., Dep't of Envtl. Prot. v. U.S. Envtl. Prot. Agency, 626 F.2d 1038, 1040 (D.C. Cir. 1980) *with* U.S. Steel Corp. v. U.S. E.P.A., 605 F.2d 283, 289 (7th Cir. 1979); Republic Steel Corp. v. Costle, 621 F.2d 797 (6th Cir. 1980).

[70] Riverbend Farms, Inc. v. Madigan, 958 F.2d 1479, 1486 (9th Cir. 1992).

[71] *Id.* at 1485-86.

[72] *Id.* at 1486.

[73] *Id.*

[74] *Id.* at 1487.

[75] *See, e.g.*, Nader v. Sawhill, 514 F.2d 1064, 1068 (Temp. Emerg. Ct. App. 1975).

[76] Now known as the Department of Energy.

[77] Mobil Oil Corp. v. Dep't of Energy, 728 F.2d 1477, 1490 (Temp. Emerg. Ct. App. 1975).

[78] *Id.* at 1492. The court also reviewed the factual question of whether the agency's good cause finding was shown in the record and concluded that it was. *Id.* at 1492-94.

TD 9865 RECORD-001722

shortages,[79] as well as in circumstances where "announcement of a future price freeze would generate a 'massive rush to raise prices.'"[80]

# Standards of Review

One potential reason for confusion regarding the issue is disagreement regarding the appropriate standard of review when agencies invoke the good cause exception. As an initial matter, federal courts appear to agree that the good cause exception is to be "narrowly construed."[81] Executive agencies bear the burden of persuasion in convincing a court that good cause exists,[82] and the exception is not to be used as an "escape clause" to avoid rulemaking procedures when convenient for the agency.[83] "Bald assertions" by an agency that comments are unnecessary in a particular situation do not create good cause.[84] Otherwise, the exception would swallow the rule.[85] In other words, agencies must provide courts with a sufficient reason showing why good cause exists in order to justify bypassing Section 553's procedural requirements.[86] Courts are divided, however, as to the proper standard of review when an agency does so.

As relevant to agency rulemaking, the APA, in Section 706, direct courts to

> hold unlawful and set aside agency action, findings, and conclusions found to be— arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; [or] without observance of procedure required by law.[87]

## Judicial Review of Agency Action

Courts employ a variety of legal doctrines when reviewing agency action. These standards are conceptually distinct, however, from judicial review of trial court proceedings.[88] Broadly, courts review agency factual findings, discretionary decisions, and legal conclusions, although

---

[79] Nader v. Sawhill, 514 F.2d 1064, 1068 (Temp. Emerg. Ct. App. 1975).

[80] DeRieux v. Five Smiths, Inc., 499 F.2d 1321, 1332 (Temp. Emerg. Ct. App. 1975).

[81] Mack Trucks, Inc. v. E.P.A., 682 F.3d 87, 93 (D.C. Cir. 2012) ("We have repeatedly made clear that the good cause exception 'is to be narrowly construed and only reluctantly countenanced.'") (citing Util. Solid Waste Activities Grp. v. E.P.A., 236 F.3d 749, 754 (D.C. Cir. 2001)); Mobay Chemical Corp. v. Gorsuch, 682 F.2d 419, 426 (3d Cir. 1982) ("In considering whether there was good cause for the agency to adopt the data compensation regulations without prior notice-and-comment, we are guided by the principle that the exception is to be narrowly construed."); San Diego Air Sports Ctr., Inc. v. F.A.A., 887 F.2d 966, 969 (9th Cir. 1989) ("We have stated that '[t]he exceptions to section 553 will be narrowly construed and only reluctantly countenanced.'") (quotations omitted) (citing Alcaraz v. Block, 746 F.2d 593, 612 (9th Cir.1984)).

[82] Arapahoe Tribe v. Hodel, 808 F.2d 741, 751 (10th Cir. 1987); Action on Smoking & Health v. Civil Aeronautics Bd., 713 F.2d 795, 801 n.6 (D.C. Cir. 1983).

[83] Tennessee Gas Pipeline Co. v. F.E.R.C., 969 F.2d 1141, 1144 (D.C. Cir. 1992) (citing American Fed'n of Govt. Employees v. Block, 655 F.2d 1153, 1156 (D.C. Cir. 1981)).

[84] Action on Smoking & Health v. C.A.B., 713 F.2d 795, 800-01 (D.C. Cir. 1983); Mobil Oil Corp. v. Department of Energy, 610 F.2d 796, 803 (Temp.Em.Ct.App.1979).

[85] Action on Smoking & Health v. C.A.B., 713 F.2d 795, 800-01 (D.C. Cir. 1983); Housing Authority of City of Omaha v. United States Housing Authority, 468 F.2d 1, 8 (8th Cir.1972).

[86] Consumer Energy Council of Am. v. Fed. Energy Regulatory Comm'n, 673 F.2d 425, 447 (D.C. Cir. 1982) aff'd sub nom. Process Gas Consumers Grp. v. Consumer Energy Council of Am., 463 U.S. 1216 (1983).

[87] 5 U.S.C. § 706(2)(A), (D).

[88] *See* David Zaring, *Reasonable Agencies*, 96 VA. L. REV. 135, 197 n.23 (2010) (noting that the judicial review standards of the APA are not "duplicated by the standards of review used by appellate courts to review trial courts.").

---

TD 9865 RECORD-001723

distinguishing between these situations can be difficult.[89] The amount of deference given by a court to the agency's decision varies depending on which agency action is under review.[90]

However, courts do not always explicitly adopt standards of review, sometimes concluding that an agency's construction of a statute stands or fails under multiple standards.[91] In addition, judicial review of agency's fact-findings can simultaneously include consideration of substantial discretionary decisions, complicating the precise scope of review.[92] Further, distinguishing differences between the potential outcomes under each standard can sometimes be a difficult analytical exercise.[93] Nevertheless, an explanation of the various standards can be helpful in understanding the nature of federal court review.

## Review of Legal Conclusions

Courts review agencies' *legal* conclusions according to several standards. When a plaintiff challenges an agency action as inconsistent with statute, courts must interpret the meaning of the legislative provision. In the case of ambiguity, courts grant *Chevron* deference to agencies' interpretations of their own statutory authority if Congress intended to permit the agency to "speak with the force of law."[94] In *Chevron U.S.A., Inc. v. Natural Resources Defense Council*, the Supreme Court ruled that when courts review an agency's "construction of [a] statute which it administers,"[95] "[s]tatutory ambiguities" are resolved, "within the bounds of reasonable

---

[89] In fact, some scholars have claimed that the differences in outcomes when courts apply the various doctrines are negligible. *See* David Zaring, *Reasonable Agencies*, 96 VA. L. REV. 135 (2010); William N. Eskridge, Jr. & Lauren E. Baer, *The Continuum of Deference: Supreme Court Treatment of Agency Statutory Interpretations from Chevron to Hamdan*, 96 GEO. L.J. 1083, 1098–1120 (2008); Paul R. Verkuil, *An Outcomes Analysis of Scope of Review Standards*, 44 WM. & MARY L. REV. 679, 682 (2002).

[90] Scholars have also criticized judicial application of these categories for lacking doctrinal consistency. *See* William N. Eskridge, Jr. & Lauren E. Baer, *The Continuum of Deference: Supreme Court Treatment of Agency Statutory Interpretations from Chevron to Hamdan*, 96 GEO. L.J. 1083, 1120-33 (2008).

[91] *See, e.g.*, NRDC v. Nat'l Marine Fisheries Serv., 421 F.3d 872, 878-89 (9th Cir. 2005) ("We need not resolve this question here, because even under the *Chevron* standard of review, the 2002 quota was based on an impermissible construction of the Act. We therefore will assume that *Chevron* review is appropriate."); Pension Benefit Guar. Corp. v. Wilson N. Jones Mem'l. Hosp., 374 F.3d 362, 369 (5th Cir. 2004) ("We do not need to decide whether the [Pension Benefit Guaranty Corp.'s ("PBGC's")] interpretation of annuity starting date warrants *Chevron* deference because it is clear that the PBGC's order may be upheld as a matter of law under the less deferential standard set forth in [*Mead*]."); Cmty. Health Ctr. v. Wilson-Coker, 311 F.3d 132, 138 (2d Cir. 2002) ("We therefore accord [the Centers for Medicare and Medicaid Services'] interpretation considerable deference, whether under *Chevron* or otherwise."); *cf.* United States v. Atandi, 376 F.3d 1186, 1189 (10th Cir. 2004) ("Without determining whether full *Chevron* deference is owed to this ATF interpretation of § 922(g)(5)(A) in light of the criminal nature of that statute, we unquestionably owe 'some deference' to the ATF's regulation." (citation omitted)); Amy J. Wildermuth, *Solving the Puzzle of Mead and Christensen: What Would Justice Stevens Do?*, 74 FORDHAM L. REV. 1877, 1912 (2006).

[92] Iowa League of Cities v. EPA, 711 F.3d 844, 872-73 (8th Cir. 2013); U.S. v. Reynolds, 710 F.3d 498, 507-09 (3d Cir. 2013); Mobil Oil Corp. v. Dep't of Energy, 728 F.2d 1477, 1486 (Temp. Emer. Ct. App. 1983) ("Nevertheless, although a court may exercise greater independent judgment when reviewing agency action on procedural, rather than substantive grounds, to the extent that the requisite procedures involve factual determinations, deference is still afforded to agency judgments.").

[93] *See* United States v. Mead Corp., 533 U.S. 218, 250 (2001) (Scalia, J., dissenting) ("[T]otality-of-the-circumstances *Skidmore* deference is a recipe for uncertainty, unpredictability, and endless litigation."); David Zaring, *Reasonable Agencies*, 96 VA. L. REV. 135, 138 (2010) ("[C]ourts do not, in the end, discern the differences among these various doctrines, frequently do not distinguish among the doctrines in application, and probably do not really care which standard of review they apply most of the time.").

[94] United States v. Mead Corp., 533 U.S. 218, 229 (2001).

[95] 467 U.S. 837, 843 (1984).

---

TD 9865 RECORD-001724

interpretation, not by the courts but by the administering agency."[96] *Chevron* deference in such cases requires courts to defer to an agency's construction of an ambiguous statute if the agency's interpretation is reasonable.[97] In *United States v. Mead*, the Supreme Court clarified that *Chevron* deference applies "when it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and that the agency interpretation claiming deference was promulgated in the exercise of that authority."[98] Congressional intent to do so with regard to a specific statute can be shown by, for example, a specific grant of power to conduct rulemaking or adjudications.[99]

Otherwise, agencies' legal interpretations are given less deference by courts.[100] This is not to say however, that agency interpretations necessarily receive no weight at all. The Court indicated in *Skidmore v. Swift and Co.* that when an agency interprets a "highly detailed" "regulatory scheme" and the agency has "the benefit of specialized experience"[101] then the agency's view is accorded "a respect proportional to its 'power to persuade.'"[102] The agency is not exercising delegated authority to interpret its statutory provision, so resolution of the question is for the judiciary. Nonetheless, courts will give consideration to the agency's interpretation, the "weight" of which "will depend upon the thoroughness evident in [the agency's] consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade."[103]

---

[96] City of Arlington, Tex. v. F.C.C., 133 S. Ct. 1863, 1868 (2013).

[97] *Id. Chevron* analysis is often described as containing two steps. At the first step, courts examine whether Congress has clearly spoken to the issue. If not, then step two, the agency gets deference in its interpretation of statutory ambiguities. The Court has indicated that the analysis at *Chevron* step two, examining whether the agency's construction is reasonable, largely overlaps with arbitrary and capricious review. Judulang v. Holder, 132 S. Ct. 476, 483 n.7 (2011); *see* Arent v. Shalala, 70 F.3d 610, 616 n.6 (D.C. Cir. 1995) ("The *Chevron* analysis and the 'arbitrary, capricious' inquiry set forth in *State Farm* overlap in some circumstances, because whether an agency action is 'manifestly contrary to the statute' is important both under *Chevron* and under *State Farm*."); *id.* at 620 (Wald, J., concurring) ("I agree with the panel that despite these distinctions, the *Chevron* and *State Farm* frameworks often do overlap."); Ronald M. Levin, *The Anatomy of Chevron: Step Two Reconsidered*, 72 CHI.-KENT L. REV. 1253, 1271 (1997). *See infra* note 112. For more on the *Chevron* doctrine, see CRS Report R43203, *Chevron Deference: Court Treatment of Agency Interpretations of Ambiguous Statutes*, by Daniel T. Shedd and Todd Garvey.

[98] *Mead*, 533 U.S. at 226-27. The question *whether* Congress gave the agency the power to interpret a statute with the force of law is sometime called *Chevron* step zero. *See* Cass R. Sunstein, *Chevron Step Zero*, 92 VA. L. REV. 187, 191 (2006).

[99] *Mead*, 533 U.S. at 226-27. These procedural options are not the exclusive indicia of congressional intent to delegate interpretative authority. *See Mead*, 533 U.S. at 230-31; Barnhart v. Walton, 535 U.S. 212, 222 (2002); Edelman v. Lynchburg College, 535 U.S. 106, 114 (2002). For more on the application of *Mead* in the federal appellate courts, see Adrian Vermeule, *Introduction: Mead in the Trenches*, 71 GEO. WASH. L. REV. 347, 361 (2003).

[100] *Mead*, 533 U.S. at 234-35. The Court has declined to adopt *Chevron* deference for a variety of agency actions that do not carry the force of law. *See, e.g.*, Wos v. E.M.A. ex rel Johnson, 133 S. Ct. 1391, 1402 (2013); Alaska Dep't of Envtl. Conservation v. E.P.A., 540 U.S. 461, 487-88 (2004); Wis. Dep't of Health & Family Servs. v. Blumer, 534 U.S. 473 (2002).

[101] *Mead*, 533 U.S. at 235

[102] *Id.* at 235 (quoting Skidmore v. Swift and Co., 323 U.S. 134, 140 (1944)).

[103] *Skidmore*, 323 U.S. at 140. As mentioned above, *supra* notes 89-93, predicting differences in outcomes based on these types of review can be difficult. For example, while *de novo* review does not require a court to give any deference to an agency interpretation, it nonetheless seems unlikely that, even absent *Skidmore* deference, a reviewing court would refuse to even consider an agency's view on a matter challenged by a plaintiff. *See* Melissa F. Wasserman, *Deference Asymmetries: Distortions in the Evolution of Regulatory Law*, 9 TEX. L. REV. 625, 638-39 (2015); David Zaring, *Reasonable Agencies*, 96 VA. L. REV. 135, 161 (2010) ("So while in theory, *de novo* review is a very different standard from that of reasonableness, in practice it is difficult to see how courts would be able to ignore reasonable agency interpretations in reaching their conclusions.").

TD 9865 RECORD-001725

Finally, when courts review agency legal interpretations regarding compliance with statutes it does not administer or the Constitution, such review can be still stricter—courts sometimes review agency compliance with the APA's procedural requirements *de novo*,[104] or without any deference at all to the agency's decision.[105] Under the APA, agency actions can be challenged for failing to comply with "procedure required by law."[106] For example, if an agency categorizes an action as an interpretive rather than legislative rule, it may bypass Section 553's notice and comment rulemaking procedures. Courts reviewing whether the rule in question is actually legislative or interpretive will sometimes review the issue *de novo*, refusing to grant any deference to the agency because the agency has not been granted authority by Congress to administer the APA.[107]

## Review of Factual Determinations and Discretionary Decisions

In contrast, courts review agency *factual* findings in *formal* proceedings under the "substantial evidence" test.[108] The APA distinguishes between formal proceedings, which must include trial-type procedures, and informal proceedings, which are not subject to the same strictures, at least by the APA. In formal proceedings, the agency's factual findings are "made on the record."[109] The Supreme Court has explained that under this review, courts examine whether the facts are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."[110] However, the APA does not specify a particular type of review for agency factual determinations in *informal* proceedings.[111] Instead, the APA's "catch-all" provision for judicial review of agency action, the "arbitrary and capricious" standard, includes review of agency factual determinations in this context.[112] Lower courts appear to agree that the difference in the amount of evidence required between the two standards is nominal,[113] although formal proceedings must be supported with evidence found within the record, while informal

---

[104] Sorenson Commc'ns Inc. v. F.C.C., 755 F.3d 702, 706 (D.C. Cir. 2014) ("[A]n agency has no interpretive authority over the APA."); Envirocare of Utah, Inc. v. Nuclear Regulatory Comm'n, 194 F.3d 72, 79 n.7 (D.C. Cir. 1999) (noting that "when it comes to statutes administered by several different agencies—statutes, that is, like the APA and unlike the standing provision of the Atomic Energy Act—courts do not defer to any one agency's particular interpretation"); Reno-Sparks Indian Colony v. U.S. E.P.A., 336 F.3d 899, 910 n.11 (9ᵗʰ Cir. 2003) ("This Court reviews de novo the agency's decision not to follow the APA's notice and comment procedures."); Campanale & Sons v. Evans, 311 F.3d 109, 120 n.14 (1ˢᵗ Cir. 2002); Warden v. Shalala, 149 F.3d 73, 79 (1ˢᵗ Cir. 1998); Meister v. Dept. of Agric., 623 F.3d 363, 370 (6ᵗʰ Cir. 2010) (de novo review but acknowledging that part of the question is discretionary which is deferential); Iowa League of Cities v. EPA, 711 F.3d 844, 872-73 (8ᵗʰ Cir. 2013); David Zaring, *Reasonable Agencies*, 96 Vᴀ. L. Rᴇᴠ. 135, 146 (2010) ("De novo review is appropriate when agencies are interpreting laws that they do not have a special responsibility to administer, like the Constitution, the APA, or Title VII.").

[105] *See* Freeman v. DirecTV, Inc., 457 F.3d 1001, 1004 (9ᵗʰ Cir. 2006) (explaining that *de novo* requires the court to "review the matter anew, the same as if it had not been heard before, and as if no decision previously had been rendered").

[106] 5 U.S.C. § 706(2)(D).

[107] *See, e.g.*, Meister v. Dep't of Agric., 623 F.3d 363, 370 (6ᵗʰ Cir. 2010); Reno–Sparks Indian Colony v. EPA, 336 F.3d 899, 909 n. 11 (9ᵗʰ Cir. 2003); Warder v. Shalala, 149 F.3d 73, 79 (1ˢᵗ Cir. 1998).

[108] 5 U.S.C. § 706(2)(E).

[109] 5 U.S.C. § 556(c), 557(b)(2).

[110] Universal Camera v. NLRB, 340 U.S. 474, 477 (1951) (quoting Consol. Edison Co. v. Labor Bd., 305 U.S. 197, 229 (1938)).

[111] *See* 5 U.S.C. § 553.

[112] *See* Association of Data Processing Service Organizations, Inc. v. Board of Governors of the Federal Reserve System, 745 F.2d 677, 684 (D.C. Cir. 1984).

[113] *Id*. at 684.

TD 9865 RECORD-001726

proceedings can be supported with any evidence an agency had before it when it made a decision.[114]

Courts also review agency *discretionary* decisions and will invalidate actions found to be "arbitrary, capricious, [or] an abuse of discretion."[115] While courts applying this standard of review "must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment,"[116] the "scope of review ... is narrow and a court is not to substitute its judgment for that of the agency."[117] This means "the agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'"[118] A court might consider whether the agency

> relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.[119]

For example, when the Federal Food and Drug Administration approves a drug for the market,[120] or the Environmental Protection Agency issues a permit that controls the amount of pollutants discharged in a geographic area,[121] federal courts review these decisions under the arbitrary and capricious standard.[122]

## Standard of Review When Agencies Invoke the Good Cause Exception

As mentioned above, courts differ as to the proper standard of review when agencies invoke the good cause exception. One pitfall is the proper characterization of the agency's action—is an agency determination that good cause exists to bypass Section 553 a discretionary decision or a legal conclusion? Challenges to agency discretionary decisions are governed by Section 706(2)(A)'s arbitrary and capricious standard, while procedural challenges pursuant to Section 706(2)(D) that an agency failed to comply with the provisions of the APA are often reviewed *de novo*. Some courts have applied the former standard when reviewing good cause determinations,[123] others the latter.[124] Because judicial review *de novo* is a much more "exacting

---

[114] Safe Extensions, Inc. v. F.A.A., 509 F.3d 593, 604 (D.C. Cir. 2007).

[115] 5 U.S.C. § 706(2)(A).

[116] Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 416 (1971).

[117] Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983).

[118] *Id.* at 43 (quoting Burlington Truck Lines v. United States, 371 U.S. 156, 168 (1962)).

[119] *Id.*

[120] *See, e.g.*, Scott v. Food and Drug., 728 F.2d 322, 324 (6th Cir. 1984); Hill Dermaceuticals, Inc. v. U.S. Food and Drug Admin., 2012 WL 5914516 (D.D.C. 2012).

[121] Natural Resources Defense Council, et. al, v. Environmental Protection Agency, 808 F.3d 556 (2d Cir. 2015).

[122] *State Farm*, 463 U.S. at 43.

[123] *See, e.g.*, Sorenson Commc'ns Inc. v. F.C.C., 755 F.3d 702, 706 (D.C. Cir. 2014); Util. Solid Waste Activities Grp., v. EPA, 236 F.3d 749, 754 (D.C. Cir. 2001); Washington State Farm Bureau v. Marshall, 625 F.2d 296, 306 (9th Cir. 1980).

[124] United States v. Dean, 604 F.3d 1275, 1278 (11th Cir. 2010); United States v. Garner, 767 F.2d 104, 116 (5th Cir. 1985); Ohio State Consumer Educ. Ass'n v. Schweiker, 541 F. Supp. 915, 919 (S.D. Ohio 1982); Coal. of Mich. Nursing Homes, Inc. v. Dempsey, 537 F. Supp. 451, 459 (E.D. Mich. 1982).

TD 9865 RECORD-001727

standard" than the "deferential" posture of arbitrary and capricious review,[125] the selection of a standard can be important. Complicating matters, however, is the practice of some courts to not clearly adopt either standard, but focus instead on simply "narrowly constru[ing]" the provision.[126] This "interpretive framework has been developed separate and apart from [the APA's text], derived from the legislative history of the good cause exception."[127] Finally, still another standard of review has been highlighted by at least one circuit as distinct: a mixed standard that incorporates *both* arbitrary and capricious and *de novo* review.[128] Here, the court reviews *de novo* "whether the agency's asserted reason for waiver of notice and comment constitutes good cause, as well as whether the established facts reveal justifiable reliance on the reason," while "any factual determinations made by the agency to support its proffered reason are subject to arbitrary and capricious review."[129]

Recent judicial analysis of the Attorney General's actions pursuant to the Sex Offender Registration and Notification Act (SORNA)[130] illustrates the divergence respecting interpretations of the good cause exception. SORNA requires states to establish sex offender registries and mandates that convicted sex offenders register their place of residence and employment with the state registry.[131] However, SORNA authorized the Attorney General to "specify the applicability" of those requirements to sex offenders convicted before the law's enactment or its "implementation in a particular jurisdiction."[132] The Attorney General issued an interim rule applying SORNA's requirements retroactively and relied on the good cause exception to bypass the notice and comment rulemaking requirements as well as the 30-day publication rule.[133] Various individuals convicted of failing to register under the statute pursuant to the interim rule's authority brought challenges to the Attorney General's invocation of the good cause exception.[134]

The interim rule specified two reasons supporting a finding of good cause to bypass Section 553's requirements. First, "to eliminate any possible uncertainty about the applicability of the Act's

---

[125] *See* Marsh v. Oregon Natural Res. Council, 490 U.S. 360, 376-77 (1989); Natural Res. Def. Council, Inc. v. U.S. E.P.A., 683 F.2d 752, 760 (3d Cir. 1982); NRDC v. SEC, 606 F.2d 1031, 1048 (D.C. Cir. 1979).

[126] Natural Res. Def. Council, Inc. v. EPA, 683 F.2d 752, 764 (3d Cir. 1982); Mid–Tex Elec. Coop. v. Fed. Energy Regulatory Comm'n, 822 F.2d 1123, 1132 (D.C. Cir. 1987).

[127] United States v. Reynolds, 710 F.3d 498, 507 (3d Cir. 2013).

[128] *Id.* at 508-09.

[129] *Id.* at 508. It is unclear whether other courts that apply *de novo* review to agency good cause determinations would recognize this standard as distinct. *See* Sorenson Commc'ns Inc. v. F.C.C., 755 F.3d 702, 706 n.3 (D.C. Cir. 2014) (applying *de novo* review to an agency's good cause determination but "defer[ing] to an agency's factual findings and expert judgments therefrom, unless such findings and judgments are arbitrary and capricious"); National Federation of Federal Emp. v. Devine, 671 F.2d 607, 610-12 (D.C. Cir 1982) (reviewing *de novo* whether good cause existed to bypass notice and comment rulemaking, but reviewing a challenge to the substantive validity of the underlying action itself—postponement of a health benefit enrollment period—under the arbitrary and capricious standard).

[130] 42 U.S.C. § 16901, *et seq.*

[131] 42 U.S.C. § 16913.

[132] 42 U.S.C. § 16913(b), (d). The Supreme Court held that SORNA's registration provision did not automatically apply retroactively. U.S. v. Reynolds, 132 S.Ct. 975, 978 (2012).

[133] Applicability of the Sex Offender Registration and Notification Act, 72 Fed.Reg. 8894, 8897 (Feb. 28, 2007) [hereinafter AG Interim Rule]; *see* 28 C.F.R. pt. 72 (2008). Subsequently, the Attorney General issued proposed guidelines for implementation of the act and solicited comments. The Attorney General issued the final regulation on July 2, 2008. National Guidelines for Sex Offender Registration and Notification, 73 Fed.Reg. 38030–01, 38030, 38046–47 (July 2, 2008).

[134] For an individual arrested for behavior occurring before the promulgation of the final rule, the government's authority to arrest the individual rested on the interim rule issued without notice and comment. If the interim rule was issued in violation of the APA, then it is invalid and cannot sustain an individual's conviction.

TD 9865 RECORD-001728

requirements," and second, "to protect the public from sex offenders who fail to register through prosecution and the imposition of criminal sanctions."[135]

The Fourth and Sixth Circuits appear to have reviewed the determination *de novo*,[136] the Fifth and Eleventh Circuits apply the arbitrary and capricious standard,[137] and the Ninth, Third, and Eighth Circuits expressly declined to decide the appropriate standard of review, ruling that the Attorney General's invocation of good cause would fail even under the deferential arbitrary and capricious standard.[138] Interestingly, the standard of review does not precisely mirror the outcomes in the cases. The Fourth Circuit, apparently applying *de novo* review, and the Eleventh Circuit, applying the arbitrary and capricious standard, both upheld the Attorney General's good cause finding.[139] In contrast, the Sixth Circuit used *de novo* review to invalidate the good cause invocation, while the Fifth, Ninth, Third, and Eighth Circuits found the Attorney General's action to fail even under the more deferential arbitrary and capricious standard.[140] These courts appear to fundamentally disagree as to what factors agencies may invoke when supporting a good cause finding.

Seemingly applying *de novo* review, although in an abbreviated fashion, the Fourth Circuit upheld the Attorney General's action for three reasons. First, "the need for legal certainty" as to whether SORNA applied retroactively; second, "[d]elaying implementation" of the rule posed a danger to public safety; and third, the Attorney General did permit public comments after the interim rule was promulgated.[141] Although conducting a substantially lengthier analysis, the Eleventh Circuit also upheld the Attorney General's good cause finding under arbitrary and capricious review, focusing primarily on the threat to public safety.[142] The court ruled that the

---

[135] AG Interim Rule, *supra* note 135, at 8896-97.

[136] *See* United States v. Cain, 583 F.3d 408, 434 n.4 (6th Cir. 2009) (Griffin, J., dissenting) ("It appears that the majority has reviewed de novo the Attorney General's finding of good cause."); United States v. Gould, 568 F.3d 459, 470 (4th Cir. 2009); United States v. Brewer, 766 F.3d 884, 888 (8th Cir. 2014) ("The Fourth and Sixth Circuits, however, applied de novo review."); United States v. Reynolds, 710 F.3d 498, 507 (3d Cir. 2013) (noting the "the Fourth and Sixth Circuits' application of de novo review, although these courts do not specifically state the standard they applied").

[137] United States v. Johnson, 632 F.3d 912, 928 (5th Cir. 2011); United States v. Dean, 604 F.3d 1275, 1278 (11th Cir. 2010); United States v. Brewer, 766 F.3d 884, 888 (8th Cir. 2014) ("This deferential standard appears similar to the approach taken by the Fifth and Eleventh Circuits, which each used an arbitrary-and-capricious standard."); United States v. Reynolds, 710 F.3d 498, 507 (3d Cir. 2013) (noting "the Fifth and Eleventh Circuits' use of the arbitrary and capricious standard in their SORNA decisions.").

[138] United States v. Reynolds, 710 F.3d 498, 500 (3d Cir. 2013) ("We conclude that the Attorney General's assertion of good cause fails even the most deferential standard of arbitrary and capricious. Just what is the applicable standard of review for agency determinations that good cause justifies waiver of notice and comment is a question for another day.") (citations omitted); United States v. Brewer, 766 F.3d 884, 888 (8th Cir. 2014) ("[W]e agree with the Third Circuit that the Attorney General's assertion of good cause fails under any of the above standards."); United States v. Valverde, 628 F.3d 1159, 1162 (9th Cir. 2010) ("Because we would, under either standard, affirm the dismissal of the indictment on the ground that no validly promulgated regulation had applied SORNA retroactively to Valverde at the time of his failure to register, we need not determine whether a de novo or an abuse of discretion standard of review applies here.").

[139] United States v. Gould, 568 F.3d 459, 470 (4th Cir. 2009); United States v. Dean, 604 F.3d 1275, 1278 (11th Cir. 2010).

[140] United States v. Brewer, 766 F.3d 884, 888 (8th Cir. 2014); United States v. Reynolds, 710 F.3d 498, 500 (3d Cir. 2013); United States v. Johnson, 632 F.3d 912, 928 (5th Cir. 2011); United States v. Valverde, 628 F.3d 1159, 1162 (9th Cir. 2010).

[141] United States v. Gould, 568 F.3d 459, 470 (4th Cir. 2009).

[142] United States v. Dean, 604 F.3d 1275, 1278 (11th Cir. 2010). Addressing the Attorney General's guidance argument, the court also noted that the agency "was granted sole discretion to determine whether SORNA applies retroactively, and there was no guidance at all in place in that matter." That is "particularly important here as the persons who were (continued...)

---

TD 9865 RECORD-001729

Attorney General only had to show that there was "good cause to believe that delay would do real harm."[143] It found that "the retroactive rule reduced the risk of additional sexual assaults and sexual abuse by sex offenders by allowing federal authorities to apprehend and prosecute them," and "removes a barrier to timely apprehension of sex offenders."[144] In addition, the court noted that the agency was given discretion to determine whether SORNA applied retroactively, and given the importance for convicted sex offenders who "need[ed] to know whether to register," there was a need for legal certainty in the matter.[145]

In contrast, the circuits that rejected the Attorney General's good cause determination did not find the professed need to eliminate uncertainty or protect public safety sufficient. These courts found the Attorney General's arguments to be largely conclusory, failing to establish independent facts that compelled a good cause finding. First, these courts reasoned, a bare desire to offer guidance to parties affected by a rule, standing alone, is not sufficient reason to find good cause. Otherwise, the exception "would swallow the rule."[146] In passing SORNA and leaving to the Attorney General whether to retroactively apply its terms to sex offenders, Congress itself had necessarily created some delay in SORNA's applicability.[147] The Attorney General's "conclusory" arguments of harm were "not sufficient to upset this balance."[148] Second, the Attorney General's public safety argument was "nothing more than a rewording of the statutory purpose Congress provided in the text of SORNA."[149] Many laws presumably protect the public, so "[i]f the mere assertion that such harm will continue while an agency gives notice and receives comments were enough to establish good cause, then notice and comment would always have to give way."[150]

# What Happens When a Court Rejects an Agency's Good Cause Finding?

The appropriate remedy when a court rejects an agency's good cause finding can also vary. The APA provides that courts "shall ... hold unlawful and set aside agency action" that violates "procedure required by law."[151] However, it also instructs courts to take "due account" of the

---

(...continued)

affected by the rule were already convicted of their prior crimes and need to know whether to register." Nonetheless, the court noted "this reason alone may not have established the good cause exception," although "it does count to some extent."

[143] *Id.* at 1281.

[144] *Id.*

[145] *Id.* at 1280.

[146] United States v. Cain, 583 F.3d 408, 421 (6th Cir. 2009); United States v. Johnson, 632 F.3d 912, 929 (5th Cir. 2011); United States v. Reynolds, 710 F.3d 498, 513 (3d Cir. 2013); United States v. Valverde, 628 F.3d 1159, 1166 (9th Cir. 2010); United States v. Brewer, 766 F.3d 884, 889-90 (8th Cir. 2014).

[147] United States v. Cain, 583 F.3d 408, 421 (6th Cir. 2009).

[148] *Id.*

[149] United States v. Reynolds, 710 F.3d 498, 513 (3d Cir. 2013).

[150] *Id.* at 512; United States v. Valverde, 628 F.3d 1159, 1167 (9th Cir. 2010) ("[T]he Attorney General did little more than restate the general dangers of child sexual assault, abuse, and exploitation that Congress had sought to prevent when it enacted SORNA."); United States v. Brewer, 766 F.3d 884, 890 (8th Cir. 2014) ("[T]he Attorney General's 'public safety rationale cannot constitute a reasoned basis for good cause because it is nothing more than a rewording of the statutory purpose Congress provided in the text of SORNA.'") (quoting Reynolds, 710 F.3d at 512); *see also* United States v. Johnson, 632 F.3d 912, 928 (5th Cir. 2011); United States v. Cain, 583 F.3d 408, 421 (6th Cir. 2009).

[151] 5 U.S.C. § 706(2)(D).

---

TD 9865 RECORD-001730

"rule of prejudicial error."[152] Consequently, when courts find that agencies failed to comply with the APA's rulemaking requirements, they will sometimes vacate the rule,[153] but may not do so if the failure to comply with those procedures was harmless.[154] Likewise, when courts reject an agency's good cause finding, the agency's rule may be vacated and remanded to the agency to comply with the APA.[155] However, in certain circumstances, the court may find that the lack of good cause was harmless, such as when the larger purposes of Section 553 of the APA are met despite certain technical compliance errors.[156] In addition, some courts have found that an agency lacked good cause and remanded to the agency to follow Section 553, but nonetheless left the challenged rules in place pending the completion of new proceedings that comply with the APA.[157]

# Presidential Transitions

Agency use of the good cause exception can also be important in the context of presidential transitions. Recent outgoing presidential administrations have engaged in "midnight rulemaking," whereby federal agencies increase the number of regulations issued during the final months of a presidential administration.[158] A subsequent presidential administration of a different party, however, may have different policy priorities. Nonetheless, once a rule is finalized by an agency, repeal of a rule requires compliance with Section 553's notice and comment procedures.[159] Further, while courts might uphold a change from one administration to the next in an agency's legal interpretation contained in a rule if the agency receives deference on the matter,[160] if no deference is given to an agency's construction of a statute, then the agency will not be able to adopt a contrary construction in the future.[161]

Consequently, in order to gain control of the rulemaking process, some Presidents have sought to impose a moratorium on new regulations at the beginning of their administration. For example, at the beginning of the George W. Bush Administration, White House Chief of Staff Andrew Card issued a memorandum to federal agencies on January 20, 2001, instructing them to (1) "send no

---

[152] 5 U.S.C. § 706.

[153] PDK Labs. Inc. v. U.S. D.E.A., 362 F.3d 786, 799 (D.C. Cir. 2004).

[154] Nat'l Ass'n of Home Builders v. Defs. of Wildlife, 551 U.S. 644, 659 (2007); Jackson Cty., N. Carolina v. F.E.R.C., 589 F.3d 1284, 1290 (D.C. Cir. 2009).

[155] Mack Trucks, Inc. v. E.P.A., 682 F.3d 87, 95-96 (D.C. Cir. 2012).

[156] *See* U.S. v. Reynolds, 710 F.3d 498, 517-18 (discussing Riverbend Farms, Inc. v. Madigan, 958 F.2d 1479 (9th Cir. 1992)).

[157] *See, e.g.*, U.S. Steel Corp. v. E.P.A., 649 F.2d 572, 577 (8th Cir. 1981); Western Oil and Gas Association v. United States Environmental Protection Agency, 633 F.2d 803, 812-13 (9th Cir. 1980).

[158] *See* CRS Report R42612, *Midnight Rulemaking*, by Maeve P. Carey.

[159] 5 U.S.C. § 551(5).

[160] *See* Nat'l Cable & Telecommunications Ass'n v. Brand X Internet Servs., 545 U.S. 967, 981 (2005) (noting that *Chevron* deference may apply to changed agency interpretations, and that agencies often reconsider interpretations and policies on the basis of changed factual circumstances or changes in presidential administrations); F.C.C. v. Fox Television Stations, Inc., 556 U.S. 502, 515 (2009) (ruling that an agency "need not demonstrate to a court's satisfaction that the reasons for the new policy are *better* than the reasons for the old one; it suffices that the new policy is permissible under the statute, that there are good reasons for it, and that the agency *believes* it to be better, which the conscious change of course adequately indicates"); *Chevron*, 467 U.S. at 866 (granting deference to the EPA when the agency changed its position as to what a "stationary source" meant in the Clean Air Act).

[161] Nat'l Cable & Telecommunications Ass'n v. Brand X Internet Servs., 545 U.S. 967, 982-83 (2005) ("Only a judicial precedent holding that the statute unambiguously forecloses the agency's interpretation, and therefore contains no gap for the agency to fill, displaces a conflicting agency construction.").

---

TD 9865 RECORD-001731

proposed or final regulation to the Office of the Federal Register," (2) withdraw rules that had been sent to the Office but not yet published, and (3) postpone the effective date of regulations that had been published but not yet gone into effect for 60 days.[162] Likewise, early in the Obama Administration, on January 20, 2009, White House Chief of Staff Rahm Emanuel issued a similar memorandum to federal agency heads.[163]

In response to both memorandums, agencies that delayed the effective date of rules sometimes justified their actions by arguing that the delay was supported by good cause.[164] The majority of these invocations were not reviewed by courts; however, in 2004, the Second Circuit Court of Appeals invalidated a Department of Energy (DOE) rule delaying the effective date of certain efficiency standards.[165] On February 2, 2001, DOE issued a "final rule," without notice and comment, delaying the effective date of certain efficiency standards.[166] The agency's final rule cited to the January 20, 2001, Card Memorandum and was effective immediately. The delay rule also noted that good cause existed to bypass Section 553 because the agency wanted more time to consider the standards and because of the imminence of the date the standards would be effective.[167] Various parties challenged, among other things, DOE's issuance of this final rule delaying the effective date of the efficiency standards.[168] In finding that there was no good cause to support bypassing notice and comment procedures in this situation, the court's analysis did not examine the significance (if any) of the Card memorandum. Instead, the court ruled that "an emergency of DOE's own making" cannot constitute good cause.[169] Further, the court noted that no emergency existed, the only thing "that was imminent was the impending operation of a statute intended to limit the agency's discretion (under DOE's interpretation), which cannot constitute a threat to the *public* interest."[170] Consequently, the court invalidated the rule.[171]

# Congressional Proposals to Alter the Standard

Various changes to the APA's good cause exception have been proposed by Members of Congress and commentators.[172] During the 114th Congress, a bill was introduced that aims to restructure

---

[162] U.S. White House Office, "Regulatory Review Plan," 66 Fed. Reg. 7702 (Jan. 24, 2001). The memorandum excluded rules promulgated pursuant to judicial or statutory deadlines and notify OMB of rules that should be excluded because of public health and safety.

[163] Executive Office of the President, "Memorandum for the Heads of Executive Departments and Agencies," 74 Fed. Reg., 4435, Jan. 26, 2009. The memorandum explained that the OMB Director could exempt rules in "emergency situations or other urgent circumstances relating to health, safety, environmental, financial, or national security matters, or otherwise." *Id.* In addition, when agencies made extensions of the effective date of regulations, agencies should "immediately reopen the notice-and-comment period for 30 days to allow interested parties to provide comments about issues of law and policy raised by those rules." *Id.*

[164] GAO-02-370R, Regulatory Review: Delay of Effective Dates of Final Rules Subject to the Administration's January 20, 2001, Memorandum (2002); Center for Medicare and Medicaid Services, Medicaid Program; State Flexibility for Medicaid Benefit Packages: Delay of Effective Date, 74 FR 5808 (Feb. 2, 2009). Agencies also justified the delay by claiming that such delays were procedural rules exempt from notice and comment rulemaking requirements.

[165] Natural Resources Defense Council v. Abraham, 355 F.3d 179, 206 (2d Cir. 2004).

[166] *Id.* at 204.

[167] *Id.* at 205.

[168] *Id.* at 184-191.

[169] *Id.*

[170] *Id.* at 205.

[171] *Id.* at 206.

[172] *See* James Kim, Note, *For A Good Cause: Reforming the Good Cause Exception to Notice and Comment Rulemaking Under the Administrative Procedure Act*, 18 Geo. Mason L. Rev. 1045, 1051 (2011); Juan J. Lavilla, *The* (continued...)

---

TD 9865 RECORD-001732

Section 553's requirements.[173] Among other things, the bill would require agencies to provide notice of proposed rulemakings to the public and the Office of Information and Regulatory Affairs;[174] to provide 60 or 90 days, depending on the rule, for comments; and in certain circumstances, to provide a public hearing for the consideration of certain factual issues.[175]

Under this bill, if an agency for good cause finds that compliance with Section 553 is unnecessary, then it may issue a final rule. However, if the agency for good cause finds that compliance is impracticable or contrary to the public interest, the agency may issue an interim rule, but must subsequently engage in notice and comment proceedings before the rule is finalized.[176] In addition, during the 60 days after a presidential inauguration, agencies may delay implementation of rules that have not been finalized for 90 days for reconsideration.[177] The bill does not, however, appear to alter the applicable standard of review for good cause, or specify what factors a reviewing court should consider.

# Author Contact Information

Jared P. Cole
Legislative Attorney
jpcole@crs.loc.gov, 7-6350

# Acknowledgments

Elizabeth Schiller, Law Librarian in the American Law Division of CRS, contributed to the discussion of applicable cases in this report.

---

(...continued)

*Good Cause Exemption to Notice and Comment Rulemaking Requirements Under the Administrative Procedure Act*, 3 ADMIN. L.J. 317, 324 (1989).

[173] Regulatory Accountability Act of 2015, S. 2006 (Introduced Aug. 6, 2015).

[174] The Office of Information and Regulatory Affairs (OIRA) is one of several offices within the Office of Management and Budget (OMB).

[175] Regulatory Accountability Act of 2015, S. 2006 § 3(2).

[176] Regulatory Accountability Act of 2015, S. 2006 § 3(2).

[177] Regulatory Accountability Act of 2015, S. 2006 § 3(2).

---

TD 9865 RECORD-001733

361

## C. U.S. TAX RULES APPLICABLE TO FOREIGN ACTIVITIES OF U.S. PERSONS (OUTBOUND)

### 1. In general

In general, income earned directly by a U.S. person from the conduct of a foreign business is taxed on a current basis,[874] but income earned indirectly from a separate legal entity operating the foreign business is not. Instead, active foreign business income earned by a U.S. person indirectly through an interest in a foreign corporation generally is not subject to U.S. tax until the income is distributed as a dividend to the U.S. person. Certain anti-deferral regimes may cause the U.S. owner to be taxed on a current basis in the United States on certain categories of passive or highly mobile income earned by the foreign corporation regardless of whether the income has been distributed as a dividend to the U.S. owner. The main anti-deferral regimes that provide such exceptions are the controlled foreign corporation ("CFC") rules of subpart F[875] and the passive foreign investment company ("PFIC") rules.[876] A foreign tax credit generally is available to offset, in whole or in part, the U.S. tax owed on foreign-source income, whether the income is earned directly by the domestic corporation, repatriated as an actual dividend, or included in the domestic parent corporation's income under one of the anti-deferral regimes.[877]

### 2. Anti-deferral regimes

#### Subpart F

Subpart F,[878] applicable to CFCs and their shareholders, is the main anti-deferral regime of relevance to a U.S.-based multinational corporate group. A CFC generally is defined as any foreign corporation if U.S. persons own (directly, indirectly, or constructively) more than 50 percent of the corporation's stock (measured by vote or value), taking into account only those U.S. persons that are within the meaning of the term "United States shareholder," which refers only to those U.S. persons who own at least 10 percent of the stock (measured by vote only).[879]

##### Subpart F income

Under the subpart F rules, the United States generally taxes the 10-percent U.S. shareholders of a CFC on their pro rata shares of certain income of the CFC (referred to as "subpart F income"), without regard to whether the income is distributed to the shareholders.[880] In effect, the United States treats the 10-percent U.S. shareholders of a CFC as having received a current distribution of the corporation's subpart F income. With exceptions described below, subpart F income generally includes passive income and

---

[874] A U.S. citizen or resident living abroad may be eligible to exclude from U.S. taxable income certain foreign earned income and foreign housing costs under section 911. For a description of this exclusion, see *Present Law and Issues in U.S. Taxation of Cross-Border Income* (JCX–42–11), September 6, 2011, p. 52.

[875] Secs. 951–964.

[876] Secs. 1291–1298.

[877] Secs. 901, 902, 960, 1293(f).

[878] Secs. 951–964.

[879] Secs. 951(b), 957, 958. The term "United States shareholder" is used interchangeably herein with "U.S. shareholder."

[880] Sec. 951(a).

370

be taxed as a DISC.[934] In general, a DISC is not subject to corporate-level tax and offers limited deferral of tax liability to its shareholders.[935] DISC income attributable to a maximum of $10 million annually of qualified export receipts is generally exempt from income tax at both the corporate and shareholder level. Shareholders must pay interest to account for the benefit of deferring the tax liability on undistributed DISC income related to this $10 million maximum annual amount.[936] Such entities are also referred to as interest charge DISCs, or IC–DISCs. Shareholders of a DISC are deemed to receive a dividend out of current earnings and profits from qualified export receipts in excess of $10 million.[937] Gain on the sale of DISC stock is treated as a dividend to the extent of accumulated DISC income.[938] The shareholders of a corporation which is not a DISC, but was a DISC in a previous taxable year, and which has previously taxed income or accumulated DISC income, are also required to pay interest on the deferral benefit, and gain on the sale or exchange of stock in such corporation is treated as a dividend.

## TAXATION OF FOREIGN INCOME AND FOREIGN PERSONS

### A. Establishment of Participation Exemption System for Taxation of Foreign Income

#### 1. Deduction for foreign-source portion of dividends received by domestic corporations from specified 10-percent owned foreign corporations (sec. 4001 of the bill and new sec. 245A of the Code)

##### REASONS FOR CHANGE

The Committee believes that the current tax system puts American workers and companies at a severe disadvantage to foreign workers and companies. This is primarily because the United States is one of the few industrialized countries with a worldwide system of taxation and has the highest corporate tax rate among OECD member countries. The worldwide system of taxation with deferral provides perverse incentives to keep funds offshore because dividends from foreign subsidiaries are not taxed until repatriated to the United States. The Committee believes that a territorial system with appropriate anti-base erosion safeguards, combined with a lower corporate tax rate, will make American workers and companies competitive again, and also will remove tax-driven incentives to keep funds offshore.

---

[934] Secs. 992(a) and (b). If a corporation fails to satisfy either or both of the 95-percent tests, it is deemed to satisfy such tests if it makes a pro rata distribution of its gross receipts which are not qualified export receipts and the fair market value of its assets which are not qualified export assets. Sec. 992(c).

[935] Sec. 991. Prior to the 1984 Revenue Act (Pub. L. 98–369), DISCs were eligible for more generous tax benefits that were eliminated in favor of the since-repealed foreign sales corporation regime ("FSC"). An overview of the history of the DISCs and FSCs regimes is provided in Joseph Isenbergh, Vol. 3 U.S. *Taxation of Foreign Persons and Foreign Income*, Para. 81. (Fourth Ed. 2016).

[936] The rate is the average of one-year constant maturity Treasury yields. The deferral benefit is the excess of the amount of tax for which the shareholder would be liable if deferred DISC income were included as ordinary income over the actual tax liability of such shareholder. Sec. 995(f).

[937] The amount of the deemed distribution is the sum of several items, including qualified export receipts in excess of $10 million. See sec. 955(b).

[938] Sec. 995(c).

EXPLANATION OF PROVISION

*In general*

The provision generally establishes a participation exemption system for foreign income. This exemption is provided for by means of a 100-percent deduction for the foreign-source portion of dividends received from specified 10-percent owned foreign corporations by domestic corporations that are United States shareholders of those foreign corporations within the meaning of section 951(b) (referred to here as "participation DRD").[939]

A specified 10-percent owned foreign corporation is any foreign corporation with respect to which any domestic corporation is a United States shareholder. The phrase does not include a passive foreign investment company within the meaning of subpart D of part VI of subchapter P.

The term "dividend received" is intended to be interpreted broadly, consistently with the meaning of the phrases "amount received as dividends" and "dividends received" under sections 243 and 245, respectively.[940] Under proposed section 245A(e), the Secretary of the Treasury may prescribe such regulations or other guidance as may be necessary or appropriate to carry out the rules of section 245A, including clarifying the intended broad scope of the term "dividend received."

For example, if a domestic corporation indirectly owns stock of a foreign corporation through a foreign partnership and the domestic corporation would qualify for the participation DRD with respect to dividends from the foreign corporation if the domestic corporation owned such stock directly, the domestic corporation would be allowed a participation DRD with respect to its distributive share of the partnership's dividend from the foreign corporation.

*Foreign-source portion of a dividend*

The participation DRD is available only for the foreign-source portion of dividends received from specified 10-percent owned foreign corporations. The foreign-source portion of any dividend is the amount that bears the same ratio to the dividend as the specified foreign corporation's post-1986 undistributed foreign earnings bears to the corporation's total post-1986 undistributed earnings. Post-1986 undistributed earnings are the amount of the earnings and profits of a specified 10-percent owned foreign corporation accumulated in taxable years beginning after December 31, 1986, as of the close of the taxable year of the foreign corporation in which the dividend is distributed and not reduced by dividends[941] distributed during that year. Post-1986 undistributed foreign earnings are, in general, the portion of post-1986 undistributed earnings that is not attributable to post-1986 undistributed U.S. earnings. Post-1986 undistributed U.S. earnings are, in general, undistributed earnings attributable to: (a) the corporation's income that is effectively con-

---

[939] Under section 951(b), a domestic corporation is a United States shareholder of a foreign corporation if it owns, within the meaning of section 958(a), or is considered as owning by applying the rules of section 958(b), 10 percent or more of the voting stock of the foreign corporation.

[940] Consequently, for example, gain included in gross income as a dividend under section 1248(a) or 964(e) would constitute a dividend received for which the deduction under section 245A may be available.

[941] Pursuant to section 959(d), a distribution of previously taxed income does not constitute a dividend even if it reduces earnings and profits.

372

nected with the conduct of a trade or business within the United States, or (b) any dividend received (directly or through a wholly owned foreign corporation) from an 80-percent-owned (by vote or value) domestic corporation.

Rules similar to the rules described above apply when a dividend is paid out of earnings and profits of a specified 10-percent owned foreign corporation accumulated in taxable years beginning before January 1, 1987. As a consequence, the participation exemption system is available for both post-1986 and pre-1987 foreign earnings. An ordering rule provides that dividends are treated as first being paid out of post-1986 undistributed earnings to the extent of those earnings.

An additional rule provides for the treatment of distributions of a specified 10-percent owned foreign corporation in excess of undistributed earnings. Under section 316(a)(2), a distribution of earnings and profits of a corporation in the taxable year of the distribution is treated as a dividend even if the distribution exceeds accumulated earnings and profits.[942] The determination of the foreign-source portion of such a distribution is calculated in a similar manner as for other types of dividends.

*Foreign tax credit disallowance; foreign tax credit limitation*

No foreign tax credit or deduction is allowed for any taxes (including withholding taxes) paid or accrued with respect to a dividend that qualifies for the participation DRD.

For purposes of computing the section 904(a) foreign tax credit limitation, a domestic corporation that is a United States shareholder of a specified 10-percent owned foreign corporation must compute its foreign-source taxable income (and entire taxable income) by disregarding the foreign-source portion of any dividend received from that foreign corporation for which the participation DRD is taken, as well as and any deductions properly allocable or apportioned to that foreign-source portion or the stock with respect to which it is paid.

*Six-month holding period requirement*

A domestic corporation is not permitted a participation DRD in respect of any dividend on any share of stock that is held by the domestic corporation for 180 days or less during the 361-day period beginning on the date that is 180 days before the date on which the share becomes ex-dividend with respect to the dividend. For this purpose, a domestic corporation is treated as holding a share of stock for any period only if the corporation is a specified 10-percent owned foreign corporation and the taxpayer is a United States shareholder with respect to such corporation during that period.

EFFECTIVE DATE

The provision applies to distributions made (and for purposes of determining a taxpayer's foreign tax credit limitation under section 904, deductions in taxable years beginning) after December 31, 2017.

---

[942] Called a "nimble dividend." *See,* Boris I. Bittker and James S. Eustice, *Federal Income Taxation of Corporations and Shareholders,* (7th ed. 2016) para. 8–12.

TD 9865 RECORD-001782

2. Application of participation exemption to investments in United States property (sec. 4002 of the bill sec. 956 of the Code)

### REASONS FOR CHANGE

The Committee believes that including amounts that a CFC invests in United States property in a domestic corporate shareholder's gross income would be the wrong result under a participation exemption system, when the CFC could otherwise pay a dividend or distribute property to the domestic corporate shareholder in a manner that would be tax-free. The Committee further believes that retention of such a rule would needlessly discourage investment in the United States. However, because the participation exemption does not extend to individuals, section 956 should remain in effect with respect to individuals who are United States shareholders of CFCs.

### EXPLANATION OF PROVISION

Under the provision, the amount determined under section 956 (relating to CFC investments in United States property) with respect to a domestic corporation is zero. A similar rule is intended for domestic corporations that own a CFC through a domestic partnership. The provision includes a specific grant of authority to the Secretary to issue regulations to effect that intent.

### EFFECTIVE DATE

The provision applies to taxable years of foreign corporations beginning after December 31, 2017.

3. Limitation on losses with respect to specified 10-percent owned foreign corporations (sec. 4003 of the bill secs. 367(a)(3)(C) and 961 of the Code, and new sec. 91 of the Code)

### REASONS FOR CHANGE

The Committee is concerned that a participation exemption system could provide inappropriate double benefits in certain circumstances. In particular, a distribution from a foreign subsidiary that is eligible for a participation DRD would reduce the value of the foreign subsidiary, thereby reducing any built-in gain or increasing any built-in loss in the shareholder's stock of the subsidiary. Reducing gain in this manner is consistent with the application of section 1248(a) (or section 964(e)) to recharacterize gain as a dividend for which a participation DRD may be permitted. Increasing loss in this manner, however, creates an inappropriate and double U.S. tax benefit for receiving a tax-free distribution from a foreign subsidiary.

Separately, the Committee is concerned that taxpayers may wish to arbitrage the application of the participation exemption system to foreign subsidiaries but not foreign branches. Specifically, a taxpayer may deduct losses from a foreign branch operation against U.S. taxable income and then incorporate that branch once it becomes profitable. Present law provides an array of loss recapture rules to address such a fact pattern,[943] but those rules generally

---

[943] See, e.g., secs. 367(a)(3)(C), 904(f)(3), 1503(d).

TD 9865 RECORD-001783

374

rely on the worldwide system of taxation to recapture losses in excess of built-in gains by taxing future earnings when repatriated. Instead of only recapturing such losses upon later repatriation of earning, the Committee wishes to recapture the U.S. tax benefits of these losses immediately upon the incorporation of a foreign branch that has generated losses. This is so that the repatriation of foreign earnings will not carry negative tax consequences thereby discouraging such repatriation, which is one of the reasons for moving to a participation exemption system of taxation.

EXPLANATION OF PROVISION

*Reduction in basis of certain foreign stock*

Under the provision, solely for the purpose of determining a loss, a domestic corporate shareholder's adjusted basis in the stock of a specified 10-percent owned foreign corporation (as defined in new section 245A) is reduced by an amount equal to the portion of any dividend received with respect to such stock from such foreign corporation that was not taxed by reason of a dividends received deduction allowable under section 245A in any taxable year of such domestic corporation. This rule applies in coordination with section 1059, such that any reduction in basis required pursuant to this provision will be disregarded, to the extent the basis in the 10-percent owned foreign corporation's stock has already been reduced pursuant to section 1059.

*Inclusion of transferred loss amount in certain assets transfers*

Under the provision, if a domestic corporation transfers substantially all of the assets of a foreign branch (within the meaning of section 367(a)(3)(C)) to a foreign corporation which, after such transfer, is a specified 10-percent owned foreign corporation with respect to which the domestic corporation is a United States shareholder, the domestic corporation includes in gross income an amount equal to the transferred loss amount, subject to certain limitations.

The transferred loss amount is the excess of: (1) losses incurred by the foreign branch after December 31, 2017 for which a deduction was allowed to the domestic corporation, over (2) the sum of taxable income earned by the foreign branch and gain recognized by reason of an overall foreign loss recapture arising out of disposition of assets on account of the underlying transfer. For the purposes of (2), only taxable income of the foreign branch in taxable years after the loss is incurred through the close of the taxable year of the transfer is included.

For transfers not covered by section 367(a)(3)(C), the transferred loss amount is reduced by the amount of gain recognized by the domestic corporation on the transfer (other than gains recognized by reason of overall foreign loss recapture). For transfers covered by section 367(a)(3)(C), the transferred loss amount is reduced by the amount of gain recognized by reason of such subparagraph.

Amounts included in gross income by reason of the provision or by reason of section 367(a)(3)(C) are treated as derived from sources within the United States.

The provision provides authority for the Secretary of the Treasury to prescribe regulations or other guidance for proper adjust-

TD 9865 RECORD-001784

375

ments to the adjusted basis of the specified 10 percent owned foreign corporation to which the transfer is made, and to the adjusted basis of the property transferred, to reflect amounts included in gross income under the provision.

### EFFECTIVE DATE

The provision relating to reduction of basis in certain foreign stock for the purposes of determining a loss is effective for distributions made after December 31, 2017.

The provision relating to transfer of loss amounts from foreign branches to certain foreign corporations is effective for transfers after December 31, 2017.

4. Treatment of deferred foreign income upon transition to participation exemption system of taxation (sec. 4004 of the bill and secs. 78, 904, 907, and 965 of the Code)

### REASONS FOR CHANGE

In transitioning to a new participation exemption system, the Committee seeks to enhance both the global competitiveness of U.S. businesses and to encourage investment in the United States. The Committee believes that many domestic companies were reluctant to reinvest foreign earnings in the United States, when doing so would subject those earnings to high rates of corporate income tax rates. Accordingly, the Committee is aware that such companies have accumulated significant untaxed and undistributed foreign earnings as a result.

The Committee is also aware that such companies are eligible for a 100-percent dividend-received deduction with respect to any distributions made under the new participation exemption system. To avoid a potential windfall for corporations that deferred income, and to ensure that all distributions from foreign subsidiaries are treated in the same manner under the participation exemption system, the Committee believes that it is appropriate to tax such earnings as if they had been repatriated under present law, but at a reduced rate.

The Committee believes the tax on accumulated foreign earnings should apply without requiring an actual distribution of earnings, and further believes that the tax rate should take into account the liquidity of the accumulated earnings. Accordingly, the provision establishes a bifurcated rate, i.e., 14 percent for earnings held in liquid form and 7 percent for accumulated foreign earnings that have been reinvested in the foreign subsidiary's business. Finally, the Committee has provided procedures for payment and collection of the transition tax that mitigate the burden on taxpayers.

### EXPLANATION OF PROVISION

*In general*

The provision generally requires that, for the last taxable year beginning before January 1, 2018, a U.S. shareholders of any CFC or other foreign corporation that is at least 10-percent U.S.-owned but not controlled (other than a PFIC) must include in income its pro rata share of the accumulated post-1986 deferred foreign income which was not previously taxed. A portion of that pro rata

376

share of deferred foreign income is deductible; the amount deductible varies depending upon whether the deferred foreign income is held in the form of liquid or illiquid assets. The deduction results in a reduced rate of tax of 14 percent for the included deferred foreign income held in liquid form and 7 percent for the remaining deferred foreign income. A corresponding portion of the credit for foreign taxes is disallowed, thus limiting the credit to the taxable portion of the included income. The increased tax liability generally may be paid over an eight-year period.

*Subpart F inclusion of deferred foreign income*

The mechanism for the mandatory inclusion of pre-effective date foreign earnings is subpart F. The provision provides that the subpart F income of a specified foreign corporation is increased for the last taxable year[944] that begins before January 1, 2018, by its accumulated post-1986 deferred foreign income. In contrast to the participation exemption deduction available only to domestic corporations that are U.S. shareholders under subpart F, the transition rule plies to all U.S. shareholders[945] of a specified foreign corporation. A specified foreign corporation means (1) a CFC or (2) any foreign corporation in which a domestic corporation is a U.S. shareholder (determined without regard to the special attribution rules of section 958(b)(4)), other than a PFIC that is not a CFC.[946] A specified foreign corporation that has deferred foreign income is a deferred foreign income corporation. Consistent with the general operation of subpart F, each U.S. shareholder of a specified foreign corporation must include in income its pro rata share of the foreign corporation's subpart F income attributable to its accumulated deferred foreign income.[947]

*Accumulated post-1986 deferred foreign income*

Accumulated post-1986 deferred foreign income of a specified foreign corporation that is the subject to mandatory inclusion under this provision is the greater of the accumulated post-1986 deferred foreign income determined as of November 2, 2017 (the date of introduction of the bill) or as of December 31, 2017. The includible portion of the accumulated post-1986 deferred foreign income is all post-1986 earnings and profits ("E&P") that are not (1) attributable to income that is effectively connected with the conduct of a trade or business in the United States and thus subject to current U.S. income tax, or (2) when distributed, excludible from the gross income of a U.S. shareholder as previously taxed income under section 959.

Post-1986 earnings and profits are those earnings that accumulated in taxable years beginning after 1986, computed in accordance with sections 964(a) and 986, even if arising from periods during which the U.S. shareholder did not own stock of the foreign corporation. Post-1986 earnings are not reduced by dividends during

---

[944] Foreign corporations no longer in existence and for which there is no taxable year beginning or ending in 2017 are not within the scope of this provision.

[945] Sec. 951(b), which defines United States shareholder as any U.S. person that owns 10 percent or more of the voting classes of stock of a foreign corporation.

[946] Taxation of income earned by PFICs remains subject to the antideferral PFIC regime and dividends received from non-CFC PFICs are ineligible for the dividend received deduction under new section 245A.

[947] For purposes of taking into account its subpart F income under this rule, a noncontrolled 10/50 corporation is treated as a CFC.

instances in which a related party guarantees the debt ("guaranteed debt"); or to a REIT by a taxable REIT subsidiary of that REIT.  Excess interest expense is the amount by which the payor's net interest expense (that is, the excess of interest paid or accrued over interest income) exceeds 50 percent of its adjusted taxable income (generally taxable income computed without regard to deductions for net interest expense, net operating losses, domestic production activities under section 199, depreciation, amortization, and depletion).  Interest amounts disallowed under these rules can be carried forward indefinitely and are allowed as a deduction to the extent of excess limitation in a subsequent tax year.  In addition, any excess limitation (that is, the excess, if any, of 50 percent of the adjusted taxable income of the payor over the payor's net interest expense) can be carried forward three years.

### D.  U.S. Tax Rules Applicable to Foreign Activities of U.S. Persons (Outbound)

#### 1.  In general

In general, income earned directly by a U.S. person from the conduct of a foreign business is taxed on a current basis,[1125] but income earned indirectly from a separate legal entity operating the foreign business is not.  Instead, active foreign business income earned by a U.S. person indirectly through an interest in a foreign corporation generally is not subject to U.S. tax until the income is distributed as a dividend to the U.S. person.  Certain anti-deferral regimes may cause the U.S. owner to be taxed on a current basis in the United States on certain categories of passive or highly mobile income earned by the foreign corporation regardless of whether the income has been distributed as a dividend to the U.S. owner.  The main anti-deferral regimes that provide such exceptions are the controlled foreign corporation ("CFC") rules of subpart F[1126] and the passive foreign investment company ("PFIC") rules.[1127]  A foreign tax credit generally is available to offset, in whole or in part, the U.S. tax owed on foreign-source income, whether the income is earned directly by the domestic corporation, repatriated as an actual dividend, or included in the domestic parent corporation's income under one of the anti-deferral regimes.[1128]

#### 2.  Anti-deferral regimes

#### Subpart F

Subpart F,[1129] applicable to CFCs and their shareholders, is the main anti-deferral regime of relevance to a U.S.-based multinational corporate group.  A CFC generally is defined as any

---

[1125] A U.S. citizen or resident living abroad may be eligible to exclude from U.S. taxable income certain foreign earned income and foreign housing costs under section 911.  For a description of this exclusion, see *Present Law and Issues in U.S. Taxation of Cross-Border Income* (JCX-42-11), September 6, 2011, p. 52.

[1126] Secs. 951-964.

[1127] Secs. 1291-1298.

[1128] Secs. 901, 902, 960, 1293(f).

[1129] Secs. 951-964.

TD 9865 RECORD-001849

foreign corporation if U.S. persons own (directly, indirectly, or constructively) more than 50 percent of the corporation's stock (measured by vote or value), taking into account only those U.S. persons that are within the meaning of the term "United States shareholder," which refers only to those U.S. persons who own at least 10 percent of the stock (measured by vote only).[1130]

Subpart F income

Under the subpart F rules, the United States generally taxes the 10-percent U.S. shareholders of a CFC on their pro rata shares of certain income of the CFC (referred to as "subpart F income"), without regard to whether the income is distributed to the shareholders.[1131] In effect, the United States treats the 10-percent U.S. shareholders of a CFC as having received a current distribution of the corporation's subpart F income.  With exceptions described below, subpart F income generally includes passive income and other income that is readily movable from one taxing jurisdiction to another.  Subpart F income consists of foreign base company income,[1132] insurance income,[1133] and certain income relating to international boycotts and other violations of public policy.[1134]

Foreign base company income consists of foreign personal holding company income, which includes passive income such as dividends, interest, rents, and royalties, and a number of categories of income from business operations, including foreign base company sales income, foreign base company services income, and foreign base company oil-related income.[1135]

Insurance income subject to current inclusion under the subpart F rules includes any income of a CFC attributable to the issuing or reinsuring of any insurance or annuity contract in connection with risks located in a country other than the CFC's country of organization.  Subpart F insurance income also includes income attributable to an insurance contract in connection with risks located within the CFC's country of organization as the result of an arrangement under which another corporation receives a substantially equal amount of consideration for insurance of other country risks.  Finally, special rules apply under subpart F with respect to related person insurance income[1136] in order to address captive insurance

---

[1130]  Secs. 951(b), 957, 958.  The term "United States shareholder" is used interchangeably herein with "U.S. shareholder."

[1131]  Sec. 951(a).

[1132]  Sec. 954.

[1133]  Sec. 953.

[1134]  Sec. 952(a)(3)-(5).

[1135]  Sec. 954.

[1136]  Sec. 953(c).  Related person insurance income is defined for this purpose to mean any insurance income attributable to a policy of insurance or reinsurance with respect to which the primary insured is either a U.S. shareholder (within the meaning of the provision) in the foreign corporation receiving the income or a person related to such a shareholder.

343

## PART I − OUTBOUND TRANSACTIONS

**1.  Deduction for foreign-source portion of dividends received by domestic corporations from specified 10-percent owned foreign corporations (sec. 14101 of the bill and new sec. 245A of the Code)**

### Reasons for Change

In moving the U.S. international tax system to a territorial system, a key component is the treatment of foreign income earned by U.S. corporations through their foreign affiliates.  Under current law, foreign income earned by a foreign subsidiary of a U.S. corporation is not subject to U.S. tax until it is distributed to the U.S. parent corporation as a dividend. Such dividends, minus credits for foreign taxes paid, are considered taxable income for the U.S. parent corporation.  In a territorial system, income earned outside the United States is not taxed in the United States.  In this provision, this is accomplished by means of a deduction for the U.S. portion of dividends received by U.S. corporations from foreign affiliates.

The provision would allow U.S. companies to compete on a more level playing field against foreign multinationals when selling products and services abroad by eliminating an additional level of tax.

The provision would eliminate the "lock-out" effect under current law, which means U.S. businesses avoid bringing their foreign earnings back into the United States to avoid the U.S. residual tax on those earnings.

### Explanation of Provision

**In general**

The provision allows an exemption for certain foreign income. This exemption is provided for by means of a 100-percent deduction for the foreign-source portion of dividends received from specified 10-percent owned foreign corporations by domestic corporations that are United States shareholders of those foreign corporations within the meaning of section 951(b) [1190] (referred to here as "DRD"). [1191]

---

[1190]  Under section 951(b), a domestic corporation is a United States shareholder of a foreign corporation if it owns, within the meaning of section 958(a), or is considered as owning by applying the rules of section 958(b), 10-percent or more of the voting stock of the foreign corporation.

[1191]  The Committee intends that in the case of a domestic corporation that is a partner in a domestic partnership that is a United States shareholder of a specified foreign corporation, the DRD applies to such partner's distributive share of a dividend received by the partnership if the partner would be a United States shareholder of such foreign corporation determined by applying the rules of section 958(a) and (b) as if the domestic partnership were a foreign partnership.

353

TD 9865 RECORD-001860

A specified 10-percent owned foreign corporation is any foreign corporation (other than a PFIC that is not also a CFC) with respect to which any domestic corporation is a U.S. shareholder.[1192]

## Foreign-source portion of a dividend

The DRD is available only for the foreign-source portion of dividends received by a domestic corporation from specified 10-percent owned foreign corporations.  The foreign-source portion of any dividend is the amount that bears the same ratio to the dividend as the undistributed foreign earnings bears to the total undistributed earnings of the foreign corporation. Undistributed earnings are the amount of the earnings and profits of a specified 10-percent owned foreign corporation[1193] as of the close of the taxable year of the specified 10-percent owned foreign corporation in which the dividend is distributed and not reduced by dividends[1194] distributed during that taxable year.  Undistributed foreign earnings are the portion of the undistributed earnings attributable to neither income described in section 245(a)(5)(A) nor section 245(a)(5)(B), without regard to section 245(a)(12).

## Hybrid Dividends

The DRD is not available for any dividend received by a U.S. shareholder from a controlled foreign corporation if the dividend is a hybrid dividend.  A hybrid dividend is an amount received from a controlled foreign corporation for which a deduction would be allowed under this provision and for which the specified 10-percent owned foreign corporation received a deduction (or other tax benefit) from taxes imposed by a foreign country.

If a controlled foreign corporation with respect to which a domestic corporation is a U.S. shareholder receives a hybrid dividend from any other controlled foreign corporation with respect to which the domestic corporation is also a U.S. shareholder, then the hybrid dividend is treated for purposes of section 951(a)(1)(A) as subpart F income of the recipient controlled foreign corporation for the taxable year of the controlled foreign corporation in which the dividends was received and the U.S. shareholder includes in gross income an amount equal to the shareholder's pro rata share of the subpart F income, determined in the same manner as section 951(a)(2).

## Foreign tax credit disallowance

No foreign tax credit or deduction is allowed for any taxes paid or accrued with respect to a dividend that qualifies for the DRD.

---

[1192]  Secs. 1297, 1298.

[1193]  Computed in accordance with secs. 964(a) and 986.

[1194]  Pursuant to section 959(d), a distribution of previously taxed income does not constitute a dividend even if it reduces earnings and profits.

TD 9865 RECORD-001861

For purposes of computing the section 904(a) foreign tax credit limitation, a domestic corporation that is a U.S. shareholder of a specified 10-percent owned foreign corporation must compute its foreign-source taxable income by disregarding the foreign-source portion of any dividend received from that foreign corporation for which the DRD is taken, and any deductions properly allocable or apportioned to that foreign-source portion or the stock with respect to which it is paid.

**Holding period requirement**

A domestic corporation is not permitted a DRD in respect of any dividend on any share of stock that is held by the domestic corporation for 365 days or less during the 731-day period beginning on the date that is 365 days before the date on which the share becomes ex-dividend with respect to the dividend. For this purpose, the holding period requirement is treated as met only if the specified 10-percent owned foreign corporation is a specified 10-percent owned foreign corporation at all times during the period and the taxpayer is a U.S. shareholder with respect to such specified 10-percent owned foreign corporation at all times during the period.

## Effective Date

The provision is effective for taxable years of foreign corporations beginning after December 31, 2017, and for taxable years of U.S. shareholders in which or with which such taxable years of foreign corporations end.

**2. Special rules relating to sales or transfers involving specified 10-percent owned foreign corporations (sec. 14102 of the bill, and secs. 367(a)(3)(C), 961, 1248 and new sec. 91 of the Code)**

## Reasons for Change

A participation exemption system could provide double tax benefits in certain circumstances. In particular, a distribution from a foreign subsidiary that is eligible for a DRD would reduce the value of the foreign subsidiary, reducing any built-in gain or increasing any built-in loss in the shareholder's stock of the subsidiary. Reducing gain in this manner is consistent with the application of section 1248(a) (or section 964(e)) to recharacterize gain as a dividend for which a DRD may be allowed. Increasing loss in this manner, however, creates a double U.S. tax benefit for receiving a tax-free distribution from a foreign subsidiary.

In addition, taxpayers may arbitrage the application of the participation exemption system to foreign subsidiaries but not foreign branches. Specifically, a taxpayer may deduct losses from a foreign branch operation against U.S. taxable income and then incorporate that branch once it becomes profitable. Present law provides an array of loss recapture rules to address such a fact pattern,[1195] but those rules generally rely on the worldwide system of taxation to recapture losses in excess of built-in gains by taxing future earnings when repatriated. Instead of only recapturing such losses upon a later repatriation of earnings, the Committee wishes to recapture the U.S. tax

---

[1195] See, e.g., secs. 367(a)(3)(C), 904(f)(3), 1503(d).

TD 9865 RECORD-001862

benefits of these losses immediately upon the incorporation of a foreign branch that has generated losses. This is to avoid the negative tax consequences of the repatriation of foreign earnings, which is one of the reasons for moving to a participation exemption system of taxation.

## Explanation of Provision

### Sales by United States persons of stock

In the case of the sale or exchange by a domestic corporation of stock in a foreign corporation held for one year or more, any amount received by the domestic corporation which is treated as a dividend for purposes of section 1248, is treated as a dividend for purposes of applying the provision

### Reduction in basis of certain foreign stock

Solely for the purpose of determining a loss, a domestic corporate shareholder's adjusted basis in the stock of a specified 10-percent owned foreign corporation (as defined in this provision) is reduced by an amount equal to the portion of any dividend received with respect to such stock from such foreign corporation that was not taxed by reason of a dividends received deduction allowable under section 245A in any taxable year of such domestic corporation. This rule applies in coordination with section 1059, such that any reduction in basis required pursuant to this provision will be disregarded, to the extent the basis in the specified 10-percent owned foreign corporation's stock has already been reduced pursuant to section 1059.

### Sale by a CFC of a lower-tier CFC

If for any taxable year of a CFC beginning after December 31, 2017, an amount is treated as a dividend under section 964(e)(1) because of a sale or exchange by the CFC of stock in another foreign corporation held for a year or more, then: (i) the foreign-source portion of the dividend is treated as subpart F income of the selling CFC for purposes of section 951(a)(1)(A), (ii) a United States shareholder with respect to the selling CFC includes in gross income for the taxable year of the shareholder with or within the taxable year of the CFC ends, an amount equal to the shareholder's pro rata share (determined in the same manner as under section 951(a)(2)) of the amount treated as subpart F income under (i), and (iii) the deduction under section 245A(a) is allowable to the United States shareholder with respect to the subpart F income included in gross income under (ii) in the same manner as if the subpart F income were a dividend received by the shareholder from the selling CFC.

In the case of a sale or exchange by a CFC of stock in another corporation in a taxable year of the selling CFC beginning after December 31, 2017, to which this provision applies if gain were recognized, the earnings and profits of the selling controlled foreign corporation is not reduced by any loss from the sale or exchange.

### Inclusion of transferred loss amount in certain assets transfers

Under the provision, if a domestic corporation transfers substantially all of the assets of a foreign branch (within the meaning of section 367(a)(3)(C)) to a specified 10-percent owned foreign corporation with respect to which it is a U.S. shareholder after the transfer, the domestic

356

corporation includes in gross income an amount equal to the transferred loss amount, subject to certain limitations.

The transferred loss amount is the excess (if any) of: (1) losses incurred by the foreign branch after December 31, 2017, and before the transfer, for which a deduction was allowed to the domestic corporation, over (2) the sum of certain taxable income earned by the foreign branch and gain recognized by reason of an overall foreign loss recapture arising out of disposition of assets on account of the underlying transfer. For the purposes of (2), only taxable income of the foreign branch in taxable years after the loss is incurred through the close of the taxable year of the transfer, is included. The transferred loss amount is reduced by the amount of gain recognized by the taxpayer (other than gain recognized by reason of an overall foreign loss recapture) on account of the transfer.

The amount of loss included in the gross income of the taxpayer under the proposed rule above for any taxable year cannot exceed the amount allowed as a deduction under new section 245A for the taxable year (taking into account dividends received from all specified 10-percent owned foreign corporations with respect to which the taxpayer is a U.S. shareholder). Any amount not included in gross income for a taxable year because of this proposed rule is included in gross income in the succeeding taxable year.

Amounts included in gross income by reason of the provision are treated as derived from sources within the United States. Consistent with regulations or guidance that the Secretary of the Treasury may prescribe, proper adjustments are made in the adjusted basis of the taxpayer's stock in the specified 10-percent owned foreign corporation to which the transfer is made, and in the transferee's adjusted basis in the property transferred, to reflect amounts included in gross income under this provision.

### Repeal of active trade or business exception

Section 367 is amended to provide that in connection with any exchange described in section 332, 351, 354, 356, or 361, if a U.S. person transfers property used in the active conduct of a trade or business to a foreign corporation, such foreign corporation shall be not, for purposes of determining the extent to which gain shall be recognized on such transfer, be considered to be a corporation.

### Effective Date

The provision relating to reduction of basis in certain foreign stock for the purposes of determining a loss is effective for dividends received in taxable years beginning after December 31, 2017.

The provision relating to transfer of loss amounts from foreign branches to certain foreign corporations is effective for transfers after December 31, 2017.

### 3. Treatment of deferred foreign income upon transition to participation exemption system of taxation (sec. 14103 of the bill and secs. 78, 172, 904, 907, and 965 of the Code)

### Reasons for Change

TD 9865 RECORD-001864

In transitioning to a new participation exemption system, the Committee seeks to enhance both the global competitiveness of U.S. businesses and to encourage investment in the United States. The Committee is aware that many U.S-parented companies have accumulated significant untaxed and undistributed foreign earnings as a result. The Committee is also aware that such companies are eligible for a 100-percent dividend-received deduction with respect to any distributions made under the new participation exemption system. To ensure that all distributions from foreign subsidiaries are treated in the same manner under the participation exemption system, the Committee believes that it is appropriate to tax such earnings as if they had been repatriated under present law, but at a reduced rate.

The Committee believes the tax on accumulated foreign earnings should apply without requiring an actual distribution of earnings, and further believes that the tax rate should take into account the liquidity of the accumulated earnings. Accordingly, the provision establishes a bifurcated rate, i.e., 10 percent for earnings held in liquid form and 5 percent for accumulated foreign earnings that have been reinvested in the foreign subsidiary's business. Finally, the Committee has provided procedures for payment and collection of the transition tax that mitigate the burden on taxpayers.

In response to reports that taxpayers are engaging in tax minimization strategies to artificially reduce their tax liability under this section, the Committee provides an extended limitations period or assessment of tax. The Committee intends to provide the Internal Revenue Service with sufficient time to audit tax minimization transactions and ensure the accuracy of amounts (such as accumulated earnings and profits) reported pursuant to this section.

### Explanation of Provision

#### In general

The provision generally requires that, for the last taxable year beginning before January 1, 2018, any U.S. shareholder of a specified foreign corporation must include in income its pro rata share of the accumulated post-1986 deferred foreign income of the corporation. For purposes of this provision, a specified foreign corporation is any foreign corporation that has at least one U.S. shareholder. It excludes PFICs that are not also CFCs. A portion of that pro rata share of foreign earnings is deductible; the amount of the deductible portion depends upon whether the deferred earnings are held in cash or other assets. The deduction results in a reduced rate of tax with respect to income from the required inclusion of pre-effective date earnings. A corresponding portion of the credit for foreign taxes is disallowed, thus limiting the credit to the taxable portion of the included income. The separate foreign tax credit limitation rules of present law section 904 apply, with coordinating rules. The increased tax liability generally may be paid over an eight-year period. Special rules are provided for S corporations and real estate investment trusts ("REITs").

#### Subpart F

The mechanism for requiring an inclusion of pre-effective-date foreign earnings is subpart F. The provision provides that in the last taxable year of a deferred foreign income corporation that begins before January 1, 2018, which is that foreign corporation's last taxable

TD 9865 RECORD-001865

year before the transition to the new corporate tax regime elsewhere in the bill goes into effect, the subpart F income of the foreign corporation is increased by the greater of the accumulated post-1986 deferred foreign income of the corporation, determined as of November 9, 2017, or as of December 31, 2017 ("measurement date").  The amount so determined is includible in gross income under section 951 (hereinafter, the section 951 inclusion).

The transition rule applies to all U.S. shareholders[1196] of a deferred foreign income corporation.  "Deferred foreign income corporation" is any specified foreign corporation with accumulated post-1986 deferred income that is greater than zero.  A specified foreign corporation is defined as any CFC as well as any section 902 corporation, as defined in section 909(d)(5) prior to date of enactment of this bill, *i.e.*, any foreign corporation in which a U.S. person owns 10 percent of the voting stock.  Consistent with the general operation of subpart F, each U.S. shareholder of a deferred foreign income corporation must include in income the shareholder's pro rata share of the foreign corporation's subpart F income attributable to its section 951 inclusion.[1197]

### Accumulated post-1986 deferred foreign income

A specified foreign corporation's accumulated post-1986 deferred foreign income on the measurement date is based on all post-1986 foreign earnings and profits ("E&P") that are not previously taxed and are neither (1) attributable to income that is effectively connected with the conduct of a trade or business in the United States and subject to U.S. income tax nor (2) subpart F income (determined without regard to the section 951 inclusion) included in the gross income of a U.S. shareholder.  The potential pool of includible earnings includes all undistributed foreign earnings accumulated in taxable years beginning after 1986, computed in accordance with sections 964(a) and 986, taking into account only periods when the foreign corporation was a specified corporation.  The pool of post-1986 foreign earnings and profits is not reduced by distributions during the taxable year to which section 965 applies.

### Reductions of amounts included in income of U.S. shareholder of foreign corporations with deficits in E&P

The pool of post-1986 earnings and profits taken into consideration in computing the section 951 inclusion required of a U.S. shareholder under this transition rule generally is reduced by foreign earnings and profits deficits that are properly allocated to that person.   The U.S. shareholder must determine its aggregate E&P deficit based on its interest in each specified foreign corporation with a deficit in post-1986 foreign earnings and profits as of the measurement date ("E&P deficit foreign corporation").

---

[1196] Sec. 951(b), which defines United States shareholder as any U.S. person that owns 10 percent or more of combined voting classes of stock of a foreign corporation.

[1197] For purposes of taking into account its subpart F income under this rule, a noncontrolled section 902 corporation is treated as a CFC.

TD 9865 RECORD-001866

The U.S. shareholder's aggregate E&P deficit is then allocated among the deferred foreign income corporations in the same ratio as the U.S. shareholder's pro rata share of post-1986 deferred income in that corporation bears to the U.S. shareholder's pro rata share of accumulated post-1986 deferred foreign income from all deferred foreign income corporations with respect to which the shareholder is a U.S. shareholder.  For the portion of aggregate E&P deficits that include qualified deficits, the portion of the deficit that is attributable to a qualified deficit, and the qualified activity, must be identified.  The provision does not permit intragroup netting among U.S. shareholders within an affiliated group.

In taxable years beginning after 2017, amounts by which the section 951 inclusion was reduced by aggregate E&P deficits are considered as amounts included in the gross income of the U.S. shareholder.  The shareholder's pro rata share of the E&P of an E&P deficit foreign corporation that used qualified deficits to reduce its section 951 inclusion is increased by the amount of such deficit and attributed to the same activity to which the income was attributed.

**Deductions from section 951 inclusion**

To determine the taxable portion of the section 951 inclusion, the U.S. shareholders with accumulated deferred foreign income may deduct a portion of the section 951 inclusion in an amount that depends upon the proportion of aggregate earnings and profits attributable to cash assets rather than noncash assets, in the nature of a partial dividends-received deduction.  A U.S. shareholder may deduct 71.4 percent of the aggregate earnings and profits attributable to cash assets, and 85.7 percent of the remainder of the aggregate earnings and profits in the section 951 inclusion.[1198]

A U.S. shareholder may elect, no later than with a timely filed return for the taxable year, not to apply its net operating loss deduction to the deemed repatriation.  If so, neither the section 951 inclusion nor any related deemed paid foreign tax credits may be taken into account in computing the net operating loss deduction for that year.

Cash position

The aggregate earnings and profits attributable to cash assets for a U.S. shareholder is the greater of the pro rata share of the cash position of all specified foreign corporations as of the last day of the last taxable year beginning before January 1, 2018, or the average of the cash position determined on the last day of each of the two taxable years ending immediately before November 9, 2017.  For purposes of this computation, the cash position of certain non-corporate entities that would be treated as specified foreign corporations if they were foreign corporations is also included.  The cash position of an entity consists of all cash, net accounts receivables, and the fair market value of similarly liquid assets, specifically including personal property that is actively traded on an established financial market (other than stock in the specified foreign

---

[1198] The Committee intends that the deduction be treated as exempting the deducted income from tax.  Thus, for example, the deducted income, if earned by a partnership, could give rise to an increase in a partner's basis under section 705(a)(1)(B).

360

corporation) government securities, certificates of deposit, commercial paper, and short-term obligations.

To avoid double counting of cash assets, a U.S. shareholder may disregard accounts receivable and short-term obligations of a specified foreign corporation if that shareholder can establish that the amounts were already taken into account by that shareholder with respect to another specified foreign corporation.

The Secretary may identify other assets that are economically equivalent to the enumerated assets that are treated as cash. The provision also authorizes the Secretary to disregard transactions that are determined to have the principal purpose of reducing the aggregate foreign cash position.

**Foreign tax credit**

A portion of foreign income tax that is deemed paid or accrued with respect to the section 951 inclusion is not creditable or deductible against the Federal income tax attributable to the inclusion. The disallowed portion of foreign tax credits is 71.4 percent of foreign taxes paid attributable to the portion of the section 965 inclusion attributable to the aggregate cash position plus, 85.7 percent of foreign taxes paid attributable to the remaining portion of the section 965 inclusion.[1199] The provision coordinates the disallowance of foreign tax credits with the requirement[1200] that a domestic corporate shareholder is deemed to receive a dividend in an amount equal to foreign taxes it is deemed to have paid and for which it claimed a credit.

**Limitations on assessment extended**

The provision also allows an exception to the otherwise applicable limitations period for assessment of tax to ensure that the period for assessment of underpayments in tax related to the treatment of the pre-effective date foreign earnings does not expire prior to six years from the date on which the return initially reflecting the section 951 inclusion was filed.

**Installment payments**

A U.S. shareholder may elect to pay the net tax liability resulting from the section 951 inclusion in eight installments. If installment payment is elected, the payments for each of the first five years equals 8 percent of the net tax liability. The amount of the sixth installment is 15 percent of the net tax liability, increasing to 20 percent for the seventh installment and the remaining balance of 25 percent in the eighth year.

The net tax liability that may be paid in installments is the excess of the U.S. shareholder's net income tax for the taxable year in which the section 951 inclusion occurs over

---

[1199] Other foreign tax credits used by a taxpayer against tax liability resulting from the deemed inclusion apply in full.

[1200] Sec. 78.

TD 9865 RECORD-001868

the taxpayer's net income tax for that year determined without regard to the section 951 inclusion. Net income tax means net income tax as defined for purposes of the general business credit, but reduced by the amount of that credit.

An election to pay tax in installments must be made by the due date for the tax return for the taxable year in which the section 951 inclusion is included in income. The Treasury Secretary has authority to prescribe the manner of making the election. The first installment must be paid on the due date (determined without regard to extensions) for the tax return for the taxable year of the income inclusion. Succeeding installments must be paid annually no later than the due dates (without extensions) for the income tax return of each succeeding year. If a deficiency is later determined with respect to the net tax liability, the additional tax due may be prorated among all installment payments in most circumstances. The portions of the deficiency prorated to an installment that was due before the deficiency was assessed must be paid upon notice and demand. The portion prorated to any remaining installment is payable with the timely payment of that installment payment, unless the deficiency is attributable to negligence, intentional disregard of rules or regulations, or fraud with intent to evade tax, in which case the entire deficiency is payable upon notice and demand.

The timely payment of an installment does not incur interest. If a deficiency is determined that is attributable to an understatement of the net tax liability due under this provision, the deficiency is payable with underpayment interest for the period beginning on the date on which the net tax liability would have been due, without regard to an election to pay in installments, and ending with the payment of the deficiency. Furthermore, any amount of deficiency prorated to a remaining installment also bears interest on the deficiency, but not on the original installment amount.

The provision also includes an acceleration rule. If (1) there is a failure to pay timely any required installment, (2) there is a liquidation or sale of substantially all of the U.S. shareholder's assets (including in a bankruptcy case), (3) the U.S. shareholder ceases business, or (4) another similar circumstance arises, the unpaid portion of all remaining installments is due on the date of the event (or, in a bankruptcy proceeding or similar case, the day before the petition is filed).

**Special rule for S corporations**

A special rule permits deferral of the transition net tax liability for shareholders of a U.S. shareholder that is a flow-through entity known as an S corporation.[1201] The S corporation is required to report on its income tax return the amount includible in gross income by reason of this provision, as well as the amount of deduction that would be allowable, and provide a copy of such information to its shareholders. Any shareholder of the S corporation may elect to defer the net tax liability until the shareholder's taxable year in which a triggering event occurs. The election to defer the tax is due not later than the due date for the return of the S corporation for its last taxable year that begins before January 1, 2018.

---

[1201] Section 1361 defines an S corporation as a domestic small business corporation that has an election in effect for status as an S corporation, with no more than 100 shareholders, none of whom are nonresident aliens, and all of whom are individuals, estates, trusts or certain exempt organizations.

TD 9865 RECORD-001869

Three types of events may trigger an end to deferral of the net tax liability. The first type of triggering event is a change in the status of the corporation as an S corporation. The second category includes liquidation, sale of substantially all corporate assets, termination of the company or end of business, or similar event, including reorganization in bankruptcy. The third type of triggering event is a transfer of shares of stock in the S corporation by the electing taxpayer, whether by sale, death or otherwise, unless the transferee of the stock agrees with the Secretary to be liable for net tax liability in the same manner as the transferor. Partial transfers trigger the end of deferral only with respect to the portion of tax properly allocable to the portion of stock sold.

If a shareholder of an S corporation has elected deferral under the special rule for S corporation shareholders and a triggering event occurs, the S corporation and the electing shareholder are jointly and severally liable for any net tax liability and related interest or penalties. The period within which the IRS may collect such liability does not begin before the date of an event that triggers the end of the deferral. If an election to defer payment of the net tax liability is in effect for a shareholder, that shareholder must report the amount of the deferred net tax liability on each income tax return due during the period that the election is in effect. Failure to include that information with each income tax return will result in a penalty equal to five-percent of the amount that should have been reported.

After a triggering event occurs, a shareholder in the S corporation may elect to pay the net tax liability in eight equal installments, subject to rules similar to those generally applicable absent deferral. Whether or not a shareholder may elect to pay in installments depends upon the type of event that triggered the end of deferral. If the triggering event is liquidation, sale of substantially all corporate assets, termination of the company or end of business, or similar event, the installment payment election is generally unavailable without the consent of the Secretary; instead, the entire net tax liability is due upon notice and demand. The installment election is due with the timely return for the year in which the triggering event occurs. The first installment payment is required by the due date of the same return, determined without regard to extensions of time to file.

**Special rules for REITs**

To alleviate burden of compliance with this section by REITs, special rules are provided if a U.S. shareholder is a REIT. First, although it must determine its pro rata share of the increase in subpart F income in accordance with the rules described above, the REIT is not required to take into account the section 951 inclusion for purposes of determining the REIT's amount of qualified REIT gross income.[1202] The section 951 inclusion is, however, taken into account for purposes of determining the income potentially required to be included in taxable

---

[1202] To qualify as a REIT, an entity must meet certain income requirements. A REIT is restricted to earning certain types of generally passive income. Among other requirements, at least 75 percent of the gross income of a REIT in each taxable year must consist of real estate-related income. Secs. 856. In addition, a REIT is required to distribute at least 90 percent of REIT income (other than net capital gain) annually. Sec. 857. Even if a REIT meets the 90-percent income distribution requirement for REIT qualification, more stringent distribution requirements must be met in order to avoid an excise tax under section 4981.

TD 9865 RECORD-001870

income under section 857(b).  Unlike a regular subchapter C corporation, a REIT is able to deduct the portion of its income that is distributed to its shareholders as a dividend or qualifying liquidating distribution each year.[1203]  The distributed income of the REIT is not taxed at the entity level; instead, it is taxed once, at the investor level.  As a result, a required inclusion under this section may trigger a requirement that the REIT distribute an amount equal to 90 percent of that inclusion despite the fact that it received no distribution from the deferred foreign income corporation.

To avoid requiring that any distribution requirement be satisfied in one year, an election to defer the section 951 inclusion is permitted.  Under a timely election, a REIT may instead take the amounts into income over a period of eight years.  It must include 8 percent in each of the five years beginning with the initial year in which the section 951 inclusion is determined, 15 percent in the sixth year, 20 percent in the seventh year and 25 percent in the eighth year.  In each of those years, it may claim a partial dividends-received deduction in the applicable percentages in proportion to the amount included in each of the eight years.  Neither the REIT nor the recipient of the distribution may elect to use the installment payment.

In the event that a REIT liquidates, ceases to operate its business, or distributes substantially all its assets (or any other similar event occurs), any portion of the required inclusion not yet taken into income is accelerated and required to be included as gross income as of the day before the event.

### Recapture from expatriated entities

The provision denies any deduction claimed with respect to the mandatory subpart F inclusion and imposes a 35-percent tax on the entire inclusion if a U.S. shareholder becomes an expatriated entity within the meaning of section 7874(a)(2) at any point within the ten-year period following enactment of the Tax Cuts and Jobs Act.  An entity that becomes a surrogate foreign corporation that is treated as a domestic corporation under section 7874(b) is not within the scope of this recapture provision.  Although the amount due is computed by reference to the year in which the deemed subpart F income was originally reported, the additional tax arises and is assessed for the taxable year in which the U.S. shareholder becomes an expatriated entity.  No foreign tax credits are permitted with respect to the additional tax due as a result of the recapture rule.  The Secretary is authorized to prescribe rules necessary to carry out the provision.

### Regulatory authority

A specific grant of regulatory authority to carry out the intent of this provision is included.  For example, the Secretary may identify instances in which it is appropriate to grant relief from potential double-counting of earnings and profits, which may occur due to different measurement dates applicable to specified foreign corporations within an affiliated group, or the timing of intragroup distributions.  It also specifies that the Secretary shall prescribe rules or

---

[1203] Liquidating distributions are covered to the extent of earnings and profits, and are defined to include redemptions of stock that are treated by shareholders as a sale of stock under section 302.  Secs. 857(b)(2)(B), 561, and 562(b).

TD 9865 RECORD-001871

guidance in order to deter tax avoidance through use of entity classification elections and accounting method changes, among other possible strategies.

## Effective Date

The provision is effective for the last taxable year of a foreign corporation that begins before January 1, 2018, and with respect to U.S. shareholders, for the taxable years in which or with which such taxable years of the foreign corporations end.

## 4. Current year inclusion of global intangible low-taxed income by United States shareholders (sec. 14201 of the bill and new sec. 951A of the Code)

### Reasons for Change

The Committee recognizes that, without any base protection measures, the participation exemption system established by the bill creates an incentive for U.S. corporations to allocate income that would otherwise be subject to the full U.S. corporate tax rate to foreign affiliates operating in low- or zero-tax jurisdictions, where the income could potentially be distributed back to the U.S. corporation with no U.S. tax imposed.  As a result, U.S. corporations may have an incentive serve the U.S. market and foreign markets through their foreign affiliates rather than U.S. affiliates.  To address this possible source of erosion of the U.S. tax base, and the potential migration of economic activity from the United States to other countries, the provision subjects certain income earned by CFCs to current U.S. tax.[1204]  Subjecting that income to current U.S. tax reduces the tax benefit of allocating that income to low- or zero-tax jurisdictions.  However, the Committee recognizes that taxing that income at the full U.S. corporate tax rate may hurt the competitive position of U.S. corporations relative to their foreign counterparts, and has decided to tax that income at a reduced rate (with a portion of foreign tax credits available to offset U.S. tax).[1205]

The Committee believes the type of income that is most readily allocated to low- or zero-tax jurisdictions is income derived from intangible property, or intangible income.  Intangible income is mobile and constitutes a large portion of the foreign-source income earned by U.S. corporations, and significant erosion of the U.S. tax base could result if no base protection measure were adopted in a move to a participation exemption system.  At the same time, if intangible income is located in a jurisdiction with a sufficiently high tax rate, the Committee believes there is limited base erosion concern.  Consequently, the Committee believes that taxing global intangible low-taxed income ("GILTI") on a current basis addresses the primary source of base erosion arising from a move toward a participation exemption system.

---

[1204]  Sec. 14401 of the bill, which establishes a base erosion and anti-abuse tax (new sec. 59A) that is based on a taxpayer's deductible payments to foreign related parties, addresses base erosion that results from U.S. and foreign companies serving the U.S. market through foreign affiliates located in low- or zero-tax jurisdictions, rather than through U.S. affiliates.

[1205]  The reduced rate of tax is achieved in sec. 14202 of the bill and new sec. 250.

TD 9865 RECORD-001872

The Committee views the most difficult problem with identifying GILTI as identifying intangible income, and believes that calculating intangible income based on facts and circumstances may be both complicated and administratively difficult.  As a result, the provision adopts a formulaic approach to calculating intangible income to make the determination simpler and more administrable.  The formula is based on the premise that directly calculating tangible income is simpler than calculating intangible income.

The provision approximates a U.S. corporation's tangible income earned through its CFCs as a 10-percent return on the U.S. corporation's aggregate pro rata share of the adjusted basis in tangible depreciable property across each CFC with respect to which it is a U.S. shareholder.  Intangible income is a residual amount generally determined by subtracting tangible income from the total amount of certain income earned by each CFC.  The Committee believes that tangible property, and the associated tangible income, are relatively immobile and an indicator of the extent to which a CFC has active business operations and presence in any particular jurisdiction.  Therefore, the provision exempts tangible income from U.S. tax. However, it generally subjects the corporation's GILTI to current U.S. tax at a reduced rate, with 80 percent of foreign tax credits available to offset U.S. tax.

GILTI is calculated at the U.S. shareholder level after aggregating both certain income and adjusted basis in tangible depreciable property on a pro rata basis across each CFC with respect to which it is a U.S. shareholder.  GILTI is treated as subpart F income, and the aggregate nature of the GILTI calculation is a departure from present law, under which subpart F income is calculated at the CFC level.  The Committee believes that calculating GILTI on an aggregate basis, instead of on a CFC-by-CFC basis, reflects the interconnected nature of a U.S. corporation's global operations and is a more accurate way of determining a U.S. corporation's global intangible income.

The provision does not permit full foreign tax credits with respect to GILTI.  The Committee believes that permitting a full foreign tax credit with respect to GILTI would make taxpayers indifferent between paying U.S. tax and foreign tax, and may reduce the incentive for taxpayers to minimize the foreign tax they pay or encourage foreign countries to adopt "soak-up" taxes knowing that a taxpayer's combined U.S. and foreign tax liability may remain unchanged with the adoption of the soak-up tax if foreign tax credits were allowed in full.  The Committee believes that allowing for partial foreign tax credits with respect to GILTI will result in an increase in the amount of U.S. tax revenue collected and decrease the amount of foreign tax revenue collected (relative to the case where full foreign tax credits are permitted with respect to GILTI).

The Committee believes that certain items of income earned by CFCs should be excluded from the GILTI, either because they should be exempt from U.S. tax—as they are generally not the type of income that is the source of base erosion concerns—or are already taxed currently by the United States.  Items of income excluded from GILTI because they are exempt from U.S. tax under the bill include foreign oil and gas extraction income (which is generally immobile) and income subject to high levels of foreign tax.  Items of income excluded from GILTI because they are taxed currently by the United States include ECI and subpart F income earned by CFCs. CFC look-through payments are also excluded from GILTI to help implement the dividend exemption system established by the bill.

TD 9865 RECORD-001873

## Explanation of Provision

### In general

Under the provision, a U.S. shareholder of any CFC must include in gross income for a taxable year its global intangible low-taxed income ("GILTI") in a manner generally similar to inclusions of subpart F income.  GILTI means, with respect to any U.S. shareholder for the shareholder's taxable year, the excess (if any) of the shareholder's net CFC tested income over the shareholder's net deemed tangible income return.  The shareholder's net deemed tangible income return is an amount equal to 10 percent of the aggregate of the shareholder's pro rata share of the qualified business asset investment ("QBAI") of each CFC with respect to which it is a U.S. shareholder.

The formula for GILTI, which is calculated at the U.S. shareholder level, is:

$$GILTI = Net\ CFC\ Tested\ Income - (10\% \times QBAI)$$

### Net CFC tested income

Net CFC tested income means, with respect to any U.S. shareholder, the excess of the aggregate of the shareholder's pro rata share of the tested income of each CFC with respect to which it is a U.S. shareholder over the aggregate of its pro rata share of the tested loss of each CFC with respect to which it is a U.S. shareholder.  Pro rata shares are determined under the rules of section 951(a)(2).

The formula for net CFC tested income, which is calculated at the U.S. shareholder level, is:

$$Net\ CFC\ Tested\ Income = Sum\ of\ CFC\ Tested\ Income - Sum\ of\ CFC\ Tested\ Loss$$

The tested income of a CFC means the excess (if any) of the gross income of the corporation—determined without regard to certain exceptions to tested income—over deductions (including taxes) properly allocable to such gross income (referred to in this document as "tested gross income").  The exceptions to tested income are: (1) the corporation's ECI under section 952(b); (2) any gross income taken into account in determining the corporation's subpart F income; (3) any gross income excluded from foreign base company income or insurance income by reason of the high-tax exception under section 954(b)(4); (4) any dividend received from a related person (as defined in section 954(d)(3)); and (5) any foreign oil and gas extraction income (as defined in section 907(c)(1)).

The tested loss of a CFC means the excess (if any) of deductions (including taxes) properly allocable to the corporation's gross income—determined without regard to the tested income exceptions—over the amount of such gross income.

### Qualified business asset investment

QBAI means, with respect to any CFC for a taxable year, the average of the aggregate of its adjusted bases, determined as of the close of each quarter of the taxable year, in specified

TD 9865 RECORD-001874

tangible property used in its trade or business and of a type with respect to which a deduction is generally allowable under section 167. The adjusted basis in any property must be determined using the alternative depreciation system under current section 168(g), notwithstanding any provision of law (or any other section of this bill) which is enacted after the date of enactment of this provision (unless such later enacted law specifically and directly amends this provision's definition).

Specified tangible property means any property used in the production of tested income.[1206] If such property was used in the production of both tested income and income that is not tested income (*i.e.*, dual-use property), the property is treated as specified tangible property in the same proportion that the amount of tested gross income produced with respect to the property bears to the total amount of gross income produced with respect to the property.[1207]

For purposes of determining QBAI, the Secretary is authorized to issue anti-avoidance regulations or other guidance as the Secretary determines appropriate, including regulations or other guidance that provide for the treatment of property if the property is transferred or held temporarily, or if avoidance was a factor in the transfer or holding of the property.

**Coordination with subpart F**

Although GILTI inclusions do not constitute subpart F income, GILTI inclusions are generally treated similarly to subpart F inclusions. Thus they are generally treated in the same manner as amounts included under section 951(a)(1)(A) for purposes of applying sections 168(h)(2)(B), 535(b)(10), 904(h)(1), 959, 961, 962, 993(a)(1)(E), 996(f)(1), 1248(b)(1), 1248(d)(1), 6501(e)(1)(C), 6654(d)(2)(D), and 6655(e)(4). However, the Secretary may provide rules for coordinating the GILTI inclusion with provisions of law in which the determination of subpart F income is required to be made at the CFC level.

The provision requires that the amount of GILTI included by a U.S. shareholder be allocated across each CFC with respect to which it is a U.S. shareholder. The portion of GILTI treated as being with respect to a CFC equals zero for a CFC with no tested income and, for a CFC with tested income, the portion of GILTI which bears the same ratio to the total amount of GILTI as the U.S. shareholder's pro rata amount of tested income of the CFC bears to the aggregate amount of the U.S. shareholder's pro rata amount of the tested income of each CFC with respect to which it is a U.S. shareholder. For a CFC with tested income, the following formula expresses how to determine the portion of GILTI treated as being with respect to the CFC:

$$CFC's\ GILTI\ = GILTI \times \left( Share\ of\ CFC's\ Tested\ Income \middle/ Share\ of\ Agg.\ CFC\ Tested\ Income \right)$$

---

[1206] Specified tangible property does not include property used in the production of tested loss, so that a CFC that has a tested loss in a taxable year does not have QBAI for the taxable year.

[1207] For example, if a building produces $1,000 of tested gross income and $250 of subpart F income for a taxable year, then 80 percent (= $1,000/$1,250) of a domestic corporation's average adjusted basis in the building is included in QBAI for that taxable year.

TD 9865 RECORD-001875

taxable year, and which has previously taxed income or accumulated DISC income, are also required to pay interest on the deferral benefit, and gain on the sale or exchange of stock in such corporation is treated as a dividend.

## INTERNATIONAL TAX PROVISIONS

### A. Establishment of Participation Exemption System for Taxation of Foreign Income

### 1. Deduction for foreign-source portion of dividends received by domestic corporations from specified 10-percent owned foreign corporations (sec. 4001 of the House bill, sec. 14101 of the Senate amendment, and new sec. 245A of the Code)

HOUSE BILL

*In general*

The provision generally establishes a participation exemption system for foreign income. This exemption is provided for by means of a 100-percent deduction for the foreign-source portion of dividends received from specified 10-percent owned foreign corporations by domestic corporations that are United States shareholders of those foreign corporations within the meaning of section 951(b) (referred to here as "participation DRD").[1478]

A specified 10-percent owned foreign corporation is any foreign corporation with respect to which any domestic corporation is a United States shareholder. The phrase does not include a passive foreign investment company within the meaning of subpart D of part VI of subchapter P.

The term "dividend received" is intended to be interpreted broadly, consistently with the meaning of the phrases "amount received as dividends" and "dividends received" under sections 243 and 245, respectively.[1479] Under proposed section 245A(e), the Secretary of the Treasury may prescribe such regulations or other guidance as may be necessary or appropriate to carry out the rules of section 245A, including clarifying the intended broad scope of the term "dividend received."

For example, if a domestic corporation indirectly owns stock of a foreign corporation through a foreign partnership and the domestic corporation would qualify for the participation DRD with respect to dividends from the foreign corporation if the domestic corporation owned such stock directly, the domestic corporation would be allowed a participation DRD with respect to its distributive share of the partnership's dividend from the foreign corporation.

*Foreign-source portion of a dividend*

The participation DRD is available only for the foreign-source portion of dividends received from specified 10-percent owned for-

---

[1478] Under section 951(b), a domestic corporation is a United States shareholder of a foreign corporation if it owns, within the meaning of section 958(a), or is considered as owning by applying the rules of section 958(b), 10 percent or more of the voting stock of the foreign corporation.

[1479] Consequently, for example, gain included in gross income as a dividend under section 1248(a) or 964(e) would constitute a dividend received for which the deduction under section 245A may be available.

596

eign corporations. The foreign-source portion of any dividend is the amount that bears the same ratio to the dividend as the specified foreign corporation's post-1986 undistributed foreign earnings bears to the corporation's total post-1986 undistributed earnings. Post-1986 undistributed earnings are the amount of the earnings and profits of a specified 10-percent owned foreign corporation accumulated in taxable years beginning after December 31, 1986, as of the close of the taxable year of the foreign corporation in which the dividend is distributed and not reduced by dividends[1480] distributed during that year. Post-1986 undistributed foreign earnings are, in general, the portion of post-1986 undistributed earnings that is not attributable to post-1986 undistributed U.S. earnings. Post-1986 undistributed U.S. earnings are, in general, undistributed earnings attributable to: (a) the corporation's income that is effectively connected with the conduct of a trade or business within the United States, or (b) any dividend received (directly or through a wholly owned foreign corporation) from an 80-percent-owned (by vote or value) domestic corporation.

Rules similar to the rules described above apply when a dividend is paid out of earnings and profits of a specified 10-percent owned foreign corporation accumulated in taxable years beginning before January 1, 1987. As a consequence, the participation exemption system is available for both post-1986 and pre-1987 foreign earnings. An ordering rule provides that dividends are treated as first being paid out of post-1986 undistributed earnings to the extent of those earnings.

An additional rule provides for the treatment of distributions of a specified 10-percent owned foreign corporation in excess of undistributed earnings. Under section 316(a)(2), a distribution of earnings and profits of a corporation in the taxable year of the distribution is treated as a dividend even if the distribution exceeds accumulated earnings and profits.[1481] The determination of the foreign-source portion of such a distribution is calculated in a similar manner as for other types of dividends.

### Foreign tax credit disallowance; foreign tax credit limitation

No foreign tax credit or deduction is allowed for any taxes (including withholding taxes) paid or accrued with respect to a dividend that qualifies for the participation DRD.

For purposes of computing the section 904(a) foreign tax credit limitation, a domestic corporation that is a United States shareholder of a specified 10-percent owned foreign corporation must compute its foreign-source taxable income (and entire taxable income) by disregarding the foreign-source portion of any dividend received from that foreign corporation for which the participation DRD is taken, as well as and any deductions properly allocable or apportioned to that foreign-source portion or the stock with respect to which it is paid.

---

[1480] Pursuant to section 959(d), a distribution of previously taxed income does not constitute a dividend even if it reduces earnings and profits.

[1481] Called a "nimble dividend." *See,* Boris I. Bittker and James S. Eustice, *Federal Income Taxation of Corporations and Shareholders,* (7th ed. 2016) para. 8–12.

597

### Six-month holding period requirement

A domestic corporation is not permitted a participation DRD in respect of any dividend on any share of stock that is held by the domestic corporation for 180 days or less during the 361-day period beginning on the date that is 180 days before the date on which the share becomes ex-dividend with respect to the dividend. For this purpose, a domestic corporation is treated as holding a share of stock for any period only if the corporation is a specified 10-percent owned foreign corporation and the taxpayer is a United States shareholder with respect to such corporation during that period.

*Effective date.*—The provision applies to distributions made (and for purposes of determining a taxpayer's foreign tax credit limitation under section 904, deductions in taxable years beginning) after December 31, 2017.

SENATE AMENDMENT

### In general

The provision allows an exemption for certain foreign income. This exemption is provided for by means of a 100-percent deduction for the foreign-source portion of dividends received from specified 10-percent owned foreign corporations by domestic corporations that are United States shareholders of those foreign corporations within the meaning of section 951(b) [1482] (referred to here as "DRD").

A specified 10-percent owned foreign corporation is any foreign corporation (other than a PFIC that is not also a CFC) with respect to which any domestic corporation is a U.S. shareholder. [1483]

### Foreign-source portion of a dividend

The DRD is available only for the foreign-source portion of dividends received by a domestic corporation from specified 10-percent owned foreign corporations. The foreign-source portion of any dividend is the amount that bears the same ratio to the dividend as the undistributed foreign earnings bears to the total undistributed earnings of the foreign corporation. Undistributed earnings are the amount of the earnings and profits of a specified 10-percent owned foreign corporation [1484] as of the close of the taxable year of the specified 10-percent owned foreign corporation in which the dividend is distributed and not reduced by dividends [1485] distributed during that taxable year. Undistributed foreign earnings are the portion of the undistributed earnings attributable to neither income described in section 245(a)(5)(A) nor section 245(a)(5)(B), without regard to section 245(a)(12).

### Hybrid Dividends

The DRD is not available for any dividend received by a U.S. shareholder from a controlled foreign corporation if the dividend is

---

[1482] Under section 951(b), a domestic corporation is a United States shareholder of a foreign corporation if it owns, within the meaning of section 958(a), or is considered as owning by applying the rules of section 958(b), 10-percent or more of the voting stock of the foreign corporation.
[1483] Secs. 1297, 1298.
[1484] Computed in accordance with secs. 964(a) and 986.
[1485] Pursuant to section 959(d), a distribution of previously taxed income does not constitute a dividend even if it reduces earnings and profits.

598

a hybrid dividend. A hybrid dividend is an amount received from a controlled foreign corporation for which a deduction would be allowed under this provision and for which the specified 10-percent owned foreign corporation received a deduction (or other tax benefit) from taxes imposed by a foreign country.

If a controlled foreign corporation with respect to which a domestic corporation is a U.S. shareholder receives a hybrid dividend from any other controlled foreign corporation with respect to which the domestic corporation is also a U.S. shareholder, then the hybrid dividend is treated for purposes of section 951(a)(1)(A) as subpart F income of the recipient controlled foreign corporation for the taxable year of the controlled foreign corporation in which the dividends was received and the U.S. shareholder includes in gross income an amount equal to the shareholder's pro rata share of the subpart F income, determined in the same manner as section 951(a)(2).

### Foreign tax credit disallowance

No foreign tax credit or deduction is allowed for any taxes paid or accrued with respect to a dividend that qualifies for the DRD.

For purposes of computing the section 904(a) foreign tax credit limitation, a domestic corporation that is a U.S. shareholder of a specified 10-percent owned foreign corporation must compute its foreign-source taxable income by disregarding the foreign-source portion of any dividend received from that foreign corporation for which the DRD is taken, and any deductions properly allocable or apportioned to that foreign-source portion or the stock with respect to which it is paid.

### Holding period requirement

A domestic corporation is not permitted a DRD in respect of any dividend on any share of stock that is held by the domestic corporation for 365 days or less during the 731-day period beginning on the date that is 365 days before the date on which the share becomes ex-dividend with respect to the dividend. For this purpose, the holding period requirement is treated as met only if the specified 10-percent owned foreign corporation is a specified 10-percent owned foreign corporation at all times during the period and the taxpayer is a U.S. shareholder with respect to such specified 10-percent owned foreign corporation at all times during the period.

*Effective date.*—The provision is effective for taxable years of foreign corporations beginning after December 31, 2017, and for taxable years of U.S. shareholders in which or with which such taxable years of foreign corporations end.

CONFERENCE AGREEMENT

### In general

The provision in the conference agreement generally follows the provision in the Senate amendment, with some changes, as described below, and allows an exemption for certain foreign income by means of a 100-percent deduction for the foreign-source portion of dividends received from specified 10-percent owned foreign cor-

599

porations by domestic corporations [1486] that are United States shareholders of those foreign corporations within the meaning of section 951(b) [1487] (referred to here, as above, as "DRD").

A specified 10-percent owned foreign corporation is any foreign corporation (other than a PFIC that is not also a CFC) with respect to which any domestic corporation is a U.S. shareholder.[1488]

The term "dividend received" is intended to be interpreted broadly, consistently with the meaning of the phrases "amount received as dividends" and "dividends received" under sections 243 and 245, respectively. For example, if a domestic corporation indirectly owns stock of a foreign corporation through a partnership and the domestic corporation would qualify for the participation DRD with respect to dividends from the foreign corporation if the domestic corporation owned such stock directly, the domestic corporation would be allowed a participation DRD with respect to its distributive share of the partnership's dividend from the foreign corporation.

The DRD is available only to C corporations that are not RICs or REITs.

### Foreign-source portion of a dividend

The DRD is available only for the foreign-source portion of dividends received by a domestic corporation from specified 10-percent owned foreign corporations. The foreign-source portion of any dividend is the amount that bears the same ratio to the dividend as the undistributed foreign earnings bears to the total undistributed earnings of the foreign corporation. Undistributed earnings are the amount of the earnings and profits of a specified 10-percent owned foreign corporation [1489] as of the close of the taxable year of the specified 10-percent owned foreign corporation in which the dividend is distributed and not reduced by dividends [1490] distributed during that taxable year. Undistributed foreign earnings are the portion of the undistributed earnings attributable to neither income described in section 245(a)(5)(A) nor section 245(a)(5)(B), without regard to section 245(a)(12).

### Hybrid dividends

The DRD is not available for any dividend received by a U.S. shareholder from a controlled foreign corporation if the dividend is a hybrid dividend. A hybrid dividend is an amount received from a controlled foreign corporation for which a deduction would be allowed under this provision and for which the specified 10-percent owned foreign corporation received a deduction (or other tax ben-

---

[1486] Including a controlled foreign corporation treated as a domestic corporation for purposes of computing the taxable income thereof. See Treas. Reg. sec. 1.952–2(b)(1). Therefore, a CFC receiving a dividend from a 10-percent owned foreign corporation that constitutes subpart F income may be eligible for the DRD with respect to such income.

[1487] Under section 951(b) as revised by the Act, a domestic corporation is a United States shareholder of a foreign corporation if it owns, within the meaning of section 958(a), or is considered as owning by applying the rules of section 958(b), 10-percent or more of the vote or value of the foreign corporation.

[1488] Secs. 1297, 1298.

[1489] Computed in accordance with secs. 964(a) and 986.

[1490] Pursuant to section 959(d), a distribution of previously taxed income does not constitute a dividend even if it reduces earnings and profits.

600

efit) with respect to any income, war profits, and excess profits taxes imposed by any foreign country.

If a controlled foreign corporation with respect to which a domestic corporation is a U.S. shareholder receives a hybrid dividend from any other controlled foreign corporation with respect to which the domestic corporation is also a U.S. shareholder, then the hybrid dividend is treated for purposes of section 951(a)(1)(A) as subpart F income of the recipient controlled foreign corporation (notwithstanding section 954(c)(6)) for the taxable year of the controlled foreign corporation in which the dividends was received and the U.S. shareholder includes in gross income an amount equal to the shareholder's pro rata share of the subpart F income, determined in the same manner as section 951(a)(2).

### Foreign tax credit disallowance

No foreign tax credit or deduction is allowed for any taxes paid or accrued with respect to any portion of a distribution treated as a dividend that qualifies for the DRD.

For purposes of computing the section 904(a) foreign tax credit limitation, a domestic corporation that is a U.S. shareholder of a specified 10-percent owned foreign corporation must compute its foreign-source taxable income (and entire taxable income) by disregarding the foreign-source portion of any dividend received from that foreign corporation for which the DRD is taken, and any deductions properly allocable or apportioned to that foreign-source portion or the stock with respect to which it is paid.

### Holding period requirement

A domestic corporation is not permitted a DRD in respect of any dividend on any share of stock that is held by the domestic corporation for 365 days or less during the 731-day period beginning on the date that is 365 days before the date on which the share becomes ex-dividend with respect to the dividend. For this purpose, the holding period requirement is treated as met only if the specified 10-percent owned foreign corporation is a specified 10-percent owned foreign corporation at all times during the period and the taxpayer is a U.S. shareholder with respect to such specified 10-percent owned foreign corporation at all times during the period.

*Effective date.*—The provision applies to distributions made (and for purposes of determining a taxpayer's foreign tax credit limitation under section 904, deductions in taxable years beginning) after December 31, 2017.

### 2. Modification of subpart F inclusion for increased investments in United States property (sec. 4002 of the House bill, sec. 14218 of the Senate amendment, and sec. 956 of the Code)

HOUSE BILL

Under the provision, the amount determined under section 956 (relating to CFC investments in United States property) with respect to a domestic corporation is zero. A similar rule is intended for domestic corporations that own a CFC through a domestic part-

TD 9865 RECORD-001923

601

nership. The provision includes a specific grant of authority to the Secretary to issue regulations to effect that intent.

*Effective date.*—The provision applies to taxable years of foreign corporations beginning after December 31, 2017.

The provision excepts domestic corporations that are U.S. shareholders in the CFC from the requirement that they recognize income when the CFC increases its investment in U.S. property.

*Effective date.*—The provision applies to taxable years of foreign corporations beginning after December 31, 2017.

The conference agreement does not follow the House bill or the Senate amendment.

**3. Special rules relating to sales or transfers involving specified 10-percent owned foreign corporations (sec. 4003 of the House bill, sec. 14102 of the Senate Amendment and secs. 367(a)(3)(C), 961, 1248 and new sec. 91 of the Code)**

***Reduction in basis of certain foreign stock***

Solely for the purpose of determining a loss, a domestic corporate shareholder's adjusted basis in the stock of a specified 10-percent owned foreign corporation (as defined in new section 245A) is reduced by an amount equal to the portion of any dividend received with respect to such stock from such foreign corporation that was not taxed by reason of a dividends received deduction allowable under section 245A in any taxable year of such domestic corporation. This rule applies in coordination with section 1059, such that any reduction in basis required pursuant to this provision will be disregarded, to the extent the basis in the 10-percent owned foreign corporation's stock has already been reduced pursuant to section 1059.

***Inclusion of transferred loss amount in certain assets transfers***

Under the provision, if a domestic corporation transfers substantially all of the assets of a foreign branch (within the meaning of section 367(a)(3)(C)) to a foreign corporation which, after such transfer, is a specified 10-percent owned foreign corporation with respect to which the domestic corporation is a United States shareholder, the domestic corporation includes in gross income an amount equal to the transferred loss amount, subject to certain limitations.

The transferred loss amount is the excess of: (1) losses incurred by the foreign branch after December 31, 2017 for which a deduction was allowed to the domestic corporation, over (2) the sum of taxable income earned by the foreign branch and gain recognized by reason of an overall foreign loss recapture arising out of disposition of assets on account of the underlying transfer. For the purposes of (2), only taxable income of the foreign branch in taxable

602

years after the loss is incurred through the close of the taxable year of the transfer is included.

For transfers not covered by section 367(a)(3)(C), the transferred loss amount is reduced by the amount of gain recognized by the domestic corporation on the transfer (other than gains recognized by reason of overall foreign loss recapture). For transfers covered by section 367(a)(3)(C), the transferred loss amount is reduced by the amount of gain recognized by reason of such subparagraph.

Amounts included in gross income by reason of the provision or by reason of section 367(a)(3)(C) are treated as derived from sources within the United States.

The provision provides authority for the Secretary of the Treasury to prescribe regulations or other guidance for proper adjustments to the adjusted basis of the specified 10-percent owned foreign corporation to which the transfer is made, and to the adjusted basis of the property transferred, to reflect amounts included in gross income under the provision.

*Effective date.*—The provision relating to reduction of basis in certain foreign stock for the purposes of determining a loss is effective for distributions made after December 31, 2017.

The provision relating to transfer of loss amounts from foreign branches to certain foreign corporations is effective for transfers after December 31, 2017.

SENATE AMENDMENT

### Sales by United States persons of stock

In the case of the sale or exchange by a domestic corporation of stock in a foreign corporation held for one year or more, any amount received by the domestic corporation which is treated as a dividend for purposes of section 1248, is treated as a dividend for purposes of applying the provision.

### Reduction in basis of certain foreign stock

Solely for the purpose of determining a loss, a domestic corporate shareholder's adjusted basis in the stock of a specified 10-percent owned foreign corporation (as defined in this provision) is reduced by an amount equal to the portion of any dividend received with respect to such foreign corporation from such foreign corporation that was not taxed by reason of a dividends received deduction allowable under section 245A in any taxable year of such domestic corporation. This rule applies in coordination with section 1059, such that any reduction in basis required pursuant to this provision will be disregarded, to the extent the basis in the specified 10-percent owned foreign corporation's stock has already been reduced pursuant to section 1059.

### Sale by a CFC of a lower-tier CFC

If for any taxable year of a CFC beginning after December 31, 2017, an amount is treated as a dividend under section 964(e)(1) because of a sale or exchange by the CFC of stock in another foreign corporation held for a year or more, then: (i) the foreign-source portion of the dividend is treated as subpart F income of the selling CFC for purposes of section 951(a)(1)(A), (ii) a United States share-

603

holder with respect to the selling CFC includes in gross income for the taxable year of the shareholder with or within the taxable year of the CFC ends, an amount equal to the shareholder's pro rata share (determined in the same manner as under section 951(a)(2)) of the amount treated as subpart F income under (i), and (iii) the deduction under section 245A(a) is allowable to the United States shareholder with respect to the subpart F income included in gross income under (ii) in the same manner as if the subpart F income were a dividend received by the shareholder from the selling CFC.

In the case of a sale or exchange by a CFC of stock in another corporation in a taxable year of the selling CFC beginning after December 31, 2017, to which this provision applies if gain were recognized, rules similar to those in section 961(d) apply.

### Inclusion of transferred loss amount in certain assets transfers

Under the provision, if a domestic corporation transfers substantially all of the assets of a foreign branch (within the meaning of section 367(a)(3)(C) as in effect before the date of enactment of TCJA) to a specified 10-percent owned foreign corporation with respect to which it is a U.S. shareholder after the transfer, the domestic corporation includes in gross income an amount equal to the transferred loss amount, subject to certain limitations.

The transferred loss amount is the excess (if any) of: (1) losses incurred by the foreign branch after December 31, 2017, and before the transfer, for which a deduction was allowed to the domestic corporation, over (2) the sum of certain taxable income earned by the foreign branch and gain recognized by reason of an overall foreign loss recapture arising out of disposition of assets on account of the underlying transfer. For the purposes of (2), only taxable income of the foreign branch in taxable years after the loss is incurred through the close of the taxable year of the transfer, is included. The transferred loss amount is reduced by the amount of gain recognized by the taxpayer (other than gain recognized by reason of an overall foreign loss recapture) on account of the transfer.

The amount of loss included in the gross income of the taxpayer under the proposed rule above for any taxable year cannot exceed the amount allowed as a deduction under new section 245A for the taxable year (taking into account dividends received from all specified 10-percent owned foreign corporations with respect to which the taxpayer is a U.S. shareholder). Any amount not included in gross income for a taxable year because of this proposed rule is included in gross income in the succeeding taxable year.

Amounts included in gross income by reason of the provision are treated as derived from sources within the United States. Consistent with regulations or guidance that the Secretary of the Treasury may prescribe, proper adjustments are made in the adjusted basis of the taxpayer's stock in the specified 10-percent owned foreign corporation to which the transfer is made, and in the transferee's adjusted basis in the property transferred, to reflect amounts included in gross income under this provision.

604

### Repeal of active trade or business exception

Section 367 is amended to provide that in connection with any exchange described in section 332, 351, 354, 356, or 361, if a U.S. person transfers property used in the active conduct of a trade or business to a foreign corporation, such foreign corporation shall not, for purposes of determining the extent to which gain shall be recognized on such transfer, be considered to be a corporation.

*Effective date.*—The provision relating to reduction of basis in certain foreign stock for the purposes of determining a loss is effective for dividends received in taxable years beginning after December 31, 2017.

The provisions relating to transfer of loss amounts from foreign branches to certain foreign corporations and to the repeal of the active trade or business exception are effective for transfers after December 31, 2017.

CONFERENCE AGREEMENT

The provision in the conference agreement retains elements of both the House Bill and the Senate amendment, as follows.

### Sales by United States persons of stock

In the case of the sale or exchange by a domestic corporation of stock in a foreign corporation held for one year or more, any amount received by the domestic corporation which is treated as a dividend for purposes of section 1248, is treated as a dividend for purposes of applying the provision.

### Reduction in basis of certain foreign stock

Solely for the purpose of determining a loss, a domestic corporate shareholder's adjusted basis in the stock of a specified 10-percent owned foreign corporation (as defined in this provision) is reduced by an amount equal to the portion of any dividend received with respect to such stock from such foreign corporation that was not taxed by reason of a dividends received deduction allowable under section 245A in any taxable year of such domestic corporation. This rule applies in coordination with section 1059, such that any reduction in basis required pursuant to this provision will be disregarded, to the extent the basis in the specified 10-percent owned foreign corporation's stock has already been reduced pursuant to section 1059.

### Sale by a CFC of a lower-tier CFC

If for any taxable year of a CFC beginning after December 31, 2017, an amount is treated as a dividend under section 964(e)(1) because of a sale or exchange by the CFC of stock in another foreign corporation held for a year or more, then: (i) the foreign-source portion of the dividend is treated as subpart F income of the selling CFC for purposes of section 951(a)(1)(A), (ii) a United States shareholder with respect to the selling CFC includes in gross income for the taxable year of the shareholder with or within the taxable year of the CFC ends, an amount equal to the shareholder's pro rata share (determined in the same manner as under section 951(a)(2)) of the amount treated as subpart F income under (i), and (iii) the

605

deduction under section 245A(a) is allowable to the United States shareholder with respect to the subpart F income included in gross income under (ii) in the same manner as if the subpart F income were a dividend received by the shareholder from the selling CFC.

In the case of a sale or exchange by a CFC of stock in another corporation in a taxable year of the selling CFC beginning after December 31, 2017, to which this provision applies if gain were recognized, rules similar to section 961(d) apply.

### Inclusion of transferred loss amount in certain assets transfers

Under the provision, if a domestic corporation transfers substantially all of the assets of a foreign branch (within the meaning of section 367(a)(3)(C)) as in effect before the date of enactment of TCJA) to a specified 10-percent owned foreign corporation with respect to which it is a U.S. shareholder after the transfer, the domestic corporation includes in gross income an amount equal to the transferred loss amount, subject to certain limitations.

The transferred loss amount is the excess (if any) of: (1) losses incurred by the foreign branch after December 31, 2017, and before the transfer, for which a deduction was allowed to the domestic corporation, over (2) the sum of certain taxable income earned by the foreign branch and gain recognized by reason of an overall foreign loss recapture arising out of disposition of assets on account of the underlying transfer. For the purposes of (2), only taxable income of the foreign branch in taxable years after the loss is incurred through the close of the taxable year of the transfer, is included. The transferred loss amount is reduced by the amount of gain recognized by the taxpayer (other than gain recognized by reason of an overall foreign loss recapture) on account of the transfer.

Amounts included in gross income by reason of the provision are treated as derived from sources within the United States. Consistent with regulations or guidance that the Secretary of the Treasury may prescribe, proper adjustments are made in the adjusted basis of the taxpayer's stock in the specified 10-percent owned foreign corporation to which the transfer is made, and in the transferee's adjusted basis in the property transferred, to reflect amounts included in gross income under this provision.

The amount of gain taken into account under this provision is reduced by the amount of gain which would be recognized under section 367(a)(3)(C) as in effect before the date of enactment of TCJA[1491] with respect to losses incurred before January 1, 2018.

### Repeal of active trade or business exception

Section 367 is amended to provide that in connection with any exchange described in section 332, 351, 354, 356, or 361, if a U.S. person transfers property used in the active conduct of a trade or business to a foreign corporation, such foreign corporation shall not, for purposes of determining the extent to which gain shall be recognized on such transfer, be considered to be a corporation.

---

[1491] Determined without regard to the rule providing for proper adjustment of basis in the stock in the specified 10-percent owned foreign corporation to which the transfer is made.

TD 9865 RECORD-001928

633

## 5. Modification of stock attribution rules for determining CFC status (sec. 4205 of the House bill, sec. 14214 of the Senate amendment, and secs. 318 and 958 of the Code)

### HOUSE BILL

The provision amends the ownership attribution rules of section 958(b) so that certain stock of a foreign corporation owned by a foreign person is attributed to a related U.S. person for purposes of determining whether the related U.S. person is a U.S. shareholder of the foreign corporation and, therefore, whether the foreign corporation is a CFC. In other words, the provision provides "downward attribution" from a related foreign person to a related U.S. person in circumstances in which present law does not so provide. The pro rata share of a CFC's subpart F income that a U.S. shareholder is required to include in gross income, however, continues to be determined based on direct or indirect ownership of the CFC, without application of the new downward attribution rule.

It also conforms the reporting requirements of section 6038 to require that entities that are treated as CFCs by reason of the rules on constructive ownership are within the scope of the reporting requirements.

*Effective date.*—The provision is effective for taxable years of foreign corporations beginning after December 31, 2017, and to taxable years of U.S. shareholders in which or with which such taxable years of foreign corporations end.

### SENATE AMENDMENT

The Senate amendment is similar to the House bill, except that it does not adopt the change to the reporting requirements of section 6038 and has a different effective date. Furthermore, the Senate Finance Committee explanation states that the provision is not intended to cause a foreign corporation to be treated as a controlled foreign corporation with respect to a U.S. shareholder as a result of attribution of ownership under section 318(a)(3) to a U.S. person that is not a related person (within the meaning of section 954(d)(3)) to such U.S. shareholder as a result of the repeal of section 958(b)(4).[1529]

*Effective date.*—The provision is effective for the last taxable year of foreign corporations beginning before January 1, 2018 and each subsequent year of such foreign corporations and for the taxable years of U.S. shareholders in which or with which such taxable years of foreign corporations end.

### CONFERENCE AGREEMENT

The conference agreement follows the Senate amendment. In adopting this provision, the conferees intend to render ineffective certain transactions that are used to as a means of avoiding the subpart F provisions. One such transaction involves effectuating "de-control" of a foreign subsidiary, by taking advantage of the section 958(b)(4) rule that effectively turns off the constructive stock

---

[1529] Committee Print, *Reconciliation Recommendations Pursuant to H. Con. Res. 71,* S. Prt. 115–20, (December 2017), p. 378, as reprinted on the website of the Senate Budget Committee, available at *https://www.budget.senate.gov/taxreform.*

634

ownership rules of 318(a)(3) when to do otherwise would result in a U.S. person being treated as owning stock owned by a foreign person. Such a transaction converts former CFCs to non-CFCs, despite continuous ownership by U.S. shareholders.

*Effective date.*—The provision is effective for the last taxable year of foreign corporations beginning before January 1, 2018 and each subsequent year of such foreign corporations and for the taxable years of U.S. shareholders in which or with which such taxable years of foreign corporations end.

## 6. Modification of definition of United States shareholder (sec. 14215 of the Senate amendment and sec. 951 of the Code)

HOUSE BILL

No provision.

SENATE AMENDMENT

The provision expands the definition of U.S. shareholder under subpart F to include any U.S. person who owns 10 percent or more of the total value of shares of all classes of stock of a foreign corporation.

*Effective date.*—The provision is effective for taxable years of foreign corporations beginning after December 31, 2017, and for taxable years of U.S. shareholders with or within which such taxable years of foreign corporations end.

CONFERENCE AGREEMENT

The conference agreement follows the Senate amendment.

## 7. Elimination of requirement that corporation must be controlled for 30 days before subpart F inclusions apply (sec. 4206 of the House bill, sec. 14216 of the Senate amendment, and sec. 951(a)(1) of the Code)

HOUSE BILL

The provision eliminates the requirement that a corporation must be controlled for an uninterrupted period of 30 days before subpart F inclusions apply.

*Effective date.*—The provision is effective for taxable years of foreign corporations beginning after December 31, 2017, and for taxable years of U.S. shareholders with or within which such taxable years of foreign corporations end.

SENATE AMENDMENT

The Senate amendment is the same as the House bill.

CONFERENCE AGREEMENT

The conference agreement follows the House bill and the Senate amendment.

*Effective date.*—The provision is effective for taxable years of foreign corporations beginning after December 31, 2017, and for taxable years of U.S. shareholders with or within which such taxable years of foreign corporations end.

322

## SUBTITLE D—INTERNATIONAL TAX PROVISIONS

### PRIOR LAW

The following discussion provides an overview of general principles of taxation of cross-border activity as well as a detailed explanation of provisions in prior law that are relevant to the provisions in the Act.

### A. General Overview of International Principles of Taxation

International law generally recognizes the right of each sovereign nation to prescribe rules to regulate conduct and persons (whether natural or juridical) with a sufficient nexus to the sovereign nation. The nexus may be based on nationality, *i.e.*, a nexus based on a connection between the relevant person and the sovereign nation, or may be territorial, *i.e.*, a nexus based on a connection between the relevant conduct and the sovereign nation.[1492] Nonetheless, most legal systems respect limits on the extent to which their laws may be given extraterritorial effect. The broad acceptance of such norms extends to authority to regulate cross-border trade and economic dealings, including taxation.

The exercise of sovereign jurisdiction to tax is usually based on either the nationality of the person taxed or the jurisdiction in which the taxed conduct occurs. These concepts have been refined and adapted to form the principles for determining whether sufficient nexus with a jurisdiction exists to conclude that the jurisdiction may enforce its right to tax. The elements of nexus and the nomenclature of the principles may differ based on whether the tax is a direct tax or an indirect tax. A direct tax is imposed directly on a person (known as a capitation tax), property, or income from property, the burden of which the taxpayer bears and generally cannot shift to another. In contrast, indirect taxes are taxes on consumption or the production of goods or services, such as sales or use taxes, value-added taxes, or customs duties.[1493] Taxpayers may be able to shift the burden of indirect taxes to others (*e.g.*, by raising prices).

Although governments since ancient times have imposed direct taxes on property and indirect taxes and duties on specific transactions, the history of direct taxes in the form of income taxes is relatively recent.[1494] When determining how to allocate the right to tax a particular item of income, most jurisdictions consider principles based on either the source of the income or the residence of the person earning the income. By contrast, when determining how

---

[1492] See American Law Institute, Restatement *(Third) of Foreign Relations Law of the United States*, secs. 402 and 403 (1987).

[1493] Maria S. Cox, Fritz Neumark, et al., "Taxation," *Encyclopedia Britannica*, https://www.britannica.com/topic/taxation/Classes-of-taxes. Whether a tax is considered a direct tax or indirect tax has varied over time, and no single definition is used. For a review of the significance of these terms in Federal tax history, see Alan O. Dixler, "Direct Taxes Under the Constitution: A Review of the Precedents," *Tax History Project, Tax Analysts, available at* http://www.taxhistory.org/thp/readings.nsf/ArtWeb/2B34C7FBDA41D9DA85257308000067017?OpenDocument.

[1494] The earliest western income tax system is traceable to the British Tax Act of 1798, enacted in 1799 to raise funds needed to prosecute the Napoleonic Wars, and rescinded in 1816. See A.M. Bardopoulos, *eCommerce and the Effects of Technology on Taxation, Law*, Governance and Technology Series 22, DOI 10.1007/978-3-319-15449-7—2, (Springer 2015), at Section 2.2. "History of Tax," pp. 23-24; see also http://www.parliament.uk/about/living-heritage/transformingsociety/private-lives/taxation/overview/incometax/.

TD 9865 RECORD-002014

323

to allocate the right to collect indirect taxes, most jurisdictions consider either the origin or the destination of the item being taxed. The balance of this Part A describes the source, residence, origin, and destination principles in more detail and how jurisdictions resolve overlapping claims of jurisdiction.

## 1. Source and residence principles

Direct taxes based on a person's citizenship, nationality, or residence are residence-based taxes. Such taxes may reach the worldwide activities of such person, and, for that reason, are the broadest assertion of taxing authority. For individuals, the test for residence may depend on citizenship, nationality, a physical presence test, or some combination. For all other persons, determining residency may be as simple as determining the person's place of organization, or may require more complex consideration of the person's management and control, or even level of activities in a jurisdiction.

Direct taxes based on where activities occur, or where property is located, are source-based taxes. If a person conducts activities or owns property in a jurisdiction, taxing such activities or property may require allocation and apportionment of expenses attributable to the activity or property to ensure that only the portion of profits that have the required nexus with the jurisdiction are subject to tax. Most jurisdictions, including the United States, have rules for determining the source of items of income and expense in a broad range of categories, such as compensation for services, dividends, interest, royalties, and gains.

## 2. Origin and destination principles

Indirect taxes based on the place where goods are produced or services are performed—irrespective of the residence of the owners of the means of production, where the goods go after being produced, or the residence of the recipients of the services—are origin-based taxes. Indirect taxes based on where goods or services are used or consumed are destination-based taxes. The most common form of indirect tax is the destination-based value-added tax ("VAT"). Over 160 countries have adopted a VAT,[1495] which is generally a tax imposed and collected on the value added at every stage in the production and distribution of a good or service. Although there are several ways to compute the taxable base for a VAT, the amount of value added can generally be thought of as the difference between the value of sales (outputs) and purchases (inputs) of a business.[1496] The United States does not have a VAT,

---

[1495] Alan Schenk, Victor Thuronyi, and Wei Cui, *Value Added Tax: A Comparative Approach*, Cambridge University Press, 2015. Consistent with the OECD International VAT/GST Guidelines, the term VAT refers to all broad-based final consumption taxes, regardless of the acronym used to identify any particular one. Thus, many countries that call their national consumption tax a GST (general sales tax) are included in the estimate of the number of countries with a VAT.

[1496] Nearly all jurisdictions use the credit-invoice method of calculating value added to determine VAT liability. Under the credit-invoice method, a tax is imposed on the seller for all of its sales. The tax is calculated by applying the tax rate to the sales price of the good or service, and the amount of tax is generally disclosed on the sales invoice. A business credit is provided for all VAT levied on purchases of taxable goods and services (*i.e.*, "inputs") used in the seller's business. The ultimate consumer (*i.e.*, a nonbusiness purchaser), however, does not receive a credit with respect to his or her purchases. The VAT credit for inputs prevents the imposition

Continued

324

nor is there a Federal sales or use tax. However, the majority of the States have enacted sales or use taxes, including both origin-based and destination-based taxes.[1497]

With respect to cross-border transactions, the OECD has recommended that the destination principle be adopted for all indirect taxes, in part to conform to the treatment of such transactions for purposes of customs duties. The OECD defines the destination principle as "the principle whereby, for consumption tax purposes, internationally traded services and intangibles should be taxed according to the rules of the jurisdiction of consumption."[1498] A jurisdiction may adopt the convention that consumption occurs at the place of business or residence of the customer. Such proxies are needed to determine the location of consumption by persons other than individuals, because such persons are more able to move the location of use of goods, services, or intangibles in response to imposition of tax.

### 3. Resolving overlapping or conflicting jurisdiction to tax

Widely-accepted norms govern what constitutes a reasonable regulatory action by a sovereign state that will be respected by other sovereign states. General consensus on the limits of state jurisdiction helps to reduce conflicts from extraterritorial state action. In addition, jurisdictions have developed mechanisms to resolve common conflicts. For example, mechanisms to eliminate double taxation address situations in which the source and residency determinations of two jurisdictions result in duplicative assertion of taxing authority over the same item.

When the same item is subject to tax under the rules of two or more jurisdictions, double taxation is usually mitigated by bilateral tax treaties or by laws permitting credit for taxes paid to another jurisdiction. The United States is a partner in numerous bilateral treaties that aim to avoid international double taxation and prevent tax avoidance and evasion. Another related objective of these treaties is the removal of barriers to trade, capital flows, and commercial travel that may be caused by overlapping tax jurisdictions and by the burdens of complying with the tax laws of a jurisdiction when a person's contacts with, and income derived from, that jurisdiction are minimal. The current United States Model Income Tax Convention (known as the U.S. model treaty), with its accompanying preamble, reflects the most recent comprehensive state-

---

of multiple layers of tax with respect to the total final purchase price (*i.e.*, a "cascading" of the VAT). As a result, the net tax paid at a particular stage of production or distribution is based on the value added by that taxpayer at that stage of production or distribution. In theory, the total amount of tax paid with respect to a good or service from all levels of production and distribution should equal the sales price of the good or service to the ultimate consumer multiplied by the VAT rate.

To receive an input credit with respect to any purchase, a business purchaser is generally required to possess an invoice from a seller that contains the name of the purchaser and indicates the amount of tax collected by the seller on the sale of the input to the purchaser. At the end of a reporting period, a taxpayer may calculate its tax liability by subtracting the cumulative amount of tax stated on its purchase invoices from the cumulative amount of tax stated on its sales invoices.

[1497] EY, *Worldwide VAT, GST and Sales Tax Guide 2015*, p. 1021, available at http://www.ey.com/Publication/vwLUAssets/Worldwide-VAT-GST-and-sales-tax-guide-2015/$FILE/Worldwide%20VAT,%20GST%20and%20Sales%20Tax%20Guide%202015.pdf.

[1498] See OECD, "Recommendation of the Council on the application of value added tax/goods and services tax to the international trade in services and intangibles as approved on September 27, 2016," [C(2016)120], appendix, page 3, reproduced in the appendix, OECD, *International VAT/GST Guidelines*, OECD Publishing, 2017.

325

ment of the United States' negotiating position with respect to tax treaties.[1499] Bilateral agreements are also used to permit limited mutual administrative assistance between jurisdictions.[1500]

In addition to entering into bilateral treaties, jurisdictions have worked in multilateral organizations to develop common principles to alleviate double taxation. Those principles are generally reflected in the provisions of the Model Tax Convention on Income and on Capital of the Organization for Economic Cooperation and Development (known as the OECD model treaty),[1501] a precursor of which was first developed by a predecessor organization in 1958, which in turn has antecedents from work by the League of Nations in the 1920s.[1502] As a consensus document, the OECD model treaty is intended to aid countries in constructing their own bilateral treaties. The provisions have developed over time as practice with actual bilateral treaties leads to unexpected results and new issues are raised by parties to the treaties.[1503]

### 4. International principles as applied in the U.S. tax system

The United States imposes residence-based taxation on U.S. persons, taxing them on their worldwide income, whether derived in the United States or abroad, with limited deferral of taxation of income earned by foreign corporations owned by U.S. shareholders, and imposes source-based taxation on U.S.-source income of nonresident alien individuals and other foreign persons. Under this system (sometimes described as the U.S. hybrid system), the application of the Code differs depending on whether income arises from outbound investment (*i.e.*, investment by U.S. persons outside the United States) or inbound investment (*i.e.*, investment by non-U.S. persons in the United States).

---

[1499] The current U.S. model treaty is available at https://www.treasury.gov/resource-center/tax-policy/treaties/Documents/Treaty-US%20Model-2016.pdf; the preamble is available at https://www.treasury.gov/resource-center/tax-policy/treaties/Documents/Preamble-US%20Model-2016.pdf. Treasury periodically updates the U.S. model treaty to reflect developments in the negotiating position of the United States. Such changes include provisions that were successfully included in bilateral treaties concluded by the United States, as well as new proposed measures not yet included in any bilateral treaty. Treasury published the current U.S. model treaty on February 17, 2016.

[1500] Although U.S. courts extend comity to foreign judgments in some instances, they are not required to recognize or assist in enforcement of foreign judgments for collection of taxes, consistent with the common law "revenue rule" in *Holman v. Johnson*, 1 Cowp. 341, 98 Eng. Rep. 1120 (K.B. 1775). American Law Institute, *Restatement (Third) of Foreign Relations Law of the United States*, sec. 483 (1987). The rule retains vitality in U.S. case law. See generally *Pasquantino v. United States*, 544 U.S. 349 (2005) (a conviction for criminal wire fraud arising from an intent to defraud Canadian tax authorities was found not to conflict "with any well-established revenue rule principle[,]" and thus was not in derogation of the revenue rule). To the extent it is abrogated, it is done so in bilateral treaties, to ensure reciprocity. At present, the United States has such agreements in force with five jurisdictions: Canada, Denmark, France, the Netherlands, and Sweden.

[1501] OECD (2014), Model Tax Convention on Income and on Capital: Condensed Version 2014, OECD Publishing, 2014, available at http://dx.doi.org/10.1787/mtc_cond-2014-en. The multinational organization, dedicated to global development, was first established in 1961 by the United States, Canada, and 18 European countries, and has since expanded to 35 members.

[1502] See "Report by the Experts on Double Taxation," League of Nations Document E.F.S. 73/F19 (1923), which was a report commissioned by the League at its second assembly; see also Lara Friedlander and Scott Wilkie, "Policy Forum: The History of Tax Treaty Provisions—And Why It Is Important to Know About It," 54 *Canadian Tax Journal* No. 4 (2006).

[1503] For example, the OECD initiated a multi-year study on base-erosion and profit shifting in response to concerns of multiple members. For an overview of that project, see Joint Committee on Taxation, *Background, Summary, and Implications of the OECD/G20 Base Erosion and Profit Shifting Project* (JCX–139–15), November 30, 2015. This document can also be found on the Joint Committee on Taxation website at www.jct.gov.

# PART I—OUTBOUND TRANSACTIONS

## SUBPART A—ESTABLISHMENT OF PARTICIPATION EXEMPTION SYSTEM FOR TAXATION OF FOREIGN INCOME

### A. Deduction for Foreign-Source Portion of Dividends Received by Domestic Corporations from Specified 10-Percent Owned Foreign Corporations (sec. 14101 of the Act and sec. 904(b) and new sec. 245A of the Code)

#### *Explanation of Provision*

##### *Background on prior law*

To limit multiple levels of corporate tax in the case of tiered corporate structures, corporations are allowed a dividends received deduction ("DRD"). U.S. corporations are permitted a deduction for qualifying dividends received from other U.S. corporations. The amount of the DRD is calculated as a percentage of the dividend received. The DRD percentage is based on the amount of stock that the recipient U.S. corporation owns in the paying U.S. corporation, as follows: (1) 50 percent if the ownership is less than 20 percent; (2) 65 percent if the ownership is at least 20 percent and less than 80 percent; and (3) 100 percent if the ownership is at least 80 percent.[1649] A U.S. corporation may also be eligible for a DRD for dividends received from a qualified 10-percent owned foreign corporation with respect to the U.S.-source portion of the dividends.[1650]

##### *In general*

The provision exempts certain foreign income of certain domestic corporations by means of a 100-percent DRD for the foreign-source portion of dividends received from a specified 10-percent owned foreign corporation. A specified 10-percent owned foreign corporation is any foreign corporation (other than a PFIC that is not also a CFC) with respect to which any domestic corporation is a U.S. shareholder.[1651] A corporate U.S. shareholder of a CFC receiving a dividend from a 10-percent owned foreign corporation shall be allowed a DRD with respect to the subpart F inclusion attributable to such dividend in the same manner as a dividend would be allowable under section 245A.[1652] However, certain dividends that qualify for the DRD may result in an inclusion under section 951(a)

---

[1649] Sec. 243. The Act changed the DRD percentages. The changes to section 243 are discussed in greater detail in the explanation of section 13002 of the Act.

[1650] Sec. 245. The DRD on the eligible portion of the dividend is based on the percentage of stock ownership of the foreign corporation, as described in section 243.

[1651] Sec. 245A(b). Under section 951(b) as revised by section 14214 of the Act, a domestic corporation is a U.S. shareholder of a foreign corporation if it owns, within the meaning of section 958(a), or is considered as owning by applying the rules of section 958(b), 10 percent or more of the vote or value of the foreign corporation.

[1652] A technical correction may be necessary to reflect this intent.

(348)

349

(subpart F) or section 951A ("GILTI") in cases in which any such inclusion is reduced under section 951(a)(2)(B) by reason of a dividend or in certain cases in which the CFC ceases to have a U.S. shareholder with section 958(a) ownership.[1653]

The term "dividend received" is intended to be interpreted broadly, consistently with the meaning of the phrases "amount received as dividends'" and "dividends received" under sections 243 and 245, respectively. For example, if a domestic corporation indirectly owns stock of a foreign corporation through a partnership and the domestic corporation would qualify for the DRD with respect to dividends from the foreign corporation if the domestic corporation owned such stock directly, the domestic corporation would be allowed the DRD with respect to its distributive share of the partnership's dividend from the foreign corporation. However, the provisions of section 245A are intended to apply only to amounts that are treated as dividends for Federal income tax purposes. Furthermore, the dividend cannot be a CFC–PFIC's section 1291(d)(2)(B) "purging" dividend.[1654] Under section 245A(g), the Secretary shall prescribe such regulations or other guidance as may be necessary or appropriate to carry out the provisions of this section, including regulations for the treatment of U.S. shareholders owning stock of a specified 10-percent owned foreign corporation through a partnership.

The DRD is available only to C corporations that are neither RICs nor REITs.[1655]

### Foreign-source portion of a dividend

The foreign-source portion of any dividend equals the amount of the dividend multiplied by the percentage of undistributed earnings that are attributable neither to ECI nor to certain dividends received from domestic corporations.[1656] Undistributed earnings are the amount of the earnings and profits of a specified 10-percent owned foreign corporation[1657] as of the close of the taxable year of the specified 10-percent owned foreign corporation in which the dividend is distributed and not reduced by dividends[1658] distributed during that taxable year.

For example, assume a domestic corporation ("U.S. Parent") wholly owns a specified 10-percent owned foreign corporation ("SFC"). At the beginning of year 1, SFC has no accumulated earnings and profits. SFC has $1,000 of current-year earnings and prof-

---

[1653] Technical corrections may be necessary to reflect this intent.

[1654] Sec. 245A(f).

[1655] An S corporation's taxable income is computed in the same manner as an individual (sec. 1363(b)) so that deductions allowable only to corporations, including the section 245A deduction, do not apply. See Report by the House Committee on Ways and Means to accompany H.R. 6055, Subchapter S Revision Act of 1982, H. Rep. No. 97-826, p. 14; and Report by the Senate Committee on Finance to accompany H.R. 6055, Subchapter S Revision Act of 1982, S. Rep. 97-640, p. 15. The Code provides that deductions for corporations provided in part VIII of subchapter B, which include the DRD under section 245A, do not apply in computing RIC taxable income (sec. 852(b)(2)(C)) or REIT taxable income (sec. 857(b)(2)(A)). Therefore, the DRD under section 245A is not available for RICs or REITs.

[1656] Sec. 245A(c). Such dividends include any dividend received (directly or through a wholly owned foreign corporation) from a domestic corporation at least 80 percent of the stock of which is owned (directly or through such wholly owned foreign corporation) by the specified 10-percent owned foreign corporation.

[1657] Computed in accordance with sections 964(a) and 986.

[1658] Note that pursuant to section 959(d), a distribution of previously taxed income ("PTI") does not constitute a dividend.

350

its for year 1, of which $250 is attributable to ECI. SFC makes a single distribution of $1,500 to U.S. Parent in year 1. The amount of the $1,500 distribution that is a dividend is $1,000 because SFC has only $1,000 of E&P in year 1.[1659] Of that amount, $750 is the foreign-source portion and eligible for the 100-percent DRD under section 245A (the $1,000 dividend * ($750 of E&P that is not ECI / $1,000 of total E&P)).

### Holding period requirement

A domestic corporation is not permitted a DRD in respect of any dividend on any share of stock that is held by the domestic corporation for 365 days or less during the 731-day period beginning on the date that is 365 days before the date on which the share becomes ex-dividend with respect to the dividend. For this purpose, the holding period requirement is satisfied only if the specified 10-percent owned foreign corporation is a specified 10-percent owned foreign corporation at all times during the period and the taxpayer is a U.S. shareholder with respect to such specified 10-percent owned foreign corporation at all times during the period.[1660]

### Foreign tax credit disallowance

No foreign tax credit or deduction is allowed for any taxes paid or accrued with respect to any dividend that qualifies for the DRD. For example, assume $100 of foreign income taxes are withheld from a $1,000 dividend from a specified 10-percent owned foreign corporation to a domestic corporation. The foreign-source portion of the dividend is $800, and an $800 DRD is allowed. No foreign tax credit or deduction will be allowed for $80 of the foreign income taxes pursuant to section 245A(d), and no foreign tax credit or deduction will be allowed for the remaining $20 of foreign income taxes pursuant to section 245(a)(8).

For purposes of computing the foreign tax credit limitation, a domestic corporation that is a U.S. shareholder of a specified 10-percent owned foreign corporation must determine its foreign-source taxable income (and entire taxable income) by disregarding any dividend for which the DRD is taken, and any deductions properly allocable or apportioned to income (other than amounts includible under section 951(a)(1) or 951A(a)) with respect to stock of such foreign corporation, or the stock to the extent income with respect to the stock is other than amounts includible under section 951(a)(1) or 951A(a).[1661]

### Hybrid dividends

The DRD is not available for any hybrid dividend. A hybrid dividend is an amount received from a CFC for which section 245A(a) would allow a DRD and for which the CFC received a deduction (or other tax benefit) with respect to any income, war profits, or excess profits taxes imposed by any foreign country or possession of the United States. Furthermore, no foreign tax credit or deduction is allowed for any taxes paid or accrued with respect to any hybrid dividend.

---

[1659] Secs. 301(c)(1) and 316.
[1660] Sec. 246(c)(5).
[1661] Sec. 904(b)(4).

351

If a CFC for which a domestic corporation is a U.S. shareholder receives a hybrid dividend from any other CFC for which that domestic corporation is a U.S. shareholder, the hybrid dividend will be treated as subpart F income, and, notwithstanding any other provision of the Code, the U.S. shareholder will include in income its *pro rata* share of the income under section 951(a).[1662] This tiered hybrid dividend rule applies to an amount treated as a dividend in the hands of the recipient CFC (as opposed to amounts allowed the DRD) and for which the distributing CFC received a deduction or other tax benefit.[1663]

### *Effective Date*

The provision applies to distributions made after (and for purposes of determining a taxpayer's foreign tax credit limitation under section 904, deductions with respect to taxable years ending after) December 31, 2017.[1664]

### B. Special Rules Relating to Sales or Transfers Involving Specified 10-Percent Owned Foreign Corporations (sec. 14102 of the Act and secs. 367(a)(3), 961, 964(e), and 1248 and new sec. 91 of the Code)

### *Explanation of Provision*

#### *Background on prior law*

Gain recognized by a U.S. person on the sale or exchange of the stock of a foreign corporation may be recharacterized as a dividend to the extent of the E&P attributable to that stock if the U.S. person owned, directly, indirectly or constructively, 10 percent or more (by vote) of the stock of the foreign corporation while the foreign corporation was a CFC at any time during the preceding five-year period.[1665] Similarly, section 964(e) requires a CFC to include in income as a dividend gain recognized on the sale or exchange of the stock of another foreign corporation to the same extent that it would have been so included under section 1248(a) if the CFC were a U.S. person.

Certain branch loss recapture rules prevent a taxpayer from deducting losses incurred by a foreign branch against U.S. taxable income and then incorporate the branch when it is profitable. Prior law required a U.S. corporation to recapture the loss deduction to the extent of built-in gain in the branch assets that are transferred outside the U.S. tax jurisdiction to a foreign corporation in an otherwise tax-free transaction.[1666] Under prior law, the recapture

---

[1662] This is the result even if, for example, the dividend would normally be entitled to look-through treatment under section 954(c)(6), the subpart F income would normally be reduced by deductions pursuant to section 954(b)(5), or the subpart F income would normally be limited by current earnings and profits under section 952(c).

[1663] A technical correction may be necessary to reflect this intent.

[1664] A technical correction may be necessary to reflect the intent that the DRD be excluded from adjusted current earnings ("ACE") adjustments for purposes of the corporate alternative minimum tax ("AMT") as applicable to certain fiscal-year taxpayers for their 2017 taxable year.

[1665] Sec. 1248(a).

[1666] Sec. 367(a)(3)(C) as in effect before the enactment of the Act. Section 367(a)(3)(C) was enacted to prevent a U.S. corporation from using losses of a foreign branch to offset its taxable income without having to pay U.S. tax on the associated future income after the branch's incorporation.

352

amount was limited to unrealized asset appreciation and treated as foreign-source income.

Section 367 generally requires gain recognition on many types of otherwise tax-free transfers by U.S. persons to foreign corporations, unless a specific exception applies. One such exception under prior law provided that property transferred to a foreign corporation for use by the transferee in the active conduct of a trade or business outside of the United States is not subject to tax.[1667]

### In general

The provision establishes limitations on the ability to obtain duplicative tax benefits from losses in specified 10-percent foreign corporations and transfers of certain foreign branch losses to such foreign corporations, as described below. It provides a new coordination rule under section 1248 to ensure that gain upon the sale or exchange of stock in the specified 10-percent foreign corporation that is recharacterized as a dividend under section 1248 is treated as a "dividend received" for purposes of applying section 245A, and further prescribes basis adjustments with respect to loss from such sales or exchanges. The ability to transfer foreign branch losses is limited by new section 91. Finally, the aforementioned active trade or business exception is repealed.

### Sales by United States persons of CFC stock

If a domestic corporation sells or exchanges stock in a foreign corporation that it has held for one year or more, any amount received by the domestic corporation which is treated as a dividend for purposes of section 1248, is treated as a dividend for purposes of applying the rules of new section 245A with respect to the new 100-percent DRD. Thus, to the extent section 1248 treats an amount received as a dividend, such dividend may qualify for a DRD under section 245A if the requirements of section 245A are satisfied.[1668]

### Sale of stock in a lower-tier CFC

If for any taxable year of a CFC beginning after December 31, 2017, an amount is treated as a dividend because of a sale or exchange by the CFC of stock in another foreign corporation held for a year or more,[1669] then: (i) the foreign-source portion of the dividend is treated as subpart F income of the selling CFC,[1670] (ii) a U.S. shareholder with respect to the selling CFC includes in gross income for the taxable year of the shareholder with or within which the taxable year of the CFC ends, an amount equal to the shareholder's *pro rata* share of the amount treated as subpart F income under (i), and (iii) the amount includible in the gross income of the United States shareholder under clause (ii) shall be treated as a divided from a specified 10-percent owned foreign corporation for purposes of applying section 245A.[1671]

---

[1667] Sec. 367(a)(3)(A) as in effect before the enactment of the Act.
[1668] Sec. 1248(j).
[1669] See sec. 964(e)(1).
[1670] See generally sec. 954(c)(1)(B).
[1671] A technical correction may be necessary to reflect this intent.

To the extent a dividend arising under section 964(e)(1) is a hybrid dividend, the tiered hybrid rules of section 245A(e)(2), rather than the rules of section 964(e)(4)(A), apply to the dividend.[1672]

### Reduction in basis of certain foreign stock

A distribution from a foreign corporation eligible for a DRD could reduce the value of the foreign corporation, reducing built-in gain or increasing built-in loss in the stock of the foreign corporation. Therefore, solely for the purpose of determining a loss, a domestic corporate shareholder's adjusted basis in the stock of a specified 10-percent owned foreign corporation (as defined in section 245A) is reduced by an amount equal to the portion of any dividend received with respect to such stock from such foreign corporation that was not taxed by reason of the DRD allowable under section 245A in any taxable year of such domestic corporation.[1673] This rule applies in coordination with section 1059, such that any reduction in basis required pursuant to this provision will be disregarded to the extent the basis in the specified 10-percent owned foreign corporation's stock has already been reduced under section 1059.

In the case of a sale or exchange by a CFC of stock in another corporation in a taxable year of the selling CFC beginning after December 31, 2017, to which this provision applies if gain were recognized, rules similar to the rules of section 961(d) apply.[1674]

### Inclusion of transferred loss amount in certain asset transfers

If a domestic corporation transfers substantially all of the assets of a foreign branch (within the meaning of section 367(a)(3)(C)) as in effect before the Act) to a specified 10-percent owned foreign corporation with respect to which it is a U.S. shareholder after the transfer, the domestic corporation includes in gross income an amount equal to the transferred loss amount, subject to certain limitations.[1675]

The transferred loss amount is, with respect to any transfer of substantially all of the assets of a foreign branch, the excess (if any) of: (1) the sum of the losses incurred by the foreign branch after December 31, 2017, and before the transfer, for which a deduction was allowed to the domestic corporation, over (2) the sum of any taxable income earned by the foreign branch after the loss incurred and any amount recognized under section 904(f)(3) on account of the transfer.[1676] The transferred loss amount is reduced (but not below zero) by the amount of gain recognized by the taxpayer (other than gain recognized by reason of an overall foreign loss recapture) on account of the transfer.[1677]

---

[1672] A technical correction may be necessary to reflect this intent.
[1673] Sec. 961(d).
[1674] Sec. 964(e)(4)(B).
[1675] Sec. 91(a).
[1676] Sec. 91(b).
[1677] Sec. 91(c). Sec. 14102(d)(4) of the Act, relating to transition rules, provides:"(4) Transition rule. The amount of gain taken into account under section 91(c) of the Internal Revenue Code of 1986, as added by this subsection, shall be reduced by the amount of gain which would be recognized under section 367(a)(3)(C) (determined without regard to the amendments made by subsection (e)) with respect to losses incurred before January 1, 2018."

354

Amounts included in gross income by reason of the provision are treated as derived from sources within the United States.[1678] Consistent with regulations or guidance that the Secretary of the Treasury shall prescribe, proper adjustments are made in the adjusted basis of the taxpayer's stock in the specified 10-percent owned foreign corporation to which the transfer is made, and in the transferee's adjusted basis in the property transferred, to reflect the amounts included in gross income under the provision.[1679]

The amount of gain taken into account under this provision is reduced by the amount of gain which would be recognized under section 367(a)(3)(C) as in effect before the date of the Act[1680] with respect to losses incurred before January 1, 2018.

To illustrate this provision assume that a U.S. multinational corporation ("U.S. Parent"), a calendar year taxpayer, incorporates its branch located in country X ("Incorporated Country X Branch") on December 31, 2018. Incorporated Country X Branch recognized $150 of losses during calendar year 2018 for which U.S. Parent took a deduction.

On December 31, 2018, Incorporated Country X Branch has tangible assets with built-in gain of $100, and U.S. Parent recognizes that $100 of gain under section 367(a)(1). Under section 91(a), U.S. Parent includes $50 in gross income ($150 of losses, reduced by $100 section 91(c) reduction amount, which in this case is the amount of gain recognized under section 367(a)(1)). However, if, for example, Incorporated Country X Branch also had $75 of pre-2018 branch losses, the $100 section 91(c) reduction amount would be reduced by $75 to $25. In this case, U.S. Parent would include $125 in gross income ($150 of losses, reduced by the $25 section 91(c) reduction amount).

### Repeal of active trade or business exception under section 367

Section 367(a) is amended to provide that in connection with any exchange described in sections 332, 351, 354, 356, or 361, if a U.S. person transfers property used in the active conduct of a trade or business outside of the United States to a foreign corporation, such foreign corporation shall not, for purposes of determining the extent to which gain shall be recognized on such transfer, be considered to be a corporation. That is, a transfer of property used in the active conduct of a trade or business outside of the United States by a U.S. corporation to a foreign corporation does not qualify for non-recognition of gain, notwithstanding that the transfer may qualify for non-recognition of gain, in whole or part, under other provisions of the Code.

### Effective Date

The provisions relating to sales or exchanges of CFC stock apply to sales or exchanges after December 31, 2017.

---

[1678] Sec. 91(d).
[1679] Sec. 91(e).
[1680] Determined without regard to the rule providing for proper adjustment of basis in the stock in the specified 10-percent owned foreign corporation to which the transfer is made.

The provision relating to reduction of basis in certain foreign stock for the purposes of determining a loss is effective for distributions made after December 31, 2017.

The provisions relating to transfer of loss amounts from foreign branches to certain foreign corporations and to the repeal of the active trade or business exception under section 367 apply to transfers after December 31, 2017.

## C. Treatment of Deferred Foreign Income Upon Transition to Participation Exemption System of Taxation and Deemed Repatriation at Two-Tier Rate (sec. 14103 of the Act and secs. 78, 904, 907, and 965 of the Code)

### Explanation of Provision

#### In general

As part of the transition from a deferral system with limitations to a system under which companies are eligible for a 100-percent dividends received deduction with respect to distributions of foreign earnings, the provision requires certain foreign corporations to include as subpart F income the untaxed and undistributed foreign earnings that were accumulated by those corporations in taxable years since 1986. The U.S. shareholders of those corporations are subject to tax ("transition tax") with respect to the shareholders' *pro rata* shares of such subpart F income. The transition tax ensures that undistributed foreign earnings that accrued before the effective date of the participation exemption system are subject to tax by the United States, allowing uniform applicability of the participation exemption with respect to post-enactment foreign earnings and profits of foreign subsidiaries.

The provision generally requires that, for the last taxable year beginning before January 1, 2018, any U.S. shareholder of a specified foreign corporation [1681] must include in income its *pro rata* share of the accumulated post-1986 deferred foreign income of the corporation. However, a portion of that *pro rata* share of foreign earnings is deductible. The deductible amount depends on the proportion of the deferred earnings that are held in cash or other assets, resulting in a reduced rate of tax applicable to the income includible under this provision. A corresponding portion of the credit for foreign taxes paid with respect to such income is disallowed, thus limiting the credit to the taxable portion of the included income. The separate foreign tax credit limitation rules of section 904 continue to apply, with coordinating rules. The transition tax generally may be paid over an eight-year period. Special rules are provided for S corporations and REITs.

#### Subpart F inclusion of deferred foreign income

The provision requires that certain pre-effective date foreign earnings be treated as subpart F income of a deferred foreign income corporation ("DFIC") in the last taxable year that begins before January 1, 2018. The increase in subpart F income of the

[1681] For purposes of this provision, a specified foreign corporation is any CFC and any foreign corporation that has at least one domestic corporation that is a U.S. shareholder. The term excludes PFICs that are not also CFCs.

384

eign base company shipping income that was previously deferred by reason of the reinvestment exception remained deferred until a net decrease in such qualified investments triggered an inclusion required by section 955. For taxable years beginning after 2004, foreign base company shipping income is no longer subpart F income. However, to the extent that foreign base company shipping income deferred before 1987 was withdrawn from qualified investments, it remained subject to inclusion under section 955.

### *Repeal of section 955*

The provision repeals section 955. As a result, a U.S. shareholder in a CFC that invested its previously excluded subpart F income in qualified foreign base company shipping operations is no longer required to include in income a *pro rata* share of the previously excluded subpart F income when the CFC decreases such investments.

### *Effective Date*

The provision is effective for taxable years of foreign corporations beginning after December 31, 2017, and to taxable years of U.S. shareholders within which or with which such taxable years of foreign corporations end.

## E. Modification of Stock Attribution Rules for Determining Status as a Controlled Foreign Corporation (sec. 14213 of the Act and secs. 318 and 958 of the Code)

### *Explanation of Provision*

### *Background on prior law*

The ownership attribution rules for determining constructive ownership of corporate stock are modified for purposes of determining U.S. shareholder status. Prior to the Act, stock owned by a foreign person, regardless of the ownership threshold, was not attributed to U.S. persons, including domestic corporations, through so-called downward attribution from a parent to its subsidiary.[1759] As a result, a wholly-owned domestic subsidiary of a foreign corporation was not treated as owning stock in other foreign corporations owned by the foreign parent.[1760] In a common example, a new foreign parent, or another non-CFC foreign affiliate, could transfer property to a CFC in exchange for stock representing at least 50 percent of the voting power and value of the CFC. Such transactions "de-control" the CFC, thus converting former CFCs to non-CFCs, despite continuous ownership by the U.S. shareholders, and avoiding the application of subpart F provisions.

### *Change to the modification of stock attribution rules*

The provision amends the ownership attribution rules by repealing the paragraph that precluded downward attribution of stock owned by a foreign person to a U.S. person. As a result, certain stock of a foreign corporation owned by a foreign person is attrib-

---

[1759] Secs. 318 and former 958(b)(4). Specifically, section 958(b)(4) provided that section 318(a)(3) did not apply to treat a U.S. person as owning stock owned by a foreign person.
[1760] Sec. 958(b)(4); Treas. Reg. sec. 1.958–2(d)(1)(iii).

385

uted to a related U.S. person owned by the foreign person for purposes of determining whether the related U.S. person is a U.S. shareholder of the foreign corporation and, therefore, whether the foreign corporation is a CFC. In other words, the provision requires "downward attribution" from a foreign person to a related U.S. person in circumstances in which prior law did not. Congress intended to render ineffective certain transactions among related persons that are used as a means of avoiding the subpart F provisions, including the "de-control" transactions described above.[1761] The *pro rata* share of a CFC's subpart F income that a U.S. shareholder is required to include in gross income, however, continues to be determined based on direct or indirect ownership of the CFC, without application of the new downward attribution rule.

### Effective Date

The provision is effective for the last taxable year of foreign corporations beginning before January 1, 2018, and each subsequent year of such foreign corporations and for the taxable years of U.S. shareholders in which or with which such taxable years of foreign corporations end.

## F. Modification of Definition of United States Shareholder (sec. 14214 of the Act and sec. 951 of the Code)

### Explanation of Provision

U.S. shareholders of a CFC must include in their gross income certain types of income and investments of the CFC that otherwise would not be currently taxable to them under general tax rules. The Act expands the definition of a U.S. shareholder under section 951(b) to include not only (as under prior law) a U.S. person who owns 10 percent of the voting stock of a foreign corporation, but also any U.S. person who owns 10 percent or more of the total value of shares of all classes of stock of a foreign corporation. This expanded definition of a U.S. shareholder applies for all purposes of the Code.[1762]

Section 1248 provides special rules for taxing U.S. shareholders (and certain former U.S. shareholders) of a CFC upon the disposition of stock in the CFC. These rules are designed to insure that any gain recognized on the disposition of CFC stock is taxed as ordinary income (rather than as capital gain) to the U.S. shareholders to the extent of earnings and profits of the CFC that had not previously been subject to U.S. taxation under subpart F.[1763] Accordingly, section 1248(a)(2) should require ownership of at least

---

[1761] A technical correction may be necessary to reflect the intent expressed by Congress. See, Committee Report, *Reconciliation Recommendations Pursuant to H. Con. Res. 71*, S. Prt. 115–20, December 2017, p. 378, as reprinted on the website of the Senate Budget Committee, available at https://www.budget.senate.gov/taxreform, (the Committee did not intend "to cause a foreign corporation to be treated as a controlled foreign corporation with respect to a U.S. shareholder as a result of attribution of ownership under section 318(a)(3) to a U.S. person that is a related person (within the meaning of section 954(d)(3)) to such U.S. shareholder as a result of the repeal of section 958(b)(4)") and Conference Report to accompany H.R. 1, H.R. Report 115–466, December 15, 2017, pp. 633–634.

[1762] For purposes of determining U.S. shareholder status, stock owned directly, indirectly and constructively is taken into account. See sec. 958. However, U.S. shareholders are subject to taxation under subpart F only to the extent of their direct and indirect ownership. Sec. 951(a).

[1763] See S. Rep. No. 1881, 87th Cong., 2d Sess. 107 (1962).

386

10 percent of the value or voting stock of the CFC during periods in which the expanded definition of U.S. shareholder under section 951(b) applies.[1764]

### Effective Date

The provision is effective for taxable years of foreign corporations beginning after December 31, 2017, and for taxable years of U.S. shareholders in which or with which such taxable years of foreign corporations end.

## G. Elimination of Requirement that Corporation Must Be Controlled for 30 Days Before Subpart F Inclusions Apply (sec. 14215 of the Act and sec. 951(a)(1) of the Code)

### Explanation of Provision

The provision eliminates the requirement that a corporation must be a CFC for an uninterrupted period of 30 days in a taxable year before a U.S. shareholder is required to include its *pro rata* share of the subpart F income of the foreign corporation. Instead, a U.S. shareholder is required to include its *pro rata* share of the subpart F income of a foreign corporation that is a CFC at any time during any taxable year (assuming the stock ownership requirements of section 951(a)(1) are satisfied with respect to the shareholder).

### Effective Date

The provision is effective for taxable years of foreign corporations beginning after December 31, 2017, and for taxable years of U.S. shareholders with or within which such taxable years of foreign corporations end.

## H. Limitations on Income Shifting Through Intangible Property Transfers (sec. 14221 of the Act and secs. 367 and 482 of the Code)

### Explanation of Provision

#### Background on prior law

Profits from transfers of intangible property between related taxpayers generally are allocated to each related taxpayer by reference to the amount of profit that a similarly situated taxpayer would realize in similar transactions with unrelated parties.[1765] A U.S. person may transfer intangible property to a related person (typically, a foreign affiliate) in one of four ways.[1766] Whether for purposes of

---

[1764] A technical correction may be necessary to reflect this intent.

[1765] See discussion of intercompany transfers in the summary of Prior Law above.

[1766] The four methods are an outright transfer of the intangible property; a license of the intangible property, in which the U.S. person transfers less than all substantial rights in the intangible property to the foreign affiliate; the provision of a service by the U.S. person to the foreign affiliate using the intangible property, rather than a direct transfer of the property; and finally, a transfer by the U.S. person of intangible property through a qualified cost-sharing arrangement with one or more foreign affiliates, under which the participants make resources available and contribute funds (through a combination of cash and existing intangible property rights) toward the joint development of a new marketable product or service. The method of transfer may determine whether the applicable section is section 482 or section 367(d). Special