1          IN THE UNITED STATES DISTRICT COURT

2            FOR THE DISTRICT OF COLORADO

3
  Civil Action No. 20-cv-03501-RBJ
4

5   LIBERTY GLOBAL INC.,

6          Plaintiff,

7          vs.

8   UNITED STATES OF AMERICA,

9          Defendant.

10  ----------------------------------------------------------------

11                REPORTER'S TRANSCRIPT
                   Oral Argument
12  ----------------------------------------------------------------

13
          Proceedings before the HONORABLE R. BROOKE JACKSON,
14  Senior Judge, United States District Court for the District of
    Colorado, commencing on the 25th day of February, 2022, in
15  Courtroom A902, United States Courthouse, Denver, Colorado.

16                    APPEARANCES

17  For the Plaintiff:
    RAJIV MADAN and NATHAN P. WACKER, Skadden Arps Slate Meagher &
18  Flom, LLP, 1440 New York Ave., N.W., Washington, D.C. 20005

19  GREGORY S. TAMKIN, Dorsey & Whitney, LLP, 1400 Wewatta St.,
    Ste. 400, Denver, CO 80202
20
    For the Defendant:
21  THOMAS J. SAWYER and JENNIFER Y. GOLDEN, U.S. Department of
    Justice, Tax Division, Ben Franklin Station, Washington, DC
22  20044

23

24

25      Sarah K. Mitchell, RPR, CRR, 901 19th Street, Room A252,
            Denver, CO 80294, 303-335-2108
        Proceedings reported by mechanical stenography;
            transcription produced via computer.

1                  *        *        *        *        *

2        (The proceedings commenced at 1:31 p.m.)

3            THE COURT:  20-cv-3501, Liberty Global versus the

4   United States, set for a hearing on the plaintiff's motion

5   for summary judgment.

6            Who's appearing for the plaintiff, please?

7            MR. MADAN:  Good afternoon, Your Honor.  Raj Madan,

8   Skadden Arps, for the plaintiff.

9            MR. WACKER:  Nathan Wacker from Skadden.

10           MR. TAMKIN:  Good afternoon, Your Honor.  Greg

11  Tamkin on behalf of the plaintiff, Liberty Global, from

12  Dorsey & Whitney.

13           MR. SAWYER:  Good afternoon, Your Honor.  Thomas

14  Sawyer representing the United States.

15           MS. GOLDEN:  Good afternoon, Your Honor.  Jennifer

16  Golden with the Department of Justice also representing the

17  United States.

18           THE COURT:  All right then, it's your motion.  You

19  may proceed.

20           MR. SAWYER:  Your Honor, may I address an

21  introductory point before we start?  With the ordering of the

22  argument, we had talked with your courtroom deputy last week,

23  and I will be handling two issues.  I'm hoping that Ms.

24  Golden can handle two issues, and we understood that you just

25  want to know in advance who is covering which issue, so I

20-cv-03501-RBJ          Oral Argument          02/25/2022   3

1    will be handling the *Chevron* and the good cause, harmless

2    error issues.  Ms. Golden will be handling the Section 7805

3    retroactivity issue.

4              THE COURT:  Okay.

5              MR. SAWYER:  Thank you.

6              MR. MADAN:  Your Honor, we have a few slides that we

7    were going to use.  I can either hand them out or project

8    them, whatever is easier for the Court.

9              THE COURT:  Project them, please.

10             MR. MADAN:  Okay.  And, Your Honor, may I ask, do we

11   have sort of a longer time period?  Because obviously there's

12   some fairly detailed rules here, and I can go through this

13   methodically.  I don't know what kind of timeframe we're

14   talking about.

15             THE COURT:  How about ten minutes to a side?

16             MR. MADAN:  Well, I was thinking a bit longer than

17   that.

18             THE COURT:  What were you thinking?

19             MR. MADAN:  Well, part of my question is do you want

20   us -- there are three separate grounds that Liberty has

21   advanced that invalidate the regs.

22             THE COURT:  I read your brief.  I read their brief.

23   I've read your reply.  I've discussed it with both my law

24   clerks.  I'm educated.

25             MR. MADAN:  I don't doubt that for a second, but my

20-cv-03501-RBJ        Oral Argument        02/25/2022    4

1   question is do you want us to discuss the issues individually

2   so we can have a little bit of back and forth so you can hear

3   both sides, or -- which might be easier than taking on all

4   three at once.

5         THE COURT:  Whatever you want.  It's your afternoon.

6   I asked you how much time do you want totally?

7         MR. MADAN:  I'm sorry, Judge, to do this, but if I

8   can just ask one more question, then I will definitely answer

9   you directly, which is the other part is if we could have a

10  little response time.  So if we -- combined with my opening

11  remarks and time I'd like to use to respond, I don't know, 30

12  to 45 minutes.

13        THE COURT:  Fine.

14        MR. MADAN:  Okay.  So to the United States

15  attorneys, I'm going to handle the first issue, and then

16  maybe you guys can respond, and we can have a back and forth,

17  close that out, and then move to the second issue, which I

18  think might be easier to follow.

19        THE COURT:  I said ten minutes facetiously because I

20  have a lot of things to do, and it's Friday afternoon, and

21  I'm trying to get ready for Monday.  So in a perfect world it

22  would be shorter rather than longer, but you take the time

23  you need.  There's a lot of money involved, and we've been

24  contacted, our chambers has, by media sources who asked us to

25  open up the telephone line so they could hear your speech,

20-cv-03501-RBJ          Oral Argument          02/25/2022     5

1   which we said fine.  So you go ahead and take the time you

2   need.

3            MR. MADAN:  Okay.  Thank you, Your Honor.  So once

4   again, Raj Madan, Skadden Arps, for Liberty.  Your Honor, as

5   you know, the issue in the case is plaintiff's position that

6   the 245A regulations are invalid, and Liberty's basis for

7   this position has three separate elements, and by separate

8   elements I mean independent grounds for invalidation.  The

9   first ground is that the 245A regulations are not authorized

10  by the statute; number two, the retroactive application of

11  these regulations is improper under Supreme Court precedent,

12  and it's in violation of the APA, the Administrative

13  Procedure Act; and, number three, the regulations fail to

14  comply with the APA requirements that the agency seek notice

15  and comment prior to promulgation.  And I guess it's

16  important to emphasize here, Your Honor, these are

17  independent grounds.  If Liberty is successful on any one of

18  them, the regs are invalidated.

19           So what I'm going to start with is issue one, that

20  the regulations are not authorized by the statute.  And just

21  to give the Court a little bit of a roadmap, I'm going to

22  break down this discussion into kind of three parts -- three

23  or four parts.  Part one is going to relate to sort of the

24  framework, the way Courts review questions like this.  Part

25  two, we're going to get into the statute itself.  We're going

 1   to, three, look at the regulations, and then talk about the

 2   application of these rules to the specific regulations at

 3   issue.

 4        So to start with, the framework.  The framework here

 5   has been articulated very well recently by the Tenth Circuit

 6   in a case called *Marlow* that's in our briefs -- both sides'

 7   briefs, and what *Marlow* says is -- it establishes some

 8   fundamental principles about agencies' right to issue

 9   regulations, how much flexibility they have.  And what *Marlow*

10   says is the agencies have a limited rule-making role.  An

11   agency's -- excuse me -- an administrative agency's power to

12   regulate in the public interest must always be grounded in a

13   valid grant of authority from Congress.  And then lastly,

14   agencies may exercise discretion only in the interstices

15   created by statutory silence or ambiguity.  They must always

16   give effect to the unambiguously expressed intent of

17   Congress.  And it's this last principle that I'd like --

18        THE COURT:  That's the principle that your opponents

19   are relying on.

20        MR. MADAN:  My opponents are relying upon it

21   incorrectly in the sense that they believe that there is some

22   gap to fill with respect to the statute at issue, 245A, and

23   what we'll establish this afternoon, Your Honor, as reflected

24   in our briefs, is that there is no gap.  There's no ambiguity

25   in the terms of the statute.  And by my opponent's own

20-cv-03501-RBJ         Oral Argument         02/25/2022    7

1   admission, they're not trying to reconcile an ambiguity, a

2   specific term in the statute that needed fleshing out.

3   Instead, as the United States has articulated in their

4   briefs, and as is reflected in the preamble to these

5   regulations, the purpose of these regulations or the point

6   that these regulations are attempting to address isn't really

7   about the statute at all.  It has this broader purpose

8   relating to TCJA, which is an acronym for a tax reform that

9   occurred a few years ago.

10         And the point there, Your Honor, is that that --

11   even the United States' argument as to how these regulations

12   fill a gap, if you will, by some broader objective of TCJA

13   violated Supreme Court precedent and the Tenth Circuit

14   precedent I just articulated from *Marlow* in the sense that

15   *Marlow* is about whether the regulations are expressly

16   authorized by the statute at issue, not whether they're

17   intended to address something that is completely unrelated to

18   that statute.  And when you evaluate the cases that analyze

19   whether a reg is invalid or not on the basis of whether it's

20   gone too far relative to the statute, the Courts hew very

21   closely to the language in the statute and analyze whether

22   the statute has ambiguity that needs this gap filling.  And

23   so the point is by the United States' own admission and the

24   preamble --

25         THE COURT:  Do you need help with your mask?

20-cv-03501-RBJ          Oral Argument          02/25/2022    8

1            MR. MADAN:  No, I'm good.

2            THE COURT:  Do you need a brand new mask?  We can do

3   that for you.

4            MR. MADAN:  I'm good.  It's just --

5            THE COURT:  Okay.  Well, please keep it up.

6            MR. MADAN:  I am.  Is that good?

7            THE COURT:  Yes, but as soon as you start talking,

8   it falls down again.

9            MR. MADAN:  Yeah, it's just a little tight.  I can

10  try a new mask, if that would help.

11           THE COURT:  Well, for $100 million you can probably

12  afford the best mask in town.

13           MR. MADAN:  Can I try this?

14           THE COURT:  Sure.  I don't mean to be a ninny about

15  it, but we've been extra careful in this courthouse to make

16  sure that nobody gets sick here.

17           MR. MADAN:  Totally understand, Your Honor.  And I

18  think this does feel more snug, and hopefully it stays on.

19  Thank you for that accommodation.  So, Your Honor, just to

20  sort of finish that point, which is that when you look at the

21  justification that the United States advances in its brief,

22  which is parallel to the justifications advanced in the

23  preamble to the temporary regulations that are at issue,

24  those justifications on their face do not satisfy Tenth

25  Circuit precedent or Supreme Court precedent because the

                    Sarah K. Mitchell, RPR, CRR

20-cv-03501-RBJ          Oral Argument          02/25/2022      9

1   objectives of the regulations are to satisfy some broader

2   purpose that doesn't have anything to do directly with the

3   statute as I'll describe in a little more detail in a few

4   minutes.

5          But in the first instance, like I said in my short

6   roadmap, I'd like to just look at the language of the statute

7   itself.  And what's on the screen, Your Honor, is the

8   language from Section 245A.  And just to orient the Court,

9   this is the only provision that's relevant.  There are some

10  subsections in 245A where the statute goes on, but none of

11  those provisions are relevant.  The regulations at issue

12  aren't trying to address those, so we can get hyperfocused on

13  language in this particular statute.

14         And as the Court can see, the statute simply says in

15  the case of a dividend received from a specified 10-percent

16  owned foreign corporation by a domestic corporation, which is

17  a United States shareholder with respect to such foreign

18  corporation, there shall be allowed as a deduction an amount

19  equal to the foreign-source portion of such dividend.  And

20  what is going to be important, as we'll get into here in a

21  minute, is that there are no terms here that are ambiguous,

22  and there are certainly no terms that the regulations at

23  issue are attempting to flesh out, like I said, by the

24  preamble's own admission and the United States' own

25  admission.

Sarah K. Mitchell, RPR, CRR

1       But moreover, there's no exceptions here.  The rule

2   doesn't say except for these circumstances.  It is a

3   categorical allowance, which we emphasize in our brief, that

4   it shall be allowed.  And so when you connect that to the

5   framework of *Marlow* and other Supreme Court precedent, right

6   off the bat regulations that are going to add extra

7   requirements beyond what's described in the statute are

8   suspect.

9       What we've done in the next slide is actually break

10  down the statute to four elements to evaluate whether there's

11  any ambiguity here and whether the regulations at issue are

12  attempting to address any of the requirements in the statute.

13  And what we've done is, number one, there has to be a

14  dividend; number two, there has to be -- that dividend has to

15  be received by a domestic corporation; number three, it has

16  to be from a specified 10-percent owned foreign corporation;

17  and, lastly, the domestic corporation must be a U.S.

18  shareholder with respect to the foreign corporation.

19      And so you look at those four requirements, and you

20  compare them to the regulations at issue, which address

21  things like extraordinary dispositions.  And in our case the

22  portion of the regulations addressed something called an

23  extraordinary reduction transaction, and the import of that,

24  Your Honor, is that those are the transactions that gave rise

25  to the dividend.  It's the step before the dividend.  How did

1   the dividend arise?

2          You can see from the four elements of the statute

3   itself there's no reference to anything about how did the

4   dividend arise.  It's not -- it's not attempting to establish

5   a rule relating to how did the dividend arise, nor does it

6   talk about transactions, what presupposed the dividend.  And

7   so when you superimpose the 245A temporary regs and concepts

8   that are being regulated there, like extraordinary reduction

9   transactions, it's obvious to see why the United States

10  didn't argue and why the preamble doesn't advance as a

11  position the idea that they are trying to address a gap in

12  these specific rules, because it has nothing to do with these

13  specific rules.

14         And moreover, Your Honor, there are other

15  regulations that are authorized, but they are wholly

16  independent of what's in play here.  So if we just go to the

17  next slide, so that's the statute.  The second part of the

18  statute is -- that's relevant to our issue in this case is

19  245A(g), which is the provision that sets forth the

20  authorization of Treasury to issue regulations.  And as

21  reflected on the screen, that provision says the following:

22  The secretary shall prescribe such regulations or other

23  guidance as may be necessary or appropriate to carry out the

24  provisions of this section, including regulations for the

25  treatment of the United States shareholders owning stock of a

1  specified 10-percent owned foreign corporation through a

2  partnership.  That's what I was referring to.

3         That second clause including regulations, that's a

4  separate set of regulations that are not at issue in our

5  case, so you can actually just focus on that first clause,

6  which is the secretary shall prescribe such regulations or

7  other guidance as may be necessary or appropriate to carry

8  out the provisions of this section.  That's it.  And we just

9  went through the provisions of this section which involved

10  four elements.  And so to -- the authorization that's

11  provided by Congress to Treasury is to address those four

12  elements.

13         And, again, when you compare the actual regulations

14  that were issued, they have nothing to do with the four

15  elements.  They have nothing to do with the authority granted

16  by this specific provision.  But what -- and if we can

17  approach, Your Honor, we have a copy of the relevant

18  regulations, if that's okay.

19         THE COURT:  Sure.  As long as you're handing it to

20  Julie, why don't you hand her a set of the slides so we'll

21  have one after you're on your way back to New York.  Thank

22  you.

23         MR. MADAN:  So the actual regulations don't start,

24  Your Honor, until several pages in on 22 of 121 on the top,

25  and I think record 156.  And if you go sort of -- in the

1  middle column there if you're on page 22 of 121 on the top,

2  it's (b) -- (b)(1) says, A Section 245A shareholder is

3  allowed a -- I'll just paraphrase -- allowed a 245A reduction

4  other than for an ineligible amount, and then right below

5  that is (b)(2) which defines an ineligible amount.  It says,

6  The term ineligible amount means with respect to a dividend

7  received by a Section 245A shareholder from a specific

8  foreign corporation -- that's what SFC stands for -- an

9  amount equal to the sum of 50 percent of the extraordinary

10 disposition amount as determined under paragraph C of this

11 section, and the extraordinary reduction amount as determined

12 under paragraph E of this section.

13          Now, Your Honor, my point in that illustration is

14 merely that those are extremely complicated concepts that are

15 adding rules to the statute we just went through which had

16 four simple elements and had a categorical command that the

17 deduction shall be allowed.  All of a sudden now the

18 regulations are evaluating disposition transactions,

19 extraordinary reduction transactions.  That's why we are so

20 focused on the idea that this is completely outside the scope

21 of the authority granted under these rules.

22          And one other thing to point out here, Your Honor,

23 is that the specific transaction that gave rise to Liberty's

24 dividend was authorized by TCJA, the tax reform bill.  Prior

25 to tax reform, that transaction would not have been

1    considered a so-called dividend.  But as Section 245A was put

2    in, the TCJA itself established that Liberty's transaction

3    shall be treated as a dividend for this purpose.  That's

4    Section 264.  And so the point is that just in the four

5    corners of the two provisions that are relevant, it's very

6    clear this is a dividend, and it's allowed as a deduction,

7    and it's not until some very extraneous rules are added

8    through this specific reg package in these temporary regs,

9    which go on in great detail, but all of which is outside the

10   scope of any of the four elements that we've talked about.

11        And the effect of this goes to the very point that

12   has been made by the Supreme Court and the Tenth Circuit,

13   which is the reason that there is this constraint that's

14   imposed on agencies to focus on the express intent of

15   Congress is separation of powers.  If the agency can write

16   whatever rules it deems appropriate relative to a specific

17   statute, the consequence is you're giving the agency, the

18   executive branch, the power to legislate, which is

19   inappropriate and why these rules exist in the first place

20   and why regulations are reviewed in this manner to determine

21   whether the regulations match congressional intent.

22        And like I said at the outset, when you then look at

23   what Treasury is specifically -- excuse me -- the United

24   States is specifically arguing here, they're specifically

25   saying that the purpose of these regulations is not to

1   address specifically 245A, but some broader purpose related

2   to TCJA, and specifically the United States argues that the

3   reason that these regulations were put into place was because

4   the income -- these are foreign earnings, not U.S. earnings

5   that are subject to tax -- the activities that gave rise to

6   these earnings occurred overseas.

7          So the United States is taxing money that was earned

8   in another jurisdiction, and what the United States is

9   arguing is that the real requirement here is not that Liberty

10  shall get a deduction as reflected in the statute, but

11  rather, the real rule is that was that income, this foreign

12  -- were these foreign earnings already subject to U.S. tax

13  under provisions that are known by the acronym GILTI and

14  another technical term that we call Subpart F income, two

15  different regimes that the U.S. uses to attempt to tax

16  foreign earnings.

17         But the point is by their own admission that's what

18  they believe the proper rule to be, that we should

19  superimpose an additional requirement inside of 245A that

20  says you only get -- Liberty and another taxpayers, you only

21  get a 245A deduction when that income has already been

22  subject to U.S. tax under these two regimes, and there is

23  nothing in this statute, in the legislative history of this

24  statute that says anything about prior taxation in order to

25  realize this deduction.

                        Sarah K. Mitchell, RPR, CRR

1           And so the point being, Your Honor, you don't have
2    to go much further than simply evaluating the government's
3    arguments about why this rule was put into place to see that
4    it is completely disconnected from the statute, the
5    authorization reflected in the statute for regulations, and
6    the elements of the statute.  And to try to sort of make this
7    more accessible, and I don't know if this is going to do
8    that, but we have an example.  So this is a hypothetical,
9    Your Honor, but something that, you know, many of us have
10   dealt with in our own personal lives, which is mortgage
11   interest deductions.
12           We've put on the screen the provision under
13   Section 163(h)(3) that provides the taxpayers, including us,
14   everyone in the courtroom, may deduct qualified residence
15   interest, and that's defined as any interest which is paid or
16   accrued during the taxable year on acquisition indebtedness
17   for any qualified residence of a taxpayer or home equity
18   indebtedness for any qualified residence of the taxpayer.
19   And with that rule in mind, if Treasury went out and issued a
20   regulation that said a taxpayer's only entitled to the
21   mortgage interest deduction if the residence is energy
22   efficient, any homes that are not energy efficient do not
23   qualify for mortgage interest reduction, it would be adding a
24   super requirement that's not reflected in the statute and
25   would violate the basic premise of the Supreme Court and the

20-cv-03501-RBJ          Oral Argument          02/25/2022    17

1   *Marlow* decision that the regulations have to stay within

2   scope.

3          And, Your Honor, I'll just conclude with while I'm

4   highlighting *Marlow*, there is other Tenth Circuit precedent.

5   There's precedent in other circuits, all of which establish

6   the same point, that when you're not gap filling, when you're

7   not addressing the ambiguity in the statute, the reg is

8   invalid.

9          THE COURT:  All right.  Thank you.

10          Now, does the government wish to respond to that

11   first issue?

12          MR. SAWYER:  Yes.  We're happy with that approach.

13          THE COURT:  Okay.  Mr. Sawyer, it sounds like he has

14   a pretty good point, doesn't he?  That's what the statute

15   says.

16          MR. SAWYER:  Well, with respect to his example, the

17   obvious question did Congress ever intend to limit the home

18   interest deduction to the amounts for only energy efficient

19   homes, I suspect -- I haven't read through the reports of

20   Congress on that, but, of course, they didn't say that, of

21   course, that wasn't Congress's intent.  We're happy to -- I

22   wish we'd been given advanced notice of that example, but

23   I'll turn to our argument here.

24          So we're in a Colorado courtroom this afternoon, but

25   we're dealing with a worldwide problem.  That's multinational

```
 1    companies avoiding or rebating taxes through the shifting of

 2    profits outside the U.S. tax base.

 3              THE COURT:  Mr. Sawyer, I'd prefer it if you don't

 4    read a speech to me.  That's not the way you communicate with

 5    me.

 6              MR. SAWYER:  So just last month the Congressional

 7    Research Service issued a report on multinational tax

 8    avoidance pointing out that about $80 billion a year escapes

 9    the U.S. tax net because of multinational corporations

10    avoiding their tax liabilities.

11              THE COURT:  Right.  And I can interrupt you, and

12    I'll try not to interrupt very often, but I can interrupt to

13    say that I'm probably no more a fan of that phenomena than

14    you are.  Like most normal people, I pay my taxes.  You pay

15    your taxes.  My staff pays their taxes.  It's the little guys

16    like us that seem to pay the tax, and often it's the big boys

17    like Liberty Global that figure out with the help of very

18    smart lawyers and accountants how to avoid it.  I get all

19    that.  My job as a judge, however, is to apply the law,

20    whether I like the result or not, and Mr. Madan has at least

21    on the surface of things a fairly compelling argument.  The

22    statute doesn't seem on its face to be ambiguous.  Don't I

23    have to follow it?  That's what I want you to address.

24              MR. SAWYER:  Sure.  And you do need to find a gap in

25    the statute.  We'll get to that.  Mr. Madan first suggested
```

1    that the Treasury didn't have authority to issue the

2    regulations that it did, and we would suggest that clearly

3    Treasury did have the authority to issue the regulations.

4    Then it says the regulation is unneeded because the statute

5    answers a precise question at issue in this case.  The

6    statute does not answer the precise question at issue in this

7    case.  So we do have to start --

8          THE COURT:  Explain that to me.  The statute,

9    according to Mr. Madan, in another place defines what was at

10   issue here as a dividend, and the statute says when a

11   dividend is paid in the circumstances that we have here,

12   according to Mr. Madan, then the deduction shall be allowed.

13   Shall be allowed.  Those are words that I think he lies in

14   bed at night smiling as they float through his dreams.

15         MR. SAWYER:  As does the secretary when the

16   secretary says shall prescribe regulations to address the

17   statute to carry out the business of the statute.

18         THE COURT:  Right.  Your job, representing the

19   United States, is to try to figure out a way that this

20   federal judge in Colorado can deal with the argument that

21   Mr. Madan made that on its face is pretty persuasive.

22         MR. SAWYER:  Well, the Tenth Circuit, the Supreme

23   Court, I believe every court, and the *Chevron* cases note that

24   looking at the terms of the statute, you look at the statute

25   as a whole in the context that it is -- that it is made, and

20-cv-03501-RBJ          Oral Argument          02/25/2022     20

--

2         THE COURT:  Well, those are two different things,
aren't they, Mr. Sawyer?  It's like when you interpret a
contract.  We're all familiar with the term -- we learned
this probably in the first day of contracts in law school, or
soon thereafter -- you interpret the contract according to
its plain meaning, but also you have to interpret the
contract according to the contract as a whole.  You can't
just take one piece in isolation and ignore the rest.  Those
are powerful concepts.  So how do you get there in this
instance?  What else is there in the statute that I have to
consider that would create an ambiguity?

MR. SAWYER:  You need to consider the Tax Cuts and
Jobs Act.  These are the most significant changes to the
international tax system in a generation, and you do need --
I know Mr. Madan doesn't want to go there, but we do need to
go to what was Congress doing when it enacted these
provisions, because he wants to look at a little narrow
portion of it and then look nowhere else.  And as we've
described in the -- in our brief, the legislative history
resoundingly supports our position.  Mr. Madan and LGI stay
away from the legislative history.

But if we -- with respect to looking at the statute
in context, you know, there's the Tenth Circuit case *New
Mexico vs. Department of Interior*, and there the Court said

1    the plainness or ambiguity of statutory language is

2    determined by reference to the language itself, the specific

3    context in which that language is used, and the broader

4    context as a statute as a whole.  And so that's why I want to

5    start with the Tax Cuts and Jobs Act, because that's the

6    statute as a whole that helps you understand what Congress

7    was doing in 245A and why there's a gap in the statute that

8    Treasury needed to fill.

9          THE COURT:  Now we're doing business.  Now you're

10   doing what I asked you to do, and that is point me to other

11   provisions in the statute that create an ambiguity.

12         MR. SAWYER:  Certainly.  If I can use an analogy to

13   describe how foreign income gets to the dividends received

14   deduction, this participation exemptions portion of the

15   statute, I'll use an analogy of a water filter that I built

16   in my junior high school science class where we take dirty

17   river water and try to turn it into clean tap water.  So you

18   make a filter with gravel, crushed gravel, sand, and maybe

19   charcoal.  You pour the dirty water in, and what comes out is

20   the clean water.  So what we have here is foreign income that

21   needs to run through this filter.

22         So here the different parts of the filter are,

23   first, as Mr. Madan mentioned, Subpart F, where we have

24   foreign income, and Congress back in the 1960s decided that

25   when foreign income -- earned by a controlled foreign

20-cv-03501-RBJ        Oral Argument        02/25/2022    22

corporate -- controlled foreign corporation, when it was the

type of income that met the standard in Subpart F, it would

be immediately taxed in the United States.  And when the Tax

Cuts and Jobs Act came in and enacted this new international

regime, they retained Subpart F.  So we start with this dirty

river water, this foreign income, and it runs through --

THE COURT:  I'm not sure some of these foreign

companies would appreciate the analogy there.

MR. SAWYER:  It's something to help me make sense of

this.

THE COURT:  Make it simple.  We're talking about

income that is earned -- pick a country -- France.

MR. SAWYER:  Belgium.

THE COURT:  Belgium, fine.  There's income earned in

Belgium from some activity that occurs over there.

MR. SAWYER:  And so --

THE COURT:  And who is the company that is

generating the income?

MR. SAWYER:  Well, Telenet in this case.

THE COURT:  Telenet.

MR. SAWYER:  It's a telecommunications company owned

by Liberty Global.

THE COURT:  All right.  So that telecommunications

company is a Belgian company.

MR. SAWYER:  Yes.

Sarah K. Mitchell, RPR, CRR

1            THE COURT:  And they're over there in Belgium doing

2   whatever they do and making money.  That's how it starts,

3   right?

4            MR. SAWYER:  That's right.  And so --

5            THE COURT:  But that money is going to somehow end

6   up in the hands of the United States corporation.

7            MR. SAWYER:  Yes.  So Liberty Global at the time

8   owned Telenet through the controlled foreign corporation, a

9   series of structures, and with respect to income that Telenet

10  was making, if it was Subpart F-type income -- let's start

11  with the general rule, and this is before the Tax Cuts and

12  Jobs Act.  The general rule of international taxation was

13  that when a U.S. company was operating a foreign business in

14  a foreign country, it was generally a deferral of income.

15  That is the taxes wouldn't -- Liberty Global wouldn't pay

16  taxes until the earnings had been repatriated to the United

17  States.  An exception was Subpart F.  Even if the Subpart

18  F-type income wasn't repatriated to the U.S., Liberty Global

19  would be paying tax on them.

20            THE COURT:  Well, what makes something subject to

21  Subpart F?

22            MR. SAWYER:  Well, detailed and complex rules, and

23  here the -- in the declaration of Kristina Rhee at page 2, we

24  note that on Liberty Global's original return they reported

25  360 million of Subpart F income.  They amended their return

1    to increase it to 2.4 billion, which had, of course, found a

2    deduction.  But anyway, so that money finds its way --

3         THE COURT:  So you're saying that Liberty Global

4    classified all this income as Subpart F income?

5         MR. SAWYER:  I'm trying to make the point of what

6    Section 245(g) -- or 245A is intended to cover, and we get --

7    and that's the dividends received deduction, the

8    participation exemption scheme -- regime of the code.  And so

9    my point was when we start with income -- foreign income,

10   before they can get down to this -- what I've referred to as

11   the pure tap water, the Section 245(g) reduction, it has to

12   be filtered out for Subpart F income, GILTI income, and to

13   the extent that they didn't pay a transition tax, usually the

14   transition tax was probably already paid by this point.

15        THE COURT:  All right.  So here's this

16   telecommunications company in Belgium.  They make all this

17   money.  Now, forget the taxpayer jobs act for a minute.  That

18   money would be taxable to the extent that it fit under what

19   you call Subsection F or this acronym GILTI.

20        MR. SAWYER:  That's correct.  And so long as --

21        THE COURT:  If it didn't fit into those categories,

22   then it doesn't get taxed at all unless and until it's

23   distributed in the United States.

24        MR. SAWYER:  Right.  And what the Tax Cuts and Jobs

25   Act did was created -- which said that instead of the

1   deferral where it was taxed when it got sent back to the

2   U.S., the U.S. moved toward a territorial-type tax system.

3   So the worldwide tax system was a U.S. corporation was taxed

4   on its worldwide income and with exceptions, like foreign tax

5   credits and such.  The territorial system would be the United

6   States only taxes U.S. corporations on money earned within

7   the United States.  Now, we didn't have a pure worldwide

8   system before, and we don't have a pure territorial system

9   now, but the changes in the Tax Cuts and Jobs Act were

10  significant because they moved the United States toward a

11  more territorial tax system.

12         And what Congress did when it created this

13  territorial system, or moved toward the territorial end of

14  the spectrum, is they said we're going to create this

15  deduction for -- this dividends received deduction.  However,

16  we still need to protect the U.S. tax base, and there's --

17  the history of what Congress did is replete with references

18  to protecting the tax base, and those items of protection of

19  the tax base were Subpart F in GILTI.  So in order to get the

20  Section 245A deduction, it needed to navigate the -- these

21  other regimes to get to the automatic deduction.

22         THE COURT:  Why didn't they say that then?

23         MR. SAWYER:  Why didn't -- I'm sorry?

24         THE COURT:  Why didn't Congress say we want to

25  change the regime, but we don't want to kiss good-bye to

1   Section F in GILTI, so this foreign income is still subject

2   to that, but then we're going to have this dividend deduction

3   section that we want to put in here.

4       MR. SAWYER:  I'd say it did say that in the Tax Cuts

5   Jobs Act.  We have Section 951A, which is the GILTI

6   provision.  We have Section 951 that was retained, which is

7   Subpart F.  And we have 245A, which is the -- this

8   participation exemption scheme, the dividend received

9   deduction.  So Congress did all three of those things, so it

10  did say that.  And we suggest that what happened here, the

11  problem we're dealing with is that Liberty Global was being

12  advised by Deloitte in Washington D.C., and Deloitte came to

13  Liberty Global with a transaction.  Essentially, using my

14  water filter analogy, they build a canal around the filter so

15  the dirty water can come straight out of the spigot and not

16  be taxed.  That's not what Congress intended.  There's a gap

17  in the statute as to 245 -- the temporary Treasury

18  regulations here do fill the gaps in the statute.

19      THE COURT:  All right.  So let's just speak in

20  simple terms.  You've got this taxpayer jobs act.  We start

21  there.  And what you're saying is that this Subpart F that

22  was, as you call it, a filter is there.  It was there before,

23  and it's there still.

24      MR. SAWYER:  Yes.

25      THE COURT:  And what people refer to as GILTI was

1    there before and is there still.

2            MR. SAWYER:  It was not there before, but it's there

3    now.

4            THE COURT:  There now.

5            MR. SAWYER:  That's to carry out this new --

6            THE COURT:  So this statute has Subpart F and GILTI

7    in it, and also this subpart 245A, which is the one we're

8    dealing with.  And so your argument is that Mr. Madan might

9    be right if you look at only 245A that it's not ambiguous,

10   but if you compare it to the rest of the taxpayer jobs act,

11   then it's inconsistent with F and GILTI.

12           MR. SAWYER:  That's right.  And I would --

13           THE COURT:  Is that your argument?

14           MR. SAWYER:  Well, it's -- if I could -- if I can

15   back up and, you know, turn to the Tenth Circuit precedent as

16   to the important thing in *New Mexico vs. Department of*

17   *Interior.*

18           THE COURT:  I'm just trying to understand what your

19   argument is first, and then we can talk about case law.  What

20   point are you making?  Where is the ambiguity here?  Forget

21   about intent.  Forget about legislative history for a minute.

22   I remember from law school, and this goes back to the early

23   '70s, that you're not supposed to look at legislative intent

24   unless there's an ambiguity in the language of the statute.

25   Where is the ambiguity in the statute?  Because if I can't

1    get there, I can't help you.

2         MR. SAWYER:  So we say that the precise question in

3    this case is whether a taxpayer should be allowed a deduction

4    on the very income that Congress intended the Tax Cuts and

5    Jobs Act base erosion provision.  That's how we define the

6    question here.  And defining the question --

7         THE COURT:  How about answering my question?

8    Because after all, what you're trying to do is persuade me to

9    your side on this case, and I'm trying to understand in the

10   simplest of terms -- let's go back to a contract.  A contract

11   has ten provisions.  One provision says the light is green,

12   but the eighth provision says the light is red.  They're

13   inconsistent.  That creates an ambiguity.  Now I get into

14   issues of intent.  What are the sections in this act that are

15   inconsistent with each other?  Just try to answer that,

16   please.

17        MR. SAWYER:  Sure.  It's the 951A, which is the

18   GILTI provisions, and the 951 Subpart F provisions need to

19   reconcile with the Section 245 deduction.  And --

20        THE COURT:  And those are all part of the same

21   statute.

22        MR. SAWYER:  They're all part of the Tax Cuts and

23   Jobs Act.  It's all part of the international tax provisions,

24   and these are obviously very complex provisions.  But -- so

25   we say that you can't look at a -- at the narrow question of

20-cv-03501-RBJ        Oral Argument        02/25/2022      29

1    -- as Mr. Madan would phrase the question much differently

2    than we do.  We say that the question is here.  Here is

3    whether Congress -- whether 245A was intended to allow a

4    reduction for income that was not subject to the provisions

5    that Congress had intended.

6           THE COURT:  All right.  Do you concede that if all

7    we look at is 245A, that Mr. Madan is right, the language is

8    not ambiguous, it's clear, and it says that the deduction

9    shall be allowed?  Do you agree with that?

10          MR. SAWYER:  I suppose in that the regulations, the

11   preamble mentioned several times a liberal reading of a

12   narrow portion of a statute.  And if you're going to take the

13   narrow reading of that portion of the statute, taking it

14   literally without taking it in context, yes.

15          THE COURT:  Right.  Taking it literally means apply

16   the plain language.

17          MR. SAWYER:  No.  Taking it literally means reading

18   a narrow part of the statute not in context and not --

19          THE COURT:  So we agree on that.  Mr. Madan wins

20   that point.  But your argument is that's winning the battle,

21   but not the war, because the war involves more than just that

22   section, and if you look at these two other sections of the

23   same statute, they're inconsistent with that, and therefore

24   ambiguous.

25          MR. SAWYER:  That's right, and that's where the gap

                        Sarah K. Mitchell, RPR, CRR

1   comes in that the section -- that the Treasury regulations

2   fill.  So in *Mayo* for example, the Supreme Court had before

3   it a statute that was the student exception from social

4   security tax, which said that service performed by the

5   employee of a school, college, or university by a student

6   enrolled and regularly attending class was exempt from social

7   security.  The Mayo Clinic in this case -- in that case

8   argued that medical residents qualified as students, and

9   therefore they're exempt from taxes because they met the rest

10  of the provision.

11          And what the Supreme Court did, they said it's

12  important how we define the question that we're answering

13  here, and the question they framed is the precise question

14  was whether medical residents are subject to the FICA.

15  That's different than whether medical residents can fall

16  under some dictionary definition of the term student.  And so

17  when the Supreme Court looked at that, they looked to the

18  context of the statute as a whole.  They looked to

19  Congressional intent, and it was plain when they did that

20  that medical residents were responsible for paying social

21  security taxes.  They're workers getting educated certainly

22  while they were finishing their residency, but they were not

23  outside the social security system.

24          So that's why we say it's so important how you

25  define the question to answer, because when you define the

1    question of whether 245A was intended to allow a deduction to

2    a company that has evaded or avoided these other provisions

3    of the international tax laws, the answer is no.  We cited

4    one case in our brief called *Square D*, and *Square D* was a tax

5    court case where a company had a -- a big employer had -- it

6    was providing medical and employee benefits to its employees

7    through a trust, and so there are two entities.  There's the

8    employer, and then there's the trust.  The company had a

9    calendar year.  The trust originally had a calendar tax year,

10   but then a statute was changed, and it said a contribution is

11   deductible to the extent it is paid during the taxable year,

12   and then it says -- then when they define the amount of the

13   deduction, they said the amount shall not exceed the fund's

14   qualified costs for the fund's taxable year.  So the statute,

15   when read literally, said the fund's taxable year.

16            Treasury issued a regulation saying that -- saying

17   that the -- and so what happened in *Square D* is in order to

18   try to accelerate their deductions, they changed the taxable

19   year of the fund to November, and their plan was to make a

20   big contribution in December so that they could get a current

21   deduction in their tax year for future services that were to

22   be rendered during the next tax -- tax -- or the next

23   calendar -- the next year of the trust.  And so they created

24   this mismatch between the fund's taxable year and the

25   company's taxable year, and the Treasury regulation stopped

1    it.  It said, no, you can't do that.  And what the tax court

2    said was the gap in the statute was created by the situation

3    where the trust and the employer used a different taxable

4    year.

5            Now, that's a gap similar to what we have here.  We

6    have -- we have a -- this Project Soy scheme that Liberty

7    Global was using was -- they were using this what they called

8    a mismatch between a -- when a shareholder needed to report

9    income to the U.S. and when -- and when money was earned by

10   this company.  So what happened, as we have noted in our

11   brief, was that, you know, this plan created by Deloitte took

12   the controlled foreign corporation, and the controlled

13   foreign corporation had U.S. shareholders.  So in the normal

14   term of events, when the corporation would issue dividends to

15   its shareholders, the corporation would get this dividends

16   received deduction, and it's the shareholders of the

17   corporation who would pay tax on it.

18           And so what the scheme here was is that they

19   eliminated a U.S. taxpayer to pay the tax on the dividend,

20   and yet they still claimed the dividend by the company

21   because the company was, you know -- was at the time a U.S.

22   company, but the transaction was designed to eliminate any

23   shareholder to pay a tax in the U.S.  So what the Treasury

24   regulation here did -- or what Liberty Global did with the

25   Treasury regulation was the regulation created an election

20-cv-03501-RBJ          Oral Argument          02/25/2022    33

1    that if you don't want your deduction disallowed, you can

2    close your taxable year, and so you can line up the

3    shareholders of -- so you have a U.S. shareholder on the day

4    of the distribution, and that works how the statute had

5    intended.

6              And let me point to Exhibit 2 attached to the

7    government's motion, which is e-mail -- internal e-mail by --

8    within Liberty Global, and the -- what they're explaining in

9    this e-mail is that they're mentioning this, you know, this

10   lack of a U.S. shareholder because that's what they're trying

11   to exploit.  They want to get the deduction, but they don't

12   want to pay the tax.  In their own e-mail -- their own e-mail

13   says in short, we believe this is a route --

14             THE COURT:  You're telling me how they eliminated

15   the U.S. taxpayer.

16             MR. SAWYER:  They eliminated the taxpayer, and their

17   own e-mail notes that what they're doing is exploiting a

18   mismatch in the Tax Cuts and Jobs Act.

19             THE COURT:  So how did they eliminate the U.S.

20   taxpayer?  Let's start there.

21             MR. SAWYER:  By -- well, when they sold -- what

22   happened is they sold a business to their --

23             THE COURT:  They sold the Belgian company.

24             MR. SAWYER:  -- to Liberty Global parent, the UK

25   Liberty Global parent.

                     Sarah K. Mitchell, RPR, CRR

20-cv-03501-RBJ       Oral Argument        02/25/2022    34

1           THE COURT:  Sold the Belgian company to a British

2    company.

3           MR. SAWYER:  That's right.  Well, they sold their

4    portion of the stock, so a majority portion of this company

5    is now owned by the British company.  And so on the date of

6    that sale, they no longer had a U.S. shareholder of the

7    entity.  It was British, I believe.

8           THE COURT:  So what happens to the U.S.

9    shareholders?  They just don't get any money anymore?

10          MR. SAWYER:  Well, it's no longer a U.S. entity.

11          THE COURT:  Mr. Malone lives here in Denver, doesn't

12   he?  How does he get his money?

13          MR. SAWYER:  Well, he owns Liberty Global UK as

14   well, so I'm not worried about Mr. Malone.

15          THE COURT:  Well, I mean, I'm just trying to

16   understand this thing.  There are plenty of Liberty Global

17   shareholders, I've got to believe, in the United States.

18   They're going to get dividends at some point.  The money

19   isn't taxable?

20          MR. SAWYER:  This money has escaped the U.S. tax

21   base permanently.  It's not -- maybe down the line Mr. Malone

22   brings something back in, but right now there's nothing.

23   This is a completed transaction.  It's far different from the

24   deferral system under the pre-Tax Cuts and Jobs Act.  But as

25   we show in Exhibit -- as what we say Exhibit 2 shows is that

20-cv-03501-RBJ        Oral Argument        02/25/2022    35

1    Liberty Global's own internal tax office was calling this a

2    mismatch.  That's the gap.  They knew about it.  They were

3    following legislation and developments so when Treasury

4    indicated it was looking into issuing a regulation here,

5    Liberty Global was following that, and all the e-mail

6    indications are that they stood ready to pull the plug on

7    this transaction if Treasury issued its regulations.

8            Then this e-mail in Exhibit 2, they say their best

9    guess is that Congress is going to close this with

10   legislation, and it won't be the Treasury closes it.  So they

11   said I think that's what's going to happen.  They were wrong.

12   Treasury closed it with a regulation that's retroactive, but

13   this e-mail shows that, you know -- their own e-mail calls it

14   a mismatch.  It's a gap within the statute.  Certainly not

15   one intended by Congress.  There's no question that Congress

16   intended this.

17           THE COURT:  So what you're saying is, and I think

18   you're probably right, Liberty Global had some very smart

19   people who understand these laws and regulations perhaps even

20   better than Congress, and they said, Well, look at this.  Can

21   you believe what the Congress has done?  They've put this

22   language in their statute here, and I think we can take

23   advantage of that to avoid taxes on $100 million or taxes on

24   more than that that add up to taxes of $100 million.  That's

25   kind of what people do, right?  They take advantage -- as

20-cv-03501-RBJ        Oral Argument        02/25/2022    36

1    long as it's legal, they take advantage of loopholes where

2    they can to save money.

3            MR. SAWYER:  And --

4            THE COURT:  And that's what they did.

5            MR. SAWYER:  And when they're unintended by Congress

6    and potentially abusive transactions, Treasury frequently

7    steps in and says no.  And, again, there is this gap in the

8    statute that the regulation is addressing.  Again, we get

9    back to --

10           THE COURT:  Well, there has to be, because it isn't

11   the job of Treasury to say, you know, gosh, Congress screwed

12   this up, but we're going to fix it.  That isn't what Treasury

13   is entitled to do.  It's Congress's job to fix it if it's

14   broken, not Treasury.  But you're right.  If there is an

15   ambiguity, then that's what you have regulations for to try

16   to resolve that ambiguity.

17           MR. SAWYER:  Well, it's more than an ambiguity.

18   It's a gap, and we don't have to point to what does dividend

19   mean, but we certainly get to, you know, what was intended by

20   the statute, what -- and, again, it is crucial how we frame

21   the precise question here, and the precise question that the

22   regulations address is what happens when this 245A deduction

23   is distributing income through a transaction that was

24   designed to avoid these base erosion provisions of the code.

25   So I suggest that the New Mexico Tenth Circuit case also

                    Sarah K. Mitchell, RPR, CRR

20-cv-03501-RBJ          Oral Argument          02/25/2022      37

1    describes the importance of defining -- framing the question.

2    It's a crucial part of this case of how do you frame the

3    question to be answered.

4            THE COURT:  I suspect there's going to be a Colorado

5    Tenth Circuit case no matter what I do.

6            MR. SAWYER:  I don't know, obviously.

7            THE COURT:  This is just a -- it's like a trial run

8    for you.  You're getting an opportunity to practice your

9    argument, as is Mr. Madan, because I think you'll be making

10   it again probably both of you.

11           MR. SAWYER:  One other thing before I close out, and

12   that is just to get back to the Treasury's regulatory

13   authority.  This is broad authority given to Treasury.

14   Section 7805 has been -- well, has been around since -- in

15   some form or another since the 1913 income tax was enacted.

16   Even before the income tax existed, Congress had delegated

17   regulatory authority to Treasury to interpret and carry out

18   the tax laws.  I recall taking my first tax class, going to a

19   bookstore for the required books, getting a casebook and then

20   they pile two volumes of the Internal Revenue Code on there,

21   and I said, Wow.  Then they pile, I think it was, six volumes

22   of Treasury regulations, and Treasury regulations are

23   somewhat unique.  They're -- they're pervasive throughout the

24   tax system.  So Congress has delegated regulatory authority

25   to Treasury.

                        Sarah K. Mitchell, RPR, CRR

1           THE COURT:  So do you know who Bill Bradley was?

2           MR. SAWYER:  Sure.

3           THE COURT:  Who was he?

4           MR. SAWYER:  He's a basketball player and a senator,

5    wasn't he?

6           THE COURT:  See, I ask questions like that to my law

7    clerks, and they just shrug, who?  But, yes, I remember Bill

8    Bradley well.  He was a superstar basketball player for

9    Princeton and then went on to have a great career for -- was

10   it the New York Knicks, and then he ran for the senate and

11   won, and he ran for president and didn't get there.  But one

12   of his campaign issues as he was trying to run for the

13   presidency was that he thought it would be a good idea just

14   to scrap the whole tax system and say that everybody, whether

15   you're a person or a corporation, just pays 10 percent, no

16   deductions, away we go.  I wonder if life would have been

17   better if we had done that.

18          MR. SAWYER:  It may have been, but I'm here to carry

19   out what Congress does, not to say what I think they should

20   do.

21          THE COURT:  I know.  I'm just teasing you,

22   Mr. Sawyer.  I'm just trying to add a little bit of poor

23   judicial humor to the proceeding.

24          MR. SAWYER:  Thank you, Your Honor.

25          THE COURT:  All right.  Now, you want to respond to

20-cv-03501-RBJ        Oral Argument        02/25/2022    39

1    him, and then we're going to move on to the retroactivity

2    issue.

3         MR. MADAN:  Your Honor, my response focuses on a lot

4    of words that I heard used during Mr. Sawyer's presentation

5    that I don't find accurate.  I don't think Mr. Sawyer's

6    misrepresenting, but in terms of --

7         THE COURT:  Was he right that these two other

8    provisions, GILTI and what was called Subsection F, are part

9    of the same bigger statute?

10        MR. MADAN:  No.

11        THE COURT:  He's not?

12        MR. MADAN:  No, not at all.  That's part of my

13   point.

14        THE COURT:  How can he be wrong about that?

15        MR. MADAN:  I don't know.  Subpart F and GILTI are

16   in a completely different part of the Internal Revenue Code,

17   Section 951.  We're obviously talking about Section 245A.

18   They are not the same statute, which is exactly my point.  I

19   heard back-and-forth talking about --

20        THE COURT:  Well, he said that they were enacted or

21   reenacted, as the case might be, in this same taxpayer jobs

22   act.

23        MR. MADAN:  It was part of the overall same act, but

24   it's not part of the same statute at all.  And the most

25   significant part of it is all of this effort to integrate

Sarah K. Mitchell, RPR, CRR

20-cv-03501-RBJ        Oral Argument        02/25/2022    40

1    these two provisions, whether the term is used part of the

2    same statute, act, or filter, that suggests very clearly to

3    the Court that there's some dependency between these

4    provisions, that there's a cross-reference -- you would

5    expect there to be a cross-reference --

6              THE COURT:  Well, they're part of the Internal

7    Revenue Code.  At least I can agree on that.

8              MR. MADAN:  That's absolutely true.  They're all

9    part of the Internal Revenue Code.

10             THE COURT:  So if there's a -- I don't want to use

11   the word mismatch -- if there is a conflict between one part

12   of the code and the other, does that create an ambiguity?

13             MR. MADAN:  No, not at all.  It definitely does not

14   create an ambiguity when 245A is categorical that it has no

15   dependency on whether that income was previously taxed.

16   Congress does that all the time.

17             THE COURT:  Where does it say that?

18             MR. MADAN:  It says it by virtue of the rule we just

19   read.  It says shall be allowed.  There's no exception unless

20   it hasn't been subject to tax.  Unless regulations are issued

21   that establish that that dividend deduction is not allowed if

22   it's not subject to tax.  It could be -- you could have a

23   cross-reference subject to the provisions of 951.  The tax

24   code is filled with circumstances where there's a direct

25   correlation, a direct dependency cross-reference where one

                    Sarah K. Mitchell, RPR, CRR

20-cv-03501-RBJ        Oral Argument        02/25/2022    41

1    deduction is dependent on some other action, and Congress is

2    well-aware of that.  It's true about the TCJA, the tax

3    reform.  In dozens of provisions there's cross-references

4    back and forth to create the type of filtering system and

5    integrated system where one provision is dependent on the

6    other provision.

7         THE COURT:  So let me ask you this, Mr. Madan.  I

8    made Mr. Sawyer a bit uncomfortable, at least it seemed that

9    he was uncomfortable, when I asked whether he agreed with you

10   that if you looked just at this statute 245A, just the part

11   you put up on the screen there, did he agree with you that

12   the language is unambiguous.

13        MR. MADAN:  Yes.

14        THE COURT:  And I think he said yes.

15        MR. MADAN:  Okay.  Yes.

16        THE COURT:  It took a little bit of doing, but I

17   think he said yes.  So turn it the other way for you.  Do you

18   agree with him that if you look at the intent of Congress as

19   a whole, it was not that you got this big windfall, but that

20   somewhere along the way the money had to be taxed?

21        MR. MADAN:  Not at all.  I don't agree at all.

22        THE COURT:  So you even won't give him that.

23        MR. MADAN:  I won't give him that, because I've read

24   the rules.  I've read -- the so-called legislative history

25   that I'm afraid of, I've looked at it.  It doesn't make any

1    reference whatsoever to the concept that 245A is dependent on

2    that income previously being taxed.  And because I practice

3    this tax law and controversy, I'm aware of circumstances

4    where there is that dependency in cross-reference and in the

5    absence of it where Congress hasn't specifically said it,

6    where Congress hasn't specifically made a cross-reference,

7    where they haven't said Treasury may issue regulations to

8    reconcile the two provisions, where the legislative history

9    makes zero, zero connection between those two provisions.  I

10   can unequivocally say, no, I don't agree with that.

11        THE COURT:  So you would agree at least that over

12   the years Congress, which is an ever-changing entity, has

13   been concerned about tax base erosion?

14        MR. MADAN:  Yes, I do agree with that.

15        THE COURT:  Then why in the world would Congress

16   intend to enact a statute that would allow companies like

17   Liberty Global with all their experts to figure out a way to

18   insulate -- what is it -- two-and-a-half billion dollars from

19   taxation, and it's not just Liberty Global, of course.  It's

20   anybody else that can use the same provision.  Why would

21   Congress intend that?

22        MR. MADAN:  First of all, Your Honor, the TCJA act,

23   the Tax and Jobs Cut Act has all kinds of objectives.  We

24   went from a system of worldwide tax, as Mr. Sawyer said, to a

25   quasi-territorial system where there were numerous provisions

20-cv-03501-RBJ        Oral Argument        02/25/2022    43

1    attempting to address various issues, and the question of why

2    Congress would enact a provision like 245A that allows this

3    amount of income to escape I can't answer.  I don't think I

4    can say I know why they would do it in sort of a rational

5    way.

6            THE COURT:  Well, do you think it was intentional or

7    accidental?

8            MR. MADAN:  I think it was intentional, because it

9    is so easy to say that these dividends are only allowed the

10   deduction if they've already been taxed.  It's super obvious.

11   It's not like -- we're not talking about some esoteric topic.

12   Where you're going to give a dividends received deduction,

13   it's very easy to have a premise that that income was

14   previously subject to tax.  Remember we were talking about

15   old Subpart F?  All of old Subpart F is premised on this

16   exact concept, that where income is taxed under Subpart F,

17   meaning that it is phantom income, it's not brought back to

18   the United States yet, that tax is accelerated.  When you

19   bring it back to the United States, you get a credit.  You

20   don't have to subject it again, because guess what?  It's

21   already been subject to tax.  That entire regime, which still

22   exists in our current tax code, is premised on the idea of

23   already been subject to tax.

24           THE COURT:  In Belgium?

25           MR. MADAN:  No, no, no.  In the United States.  In

Sarah K. Mitchell, RPR, CRR

1    the United States.  So to go to your fact pattern, Telenet

2    earns a bunch of money in Belgium from their

3    telecommunications operations.  If that income had been

4    subject to Subpart F -- and to answer your question that you

5    posed to Mr. Sawyer, what type of income is subject to

6    Subpart F, there's a -- it's a very complex regime, but

7    passive income, if it was just investment income, for

8    example, it would be subject to Subpart F tax, and that gets

9    accelerated whether you bring it back to the United States or

10   not.

11        If that income has been subjected to Subpart F U.S.

12   tax, when you bring it back to the United States, there's a

13   concept that's literally referred to as already been taxed.

14   I mean, not literally, but that's the colloquial term for it.

15   And my point being that still exists, and it is such a deep

16   fabric of international tax, the idea that if Congress

17   intended to have a concept of already been subject to U.S.

18   tax, it's easy to incorporate in 245A.  It is the fundamental

19   premise of Subpart F and how income moves from foreign

20   multinationals into the United States.  Has it been subject

21   to tax, has it not been subject to tax when it's dividended

22   to the United States.

23        THE COURT:  Well, where was this Belgian company's

24   earning subjected to U.S. tax?  Where did that happen?

25        MR. MADAN:  Well, I can't answer that completely,

Sarah K. Mitchell, RPR, CRR

20-cv-03501-RBJ        Oral Argument        02/25/2022    45

1    but I'm going to try, so if you'd just -- if you'd give me

2    the qualification that I'm not 100 percent sure, but I'll say

3    this.  My guess is that, first of all, that income is active

4    income, so it wouldn't hit Subpart F, the criteria of Subpart

5    F.  And, by the way, like, it's not just -- it's not just

6    Liberty Global.  Most U.S. multinationals -- you've read

7    about many U.S. multinationals -- have kept money overseas

8    for years.  By the way, like, there's an element here of

9    these corporations attempt to avoid U.S. tax.

10           There's also an entirely different narrative where

11   our system is one where you get subject to a very high tax

12   rate and worldwide tax on that.  It was difficult -- one of

13   the reasons TCJA came into effect is because it's difficult

14   for U.S. companies to compete with foreign companies where

15   they're not subject to worldwide tax, where the tax rates are

16   lower.  So the idea here was going forward we're in a

17   territorial system, or at least quasi.  Foreign -- money

18   earned by Telenet, for example, would not be subject to U.S.

19   tax.

20           THE COURT:  Ever?

21           MR. MADAN:  Ever.  That's the whole idea.  To make

22   the United States companies more competitive.

23           THE COURT:  So it hasn't been already taxed?

24           MR. MADAN:  It hasn't been already taxed.

25           THE COURT:  Well, you were just telling me that the

1    whole idea from Congress is that it only ought to be taxed

2    once.

3            MR. MADAN:   The whole idea from Congress was that --

4    my point is the regimes that were in place were very focused

5    on the idea of has it been taxed by Subpart F or not, and

6    many provisions in the international code are dependent on

7    that question, do you get to exclude that from income?  So my

8    point is it's at their fingertips, so I can't answer why it's

9    not in 245A.  But what I can answer is the notion that these

10   two provisions are separate, and there is no connection.

11   When you use the term contract, show me the ambiguity in the

12   contract, I would say, Your Honor, respectfully, that we're

13   talking about three different contracts here at a minimum.

14   And so in order for the 245A contract to borrow from the 951

15   contract, the one that the United States is advancing as

16   their objective, you'd need a cross-reference.  You wouldn't

17   otherwise start looking at the intent of provisions in

18   another contract to figure out what's going on with 245A.

19           And Supreme Court precedent works the same way.

20   There is no case out there that says you look at the overall

21   regime to figure out this narrow provision, 245A, nor does it

22   say that you attempt to reconcile everything when the

23   provision is categorical and clear on its face.  I heard you

24   ask Mr. Sawyer many times where's the ambiguity?  Where's the

25   gap in this provision?  And each time he switches to these

```
 1   other provisions that have no connection, literally, by

 2   language, by statute, by legislative history, or otherwise.

 3          All the base erosion points he's making relate to

 4   completely different statutes that were not incorporated into

 5   245A as an objective purpose or a literal rule.  So the idea

 6   that we're gap-filling from a completely different contract,

 7   statute, has no relationship to what the Supreme Court, the

 8   Tenth Circuit require.

 9          THE COURT:  Okay.

10          MR. MADAN:  Okay.

11          THE COURT:  All right.  Let's move on.  We've

12   consumed more than all the time just on this issue.

13          MR. SAWYER:  Would you indulge me to read three

14   sentences of a House Report in response to Mr. Madan?

15          THE COURT:  Well, of course, Mr. Sawyer.

16          MR. SAWYER:  Thank you.  So the House Report that we

17   put into the record, this is a section of establishment of a

18   participation exemption system for taxation of foreign

19   income.  That's the 245A deduction.  Here's what Congress

20   said in the report:  Because the United States is one of the

21   few industrialized countries with a worldwide system of

22   taxation and has the highest corporate tax rate among OECD

23   countries, the worldwide system of taxation with deferral

24   provides perverse incentives to keep funds offshore because

25   dividends from foreign subsidiaries are not taxed until
```

20-cv-03501-RBJ          Oral Argument          02/25/2022    48

1    repatriated.  The committee believes that a territorial

2    system with appropriate anti-base erosion safeguards combined

3    with a lower tax rate will make American workers and

4    companies competitive again and will also remove tax-driven

5    incentives to keep funds offshore.

6         THE COURT:  All right.  Now let's talk about

7    retroactivity.

8         MR. MADAN:  Okay.

9         THE COURT:  I think, by the way, Mr. Madan, that

10   your retroactivity argument is very lousy, so you're going to

11   have to be at your very best to convince me on this one.

12        MR. MADAN:  All right.  Well, I'm a Knicks fan and

13   Bill Bradley, so let me give it a shot.  So I'm going to use

14   basically the same framework as I did with the first

15   discussion, which is start with the framework of how

16   retroactivity is assessed, evaluated.  Then look at the

17   specific law, and then apply it, obviously, to our case.

18        So the Supreme Court in a case called *Bowen*, which

19   has been briefed by both parties, has the following quote,

20   the significance of which is where a -- where regulations may

21   be applied retroactively, the statute authorizing it has to

22   be express, affirmative in its authorization, and it has to

23   be focused.  And specifically the language reads:  A

24   statutory grant of legislative rule-making authority will

25   not, as a general matter, be understood to encompass the

Sarah K. Mitchell, RPR, CRR

20-cv-03501-RBJ          Oral Argument          02/25/2022     49

1    power to promulgate retroactive rules unless that power is

2    conveyed by Congress in express terms.

3          And what I'll submit to you, Your Honor, is that the

4    statute that's in play here, 7805(b)(2), is not express.

5    It's the furthest thing from express.  And for that reason, I

6    don't believe that it can -- these regulations can be applied

7    retroactively, among others.  And so maybe what we can do is

8    pass out the 7805, so everybody has it handy.

9          THE COURT:  Sure, if you want to, but I've read it.

10   So you have to look to (b)(1) first.

11         MR. MADAN:  You do have to look at (b)(1) first.

12   And, Your Honor, just to sort of finish the *Bowen*

13   conversation, in *Bowen* it involved regulation of Medicare

14   cost reimbursements, and in that regulation at issue, the

15   statute authorizing the regulations had contemplated

16   retroactive adjustments, but the Supreme Court was super

17   focused on whether the specific type of -- whether the --

18   excuse me -- the statute was broad enough to authorize

19   regulations on the topic, okay?

20         But let's look at (b)(1).  So obviously this is the

21   broad grant of regulations, and, first of all, Your Honor, if

22   I may, before we get -- I made one little error here, if I

23   can just backtrack us a minute.

24         Can we put back up the regulation?

25         Before we get to 7805(b) -- remember, looking at

Sarah K. Mitchell, RPR, CRR

20-cv-03501-RBJ          Oral Argument          02/25/2022     50

1    Supreme Court precedent here, the question is what did the

2    statute authorizing this regulation say, and when you look at

3    the reg -- I'm sorry -- you had it right.  I'm sorry.  When

4    you look at the 245A(g) regulation authorizing these regs,

5    they don't say anything about retroactive.  So the concept of

6    the specific authorization by Congress doesn't talk about

7    expressly or otherwise that the regulations can be applied

8    retroactively, and that right there, Your Honor, is relevant

9    because we are going to go to a broader provision, and if you

10   apply the Court's precedent, the language has to be very

11   express.  Otherwise, they're not going to -- the Court, at

12   least the Supreme Court's, not going to just read in

13   retroactivity.

14          So we start with (b)(1), as you say, and that's a

15   general grant of authorization for Treasury to issue

16   regulations across the board, and then we go to (b)(2).  I'm

17   sorry.  My fault.  That's (a).  (b)(1) sets very specific

18   limits on the ability -- it's a broad prohibition on

19   retroactive rules -- rule-making, right?

20          THE COURT:  Well, basically (b)(1) in simple

21   language says except as otherwise provided in this

22   subsection, which is (b) --

23          MR. MADAN:  Yes.

24          THE COURT:  -- the regs are not retroactive.

25          MR. MADAN:  Right.  Okay.  So then let's go to

1   (b)(2).

2          THE COURT:  And then we get to (b)(2), and it says

3   in (b)(2), paragraph 1 doesn't apply to regulations issued

4   within 18 months of the enactment of the statute.

5          MR. MADAN:  Right.  And just for a minute, and then

6   we'll come right back to (b)(2), now look at (b)(3).

7          THE COURT:  I know what (b)(3) says, and sometimes

8   you wonder why don't they write everything like they did

9   (b)(3) and (b)(4), but they didn't.  Why do we have books of

10  regulations that are paperweights and go on for thousands of

11  pages?  But (b)(1) says the regulations are not retroactive

12  except as provided elsewhere in this section, and then (b)(2)

13  says, by the way, (b)(1) doesn't apply here.

14         MR. MADAN:  Okay.

15         THE COURT:  Why doesn't that mean pretty much what

16  it says?  (b)(1) says not retroactive, and (b)(2) says (b)(1)

17  doesn't apply.

18         MR. MADAN:  Right.  And --

19         THE COURT:  You kind of think that that would mean,

20  yes, okay, retroactive if done within 18 months.

21         MR. MADAN:  Yeah, and I think the nomenclature here

22  is not accidental, because every other provision that follows

23  (b)(2) is worded in the affirmative except for that one.

24         THE COURT:  Then what -- what does the 18-month

25  thing even mean then?

                        Sarah K. Mitchell, RPR, CRR

1          MR. MADAN:  Well -- and, Your Honor, this is my

2     supposition, but an educated hypothesis based on this

3     language, which is I believe there needs to be something

4     more.  The statute authorizing the regulation itself, for

5     example, could say the regulations need to be issued

6     expeditiously, which we've seen in Supreme Court precedent,

7     in Tenth Circuit precedent, and D.C. Circuit precedent, not

8     in the tax context necessarily, but other agency context.

9     And when regulations by statute have to be issued

10    expeditiously, the point of (b)(2) is they've turned off the

11    bar.  They've turned off the general rule and are going to

12    allow the affirmative use of retroactive regulations in that

13    context.  But without it, without something more, all it's

14    saying is it's neutral.  And when you overlay the statute

15    authorizing the 245A regulations, they don't do that.

16          THE COURT:  You haven't answered my question.

17          MR. MADAN:  Please.

18          THE COURT:  My question was a real simple one.

19          MR. MADAN:  Yeah.

20          THE COURT:  What does the 18-month reference in

21    (b)(2) mean if it doesn't mean that it can be retroactive for

22    18 months?

23          MR. MADAN:  Just to make sure I understand, in other

24    words, if regs are enacted or issued within 18 months of the

25    statute, what else could it mean but that's okay?

                        Sarah K. Mitchell, RPR, CRR

20-cv-03501-RBJ          Oral Argument          02/25/2022    53

1          THE COURT:  Yes.

2          MR. MADAN:  That it can be retroactive then.

3          THE COURT:  It can be.

4          MR. MADAN:  Your Honor --

5          THE COURT:  The 18-month reference has to mean

6   something.

7          MR. MADAN:  And that's what I'm trying to answer,

8   and maybe I'm not doing a very good job of it.  I'm saying

9   that in that context, you are now on a level playing field.

10  When regs are issued within 18 months, it's not necessarily

11  okay for the regulations to go retroactive.  It's just that

12  they're not prohibitive -- prohibited, and my point is what

13  you need -- that something more you need is the statute

14  authorizing the particular regulations.  Because what this

15  does is it makes it neutral.  It turns off the prohibition.

16  And when you apply the Supreme Court precedent, it says that

17  the authorization and the grant has to be express.  It has to

18  be affirmative.  This doesn't say it's allowed.  It just

19  turns off the prohibition.

20         THE COURT:  Well, what if the statute said it can be

21  retroactive, period.  If the 18 months says you can make a

22  regulation retroactive within 18 months, if the statute says

23  it can be retroactive, then what if the statute says it can

24  be retroactive if it's done within 24 months?

25         MR. MADAN:  In that context -- this is like sort of

Sarah K. Mitchell, RPR, CRR

1    a debatable topic -- but you would run into a rule of

2    specificity, which one is more specific, where you have a

3    conflict in two statutes later in time.  Those are

4    challenging issues to have to confront, and gratefully we

5    don't have that circumstance.  But the point is that the

6    architecture of this particular provision, 7805(b) is very

7    clear in the sense that it doesn't have an affirmative grant

8    of allowing the Treasury Department to issue regulations

9    within 18 months.  And that's very important when it comes to

10   not just *Bowen*, but numerous other cases that all focus on

11   how express and clear Congress's edict is to the agency about

12   the right to issue retroactive regulations.  And this is not

13   an affirmative grant.  This is just putting Treasury on an

14   even playing field.  It's not saying you can do it.  It's

15   saying the prohibition is gone, opening the door for another

16   statute to allow or authorize retroactive regulations.

17        THE COURT:  So one statute says -- one statute

18   issued by Congress says it's okay for regulations to be

19   issued retroactively for 18 months, but only if we, Congress,

20   in some other section say it's okay to issue them

21   retroactively.  So in the other section we're going to say

22   it's okay to do it retroactively, but in this section we're

23   going to say there's a statute of limitations of 18 months.

24        MR. MADAN:  Well, just based on basic rules of

25   statutory interpretation, where you have a provision like

1    this that has affirmative, express, clear authorizations to

2    do something, to issue retroactive regulations where there's

3    abuse or a conflict between regs, they affirmatively say

4    you're allowed to do this, Treasury.  The contrast of (2)

5    with (b)(1), applying that statutory construction can only

6    mean one thing, that it's not an affirmative grant of

7    authority.  I mean, we can speculate various scenarios of how

8    this would operate, but in terms of just reading the plain

9    language, this doesn't meet the *Bowen* standard.

10          So that's obviously our position with respect to --

11   and, Your Honor, like, that's especially true when you go to

12   the more specific grant of 245A(g), which is silent,

13   completely silent on retroactivity.  In that context, the

14   Court should defer to the more specific language because

15   that's what *Bowen* commands in the sense that it's saying I

16   want to look narrowly at what Congress is intending with

17   respect to this statute, with respect to these provisions.

18   So when you combine the sort of negative implication of

19   (b)(2) just making it neutral with the affirmative language

20   in 245A(g), I think we have a good argument that retroactive

21   regulations were not authorized.

22          And one thing, Your Honor, that is cited in the

23   United States' briefing that actually creates this exact same

24   divide, they cite to I think a House Report for (b)(2), and

25   maybe I can pass this out just so I can --

1              THE COURT:  So we're going to be relying on

2      legislative history now, but we shouldn't have on the first

3      issue.

4              MR. MADAN:  Yeah, and, by the way, I'm not

5      necessarily saying this is authoritative or persuasive.  It's

6      just a House Report.  It didn't come from both sides of

7      Congress.  But I do think given that it's contemporaneous, it

8      is interesting the construction of the language.  This is

9      what was relied upon by the United States.  So if you go to

10     what's on the top of the page, 44 -- actually, in the middle

11     of the top of the page, very top, 32, the last page in the

12     set --

13             THE COURT:  Last page, okay.

14             MR. MADAN:  And the first sentence just reiterates

15     (b)(1).  And then if you look at the next sentence, it refers

16     to (b)(2), Any regulations filed or issued within 18 months

17     of the enactment of the statutory provision to which the

18     regulation relates may be issued with retroactive effect.

19     That is the language that the United States cites in support

20     of its position.  But if you read the next two sentences,

21     it's instructive:  This general prohibition on retroactive

22     regulations may be superseded by a legislative grant

23     authorizing the Treasury to prescribe the effective date with

24     respect to a statutory provision.  And then the paragraph

25     goes on to list the other elements of (b), (b)(3), (b)(4),

20-cv-03501-RBJ        Oral Argument        02/25/2022    57

1   which implies, to me anyway, that there's a distinction

2   that's being drawn here between (b)(3), (b)(4), et cetera,

3   where there has been an affirmative grant by Congress

4   authorizing retroactive regs and the preceding sentence,

5   which does not have that label attached to it, at least

6   according to the House.

7           THE COURT:  Well, if I were to apply your own

8   emphasis on the plain language, the plain language of the

9   sentence that you don't like says, quote, Any regulations

10  filed or issued within 18 months of the enactment of the

11  statutory provision to which the regulation relates may be

12  issued with retroactive effect, closed quote.  There's

13  nothing ambiguous about that sentence.  But here, because it

14  fits your argument better, you want to say, well, but then if

15  you look at some other sentences in this same paragraph and

16  look at it as a whole, then it doesn't really mean what it

17  says.  Isn't that fair?

18          MR. MADAN:  That is fair to some degree.  The part

19  that I will quibble with is that says may be issued.  Again,

20  that reconciles with my interpretation.  It's permissive.

21  It's opening the door to a further authorization by Congress

22  allowing the regulations.  It doesn't say shall, can be.  It

23  says may be.

24          THE COURT:  Okay.

25          MR. MADAN:  And, by the way, this isn't just my

20-cv-03501-RBJ          Oral Argument          02/25/2022   58

1   interpretation.  There are several cases that have

2   interpreted in an analogous context that we're going to

3   discuss -- how many minutes now -- that third subject, which

4   is notice and comment, where the question is whether the APA

5   can be overridden, and in that context where the words may be

6   are used, the Courts said that's not shall.  That's

7   permissive.  And it's very analogous because here we are

8   actually overruling the basic disfavorment toward retroactive

9   rules.

10          The only other thing, Your Honor --

11          THE COURT:  I think you have to be a little careful,

12   because once we get into that next argument, and you're going

13   to be talking about whether the error was harmless, this

14   retroactivity provision might be your best friend.

15          MR. MADAN:  They go hand in hand for me.  In other

16   words, they work together.  I have the same analysis on both,

17   so I'm not trying to be inconsistent there.  I'm saying that

18   that -- applying that authority works.  The only other point

19   I'll make, Your Honor, is that the United States also cites

20   as a basis for the retroactive issuance of these regulations

21   -- or the retroactive application of these regulations

22   (b)(3), and --

23          THE COURT:  They can't do that.

24          MR. MADAN:  Okay.  That's what I thought.  All

25   right.  That's all.

1          THE COURT:  They should have raised their (b)(3)

2    abuse issue earlier if they wanted to, but they didn't.

3          MR. MADAN:  Right.  And as far as all that

4    discussion goes about Liberty's transaction and whether it

5    was attempting to -- was abusive, the fact that Treasury

6    itself decided not to invoke (b)(3) should at least color the

7    view objectively about how aggressive that transaction was.

8          THE COURT:  Okay.  All right.  Retroactivity, that's

9    Ms. Golden's argument, but I think before we go there we

10   better take a break, right, Sarah?  Yes.  Let's take ten

11   minutes here for regrouping purposes.

12         THE COURTROOM DEPUTY:  All rise.

13         THE COURT:  And to save the court reporter's arms to

14   the extent they're still salvageable.

15         THE COURTROOM DEPUTY:  Court is in recess.

16     (Break was taken from 3:14 p.m. to 3:27 p.m.)

17         THE COURT:  Okay.  It's Ms. Golden's turn.

18         MS. GOLDEN:  The question of permissible

19   retroactivity comes down to what Your Honor has already

20   pointed out earlier this afternoon.

21         THE COURT:  Pull the mic down, will you please, a

22   little bit.

23         MS. GOLDEN:  Is this better?

24         THE COURT:  Yes, thank you.

25         MS. GOLDEN:  The question of permissible

Sarah K. Mitchell, RPR, CRR

20-cv-03501-RBJ          Oral Argument          02/25/2022    60

 1   retroactivity comes down to what Your Honor has already

 2   pointed out earlier this afternoon, which is a plain reading

 3   of Section 7805(b)(2) of the Internal Revenue Code based on

 4   its statutory text and legislative history.  That's true

 5   whether the Court is looking to Liberty Global's arguments

 6   under Section 553(d) of the APA or the Supreme Court's *Bowen*

 7   case.  Section 7805(b)(2) expressly authorizes Treasury to

 8   issue a retroactive regulation within 18 months of the

 9   enactment of the statutory provision to which the regulation

10   relates, and that's precisely what Treasury has done here.

11          The regulations were issued within 18 months of the

12   Tax Cuts and Jobs Act, or TCJA as we've been calling it here.

13   Section 7508(b)(2) allows retroactivity for the regs in this

14   case, and as the more specific provision, should control over

15   Section 553 of the APA.

16          THE COURT:  So how do you explain the fact that in

17   (b)(3) and (b)(4) they're very express on allowing

18   retroactive application, but in (b)(2) they do this kind of

19   hocus pocus to get there?

20          MS. GOLDEN:  Certainly the phrasing is different,

21   but that doesn't make it any less express or direct.  As

22   discussed earlier today, 7805(b)(1) sets forth the general

23   rule that regulations must be prospective, and then

24   7805(b)(2) follows up by saying exception for promptly issued

25   regulations providing that the anti-retroactivity rule that's

1    set forth in (b)(1) does not apply when it's done within

2    18 months of the statute.  And we can see actually even if we

3    just look at 7805(b) itself that Congress has said it

4    different ways.

5           So Mr. Madan points to (b)(3) and (b)(4) and its may

6    provide language and tries to contrast that with (b)(2), but

7    actually if we look further down, (b)(6) also phrases it

8    differently and doesn't say it, and it appears Mr. Madan

9    would not call that express enough for purposes of *Bowen* or

10   overriding the APA, and yet (b)(6), likewise, carves out an

11   exception in the same way that (b)(2) does.  So even just

12   looking at 7805(b)(2) -- sorry -- 7805(b), Congress has

13   carved out these express exceptions in a variety of

14   phrasings, but just because the phrasing is slightly

15   different, that's ultimately a distinction without a

16   difference.  It's still express.

17          The legislative history that we discussed today,

18   this is for Section 7805(b) as amended in 1996, and the case

19   law supports the plain reading of Section 7805(b) that the

20   government is advocating for.  The same House Report that

21   Mr. Madan directed Your Honor's attention to and that same

22   provision that we read out supports the common sense reading.

23   Any regulations filed or issued within 18 months of the

24   enactment of the statutory provision to which the regulation

25   relates may be issued with retroactive effect.  And so when

1   you take the clear statutory text and the clear legislative

2   history, that's it.  That shows that Section 7805(b) is

3   express.

4          There's also the case law that the government cited

5   in the briefs where the First and Ninth Circuits have

6   interpreted Section 7805(b) not as a limiting provision as

7   Liberty Global argues, but as expressly authorizing Treasury

8   to make regulations retroactive under the term specified, and

9   those cases even cite *Bowen*, the same standard that Liberty

10  Global is advocating for.  So that would be the *Maine Medical*

11  case from the First Circuit and *Baldwin* case from the Ninth

12  Circuit.  And those look at (b)(1), but (b)(1) also -- if

13  Your Honor recalls from earlier today, (b)(1) says -- it

14  generally lays out a prohibition against retroactivity except

15  under certain specified circumstances, and essentially what

16  *Maine Medical* and *Baldwin* said is that that is express under

17  *Bowen*.  If you fall under one of those specified

18  circumstances, then Congress has allowed retroactivity.

19         And just for -- as a brief policy comment, the

20  18-month rule here makes sense because Treasury needs to

21  adapt regulations after a statute is issued to deal with

22  perhaps unexpected situations or to clarify or to enforce the

23  terms of the statute, and this 18-month rule allows Treasury

24  to fix issues starting from the date of the statute

25  retroactively to ensure uniform treatment for

20-cv-03501-RBJ        Oral Argument        02/25/2022    63

1   similarly-situated taxpayers.  But that's not an unchecked

2   power.  It's got to be done within 18 months of the statute,

3   and, again, there's no dispute that the regulations here were

4   issued within 18 months of the statute.

5          THE COURT:  Are you saying that those cases from the

6   Ninth Circuit, and I think you said maybe the Fourth Circuit,

7   are specific as to section (b)(2)?

8          MS. GOLDEN:  No, Your Honor.  They are specific to

9   section (b)(1).

10         THE COURT:  So is there any case that's specific as

11  to (b)(2)?

12         MS. GOLDEN:  I am not aware of any cases specific to

13  (b)(2), but I was making an analogy using the First Circuit

14  and Ninth Circuit cases on (b)(1) because the way that (b)(1)

15  is structured and lays out exceptions is similar to the way

16  that (b)(2) itself serves as a carved-out exception.

17         THE COURT:  Okay.

18         MS. GOLDEN:  To continue, you know, certainly the

19  language in (b)(2) may be a little bit different, but Liberty

20  Global's reading, as I think Your Honor pointed out earlier

21  today, it's hard to read Section 7805(b)(2) as anything other

22  than expressly authorizing retroactivity, and the reading

23  that Liberty Global is advocating for would nullify Section

24  7805(b)(2), and it ignores the broad authority in

25  Section 7805(b) to issue retroactive regulations.  So Your

1    Honor's familiar with the general canon of construction

2    against surplusage, and so that's the argument that I'm

3    making here is that only the government's construction gives

4    full effect to Section 7805(b)(2), and that view should

5    prevail.

6            It's worth noting too in context that, you know,

7    this is against the backdrop of long-standing power given to

8    Treasury to issue retroactive regulations which predated the

9    enactment of the APA.  So I won't go into the full lengthy

10   history that's described in the briefs, but the government's

11   briefs do discuss how the Treasury has broad rule-making

12   authority in general dating back to at least 1862, and its

13   ability to issue retroactive regulations was already

14   long-standing by the time the APA was enacted in 1946.  So

15   the APA didn't repeal Treasury's ability to issue retroactive

16   regulations.  And under the *Disabled American Veterans* case

17   cited in the government's briefs, Congress is assumed to

18   legislate against the backdrop of established law, the

19   established law in this case being Treasury's power to issue

20   retroactive regulations.

21           And so when we get to current Section 7805(b) which,

22   as both parties' briefs note, was amended in 1996 under the

23   Taxpayer Bill of Rights II act, Congress did pull back the

24   limitations on -- did pull back on the power of retroactivity

25   and put in some limitations, but it also carved out express

20-cv-03501-RBJ        Oral Argument        02/25/2022    65

1   exceptions, (b)(2) through (b)(7), as we've discussed

2   generally here.  And right now the government is primarily

3   relying on (b)(2), the 18-month rule.

4        So to explain a little bit more -- I think what I

5   discussed so far covers the government on *Bowen*.  We've

6   discussed Section 7805(b)(2)'s language and its legislative

7   history, and it expressly authorizes Treasury to issue the

8   particular regulations in this case retroactively.  So now

9   the question is whether that should override the APA.

10        THE COURT:  Override what?

11        MS. GOLDEN:  Override the APA, the Administrative

12   Procedure Act.

13        THE COURT:  So you're moving into the notice and

14   comment argument?

15        MS. GOLDEN:  I'm not moving into the notice and

16   comment -- well, granted there are some overlaps with the

17   points that I'm going to make here that are similar to the

18   notice and comment argument, but I was making them more

19   specifically to why Section 7805(b), the retroactivity piece,

20   should prevail over the APA.

21        THE COURT:  Okay.  Well, I thought you were finished

22   with that.

23        MS. GOLDEN:  I can -- you know, it may make more

24   sense, since they are similar points, if we wanted to address

25   which prevails, 7805 or APA -- I can do those in tandem with

20-cv-03501-RBJ       Oral Argument       02/25/2022    66

1    the notice and comment, because it is pretty similar

2    arguments in that vein.

3            THE COURT:  Okay.

4            MS. GOLDEN:  So I can -- I can wait on that.  So

5    I'll just note that the government's argument overall is that

6    Section 7805(b) should prevail over the APA as the more

7    specific statute, and more of that will be discussed later.

8            And to conclude, just as a reminder to the Court,

9    there are -- I'll refer the Court to the government's briefs

10   explaining also why Congress would not -- has got to use

11   magic words in Section 7805(b) to indicate that it was

12   overriding -- I'm sorry, I'm actually mixing into the APA

13   points.  Let me cut that off.  And lastly, although

14   Section 7805(b)(2) is the government's primary grounds for

15   why the regulations are allowed to be retroactive, as argued

16   in the briefs, Treasury can also rely on Section 7805(b)(3)

17   for prevention of abuse, and we'll rest on our arguments as

18   stated in the briefs there.

19           And so in conclusion, on the retroactivity point,

20   Section 7805(b)(2) allowed these regulations to be

21   retroactive, and nobody disputes that the regulations here

22   satisfy the terms of Section 7805(b)(2), so they should be

23   upheld.

24           THE COURT:  Okay.  Now we're going to get to the

25   procedural point.

                    Sarah K. Mitchell, RPR, CRR

1           MS. GOLDEN:  Yes.  And I think Mr. Madan would

2      probably go first on that one.

3           THE COURT:  Well, that's fine, if he wants to go

4      first.  I guess that's the way we've done it.

5           Go ahead, Mr. Madan.  Before you launch into that

6      argument, I'm still thinking about the dispute between you

7      and Mr. Sawyer about whether the 245A and the Subpart F and

8      GILTI provisions are or are not part of the same statute.  He

9      said they are.  You said they're not.  You used the analogy

10     of three contracts instead of one contract.  But it is true,

11     is it not, that all of them are part of what you call the Tax

12     Cuts and Jobs Act?

13          MR. MADAN:  That's true, yes.

14          THE COURT:  So if you look at the Tax Cuts and Jobs

15     Act as the statute, then at least he's right that you've got

16     these three provisions, two of which are called transition

17     provisions in the regulation, the other one called a

18     participation provision, but regardless of what lingo you

19     want to use, all three of those provisions, regimes, call

20     them what you wish, are part of the same Tax Cuts and Jobs

21     Act.

22          MR. MADAN:  They're all part of the same --

23          THE COURT:  And so his argument is that you can look

24     for ambiguity as between different parts of the Tax Cuts and

25     Jobs Act, and if you find it, you go to the questions of

1    intent and legislative history.  Your argument is that while

2    part of the same act, they are distinctly different parts of

3    the act, and you have to look at the so-called participation

4    exemption under 245A in isolation.

5           MR. MADAN:  Not only do I say that, but I would say

6    the Supreme Court and the Tenth Circuit would say that.

7           THE COURT:  They haven't construed 245A yet to my

8    knowledge.

9           MR. MADAN:  That's right.  You're right, Your Honor.

10          THE COURT:  You're asking this lowly district court

11   in Denver, Colorado, to address these grand arguments that no

12   one else has ever addressed.

13          MR. MADAN:  I wouldn't characterize Your Honor or

14   this Court in that manner having now been the subject of a

15   debate with you for a while, but it's not just that no Court

16   has ever broadened the inquiry to enact omnibus legislation

17   that has various provisions.  In that same act there are

18   provisions that relate to you and I.  We wouldn't start

19   looking at the elimination of the mortgage interest deduction

20   and state and local income taxes, all of which were in TCJA.

21          And the point is that what the law requires and what

22   makes sense is you look at the statute and whether the

23   statute has a gap ambiguity that needs to be filled, A, and

24   the point is that in order to draw in these other provisions,

25   you would expect there to be some sort of integration, some

20-cv-03501-RBJ          Oral Argument          02/25/2022     69

1   sort of element here that 245A explicitly reflects this

2   effort to identify these other provisions.  And, by the way,

3   like, it's not that hard.  Like I said earlier, because this

4   is common parlance, you're not grasping for straws when you

5   search for a concept of already been taxed.  That is so

6   deeply in the Internal Revenue Code already that I find it

7   hard to believe that if Congress wanted to incorporate that

8   provision or that aspect of a factor that would make the 245A

9   deductions eligible for deduction or not, they would have.

10          THE COURT:  Well, wait a minute.  You admitted that

11  this money that was generated by the work of the

12  telecommunications company in Belgium has never been taxed.

13          MR. MADAN:  Yeah, that's right.  It's not --

14          THE COURT:  So that -- you said, the way I heard it,

15  this whole notion that income should be taxed but taxed only

16  once has been historically a fundamental tenet of our tax

17  laws.  Now here we have you arguing that the provision that

18  allows the escape of any tax at all on all this income is

19  what the statute provides.  How do you reconcile those two

20  things?

21          MR. MADAN:  Well, there's two different concepts

22  there.  It's not -- there's no mandatory tax of foreign

23  earnings.  There's no such thing as every dollar of earnings

24  has to be subject to foreign tax.

25          THE COURT:  No.  But you said, and I think Sawyer

Sarah K. Mitchell, RPR, CRR

1  said also, that the concept that income should be taxed but

2  taxed only once has been around for a long time, and it makes

3  sense.

4          MR. MADAN:  That concept is not so much about

5  ensuring that the foreign earnings are taxed once.  That

6  concept is ensuring that those foreign earnings aren't taxed

7  twice.  Those are two very different concepts.

8          THE COURT:  Well, we don't want them taxed twice.

9  Why do we want them taxed never?

10          MR. MADAN:  That part of it is dependent on the way

11  the rules work.  Much of this income, not just for Liberty

12  Global, but for many multinationals wasn't taxed for decades

13  just because of the fact that the rules operate in this

14  manner where if you don't bring --

15          THE COURT:  It wasn't taxed for decades because they

16  figured out if they don't bring it back in the United States,

17  if they just hold it hostage in a foreign country, then it

18  won't get taxed because it will only get taxed when it comes

19  back to the U.S., but it still was the law that if the money

20  comes back to the U.S., it gets taxed.  This money comes back

21  to the U.S. company ultimately with no tax.

22          MR. MADAN:  Just to be clear about -- I heard you

23  ask Mr. Sawyer that too, or posit that point.  The money's

24  not technically coming into the United States, the money that

25  we're talking about here.  It's not --

1           THE COURT:  Technically, what do you mean

2     technically?

3           MR. MADAN:  Because the reason that these amounts

4     are treated as dividends is that when LGI sells this Telenet

5     company to its parent, it has gain, taxable gain on that

6     transaction, and the consequence of that under the Internal

7     Revenue Code, the Internal Revenue Code as sort of currently

8     enacted re-characterizes that gain as a dividend.  It treats

9     it constructively as a dividend.

10          THE COURT:  Okay.  So the dividend is received by

11    the parent company.

12          MR. MADAN:  By operation of law.

13          THE COURT:  But that dividend never gets taxed.  It

14    used to get taxed.  It doesn't anymore.

15          MR. MADAN:  It never gets taxed because of 245A and

16    the fact that they enacted this rule that says specifically

17    it doesn't get taxed.  But, like, the point is that to cure

18    an issue that either Congress intentionally left out or

19    Congress mistakenly left out by issuing regulations that have

20    no relationship to that specific statute or any ambiguity or

21    gap in the statute is exactly what the Supreme Court and

22    Tenth Circuit have said should be avoided, which is allowing

23    the agency to legislate rather than Congress.

24          THE COURT:  Oh, I hear you, but if you consider the

25    statute to be the so-called TC --

20-cv-03501-RBJ          Oral Argument          02/25/2022     72

1              MR. MADAN:  JA.

2              THE COURT:  -- JA, a nice name for the politicians

3     to give it -- whether it really created tax cuts and jobs I

4     don't know, but it was ballyhooed as such.  If you consider

5     that statute to be the statute, then at least Sawyer's got an

6     argument, right?

7              MR. MADAN:  I have trouble with that in the sense

8     that that law does not say that every single dollar of

9     foreign earnings must be taxed, and whenever you dividend

10    money to the United States it has to have been subjected to

11    tax.  That's why we don't see anything about that in 245A.

12    So I have trouble making this connection, not just because

13    it's different statutes, but because Congress didn't make any

14    such connection, and so we're left to our own devices to sort

15    of sit here and say maybe we should draw from some other --

16             THE COURT:  What do you mean when you say different

17    statutes?

18             MR. MADAN:  Well, it's the same act, but at least

19    the way I understand it, Your Honor.

20             THE COURT:  An act is a statute.  A statute is an

21    act.

22             MR. MADAN:  I understand each provision to be its

23    own statute, but maybe it's just nomenclature.

24             THE COURT:  Yeah, maybe I'm the one that's wrong

25    about that.  I thought about an act and statute as being sort

20-cv-03501-RBJ          Oral Argument          02/25/2022   73

1    of different ways of saying the same thing.

2             MR. MADAN:  There might be some definition of

3    statute, but my understanding is that each one of these rules

4    is its own statute.  When you amend 245A, if they would, that

5    would be amending that statute, and it wouldn't affect any

6    other provision.  You can repeal a particular statute, and,

7    you know, the rest of the provisions would stay intact.

8             THE COURT:  Or you could say, depending on

9    semantics, you can repeal or modify a portion of a statute.

10            MR. MADAN:  Right.

11            THE COURT:  You can eliminate 245A, and you could

12   say, if you wanted to say, we have just eliminated a portion

13   of the TCJA.  Or you could say every portion of the TCJA is

14   its own statute, and we've now eliminated a statute.

15            MR. MADAN:  Yeah.

16            THE COURT:  I guess you can call it whatever you

17   want.

18            MR. MADAN:  But what rules -- tax rules, healthcare

19   rules, they're often brought in with a whole host of other

20   related rules, and that doesn't create a framework where you

21   borrow from the purpose of a different rule just because they

22   were all enacted under the same act.  I've never seen any

23   authority to support drawing from an overall act relative to

24   drawing from the narrow statute in front of us.  And I'll say

25   that when you look at the language in *Marlow* and the cases

 1    *Marlow* cites, it's all about narrow construction.  They have

 2    a very strong preference for not allowing deviation from the

 3    words of the specific statute, and the discussion we're

 4    having would have the -- would be the exact opposite filter

 5    or framework.  You would be expanding -- expanding the

 6    evaluation of purpose and attempting to draw in other rules,

 7    whereas the lens with which these Courts look -- Tenth

 8    Circuit, Supreme Court look at it is as narrowly as possible.

 9           THE COURT:  Remember when Mr. Sawyer got up right

10    after you made your rebuttal argument and said can I read

11    three sentences or something like that?  Remember that?

12           MR. MADAN:  Sure.

13           THE COURT:  And he got up and he read three

14    sentences.  And one of them, or maybe it was just one

15    sentence, said something to the effect that in doing this we

16    are preserving the base erosion protection.  You would say,

17    no, they didn't.  Maybe they intended to, but that isn't what

18    they did.

19           MR. MADAN:  Well, I would say those are three

20    sentences that aren't like the underpinnings of that

21    provision.  They're just sort of broad language, and we'd

22    have to put all of it in context, but that didn't tell me

23    anything about the debate we're having here today.  That did

24    not say to me that 245A has the overarching same purpose as

25    these other provisions.  It doesn't say, for example, that we

1   are enacting 245A with the expectation that all the income

2   would be taxed before it's dividended.

3          THE COURT:  I think what it said, or what Mr. Sawyer

4   was trying to suggest that it was saying, is that we are

5   enacting 245A with the understanding that we are preserving

6   the base -- anti-base erosion protections in the law.  I

7   think that's what he said it said.

8          MR. MADAN:  Okay.  First of all, I don't think it's

9   that clear.  I don't think that that is the tenet under which

10  245A is established.  There's nothing in the statute itself

11  that reflects any version of base erosion, base -- avoiding

12  base erosion or any connection to the other statute.  And so

13  I think where we end up is with the same question you've

14  posed to Mr. Sawyer and that you're grappling with is where's

15  the ambiguity in this statute?  Even if we accept some

16  version of the relevance of the overall act, it still doesn't

17  address in any way that there is nothing ambiguous about

18  245A.  It doesn't establish any gap in 245A.  What is the

19  gap?  The gap that has been established through these

20  regulations or the alleged gap that's being filled is

21  something about disposition transaction, extraordinary

22  disposition transaction, extraordinary reduction

23  transactions.  That has nothing -- there's no reference to a

24  disposition, a transaction, or anything that happened that

25  gave rise to the dividend.

1           So from some broad objective of the overall act to

2     avoid base erosion that isn't in our provision, we're going

3     to draw in these very intricate rules about how the dividend

4     arose when the statute isn't concerned whatsoever with

5     disposition transactions, extraordinary or otherwise, nor is

6     it -- nor does that provision at all talk about things like,

7     well, 50 percent of the income is allowed then.  The point is

8     the Treasury is now legislating in the same way that Congress

9     was supposed to enact these rules, and that is the sort of

10    third rail that *Marlow* and these other Supreme Court cases

11    are attempting to avoid.

12          THE COURT:  Okay.  I think I understand your

13    argument pretty well.

14          MR. MADAN:  Okay.

15          THE COURT:  What about the procedural point?

16          MR. MADAN:  All right.  So you know my formula now.

17    Let's start with the sort of legal framework, and what we're

18    talking about here, as Your Honor well knows at this point,

19    that the regulations at issue did not go through

20    pre-promulgation notice and comment.  And because you

21    previewed with me a little bit of your concern, if you will,

22    to my position in the sense that you said, well, what about

23    the fact that it's been cured, this is a critical point,

24    which is the temporary regulations that are at issue in this

25    proceeding and that cause Liberty to have its 245A deduction

20-cv-03501-RBJ        Oral Argument        02/25/2022    77

1    disallowed never went through notice and comment.

2                THE COURT:  True.

3                MR. MADAN:  Ever.

4                THE COURT:  True.

5                MR. MADAN:  So there is no cure.  Nothing happened

6    subsequently to resolve the absence of pre-promulgation

7    notice and comment.  The only regulations that went through

8    that process are the final regulations and proposed

9    regulations -- or the proposed regulations that ended up

10   being final, which have no application to Liberty Global's

11   case.  So the idea that no harm, no foul I don't see

12   whatsoever, because there was never pre-promulgation notice

13   and comment, nor post-promulgation notice and comment in

14   direct violation of the APA.

15               THE COURT:  Well, their argument is this is harmless

16   error, if it's error at all.  By the way, judges hate it when

17   appellate courts start talking about harmless error.  It's

18   kind of insulting really.  But their argument, I think, is

19   that, okay, we thought we had sort of an emergency on our

20   hands, and so we just did it.  But if that was wrong, if we

21   should have done notice and comment, what we did is we went

22   back and provided for notice and comment on the final rule,

23   which is the same as the temporary rule, and we went through

24   the notice-and-comment period, and then we enacted the final

25   rule, and so it's kind of silly to think if we had done the

20-cv-03501-RBJ        Oral Argument        02/25/2022    78

1   notice and comment on the same rule earlier we wouldn't have

2   come to the exact same result, so no harm, no foul.  I think

3   that's what their argument is.

4            MR. MADAN:  Right.  And I've got like two

5   fundamental answers, and then we'll get into the actual other

6   elements of our position.  Answer one is, first of all,

7   that's not true, because the regulations at issue never went

8   through notice and comment, as we just talked about.

9   Different regulations went through notice and comment.  It

10  would be like if in our apartment building we had a broken

11  light bulb, and they fixed the light bulb in another

12  building.

13           THE COURT:  Where are they different?

14           MR. MADAN:  They're very different, if you just

15  pause for a second and think about it this way.  If we apply

16  the final regulations or the proposed regulations to Liberty,

17  we wouldn't be here.  We would have won the case.

18           THE COURT:  And that is because?

19           MR. MADAN:  They're not retroactive.

20           THE COURT:  There you go.

21           MR. MADAN:  And we just had an entire discussion

22  that in the very same provision, 7805(b)(1) -- or (b)(2),

23  excuse me -- apparently authorized these retroactive

24  regulations.

25           THE COURT:  So isn't this your best argument that

20-cv-03501-RBJ          Oral Argument          02/25/2022      79

1    the APA says that you should have notice and comment unless

2    the statute says you don't have to?  There may be exceptions

3    to that, but here the notice and comment that finally was

4    provided isn't good enough because the final regs aren't

5    retroactive.  There was never any notice and comment on the

6    retroactivity point.

7              MR. MADAN:  That's right.

8              THE COURT:  That's your best argument.

9              MR. MADAN:  That is my best argument, yes.  Thank

10   you.  And you made it more eloquently than I would have.

11             THE COURT:  Well, I made it because I want to hear

12   what Mr. Chambers (sic) or Ms. Golden have to say about that.

13   That's -- I'm leaning in your direction on this procedural

14   point because of that very argument.

15             MR. MADAN:  And so -- but I think I have a lot more

16   in my favor on this one.

17             THE COURT:  Sometimes when you're ahead, you ought

18   to sit down.

19             MR. MADAN:  Well, if I could just make one other

20   sort of broad point, and then I will sit down.

21             THE COURT:  I'm going to listen carefully to see if

22   maybe you undo the advantage.

23             MR. MADAN:  My client is sitting back there.  You

24   can't do that to me if I do do that.  So the provision that

25   the United States says authorizes this violation of the APA

20-cv-03501-RBJ          Oral Argument          02/25/2022    80

1  is in the very same rule that we were just looking at.

2  Instead of it being 7805(b), it's (e).

3          THE COURT:  (e)?

4          MR. MADAN:  E as in Edward.

5          THE COURT:  Well, I guess I should look at (e) then.

6          MR. MADAN:  This is the authority that the United

7  States says allows Treasury to violate the APA.

8          THE COURT:  (e) says --

9          MR. MADAN:  Any temporary regulation issued by the

10  secretary shall also be used --

11          THE COURT:  Issued.

12          MR. MADAN:  Excuse me.  Should also be issued as a

13  proposed regulation.

14          THE COURT:  Yes, it does say that.

15          MR. MADAN:  And then there's something about a

16  three-year duration.

17          THE COURT:  Temporary regulations expire within

18  three years.

19          MR. MADAN:  And my point is just like with respect

20  to retroactivity and *Bowen*, with respect to violating another

21  federal statute, i.e. the APA, the Courts require an express

22  statement as to how the APA is being overruled, if you will,

23  or at least how the procedures are being overruled.  And this

24  -- however you think of my argument under (b)(2), I think

25  this is a lot clearer that this is not express.  This doesn't

Sarah K. Mitchell, RPR, CRR

20-cv-03501-RBJ          Oral Argument          02/25/2022    81

1    say anything about overruling the APA, about having a

2    different timeframe, or anything like it.  And when you

3    combine that with Supreme Court precedent about the

4    requirements, including the case that's cited by the United

5    States, *Asiana Airlines*, they require an explicit reference

6    to how are you overruling the APA or the procedures under the

7    APA.

8            THE COURT:  I think the discussion we had minutes

9    ago about what I think is your best argument assumes that

10   you're right on subpart (e)(1).

11           MR. MADAN:  That's right.  No, no, no --

12           THE COURT:  Which gets to the next point --

13           MR. MADAN:  It assumes I'm wrong on this one.  If I

14   win on this, we never get to cure it.

15           THE COURT:  No.  This one says temporary regulations

16   shall be issued as a proposed regulation.  Your argument is,

17   okay, you can put the label temporary on it if you want, but

18   unless there's an express exemption, it can't be done without

19   notice and comment.

20           MR. MADAN:  That's right.

21           THE COURT:  Okay.  I think you're right.  But then

22   they say, Well, okay, if you agree with Madan on that, then

23   we're going to say this is harmless error because of what we

24   did to cure the problem.  I just jumped right to that because

25   I thought that was where the argument is going to be made.

                        Sarah K. Mitchell, RPR, CRR

20-cv-03501-RBJ        Oral Argument        02/25/2022    82

1           MR. MADAN:  But the only thing I say there, Your

2    Honor, is if we're right about (e)(1), I don't think this

3    gives them any authority to violate the APA before we get to

4    harmless error.  In order to get to harmless error, you first

5    have to say, well, first of all, they were authorized, but

6    that -- because the implication -- I think this is where we

7    have a disconnect.

8           Let me say this, and maybe this will help.  The

9    implication of the DOJ's argument about this provision is

10   that you need both.  You, number one, need this provision to

11   apply, A; and then, B, you need subsequent notice and

12   comment.  One is not enough.  They need both.  And I'm saying

13   they don't have either.  They don't have the right authority

14   here, because it's not express, as two Courts have already

15   found.  A federal court in Texas and the tax court in a

16   concurring opinion have said this isn't enough authority to

17   violate the APA.

18           THE COURT:  So you think that Texas law applies here

19   in Colorado?

20           MR. MADAN:  I just think their rationale is sound.

21   That this is not a clear --

22           THE COURT:  Those Texas people are the ones that are

23   always causing our ski lifts to break down.

24           MR. MADAN:  I'll say this.  As an East Coast person,

25   I have no comment on Texas people.

                    Sarah K. Mitchell, RPR, CRR

20-cv-03501-RBJ        Oral Argument        02/25/2022    83

1        THE COURT:  I'm just kidding.  We love Texans up

2   here.  And even more, I respect their court system greatly,

3   of course.

4        MR. MADAN:  But even two senior judges on the tax

5   court wrote a concurring opinion in which they agreed with

6   the majority, but said I don't even have to get to where the

7   majority is because this provision does not authorize

8   violating the APA and avoiding pre-issuance notice and

9   comment.  And even the Treasury's own notice that they cite

10  from March of 2019 specifically says they need both.  This

11  provision needs to apply, and then they need subsequent

12  notice and comment on the specific statute.  So my point is

13  they have two failings here, and we should prevail on both.

14        THE COURT:  Okay.

15        MR. MADAN:  Okay.

16        THE COURT:  Let me hear from the government lawyer,

17  Ms. Golden.

18        MS. GOLDEN:  Your Honor, the first thing I was going

19  to note was that I, in fact, am a Texan, but I am not a

20  skier.

21        THE COURT:  Ms. Golden, I apologize.  Once again --

22        MS. GOLDEN:  I have never skied in my life.

23        THE COURT:  -- a bad effort at judicial humor proved

24  that I probably should be kept -- I should be silent about my

25  humorous attempts.

Sarah K. Mitchell, RPR, CRR

1        MS. GOLDEN:  No.  We have to have some levity

2    talking about tax on a Friday afternoon.  All right.  So I'll

3    get straight to the point that Your Honor was discussing with

4    Mr. Madan, which is the concern -- Your Honor expressed a

5    concern that there was no notice and comment on the

6    retroactivity point, and the answer to that is that Treasury

7    wasn't allowed -- Treasury wasn't required to provide notice

8    and comment under the circumstance because, as we discussed

9    earlier today, Section 7805(b)(2) allowed the temporary

10   Treasury regulations here to be issued retroactively.  (b)(2)

11   specifically includes temporary regulations, and Section

12   7805(e) allows temporary regulations to be issued without

13   notice and comment.

14        THE COURT:  It doesn't say that.

15        MS. GOLDEN:  Well, Your Honor --

16        THE COURT:  It says any temporary regulation issued

17   by the secretary shall also be issued as a proposed

18   regulation.  Proposed regulations are what you have notice

19   and comment for.

20        MS. GOLDEN:  So that is what 7805(e)'s language

21   says, but within that is -- it's an acknowledgment of a

22   long-standing agency practice of issuing temporary

23   regulations.  So this was discussed in the government's brief

24   that the Section 7805(e) was issued in 1988.  The temporary

25   Treasury regulation practice dates back to at least the 1950s

20-cv-03501-RBJ       Oral Argument        02/25/2022    85

1    and appeared to have been pretty common throughout the 1970s

2    and 1980s in the run-up to the 1988 act where Section 7805(e)

3    was passed.

4         THE COURT:  Are you saying that you never have to do

5    notice and comment on a temporary regulation, bearing in mind

6    that these temporary regulations can last for three years.

7    But you never have to do notice and comment on them?

8         MS. GOLDEN:  Well, we don't have to do notice and

9    comment on a temporary regulation when the temporary

10   regulation itself is issued.  That is -- that -- our position

11   is that that is explicitly authorized by Section 7805(e).

12   Now, notice and comment does happen afterwards because

13   Section 7805(e)(2) requires -- sorry -- I think it's actually

14   (e)(1) requires that temporary regulations also be issued

15   simultaneously as proposed regulations, which, as Your Honor

16   noted, triggers the notice and comment.

17        THE COURT:  No, (e)(1) -- I'll read it again.

18   (e)(1), any temporary regulation issued by the secretary

19   shall also be issued as a proposed regulation.  Now, to me

20   what that says is you can do a temporary regulation, but it's

21   also a proposed regulation, and if it's a proposed

22   regulation, you have to go through notice and comment.  Is

23   there any case out there that says that notice and comment

24   does not apply to temporary regulations?

25        MS. GOLDEN:  Well, Your Honor, I don't think I have

Sarah K. Mitchell, RPR, CRR

1   a case citation for that, but as noted in the briefs, there

2   is the legislative history to Section 7805(e), and there's

3   other cases that can help us make an analogy even if they

4   don't discuss 7805 specifically.  So I'll start with the

5   legislative history.  So as discussed in the government's

6   briefs, the legislative history for Section 7805(e) for both

7   houses of Congress shows that Congress was aware of

8   Treasury's common practice of issuing temporary regulations

9   without notice and comment, which, again, have been going on

10  for decades at the time Section 7805(e) was enacted.

11          When we look at the legislative history, there's no

12  concerns about Treasury's authority to issue temporary

13  regulations without notice and comment.  Congress's only

14  concerns were that temporary regulations were staying on the

15  books too long and weren't being finalized quickly enough,

16  and so that's how we ended up with Section 7805(e) which

17  requires that temporary regulations also be issued

18  concurrently as proposed regulations, which is a different

19  type of regulation, and it requires that temporary

20  regulations sunset in three years.

21          THE COURT:  So you're saying that the United States

22  government's position is that it can issue a so-called

23  temporary regulation.  In this particular case it took them

24  18 months to even do that.  But they can, after their

25  18 months, issue a temporary regulation that has the impact

1    of costing Liberty Global $100 million because of its

2    retroactive application, but they don't ever have to let

3    Liberty Global have an opportunity to comment on it?

4            MS. GOLDEN:   That is mostly correct, Your Honor.

5    The government's position is that Section 7805(b)(2) combined

6    with Section 7805(e) allows Treasury to issue this temporary

7    regulation retroactively in a way that -- with an impact that

8    Liberty Global obviously disliked resulting in this case.

9            THE COURT:   Okay.  So let me ask you this then.

10   Your case for the government is basically based on what is

11   the fair result, and you're saying that if you look at this

12   taxpayer -- Tax Cuts and Jobs Act as a whole, and if you look

13   at the legislative history, what Congress intended and what

14   would be fair is to keep these anti-base erosion rules, which

15   had a very important purpose, while also allowing these

16   dividends after you apply F and GILTI as appropriate to be

17   tax free, it's fair, it's what Congress intended, but then we

18   get to this issue of whether or not there ought to be some

19   notice to the public and an opportunity to comment.  What's

20   fair doesn't matter anymore.

21           Now, you go back to the statute and say, well, we

22   can do this, and we can do that, and too bad for you, Liberty

23   Global, but we're going to apply this thing retroactively,

24   and you're not going to have a chance to comment.  And then

25   it's going to be final, and you won't have a chance to

 1    comment on the retroactivity there either because it's not

 2    retroactive anymore.  Now, what's the fairness in that?

 3             MS. GOLDEN:  So that's partly true, but if we

 4    continue that, so this temporary regulation came out, and

 5    Liberty Global is correct that those regulations that were

 6    proposed simultaneously were later finalized, and those final

 7    regulations weren't retroactive, but what Mr. Madan doesn't

 8    point out is that when the final regulations were issued,

 9    there was an option for taxpayers to elect to apply that

10    final regulation that had undergone notice and comment

11    instead of the temporary regulations.

12             THE COURT:  What good does that do them?

13             MS. GOLDEN:  Well, if their concern is truly the

14    procedural validity, as one would presume it would be when

15    there's an APA challenge, then it lets them apply the final

16    rule that went through notice and comment, and they had an

17    opportunity to comment on that rule.

18             THE COURT:  Yes, but the problem is their comment on

19    the final rule doesn't have anything to do with retroactivity

20    because it's not part of the final rule.  That's a huge part

21    of this dispute, isn't it?  The retroactivity part.  If you

22    can't apply your rule retroactively, you're dead in the

23    water.  So what good does it do them to have comments on the

24    final rule, which -- it's like the horse is out of the barn

25    by then, right?

                         Sarah K. Mitchell, RPR, CRR

1            MS. GOLDEN:  In a way, but --

2            THE COURT:  That's a Texas expression.

3            MS. GOLDEN:  I appreciate that, Your Honor.  So when

4    I mentioned that there was an option for taxpayers to elect

5    to apply the final rules to transactions that occurred before

6    effective date of the final rules, that's addressing the

7    fairness point.  But also in terms of fairness,

8    Section 7805(b)(2) is expressly authorized by Congress.  So

9    if there's a fairness issue, then the problem is for Congress

10   to try to address, not for the courts.

11           THE COURT:  Mr. Madan is liking what he's hearing

12   now.  (b)(2) I'm inclined to interpret your way.  I said that

13   earlier, and I don't think he's necessarily changed my mind,

14   although I want to think about it a bit.  But let's say that

15   I interpret it your way, which is that (b)(2), although it's

16   worded rather bizarrely, allows retroactive application.

17   Okay.  But the one thing that (b)(2) doesn't do in any way,

18   shape, or form is say, and, oh, by the way, that can be done

19   without telling anybody.  We just do that.  We just enact

20   this rule.  We make it retroactive, and nobody gets to talk

21   about it.  Too bad for them.  It doesn't say that.

22           MS. GOLDEN:  Well, if we combine (b)(1) and (b)(2),

23   because (b)(1) says -- when it mentions regulations, it says

24   no temporary proposed or final regulation, and it requires

25   them to be prospective, but it has that lead-in language

20-cv-03501-RBJ        Oral Argument        02/25/2022      90

1     except as otherwise provided in this subsection, and then

2     (b)(2) is except as otherwise provided.

3               THE COURT:  And I'm saying I think I'm probably

4     leaning toward your side of that, Ms. Golden.  But that, to

5     my mind at least, and I might be missing your point here, has

6     very little to do with the question of whether you have to go

7     through the notice-and-comment period.  Now, I can understand

8     how in certain circumstances, and I think there were some

9     examples given in the papers -- in certain circumstances

10    there's an emergency of some kind.  Something's going to

11    happen.

12              It's like a temporary restraining order in court.

13    We can do a temporary restraining order on an ex parte basis

14    in the rare situation that there is irreparable harm, and you

15    haven't had a chance to really notify the opposing party.

16    But it's not the way we do it normally.  Normally Courts give

17    people their day in court.  They want to hear what they have

18    to say, and equally importantly, they want them to feel like

19    they were heard, whether they agree with the outcome or not.

20    Here they didn't have a chance to be heard.  They woke up one

21    day, and they've just lost $100 million without even a chance

22    to comment.  Now, you're going to have to have some pretty

23    good language in some statute to convince me that's okay.

24              MS. GOLDEN:  So, Your Honor, I think the answer to

25    your question starts with what we talked about earlier today,

1    Section 7805(e)'s language and legislative history.  So we

2    discussed that.  I also mentioned there's some case law that

3    I think would provide a helpful analogy, so I'll discuss that

4    now.

5              THE COURT:  What's the legislative history that

6    supports you under section (e)?

7              MS. GOLDEN:  Maybe I didn't get to finishing that

8    one.  So I was going to discuss -- so this is cited in the

9    government's briefs, and it's also in the legislative

10   history.  It's exhibit Docket 33-8 at page 23.  So this is a

11   conference report to the 1998 act where Section 7805(e) was

12   issued by Congress.  And so there it -- first we see there's

13   a section that says present law, and I'll paraphrase that

14   that section essentially acknowledges that the IRS has a

15   long-standing practice of issuing some regulations as

16   temporary regulations, and that those temporary regulations

17   are effective immediately upon publication, so no notice and

18   comment.

19             THE COURT:  Well, so no notice and comment, you just

20   added that part.

21             MS. GOLDEN:  Correct.  But --

22             THE COURT:  That wasn't there.

23             MS. GOLDEN:  What it says is are effective

24   immediately upon publication, which I would read as

25   equivalent to saying no notice and comment.

                        Sarah K. Mitchell, RPR, CRR

1            THE COURT:  Well --

2            MS. GOLDEN:  So --

3            THE COURT:  -- they can be effective immediately

4    after people have a chance to comment on them too.  I mean,

5    that's a possibility.  I hear you.  I understand.

6            MS. GOLDEN:  Well, Your Honor, this is how -- from

7    the government's position, this is how Section 7805(e)'s

8    legislative history supports our reading, and so in the

9    present law section Congress describes the current practice,

10   temporary regulations, no notice and comment.  It doesn't

11   comment on that, and, in fact, if we look further on in the

12   section called Senate amendment, there's a sentence there

13   that says the IRS, quote, may continue its present practice

14   of issuing temporary regulations and corresponding proposed

15   regulations by cross-reference, and that the duration limit

16   on temporary regulations is not to affect their validity.

17            So when we look at that legislative history, that

18   backs up what I was talking about earlier that Congress was

19   aware of this long-standing practice of issuing immediately

20   effective temporary Treasury regulations, and it didn't

21   express any concerns on that when it was enacting 7805(e).

22   It instead just limited it to three years and required that

23   there also be proposed regulations to keep things moving

24   forward.  So I think the government -- the best analogy,

25   though, in the case law that helps support why this 7805(e)

1  language and legislative history should be read the way that

2  the government is advocating is the *Disabled American*

3  *Veterans* case that's cited in the briefs.  That's a federal

4  circuit case from 2005, and that case involved a statute that

5  was aimed at allowing the Board of Veteran Affairs to obtain

6  external medical opinions, but in providing that authority,

7  it noted that the agency commonly obtained internal medical

8  opinions from within the VA.  So it was admittedly a less

9  direct type of authorization, but there was an express

10  acknowledgment and assumption of a long-standing agency

11  practice at the time, which is discussed in more detail in

12  that *Disabled American Veterans* case.

13          THE COURT:  Well, then let me ask you a question.

14  Why did not your agency allow notice and comment?  Why didn't

15  they do it?

16          MS. GOLDEN:  Well, Your Honor, we -- Treasury

17  followed Section 7805(e), and 7805(e) says, at least under

18  our reading, we can issue temporary regulations without

19  notice and comment, so we did.

20          THE COURT:  It doesn't say without notice and

21  comment.  It says you can issue temporary regulations.  My

22  question is why didn't they go ahead and allow notice and

23  comment?  What was the reason?  There wasn't any emergency.

24  If you're right about retroactive application, there's no

25  emergency.  You issue the notice and comment, and then you go

20-cv-03501-RBJ        Oral Argument        02/25/2022   94

1    ahead with the final rule, and if you're right, and you are

2    correct on their reading of the statute and the retroactivity

3    point, then you get the money back.

4            MS. GOLDEN:  The urgency relates to the future

5    transactions.  So as the preamble discusses as -- and I think

6    Mr. Sawyer's argument on good cause would likely discuss this

7    in more detail, but Treasury knew that taxpayers were

8    actively structuring into these types of abusive situations,

9    and so --

10           THE COURT:  Sure.  I agree with that.

11           MS. GOLDEN:  -- shutting down future transactions --

12           THE COURT:  So here are the taxpayers out there

13   doing their darnedest to figure out these loopholes and avoid

14   the tax and keep their money.  Okay.  And if there was

15   something that suggested, you know, Liberty Mutual -- Liberty

16   Global was going to take this money that they don't have to

17   pay tax on and put it in someplace where Treasury could never

18   get access to it, then there's an emergency, but that isn't

19   the case.  They're not going to go bankrupt.  They're not

20   going to squirrel away the money someplace.

21           You know, we're talking about a lot of money, and

22   they paid it actually, right?  You have the money.  There's

23   certainly no emergency.  You've got it.  It's in your pocket.

24   They're trying to get it back by a refund.  So why not give

25   them a chance to comment, listen to what they have to say,

1   and then if you want to say, well, we don't agree, to heck

2   with you, okay, it's retroactive.  You've got the money.  You

3   don't pay it back.  So I don't see what the logic is for not

4   letting them have that opportunity.

5        MS. GOLDEN:  Your Honor, it comes back to the future

6   transaction thing.  Certainly on the retroactivity point,

7   then if the transaction has already happened, then there

8   would not be urgency in preventing those transactions, but

9   the proliferation of those transactions, which is one of the

10  primary drivers of good cause statements in the preamble is

11  directed at stopping future transactions.  If we issue a

12  proposed regulation, that's not binding, and, in fact, puts

13  people on notice this is coming, and they will rush to

14  complete these transactions.  So that's where the urgency is

15  coming from, and there's cases that we cited in the brief

16  showing that urgency can be fiscal harm.

17       So the Tenth Circuit's standard is where delay would

18  do real harm, so the harm here is the harm to the -- is the

19  harm to the FISC and ultimately to taxpayers in general.

20  And, yes, taxpayers could -- if there wasn't a temporary

21  regulation, perhaps the taxpayers could have engaged in the

22  transactions, filed for a refund suit like we are here, but

23  that takes time and additional expenditure of funds, and it's

24  easier when there's this sort of abusive behavior

25  proliferating to be able to nip it in the bud.

                    Sarah K. Mitchell, RPR, CRR

20-cv-03501-RBJ          Oral Argument          02/25/2022    96

1        And one of the Tenth Circuit cases in the good cause

2   section talks about that.  It's the -- I believe the *Northern*

3   *Arapahoe* case talks about wildlife hunting limits and needing

4   to issue regulations before the start of hunting season.  And

5   although the agency there had known it was an issue for a

6   while, it was important to get it out before the start of the

7   next hunting season because if the herds were allowed to

8   deplete more, yes, that could be fixed, but it would require

9   a greater expenditure of funds.

10       THE COURT:  Well, if you go out and shoot an animal,

11  and he's dead, unless there's a Lazarus effect, he's dead.

12  He's not coming back.  But we're talking about money here

13  that actually you already have.  I understand your point.

14  You spotted -- somebody spotted -- Congress didn't spot it,

15  but you spotted it -- your agency spotted that there's a --

16  there's a problem in this statue potentially, and companies

17  like Liberty Global, who have the resources to really dig

18  into it, are going to figure out that they can use this to

19  their benefit, and it's going to cost the government millions

20  and millions, billions even, so we better get this regulation

21  out right away so that they won't do that.  I understand

22  that.  But I'm concerned about fairness here, and I'm also

23  concerned about the fact that there's nothing in these

24  statutory provisions that says you can do that.  Honestly, a

25  long-standing Treasury practice doesn't move my needle too

Sarah K. Mitchell, RPR, CRR

1    much if the practice itself is wrong.

2         MS. GOLDEN:  Well, Your Honor, the point I was

3    trying to make with the *Disabled American Veterans* case

4    speaks to that.  It's that there is a long-standing agency

5    practice, and when Congress knows about it and explicitly

6    acknowledges it in the text, it's a ratification of that

7    practice.  So that's what happened with the Veteran Affairs

8    regulation and statute in the *Disabled American Veterans*

9    case, and that's the analogy that I'm making here with

10   Section 7805(e), that Congress ratified this long-standing

11   agency practice of issuing temporary regulations without

12   notice and comment.

13        And under the *Asiana Airlines* case and the *Marcello*

14   *v. Bonds* case, Congress doesn't need to provide magic words

15   to override the Administrative Procedure Act.  They just need

16   a clearly expressed intent to replace the norm.  So if you

17   combine the reasoning of *Asiana Airlines* and *Marcello* -- I'll

18   summarize that as no magic passwords -- with *Disabled*

19   *American Veterans,* which allows ratification of a

20   long-standing agency practice by reference and statute, then

21   that's what we have with Section 7805(e).

22        THE COURT:  Okay .

23        MS. GOLDEN:  So to continue briefly more on why

24   Section 7805(e) should be seen as overriding the APA, the

25   case law, again -- I think I discussed this earlier, but if

20-cv-03501-RBJ        Oral Argument        02/25/2022    98

1   not, in the briefing we cite a couple of cases for the common

2   proposition that when two statutes conflict, the more

3   specific statute controls, and so that's the case with

4   Section 7805(e), directed at temporary regulations without

5   notice and comment and Section 7805(b), directed at

6   retroactive regulations.  And, you know, Liberty Global's

7   reading here would -- the reading they advocated in the

8   briefs would make Section 7805(e) superfluous, because you

9   would never issue a temporary notice if you then had to do

10  notice and comment.

11          THE COURT:  Why?  Why wouldn't you?

12          MS. GOLDEN:  Because it would be -- from a practical

13  perspective, it would just be better to go straight to a

14  proposed regulation than finalize it, because you wouldn't be

15  subject to the three-year sunset period in Section 7805(e).

16          THE COURT:  Maybe that's a good thing.

17          MS. GOLDEN:  Well, now you're making their argument.

18          THE COURT:  Maybe the point of temporary regulations

19  is sometimes there are emergencies.  You're talking about

20  hunting law.  You're talking about an environmental law.

21  You're talking about if we can't do something right away,

22  something bad is going to happen.  That's the concept of

23  irreparable harm that is just like a temporary restraining

24  order in a court in a civil case.  So I can see that may

25  allow for the possibility that as a practical matter there

Sarah K. Mitchell, RPR, CRR

1    are emergencies, and we've got to do something and do it now,

2    so let's get it done.

3           Here, though, there wasn't that kind of an

4    emergency.  In fact, because the retroactivity provision by

5    your interpretation gives you 18 months, you could sit on

6    this thing for up to 18 months before you did anything, and

7    then once you issued the temporary restraining order -- or

8    temporary regulation, it's good for three years, that's a lot

9    of time.  There's no -- it's not an emergency situation, but

10   here these people have been denied their opportunity to

11   comment.  It just doesn't seem right to me.  But I hear you.

12          MS. GOLDEN:  I think Your Honor understands my

13   points about the urgency in preventing future transactions

14   and the authorization under Section 7805 to issue retroactive

15   temporary regulations in this case.  So to just briefly cover

16   some of the other arguments on why Section 7805 should

17   override the APA, I've discussed the no magic words.  So that

18   applies, likewise, to 7805(b) and Section 7805(e), and in

19   both cases we have a clearly expressed intent to displace the

20   APA.

21          And one thing that is discussed in the brief that I

22   did want to note again today is that, you know, part of the

23   reason why Congress may not have thought to use magic words

24   in Section 7805 to override the APA is because under

25   prevailing administrative law at the time, so 1988 to 1996,

1   most Treasury regulations including temporary regulations

2   were seen as not subject to the APA because historically they

3   were considered interpretative rules, which Your Honor

4   probably recognizes is another exception that exempts

5   regulations from APA notice and comment in retroactivity

6   limits.

7          Now, that's not the view anymore, and certainly the

8   government isn't advocating that the Court revert to the old

9   administrative law view or that Treasury regulations are

10  never subject to the APA, but in this particular circumstance

11  that we're faced with here where we have Section 7805(b) and

12  (e), we were allowed to issue this temporary regulation with

13  retroactive effect.

14         And Liberty Global's quick to point to a couple of

15  the cases in its favor, but the case law in Section 7805(e)'s

16  interaction with the APA is sparse.  It hasn't been addressed

17  by the Supreme Court or any Court of Appeals, and really it's

18  only the one district court opinion that Liberty Global

19  talked about that directly addressed the issue.  The other

20  opinion is a two-judge tax court concurrence.

21         THE COURT:  Well, the one court in Texas that did

22  discuss the issue, you lost that case.

23         MS. GOLDEN:  That is correct.  But it is one court,

24  and my point is that, you know, this is an issue of first

25  impression here, and that is the only decision that we're

1    aware of on the 7805 and APA issue.

2            THE COURT:  So let me ask you a couple questions

3    about the future of this case.  Hypothetically, if the Court

4    were to agree with the government on the first two arguments

5    but disagree on the notice and comment, what happens next?

6            MS. GOLDEN:  Well, then I would probably turn the

7    floor over to my colleague Mr. Sawyer to talk about good

8    cause under the APA and harmless error.

9            THE COURT:  Well, let me ask the other side of the

10   coin.  Suppose I do agree with Mr. Madan on his statutory

11   argument and/or his retroactivity argument, either one,

12   suppose I were to agree with him, then what happens next?  I

13   remember from our discussion way back in October -- well, I

14   shouldn't say I remember it.  There's a transcript, and I

15   read it.  My memory isn't that good.  But at that time we

16   were -- we had a lot of discussion about your wanting to

17   obtain discovery and go to trial, and your point was we want

18   to at least keep open the idea that they didn't even do the

19   calculations properly.

20           Even if you agree with them on what the taxpayer --

21   Tax Cuts and Jobs Act says, they didn't even apply it

22   properly, or at least we aren't ready to concede that.  We

23   think that needs to be tried.  So is that what would happen

24   next if we agree with the government -- I mean with the

25   plaintiff, we're going to have a trial sometime in the fall

1    on that?

2              MS. GOLDEN:  Your Honor is correct that we would

3    have -- if the Court agrees with Liberty Global on the

4    regulation issue, yes, this case would proceed to discovery

5    and trial.  I also reviewed the transcript, and I recall that

6    I described the issue as calculations, but it's actually --

7    it's more complex than that, because there's a number of

8    different statutory provisions.  It's not simply just

9    calculations.  It's whether or not Liberty Global actually

10   met the terms of those other statutes as written, because

11   here we're only talking about the deduction under

12   Section 245A of the Internal Revenue Code.

13             But in order for them to get to that deduction that

14   they're claiming, they need to have a dividend, and there's

15   multiple layers on how they get to a dividend, and there are

16   technical questions of tax law about whether the facts here

17   mean that they actually can meet each of those steps that

18   result in them having a dividend that they can claim for the

19   deduction.  So it's more -- I made it sound more numerical at

20   the time, but it's really more about a substantive and

21   technical tax argument there.

22             And as I mentioned at the scheduling conference in

23   the case, the IRS's audit was truncated, and so the IRS was

24   seeking information from Liberty Global at the time this

25   refund suit was filed to try to verify or see if there was --

20-cv-03501-RBJ        Oral Argument        02/25/2022    103

1    see what the merits or not were of those technical tax

2    arguments, and that hasn't been done.

3            THE COURT:  Right.

4            MS. GOLDEN:  The government's answer also refers to

5    the possibility of the application of judicial doctrines to

6    also overturn the transaction at issue here, and so those are

7    the things that from a high level would be in play if the

8    Court rules for Liberty Global on the regulation issue.

9            THE COURT:  Okay.

10           MS. GOLDEN:  But actually if not, even if the

11   regulation is upheld as the government is arguing it should

12   be, there are still those arguments there, and the

13   government's position on that point is the same as discussed

14   at the scheduling conference, which is that the Court should

15   look at the legal issues of the regulation validity with

16   these other arguments to get a complete picture, because it's

17   possible that the legal issue of regulation validity isn't

18   needed to rule on the case, whether it ultimately comes out

19   in the government's favor or Liberty Global's.  But certainly

20   to deny a refund, that can be denied on potentially a host of

21   other grounds besides the regulation here.

22           MR. MADAN:  Your Honor, may I be heard on this

23   question?

24           THE COURT:  Yeah, if she's finished.  I want to give

25   her --

                    Sarah K. Mitchell, RPR, CRR

1           MR. MADAN:  Not on the substantive point, but on

2    this particular procedural question.

3           THE COURT:  Wait until she's finished.

4           MS. GOLDEN:  So I think I am probably about done

5    here.  So the point that I'm making on the notice and comment

6    is essentially that there's a long-standing agency practice,

7    and there's a more specific statute, Section 7805, that

8    should control over the APA's provisions on notice and

9    comment and retroactivity.  And this is an issue that affects

10   not just the regulations in this case, but a wide range of

11   temporary regulations throughout tax administration.

12          And I'll close with a quote from the government's

13   brief from the 1935 Supreme Court case *Bull vs. United*

14   *States*, which said that taxes are the lifeblood of government

15   -- and I lost my bullet point for the rest of that quote --

16   taxes are the lifeblood of government, and their prompt and

17   certain availability an imperious need.  So we would ask that

18   the Court uphold the temporary regulations here on procedural

19   grounds, because Section 7805 prevails over the

20   Administrative Procedure Act.

21          THE COURT:  Okay.  Thank you.  All right.

22          Mr. Madan, you want to have what I hope will be the

23   final word.  You may not be the only one in the building that

24   hopes this will be the final word.

25          MR. MADAN:  I get that frequently.  So just on that

20-cv-03501-RBJ          Oral Argument          02/25/2022     105

1    procedural discussion before I get to what happens with the

2    case depending on how you rule, so you sort of alluded to

3    this earlier in the day, maybe hours ago.  I think there's a

4    world in which one of the parties would seek interlocutory

5    appeal to avoid the resources that needed to be allocated to

6    address that other issue.

7              THE COURT:  I assume so.

8              MR. MADAN:  Yeah, and so this is like -- we haven't

9    talked about this at all, so take this with a grain of salt.

10   But that other issue, there's many ways to deal with it

11   without a trial, the other sort of second shoe to drop.  So I

12   would propose, depending on your ruling, that it go up, and

13   depending on what the Court thinks and obviously opposing

14   counsel so we don't have one -- one of the elements of

15   seeking interlocutory appeal is to save resources where

16   there's pending a second issue to deal with.

17             THE COURT:  Okay.  Well, if somebody moves for an

18   interlocutory appeal, I'll have to consider the motion.

19             MR. MADAN:  Right.  Just to fill out the potential

20   scenarios of how this could play out.  And so, Your Honor,

21   I'm going to be very brief on the substantive -- I don't know

22   -- substantive procedural -- the discussion you were having

23   about notice and comment, because I think you get it.  Just

24   to sort of be clear about this, what 7805(e), the provision

25   that we've been talking about where they allow temporary

20-cv-03501-RBJ          Oral Argument          02/25/2022    106

1    regulations, the debate with respect to -- the effect of that

2    provision is about whether it authorizes Treasury to issue

3    regulations without notice and comment before the issuance of

4    the regulation.  And what the *Chamber of Commerce* case, the

5    so-called Texas case, and the concurrence in the tax court

6    have held is no, that that provision is not effective in

7    avoiding the APA's fundamental requirement that before you

8    issue the regulation, before Treasury issues the regulation,

9    it must seek notice and comment.

10          THE COURT:  Are you saying that they can never issue

11   temporary regulations without notice and comment?

12          MR. MADAN:  They can issue temporary regulations

13   where they have good cause, the exigency circumstances, but

14   that's exactly what the Texas court holds, which is that

15   let's harmonize the APA statute and 7805(e) which says, yeah,

16   in most cases you need it, but you can issue a temporary

17   regulation in an exigent circumstance if you have good cause.

18   But this is -- this is what I was trying to say earlier.  In

19   all events, including the Treasury department's own position

20   if you look at in their brief the attachment to tab B, in all

21   events, even in the circumstance where you agree with them

22   that 7805(e) allows them to circumvent the pre-promulgation

23   notice and comment, in all events they still need subsequent

24   notice and comment, which they didn't do here with respect to

25   the temporary regulations.

20-cv-03501-RBJ          Oral Argument          02/25/2022    107

1          This is my point about we have two failings here,

2     and we win either way.  We win if you determine -- this Court

3     determines that 7805(e) does not allow Treasury to circumvent

4     the APA's requirement for pre-promulgation notice and

5     comment, because it's not specific.  It doesn't say anything

6     about when it's issued, what it has to avoid, which is what

7     the Supreme Court has required.  But regardless, even if we

8     accept and concede for a moment for discussion purposes that

9     7805(e) is effective in trumping the APA, nevertheless, they

10    must still seek notice and comment subsequently, which they

11    didn't do with respect to our regulations.  Their argument is

12    that the other regulations, the final and the proposed which

13    don't have retroactive effect, that was good enough.

14          THE COURT:  So what happens if I agree with you on

15    this point?

16          MR. MADAN:  If you agree with me, I'm sorry, sir?

17          THE COURT:  If I agree with you on this point about

18    the notice and comment, and this is Friday, but Monday

19    morning they issue the notice and provide for a 30-day

20    comment period on the temporary regulation, which is still in

21    effect.

22          MR. MADAN:  I think they've already issued final

23    regulations.

24          THE COURT:  Yes.  But they aren't in effect yet, are

25    they?

                         Sarah K. Mitchell, RPR, CRR

20-cv-03501-RBJ        Oral Argument        02/25/2022    108

1              MR. MADAN:  Yeah, they are.

2              THE COURT:  Oh, I thought the temporary regulation

3    was still in effect.

4              MR. MADAN:  The final regulations are the pair with

5    the proposed regulations which don't have retroactive effect.

6              THE COURT:  I know the final don't -- regulations

7    don't have retroactive effect.  I thought we were still in

8    the temporary regulations.  But if not, so what?  What if

9    they issue a notice and a comment period and say, Okay, fair

10   enough.  Go ahead and put in your comments on the temporary

11   regulations, and we'll consider them.

12             MR. MADAN:  I think, Your Honor, because they've

13   issued final regulations on this specific point, exactly how

14   these regulations -- excuse me -- how extraordinary dividends

15   work, how extraordinary reductions work -- excuse me --

16   extraordinary dispositions work, how extraordinary deductions

17   work, there would be no room to issue a second final

18   regulation.

19             THE COURT:  Well, they would say this wacko judge in

20   Colorado said Liberty Global should have the right to comment

21   on the retroactivity point.  They never had that right, so

22   have at us.

23             MR. MADAN:  But we would prevail anyway because they

24   failed to meet the notice-and-comment period prior to

25   issuance of the temporary reg consistent with the *Chamber of*

                    Sarah K. Mitchell, RPR, CRR

1    *Commerce* case, the concurrences, and even the *Sebelius* case

2    in the D.C. District Court, which has an analogous ruling.

3              THE COURT:  So they can't fix it that way, so I

4    guess the way they try to fix it then is to raise the issue

5    of good cause.

6              MR. MADAN:  Which they've already raised, and we can

7    address, but I think you're already there.  It's Friday

8    afternoon.  There were no exigent circumstances, and there

9    were no future transactions to prevent, because the minute

10   they issued temporary regs or proposed regs, no multinational

11   corporation is going to violate either one of those.

12             THE COURT:  Okay.

13             MR. MADAN:  Okay.

14             THE COURT:  Thank you.

15             MR. MADAN:  Thank you.  Thank you, Your Honor.

16             THE COURT:  Now, Mr. Sawyer, have you had a chance

17   to say everything you want to say?

18             MR. SAWYER:  So, yes, Your Honor, just to address

19   briefly good cause.  Ms. Golden touched on it a bit when she

20   discussed the *North American Coal* and the *North Arapahoe*

21   decisions, but here the Treasury does have good cause for

22   issuing these regulations.  There's a suggestion that because

23   18 months has gone by that that's automatically dilatory, and

24   I'm not sure where that comes from.  If we look back to

25   7805(b)(2), look at the title of that -- the subheading.

20-cv-03501-RBJ          Oral Argument          02/25/2022     110

1  It's like -- it's promptly issued regulations.  It's almost

2  by definition action that the government can take within

3  18 months is prompt.  This is a very -- I mean, the Tax Cuts

4  Jobs Act was an enormous statute, an enormous undertaking for

5  Treasury and chief counsel of the IRS to deal with all the

6  guidance that was necessary from that act.

7          Mr. Madan mentioned *Coalition for Parity vs.*

8  *Sebelius*, and the Court there said as long -- Courts have

9  long recognized the rule-making process is necessarily slow,

10  deliberate, and fraught with delays.  In light of the novel

11  issues of the Tax Cuts Jobs Act, it's not surprising it took

12  time to get this guidance out.  The only suggestion here of

13  dilatoriness is just simply because 18 months has gone by.

14  There's no indication of any bad faith by the IRS.

15          We noted in our brief, we provided a link to an IRS

16  website that discusses guidance on the IRS and Tax Cuts and

17  Jobs Act.  The IRS has issued over 150 items of written

18  guidance relating to Tax Cuts Jobs Act.  59 of those were

19  Treasury decisions.  And how many of those were issued within

20  18 months were -- roughly 10 of the Treasury decisions were

21  issued within 18 months.  This -- including ours, the

22  temporary regulation at issue here.

23          This regulation project proceeded quickly.  We

24  obviously would have liked to have gone faster and not be

25  dealing with the temporary part of the reg, but if we'd

Sarah K. Mitchell, RPR, CRR

1  gotten the regulations out 60 days earlier, would we have

2  been able to go through the notice-and-comment process

3  sufficiently without LGI raising arguments that that wasn't

4  enough time to consider the issues?  I point out that here we

5  did have a 90-day comment period for the proposed

6  regulations.  Then we had a hearing after the 90-day comment

7  period.  And it was about -- I can't recall -- I want to say

8  like 11 months, about a year process before the regulations

9  were finalized.

10         And in the preamble to the new Treasury decision

11  with the final regulations, they addressed the comments that

12  were made by practitioners or the companies to the -- to

13  these items.  So I would say, first of all, the IRS did -- or

14  Treasury did move promptly here.

15         THE COURT:  Well, I'm not criticizing the IRS for

16  taking time.  I understand this act was huge, and it's

17  complicated, and it's difficult.  And I don't envy the people

18  at the Treasury Department who had to deal with it and try to

19  come up with regulations to implement it.  I sure couldn't

20  have done it.  But I wonder if that doesn't almost make --

21  make Liberty Global's point.  If it's so difficult and so

22  complex and so huge, why wouldn't the simple task of inviting

23  comments have been helpful?

24         MR. SAWYER:  Well, Liberty Global did attach to its

25  brief a tax notes article where a Treasury official described

1   that regulations were being considered on this point.

2   Liberty Global could -- I mean, if multinational corporations

3   know how to do anything, it's to lobby government officials.

4   The informal process that goes on in the regulation -- when

5   regulations are promulgated is maybe as robust as the formal

6   hearing that goes along with it.  The Treasury's approached

7   all the time on these projects, and they're receptive --

8          THE COURT:  Did that happen?  In other words, when

9   you published that you were considering this regulation, did

10  you get comments?

11         MR. SAWYER:  My understanding is that Treasury did

12  have discussions with practitioners, you know, at

13  conferences.

14         THE COURT:  Well, maybe it's not a fair question.

15         MR. SAWYER:  I don't know -- I did ask that

16  question, and the answer was we're always talking to people.

17         THE COURT:  Okay.

18         MR. SAWYER:  And the final point, you know, is that,

19  again, there is real harm here.  The retroactive portion of

20  this regulation is worth billions of dollars.  In the two

21  Tenth Circuit cases we've been talking about, the *North

22  American Coal*, we had black lung claims.  Obviously much,

23  much smaller amounts, but we're dealing with individual

24  working class miners, so it's significant for them.  And the

25  Court was persuaded that they had good cause, because

Sarah K. Mitchell, RPR, CRR

1   otherwise these miners could lose these health benefits, and

2   that would be real harm.

3            Well, I'd suggest that real harm is also to the

4   American taxpayer when these huge multinational corporations

5   are running these what we consider abusive transactions to

6   gain tax benefits that were never intended.  I think that's

7   clearly -- not clearly -- I hate to say clearly -- it is good

8   cause.  It is real harm.  And, finally -- if I've already

9   said finally once, this will be my last finally -- the

10  Treasury policy statement that's in the administrative

11  record, Treasury has made movement over the years.  As Ms.

12  Golden indicated earlier, the temporary regulations were

13  common back in the '70s and maybe early '80s.  They're not

14  common anymore.  This is the only temporary regulation in the

15  international area that I'm aware of to come out of the Tax

16  Cuts and Jobs Act.

17           This is a rare, you know, not commonly used process

18  by Treasury, and given that Treasury put out its policy

19  statement, you know, affirming its -- the importance of

20  notice and comment whenever possible, the very, very few

21  times now that Treasury doesn't give notice and comment is

22  generally for very good reason.  They're not trying to avoid

23  notice and comment here.

24           THE COURT:  Okay.  Well, ladies and gentlemen it is

25  4:56.  You didn't use the last four minutes.  You must be off

                    Sarah K. Mitchell, RPR, CRR

20-cv-03501-RBJ          Oral Argument          02/25/2022      114

1    your game today, but I want to thank you for your arguments.

2    It's very interesting.  I'm not much of a tax person myself,

3    so I find it quite interesting and challenging.  I want you

4    to stay healthy, to avoid COVID, to stay safe in your travels

5    back home.

6          Now, this is one that deserves and needs a written

7    decision, but I have to warn you it may be a while because we

8    have a horrendous looking docket.  I'm in trial for the next

9    seven weeks, three different cases back to back to back.

10   It's going to be a while before we can get this done in a

11   thoughtful way, but I know you want to get a decision, and

12   we'll do it as quickly as we can.

13         MR. SAWYER:  If I may ask -- we do have a trial date

14   in October.  We have expert witnesses we're trying to --

15         THE COURT:  We're not going to wait until October.

16         MR. SAWYER:  Well, I mean, for the trial, right now

17   we're staged for discovery.  Like, for example, we served

18   subpoenas.

19         THE COURT:  No worries.  If we get to a point where

20   it's going to go to trial and you don't have enough time to

21   finish your discovery, we'll deal with that.  But what's

22   going to probably happen is one side or the other is probably

23   going to seek an interlocutory appeal, and that will moot the

24   issue of the trial probably.  I'm just guessing on that.  All

25   right.  Thank you.

                    Sarah K. Mitchell, RPR, CRR

20-cv-03501-RBJ        Oral Argument        02/25/2022    115

1              MR. SAWYER:  Thank you.

2              MR. MADAN:  Thank you, Your Honor.

3              THE COURTROOM DEPUTY:  All rise.  Court is in

4    recess.

5         (The proceedings were concluded at 4:58 p.m.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                     Sarah K. Mitchell, RPR, CRR

1                    REPORTER'S CERTIFICATE

2

3          I, SARAH K. MITCHELL, Official Court Reporter for the

4    United States District Court for the District of Colorado, a

5    Registered Professional Reporter and Certified Realtime

6    Reporter, do hereby certify that I reported by machine

7    shorthand the proceedings contained herein at the time and

8    place aforementioned and that the foregoing pages constitute a

9    full, true and correct transcript.

10         Dated this 21st day of March, 2022.

11

12

13

14         _____/s/ Sarah K. Mitchell_____

15               SARAH K. MITCHELL
                Official Court Reporter
16         Registered Professional Reporter
                Certified Realtime Reporter
17

18

19

20

21

22

23

24

25

                    Sarah K. Mitchell, RPR, CRR